IN THE

# United States Court of Appeals
# for the Fourth Circuit

NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, *et al.*,

*Appellants*,

*v.*

MONTGOMERY COUNTY, MARYLAND,

*Respondent*.

On Appeal from the U.S. District Court for the
District of Maryland, No. 8:24-cv-03024-PX

## APPELLANTS' OPPOSED MOTION TO EXPEDITE APPEAL

Scott Novak
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 304-5099
scott.novak@bakerbotts.com

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
mark.little@bakerbotts.com

Daniel B. Rankin
BAKER BOTTS, L.L.P.
401 S. 1st St.
Austin, Texas 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for Appellants*

Appellants National Association of Home Builders of the United States, Restaurant Law Center, National Federation of Independent Business, Inc., Maryland Building Industry Association, National Propane Gas Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96 move the Court to expedite their appeal in the above-captioned matter and to adopt their proposed briefing schedule pursuant to Local Rule 12(c).

**INTRODUCTION**

This case concerns a local law that starts the process of prohibiting the use of federally regulated gas appliances. In 2023, Montgomery County, Maryland, enacted Bill 13-22, titled "Buildings–Comprehensive Building Decarbonization." That law, which Appellants will refer to as the "County Appliance Ban," requires the County Executive to issue regulations no later than December 31, 2026, for the County Council's approval that would ban the use of gas appliances in a wide variety of commercial and residential buildings. Appellants—a broad coalition of trade organizations, companies, and unions—rely on the availability of gas appliances and systems for their livelihoods. They challenged the County Appliance Ban as preempted under the federal Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6201, *et seq.*, and are now appealing the district court's adverse summary judgment ruling to this Court.

As Appellants have detailed in their pleadings and declarations, the County Appliance Ban is inflicting ongoing harm in the form of delayed construction timelines, disrupted business plans, higher gas prices, and loss of customers and revenue. These harms, immediate and concrete as they are now, will only worsen once the County Executive issues the mandated regulations by the end of this year, if not sooner. The worst of these harms, however, can be avoided through swift appellate action. To that end, Appellants respectfully move to expedite this appeal in order to provide the Court an opportunity to consider the legality of the County Appliance Ban before it causes more irreversible damage. Appellants accordingly request that the Court grant this motion and order (1) a briefing schedule that sets the same time limits that are already specified in this Court's April 15, 2026, Briefing Order, but additionally provides that there shall be no extensions of those deadlines, and (2) priority treatment for oral argument.

## BACKGROUND

The County Appliance Ban starts the process of banning the use of federally regulated gas appliances in new construction within Montgomery County. It does so by requiring the County Executive to issue, by no later than December 31, 2026, "all-electric building standards for new construction," Montgomery County Code § 8-14D, which will then be submitted to the County Council for approval, *id.* §§ 2A-15, 8-14D. Critically, such standards include a prohibition on "combustion

equipment, or plumbing for combustion equipment, installed within the building or building site," which translates into an outright ban on "any equipment or appliance used for space heating, service water heating, cooking, clothes drying and/or lighting that uses fuel gas or fuel oil." *Id.* § 8-14D. In other words, the County Appliance Ban amounts to a ban on the use of gas appliances in new commercial and residential buildings within Montgomery County.

Appellants filed the underlying suit in October 2024, challenging the County Appliance Ban as preempted under EPCA, a federal law that preempts any state or local law "concerning the energy efficiency [or] energy use" of gas appliances." 42 U.S.C. §§ 6297(c), 6316(b)(2)(A).

Appellants detailed their harms from the County Appliance Ban in their pleadings and declarations. Residential builders with yearslong construction lead times cannot rely on gas as an option for their developments, despite it being cheaper and widely preferred by their customers; gas appliance manufacturers and vendors face significant and imminent declines in revenue, thereby affecting in real time their investment risk profiles; gas utilities are losing potential customers, with their remaining customers facing higher rates as a result; and union workers will lose a significant amount of work and bargaining power from the inevitable loss of building and maintenance of gas infrastructure. *See* Exhibit 3, Am. Compl., ECF No. 32, at ¶¶ 12-19; Exhibit 4, Am. Thomas E. Kettler Decl., ECF No. 32-2, at ¶¶ 5-8; Exhibit

4

5, Am. Tyler Douglas Wood Decl., ECF No. 32-3, at ¶¶ 5-9; Exhibit 6, Am. Perry McGuire Decl., ECF No. 32-4, at ¶¶ 5-7; Exhibit 7, Am. Angelo Amador Decl., ECF No. 32-5, at ¶¶ 7-9; Exhibit 8, Jim Vagonis Decl., ECF No. 32-6, at ¶ 5; Exhibit 9, Todd Holtzman Decl., ECF No. 32-7, at ¶¶ 5-7; Exhibit 10, Am. Donald "Blue" Jenkins Decl., ECF No. 32-8, at ¶¶ 6-10; Exhibit 11, Am. Ryan Boyer Decl., ECF No. 32-9, ¶¶ 6-8; Exhibit 12, Am. Wilder Reed Decl., ECF No. 32-10, at ¶¶ 6-7.

Based on those harms, among others, Appellants requested a permanent injunction enjoining the County from enforcing the County Appliance Ban and for a declaratory judgment declaring it preempted under federal law. Both sides moved for summary judgment, with the disputed issues concerning standing, ripeness, and the merits of the EPCA preemption challenge. *See* Exhibit 1, District Court Mem. Op., ECF No. 60, at 4.

The district court sided with Appellants on the standing and ripeness issues, but agreed with the County on the merits and held that EPCA does not preempt the County Appliance Ban. *Id.* at 4–13. The district court accordingly granted summary judgment in favor of the County and denied Appellants their requested declaratory and injunctive relief. *See id.* at 13; Exhibit 2, District Court Final Order, ECF No. 61. This appeal followed.

**ARGUMENT**

Under this Court's local rules, a motion to expedite must state (1) the reasons supporting expedition, (2) the ability of the parties to present the appeal on the existing record, and (3) the need for oral argument. Loc. R. 12(c). Appellants address each of these requirements in turn.

Expedition is warranted because the County Appliance Ban is causing Appellants ongoing harm that will worsen significantly as time progresses. The district court acknowledged and recognized Appellants' demonstrated harms. *See* Exhibit 1, District Court Mem. Op., ECF No. 60, at 5-8. Those harms take the form of delayed construction timelines, disrupted business plans, higher gas prices, and loss of customers and revenue. *See* Exhibit 3, Am. Compl., ECF No. 32, at ¶¶ 12-19; Exhibit 4, Am. Thomas E. Kettler Decl., ECF No. 32-2, at ¶¶ 5-8; Exhibit 5, Am. Tyler Douglas Wood Decl., ECF No. 32-3, at ¶¶ 5-9; Exhibit 6, Am. Perry McGuire Decl., ECF No. 32-4, at ¶¶ 5-7; Exhibit 7, Am. Angelo Amador Decl., ECF No. 32-5, at ¶¶ 7-9; Exhibit 8, Jim Vagonis Decl., ECF No. 32-6, at ¶ 5; Exhibit 9, Todd Holtzman Decl., ECF No. 32-7, at ¶¶ 5-7; Exhibit 10, Am. Donald "Blue" Jenkins Decl., ECF No. 32-8, at ¶¶ 6-10; Exhibit 11, Am. Ryan Boyer Decl., ECF No. 32-9, ¶¶ 6-8; Exhibit 12, Am. Wilder Reed Decl., ECF No. 32-10, at ¶¶ 6-7. Appellants' harms will substantially increase in severity once the County Executive issues the

County Appliance Ban's implementing regulations, which is slated to occur by the end of this year at the latest.

Despite this Court's admirable record of resolving appeals quickly and efficiently, the ordinary appellate process likely will push resolution of this appeal past the County Executive's end-of-year deadline. That means that the usual pace of appellate litigation will subject Appellants to significant additional harm. Expediting the Court's consideration of this appeal, however, would result in a faster resolution of this case—potentially even before the County's end-of-year deadline—that would minimize the duration and magnitude of Appellants' harm. That is why expedition is warranted here.

No record issues present any bar to expedited treatment. The parties engaged in no discovery below, and the district court resolved the parties' summary judgment motions without a hearing. As such, this Court is presented with a concise record on which to resolve the pure issues of law presented by this appeal.

As for the necessity of oral argument, Appellants submit that oral argument in this appeal would assist this Court's decisional process. This case presents an important question concerning the scope of EPCA preemption that has split federal courts across the country. *Compare California Restaurant Association v. City of Berkeley*, 89 F.4th 1094, 1107 (9th Cir. 2024) (holding that EPCA preempted a city's gas ban), *with, e.g.*, Exhibit 1, District Court Mem. Op., ECF No. 60, at 11-13

(holding that EPCA did not preempt the County's gas ban). The importance of this case should additionally counsel in favor of expedition because everyone—individuals, businesses, and governments alike—across the Fourth Circuit would benefit greatly from prompt guidance by this Court on this increasingly salient issue that has fractured the federal courts.

Accordingly, Appellants request that the Court grant this Motion and set the following schedule for this case, which follows the deadlines already set in this Court's April 15, 2026, Briefing Order, but additionally provides that there shall be no extensions of those deadlines and prioritizes the case for an oral argument setting:

- Appellants' Opening Brief and Joint Appendix due May 26, 2026, with no extensions.

- Appellee's Response Brief due June 25, 2026, with no extensions.

- Appellants' Reply Brief due 21 days after the filing and service of Appellee's Response Brief, with no extensions.

- Case set for oral argument on a priority basis once briefing has been completed.

Lastly, Appellants note that they are not seeking the more extraordinary relief of an injunction pending appeal at this time.[*] While such an injunction would shield Appellants from further harm, Appellants have opted to exercise restraint and instead

---

[*] Appellants reserve the right to later seek an injunction pending appeal if circumstances develop in a manner that makes that relief necessary.

propose expedition as more modest means of minimizing Appellants' irreparable harm during the pendency of this challenge.

## CONCLUSION

For these reasons, Appellants respectfully request that the Court grant this Motion and expedite its consideration of this appeal. Specifically, Appellants request that the Court set the following schedule for this case:

- Appellants' Opening Brief and Joint Appendix due May 26, 2026, with no extensions.

- Appellee's Response Brief due June 25, 2026, with no extensions.

- Appellants' Reply Brief due 21 days after the filing and service of Appellee's Response Brief, with no extensions.

- Case set for oral argument on a priority basis once briefing has been completed.

Appellants additionally request such further relief to which they may be entitled.

## LOCAL RULE 27(A) STATEMENT

Pursuant to Local Rule 27(a), counsel for all parties have been informed of the intended filing of this motion. Counsel for the County indicated that it opposes the relief sought in this motion and intends to file a response.

*/s/ J. Mark Little*
J. Mark Little

**CERTIFICATE OF COMPLIANCE**

1.      This motion complies with the type-volume limitation of Fed. R. App. P. 27 (d)(2)(A) because it contains 1,723 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2.      This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.  This motion was scanned for viruses and none were present.

*/s/ J. Mark Little*
J. Mark Little

## CERTIFICATE OF SERVICE

I certify that on April 23, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ J. Mark Little*
J. Mark Little

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 8:24-cv-03024-PX |
| MONTGOMERY COUNTY, MARYLAND, | | |
| | * | |
| Defendant. | | |
| | *** | |

**MEMORANDUM OPINION**

Pending is Defendant Montgomery County, Maryland ("Montgomery County" or "the County")'s motion to dismiss the Amended Complaint, or in the alternative, motion for summary judgment to be granted in its favor. ECF No. 42. Plaintiffs, the National Association of Home Builders of the United States, the Restaurant Law Center, the National Federation of Independent Business, Inc., Maryland Building Industry Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, Teamsters Local 96, and Nation Propane Gas Association (collectively, "Plaintiffs"), cross-move for summary judgment in their favor. ECF No. 51.[1] The Court finds no need for a hearing. *See* D. Md. Loc. R. 105.6. For the

---

[1] Also pending are three motions for leave to appear as amicus curiae. ECF Nos. 44, 45 & 52. The Court retains discretion to grant such motions where the amicus curiae provide "helpful analysis of the law," has "special interest in the subject matter of the suit," or counsel of record needs assistance. *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 728 (D. Md. 1996); *Am. Humanist Ass'n v. Maryland-Nat'l Cap. Park & Plan. Comm'n*, 303 F.R.D. 266, 269 (D. Md. 2014). Sierra Club and Chesapeake Climate Action Network have a "special interest' in the case given the organizations' efforts in combatting the negative public health impacts of indoor pollution derived from gas appliances, as well as the potential impact this litigation may have on the organizations' future initiatives. ECF No. 44. Likewise, the American Gas Association also has a special interest in this action based on its representation of local natural gas distribution companies. ECF No. 52. And Public Health Law Center aids the Court's analysis of

following reasons, the Court GRANTS Montgomery County's motion for summary judgment and DENIES Plaintiffs' cross-motion.

## I.      Background

Plaintiffs seek declaratory relief and a permanent injunction related to the enforcement of Montgomery County Bill 13-22, Buildings–Comprehensive Building Decarbonization ("Bill 13-22" or "the Bill").  ECF No. 51.  Bill 13-22 essentially mandates that by December 31, 2026, the County Executive will issue new building codes and regulations that require "all-electric building standards for new construction [and] major renovation[s]."  ECF No. 42-8 (cleaned up).  Bill 13-22 defines an "all-electric building" as a "public or private building that contains no combustion equipment, or plumbing for combustion equipment, installed within the building or building site." *Id.* at 2.  "Combustion equipment" is further defined as any "equipment or appliance used for space heating, service water heating, cooking, clothes drying and/or lighting that uses fuel gas or fuel oil."  *Id.*  Although Bill 13-22 allows for the promulgation of exceptions to the "gas ban," such exceptions are narrowly drawn for buildings that, for example, require "emergency backup systems," are used by utilities regulated by the Maryland Public Service Commission, or to treat sewage or food waste.  *Id.* at 3.  But otherwise, Bill 13-22 bans gas-powered appliances in new construction.

Plaintiffs, an assortment of building and appliance trade associations and corporations, contend that that the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201–6422, expressly preempts Bill 13-22.  ECF No. 32 ¶¶ 68–74.  The EPCA is a proscriptive statute regulating the energy efficiency standards for consumer and industrial appliances.  When first

the legislative history and purpose of the EPCA.  ECF No. 45.  Accordingly, the motions (ECF Nos. 44, 45 & 52) are granted.

passed in 1975, the EPCA aimed to reduce "energy consumption through the operation of specific voluntary and mandatory energy conservation programs." *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *3 (S.D.N.Y. Mar. 18, 2025) (quoting *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498–99 (9th Cir. 2005)).  Eventually, Congress amended the EPCA through the National Energy Conservation and Policy Act, Pub. L. No. 95–619, 92 Stat. 3206 (1978), and again in the National Appliance Energy Conservation Act of 1987, Pub. L. No. 100–12, 101 Stat. 103 (1987), to establish uniform energy efficiency standards for appliances.  In its most recent form, the EPCA requires appliance manufacturers and distributors to test, certify and label appliances to reflect whether the appliances meet applicable federal energy conservation standards.  *See generally* 42 U.S.C. §§ 6293, 6314; 10 C.F.R. §§ 430–31; 10 C.F.R. § 429.12; 42 U.S.C. § 6291(6); 42 U.S.C. §§ 6294, 6315; 16 C.F.R. § 305.17.

The EPCA also includes two express preemption provisions.  The first concerns consumer covered appliances, and directs that "no State regulation concerning the energy efficiency*, energy use*, or water use of such covered product shall be effective with respect to such product," unless one of the exceptions applies.  42 U.S.C. § 6297(c) (emphasis added).  The second preemption provision pertains to industrial covered appliances, and makes clear that "[a] standard prescribed or established under section 6313(a) of this title shall, beginning on the effective date of such standard, supersede any State or local regulation concerning the energy efficiency or *energy use* of a product for which a standard is prescribed or established pursuant to such section."  42 U.S.C. § 6316(b)(2)(A) (emphasis added).

Plaintiffs essentially contend because Bill 13-22 regulates "energy use" by prohibiting any use of gas appliances in new construction, the Bill is preempted under 42 U.S.C. §§ 6297 and

6316(b)(2)(A). ECF No. 32 ¶ 69. Plaintiffs, in turn, ask this Court to declare Bill 13-22 a nullity and permanently enjoin the County from enforcing or attempting to enforce the Bill. *Id.* ¶¶ 76, 77. The County responds that because Bill 13-22 prohibits appliances that use a certain type of energy—gas—but does not otherwise affect any energy-use *standards*, the EPCA does not preempt the Bill, and urges the Court to deny Plaintiffs' requested relief. ECF No. 42-2 at 20–29. Although this action is in its infancy, the parties agree that the Plaintiffs' claim turns on this pure question of law, namely the interpretation of the EPCA preemption terms. Thus, neither party objects to the Court reaching this question on summary judgment. *See* ECF No. 42 (the County moving for summary judgment in the alternative); ECF No. 51 (Plaintiffs cross-moving for summary judgment). However, before reaching the merits, the Court must satisfy itself of its power to hear the case.

## II.   Jurisdiction

### A.   Standing

The County first argues that dismissal is warranted because no plaintiff has standing to bring this suit. ECF No. 42-2 at 17. A party's standing to maintain an action "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). This "standing requirement applies to each claim that a plaintiff seeks to press." *Overbey v. Mayor of Balt.*, 930 F.3d 215, 230 (4th Cir. 2019) (quoting *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014)). The plaintiff bears the burden of demonstrating "standing separately for each form of relief sought." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). That said, only one plaintiff must demonstrate it has standing for the case to proceed. *See Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017)).

To establish standing, a plaintiff must show that it (1) suffered an injury in fact that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable" to the defendant's conduct; and (3) that the injury can be "redressed by a favorable decision." *Friends of the Earth, Inc.*, 528 U.S. at 180–81 (citing *Lujan*, 504 U.S. at 560–61). The County argues solely that Plaintiffs cannot satisfy the injury-in-fact requirement because the alleged injuries flowing from Bill 13-22 are "speculative," and based on yet-to-be enacted "regulations" that do not go in effect until December 31, 2026. ECF No. 42-2 at 17–18. The Court disagrees.

The gravamen of the alleged injury is that Bill 13-22 effectively bans gas appliances in any new construction. From this, Plaintiff Washington Gas Light Company ("WGL") has alleged a sufficiently concrete and particularized injury to confer jurisdiction. WGL's Executive Vice President & President, Donald Jenkins, attests that WGL provides natural gas service to more than 1.2 million area customers, 241,000 of whom are Montgomery County residents, which make up 47% of WGL's Maryland customer base. ECF No. 32-8 ¶¶ 2–3. Further, Jenkins states that larger corporate customers would otherwise purchase gas for new construction projects but, with the passage of Bill 13-22, will no longer do so because it is "[a]ll electric from here on out." *Id*. ¶¶ 6–7.

Similarly, Thomas Kettler ("Kettler"), a local homebuilder and owner of Kettler Forlines, Inc., will suffer likely injury of diminished home sales. ECF No. 32-2 ¶¶ 5–8. Kettler Forlines—a member of the Maryland Building Industry Association and the National Association of Home Builders of the United States—has built over 4,000 homes, and "natural gas has been the preferred source for heating, hot water, cooking and gas fireplaces for at least 90% of [its customers]." *Id.* ¶ 5. Were Bill 13-22 to take effect, no gas appliances will be permitted in new construction,

requiring the company to drastically retool its new construction plans, or face reasonable prospect that homebuyers will look elsewhere to build new construction. *Id.* ¶¶ 7–8. Because builders such as Kettler must decide whether gas service and appliances will be used in new development as much two years in advance of breaking ground, the injuries stemming from Bill 13-22 are neither remote nor speculative. *Id. See also* ECF No. 32-2 (Douglas Tyler Wood declaring the "long lead time" of the decision whether to use gas in new construction "has an effect now on the choices builders must make regarding the use of gas in custom homes."). This is so even though the new building standards will not take effect until, at the *latest*, the end of this year. ECF No. 42-8 at 5. *See, e.g.*, *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304, 322 (N.D.N.Y. 2025) (standing conferred even when building code prohibition did not take effect for six months) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024). These injuries are sufficiently concrete and imminent to confer standing. *Mulhern Gas Co.*, 798 F. Supp. 3d at 321.

## B.    Ripeness

The County alternatively argues that the Court lacks jurisdiction because the claims are not ripe for judicial review. ECF No. 42-2 at 13. *See South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019). "Ripeness 'concerns the appropriate timing of judicial intervention.'" *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (quoting *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 389 (4th Cir. 2001)). The Plaintiffs bear the burden of proving that the suit is ripe. *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). The ripeness inquiry is necessary to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and to protect against "judicial interference

6

until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967).

Ripeness depends on two principal factors: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Cooksey*, 721 F.3d at 240 (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). As to an issue's "fitness," where, as here, the dispute is "purely legal" and the present controversy does not depend on "future uncertainties," the matter is sufficiently fit for review. *Miller*, 462 F.3d at 319 (citation omitted). But where the challenged law or policy is not sufficiently "crystalized," and thus subject to change, the Court may conclude the claim is best deferred. *Reg'l Mgmt. Corp. v. Legal Servs. Corp.*, 186 F.3d 457, 465 (4th Cir. 1999) (quoting *City of Houston v. Dep't of Hous. and Urb. Dev.*, 24 F.3d 1421, 1430–31 (D.C. Cir. 1994)) (internal quotation marks omitted). *See also South Carolina*, 912 F.3d at 730.

The County principally contends that the claim lacks fitness "because the full scope of exemptions and the law's impact will not be known until the County Executive promulgates" the regulations that establish the "all-electric building standards." ECF No. 42-2 at 14. But this "exemption" argument misapprehends Plaintiffs' fundamental contention—that the Bill's complete *ban* on using gas appliances in new construction is preempted under the EPCA. This question is narrowly circumscribed and a well-defined question of law. It is also fit for resolution now because if, as Plaintiffs urge, the EPCA preempts Bill 13-22, then no further regulatory work on the Bill's exceptions will matter. ECF No. 51-1 at 18 (citing Montgomery County Code § 8-14D(a)). *See Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 581 (1985) ("The issue presented in this case is purely legal, and will not be clarified by further factual development.").

7

By contrast, if the EPCA does not preempt the Bill, then its roll-out may proceed as planned. The suit, therefore, is ready for judicial review.

As for hardship to the parties should the Court withhold consideration, the inquiry turns on whether the plaintiff has suffered injury from the challenged action or whether the effects of adjudicating the dispute remain "wholly speculative." *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)). Several plaintiffs have attested that the construction industry requires advance planning and approval such that the effects of the Bill are felt now, even though the actual implementing regulations may be several months away. *See* ECF No. 32-2 (Kettler declaration); ECF No. 32-3 (Douglas Tyler Wood declaration); ECF No. 32-4 (Perry McGuire declaration); ECF No. 32-8 (Jenkins declaration). These "long lead times" and advanced decision-making in this industry mean that businesses have already been affected by the impending gas ban. *See, e.g.*, ECF No. 32-2 (Kettler declaration). Accordingly, Plaintiffs have suffered injury, and the matter is ripe for resolution now. *But cf. Reg'l Mgmt. Corp.*, 186 F.3d at 465 (holding that delay in adjudication of the policy would have "no present effect" on the plaintiffs, "much less a direct one" on its day-to-day business) (internal quotation marks and citation omitted). The matter is ripe for review.

The Court next turns to the merits of the action.

## III.     Whether the EPCA Preempts Bill 13-22

The Supremacy Clause of the Constitution "renders federal law 'the supreme Law of the Land,'" state law "'to the Contrary notwithstanding.'" *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (quoting U.S. Const. art. VI, cl. 2). Federal law may preempt state law in three ways: by "express preemption," by "field preemption," or by "conflict preemption." *See Pinney v. Nokia, Inc.*, 402 F.3d 430, 453 (4th Cir. 2005). Plaintiffs singularly contend that the EPCA

expressly preempts Bill 13-22 through the EPCA's preemption provisions.  A state law is expressly preempted when Congress says so by federal legislation.  *Id.* at 454.  Accordingly, the text of the statute itself remains "the best evidence of Congress' preemptive intent."  *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 761 (4th Cir. 2018) (quoting *Commonwealth of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016)).

Plaintiffs argue that because Bill 13-22 bans all gas-powered appliances, it sets the "energy use" of appliances at "zero" and so it is preempted under the EPCA.  ECF No. 32 ¶ 56.  Plaintiffs point specifically to the provision of the EPCA that reads, "for any covered product, no State regulation concerning the . . . *energy use* . . . of such covered product shall be effective with respect to such product unless" the regulation meets exceptions not applicable here.  42 U.S.C. § 6297(c) (emphasis added).  Further, say the Plaintiffs, the EPCA defines "energy use" as "the *quantity* of energy directly consumed by a consumer product *at point of use*" and as "determined in accordance with test procedures under section 6293 of this title."  42 U.S.C. § 6291(4) (emphasis added).  From this, Plaintiffs maintain that the natural and plain meaning of "energy use" of a covered product at the "point of use" means the quantity of gas used at the place where the appliance is installed and used by the consumer.  *See* ECF No. 51-1 at 31 (explaining that "the quantity of energy directly consumed by a consumer product at point of use" should be interpreted to mean the quantity of energy directly consumed by a consumer product at "the place where or time when a product or service is used") (quoting Cambridge English Dictionary Online (2025)).  Thus, say Plaintiffs, because Bill 13-22 regulates "energy use" by banning gas appliances at the "point of use," the EPCA preempts the Bill.

In so arguing, Plaintiffs principally rely on *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024).  There, the Ninth Circuit held that the EPCA preempted a county

ordinance that prohibited installation of gas lines in new construction.  The Court reasoned that because the "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations," then the ordinance impermissibly regulated "energy use" by setting the quantity to be used in new construction at "zero."  *Id.* at 1101–02 (emphasis in original).  Thus, the majority explained, a prohibition on natural gas infrastructure that reduces the energy consumed by natural gas to "zero," in effect, regulates the "quantity of energy" in new construction, which the EPCA expressly preempts.  *Id.*

The County, on the other hand, embraces Judge Friedland's dissent in *California Restaurant Association*, in which she faults the majority for "misinterpret[ing] the statute's key terms to have colloquial meanings instead of the technical meanings required by established canons of statutory interpretation."  *California Rest. Ass'n*, 89 F.4th at 1120.  Judge Friedland grounded her dissent in a careful reading of the EPCA, as informed by its history, amendments, and the use of the operative terms within the energy regulatory industry.  *Id.* at 1120–22.  Judge Friedland explained that the EPCA, from its inception, was designed to set "uniform appliance efficiency standards," for covered products that proceed to market, and *not* to create a "consumer right to use" any given appliance.  *Id.* at 1121.  Equally important, noted Judge Friedland, the EPCA is a "technical statute" that proscribes the method for setting and enforcing national efficiency standards of covered products before they are put into the stream of commerce.  *Id.* Thus, the critical terms here—"energy use" and "point of use"—must be given their technical and industry-relevant meanings as "instruction to [the Department of Energy] and manufacturers."  *Id*. at 1123.  Judge Friedland explains,

> Congress was relying on the technical meaning of the term to convey that the "energy use" of an appliance under EPCA does not include indirect energy consumption upstream in the supply chain. That instruction was needed because other regulators at the time *did* consider such indirect energy consumption . . . .

[And] [i]ndustry and regulatory sources consistently use the term "point of use" in this technical sense, and many expressly recognize that EPCA does so as well.

*Id.* (internal citations omitted) (emphasis in original).

When giving such terms the proper technical construction, the gas ban ordinance, Judge Friedland concluded, was not preempted. The ordinance "simply directs consumers to one set of products with one set of federal efficiency standards (electric appliances) over another set of products with different federal efficiency standards (gas appliances)" but in so doing, does not regulate "energy use" at the "point of use" as specifically defined in the EPCA. *Id.* (citing 42 U.S.C. § 6295(e)(1)(A), (C)).

This reading of these terms aligns with the EPCA's legislative history and purpose. By enacting the EPCA, "Congress intended to preempt state energy efficiency standards, testing procedures, and consumer labeling requirements." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005). *See also* H.R. Rep. No. 94-340, at 95 (1975) ("[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation."); *id.* at 17 (describing the energy labeling and efficiency standards for consumer products). Bill 13-22's mandate for "all electric" new construction touches on none of those efficiency standards, consumer labeling, or testing procedures relevant to covered appliances. *See also also Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.,* No. CV 24-10482 PA (PDX), 2025 WL 2427844, at *6 (C.D. Cal. July 22, 2025). The Bill instead prohibits a category of appliances regardless of whether they meet the efficiency or labeling standards under the EPCA.

11

Moreover, reading the terms "energy use" and "point of use" as Plaintiffs urge would run counter to the EPCA's web of implementing regulations.  10 C.F.R. § 429.12, for example, requires that covered appliances meet energy-use testing standards under 42 U.S.C. § 6293 *before* the appliance is offered for sale.  *See* 10 C.F.R. § 429.12 ("Each manufacturer, *before* distributing in commerce any basic model of a covered product or covered equipment subject to an applicable energy conservation standard . . . shall submit a certification report to DOE . . .") (emphasis added). "If, as Plaintiffs contend, 'energy use' refers to the amount of energy a product actually consumes in the hands of a consumer, then this rule would be impossible to implement."  *Ass'n of Contracting Plumbers of City of New York, Inc.*, 2025 WL 843619, at *5.  Likewise, 16 C.F.R. § 305.17 (water heaters), 16 C.F.R. § 305.18 (air conditioning), 16 C.F.R. § 305.19 (pool heaters) all regulate how manufacturers must label such products before the products enter the market. These regulations would make little sense if "energy use" refers to the quantity of energy used *after* the product was sold to the consumer.

Nor is the Court persuaded that "[a]t the very least," Bill 13-22 "qualifies as a regulation 'concerning' the amount of natural gas EPCA-covered appliances consume since it makes it impossible for those appliances to consume any [zero] natural gas whatsoever at the point of use." ECF No. 51-1 at 35.  True, the EPCA preempts state law "concerning the . . . energy use" of "covered products."  42 U.S.C. § 6297(c).  However, "Congress' use of the word 'concerning' does not create a limitless preemption; the regulation at issue must still relate to or be about or regarding the 'energy use' of a covered product for preemption to apply."  *Mulhern Gas Co.*, 798 F. Supp. 3d at 326.  This Court has already concluded that Bill 13-22 simply does not regulate "energy use" as the term is understood in the EPCA.  *See supra* pp. 10–12.  For the same reason, the Bill does not "concern" the energy use of a covered product such that the Bill is preempted.

For these reasons, the Court agrees with Judge Friedland and joins several lower courts in adopting her construction of the EPCA's preemption provisions. *See Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) (prohibition on the use of fossil fuels in new residential construction); *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025) (prohibition on the installation of fossil-fuel equipment and building systems in new construction). *See also Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.,* No. CV 24-10482 PA (PDX), 2025 WL 2427844, at *1 (C.D. Cal. July 22, 2025) (zero-nitrogen oxide emission standard on certain categories of natural gas appliances). After all, "when a statute, like this one, is 'addressing a . . . technical subject, a specialized meaning is to be expected." *Van Buren v. United States*, 593 U.S. 374, 389 n.7 (2021) (interpreting the Computer Fraud and Abuse Act of 1986) (citation omitted). *See also id.* at 388 (quoting *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020)) ("When 'a statute includes an explicit definition' of a term, '[the Court] must follow that definition, even if it varies from a term's ordinary meaning.'"). The EPCA, therefore, does not preempt Bill 13-22. Summary judgment must be granted in favor of Montgomery County and against Plaintiffs.

## IV.    Conclusion

Based on the foregoing, the Court concludes that the EPCA's preemption provisions do not reach Bill 13-22. Because the Bill does not regulate "energy use" at the "point of use," its "all electric" mandate for new construction is not preempted. ECF No. 42-5 at 4. Montgomery County's motion, construed as one for summary judgment, is GRANTED and Plaintiffs cross-motion for summary judgment is DENIED.

A separate order follows.

14

03/25/2026

Date

              /s/

Paula Xinis

United States District Judge

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

NATIONAL ASSOCIATION OF
HOME BUILDERS OF THE
UNITED STATES *et al.*,          *

    Plaintiffs,          *

  v.          *          Civil Action No. 8:24-cv-03024-PX

MONTGOMERY COUNTY,
MARYLAND,
          *

    Defendant.
          \*\*\*

**ORDER**

For the reasons stated in the foregoing Memorandum Opinion, it is this 25th day of March,

2026, by the United States District Court for the District of Maryland, **ORDERED** that:

1. The Motion to Dismiss the Amended Complaint, or in the Alternative, Motion for

    Summary Judgment by Defendant Montgomery County, ECF No. 42, is **GRANTED**;

2. The Cross-Motion for Summary Judgment filed by Plaintiffs, ECF No. 51, is **DENIED**;

3. The Motions for Leave to File Brief Amicus Curiae at ECF Nos. 44, 45 & 52 are

    **GRANTED**; and

4. The Clerk is directed to **CLOSE** the case.


   3/25/2026                                   /s/
_____          _____
Date                                             Paula Xinis
                                                 United States District Judge

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

NATIONAL ASSOCIATION OF HOME
BUILDERS OF THE UNITED STATES
1201 15th St NW, Suite 400
Washington, DC 20005

RESTAURANT LAW CENTER
2055 L St NW, Suite 700
Washington, DC 20036

NATIONAL FEDERATION OF
INDEPENDENT BUSINESS, INC.
555 12th Street NW, Suite 1001
Washington, DC 20004

MARYLAND BUILDING INDUSTRY
ASSOCIATION
11825 West Market Place
Fulton, Howard County, MD 20759

NATIONAL PROPANE GAS
ASSOCIATION
1140 Connecticut Ave., NW, Suite 1075
Washington, DC 20036

WASHINGTON GAS LIGHT COMPANY
1000 Maine Ave., SW
Washington, DC 20024

PHILADELPHIA-BALTIMORE-
WASHINGTON LABORERS' DISTRICT
COUNCIL
665 N. Broad Street
Philadelphia, PA 19123

TEAMSTERS LOCAL 96
5627 Allentown Rd, Suite 202
Camp Springs, Prince Georges County, MD
20746

                        *Plaintiffs,*

        v.

MONTGOMERY COUNTY, MARYLAND
101 Monroe Street, 2nd Floor
Rockville, MD 20850
                        *Defendant.*

CASE NO. 8:24-CV-03024-PX


**FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

1

**INTRODUCTION[1]**

1. Plaintiffs National Association of Home Builders of the United States, Restaurant Law Center, National Federation of Independent Business, Inc., Maryland Building Industry Association, National Propane Gas Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96 seek declaratory and injunctive relief under federal law against enforcement of provisions of Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban"), which sets into motion the process for banning the use of gas appliances in new construction. The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, already regulates the energy use of such appliances and expressly preempts state and local laws on that subject. The County Appliance Ban falls within the heartland of EPCA's express preemption provision because it too purports to regulate the energy use of gas appliances—by preventing such use entirely. As such, the County Appliance Ban is preempted by EPCA and unenforceable as a matter of law.

2. Born out of the oil crisis of the 1970s and the accompanying concerns with energy independence, EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances. *See, e.g.*, 42 U.S.C. § 6297(c). The thrust of EPCA is that nationally uniform energy use and efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply and preserving consumer choice. *See, e.g.*, *id.*; S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

---

[1] Pursuant to Local Rule 103.6(c), attached as Exhibit 1 is a copy of this First Amended Complaint that reflects the changes from the Original Complaint.

3. To accomplish that needed national uniformity, EPCA expressly preempts state and local regulations concerning the energy use and energy efficiency of products for which EPCA sets energy conservation standards—with only the narrowest of exceptions to that preemption for state and local regulations that meet certain stringent statutory conditions. 42 U.S.C. §§ 6297(c)(3), (f)(3).

4. The Ninth Circuit's invalidation of the City of Berkeley's prohibition on gas piping in new buildings just last year is particularly noteworthy since it struck down this same kind of attack on gas appliances. *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023), *amended and superseded by Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Perhaps most notable is that the unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n*, 89 F.4th at 1107. Because the County Appliance Ban does exactly that, there is "no doubt" that EPCA preempts it. *See id.* Indeed, some state and local governments have since taken note of EPCA and reconsidered their efforts to enact similar bans. *See, e.g.,* Kale Williams, *Eugene reverses natural gas ban after ruling by federal appeals court*, KGW8 (July 12, 2023), https://www.kgw.com/article/news/politics/natural-gas-ban-eugene-oregon-repealed/283-5195461a-22cd-4176-9db7-8047fb56d887. Because the County did not do so on its own, the Court must order it to do the same.

5. The County Appliance Ban inflicts serious and irreparable harm. Banning the use of gas appliances in new construction is at odds with the needs of County residents, workers, and businesses for affordable, resilient, and reliable energy. Prohibiting gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the

public interest and consumer choice, exacerbates the County's housing crisis, and aims to shift the County's energy demand to an electric system that is facing both historic and increasing electricity demand and dwindling dispatchable electricity supply. Due to the County Appliance Ban artificially limiting the pool of gas customers, homes, restaurants, and other businesses that rely upon gas services will be forced to pay higher gas prices than they would otherwise have to pay. Thus, the County Appliance Ban will negatively impact existing buildings as well.

6. The County Appliance Ban operates by mandating the promulgation of regulations for approval by the County Council to accomplish the ban, but its deleterious effects are already manifesting. The County Appliance Ban is causing customers to choose electricity over gas, thereby reducing the demand for gas and harming Plaintiffs. Further, by calling into question the long-term prospects for gas-related trades, the County Appliance Ban likely is reducing the number of workers who wish to enter those trades. That harms the unions representing those workers— including the applicable Plaintiffs here—by shrinking their pool of future members and harming their bargaining power. To be sure, these harms and others will be amplified once the County Appliance Ban takes its future form as an approved regulation, but they are being felt now as well.

7. Plaintiffs—a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems for their livelihoods—stand to lose much if the County Appliance Ban is not enjoined. Plaintiffs and their members span a broad array of industries and labor, including construction, food service, retail, and delivery related to gas and gas infrastructure. The County Appliance Ban is already undermining their livelihoods, harming profits, disrupting long-term business strategy and asset planning, jeopardizing jobs and hiring and training programs, and hampering the ongoing development of new desperately needed multifamily homes. And those

harms will only increase as time goes on and the County Appliance Ban becomes an approved regulation. Ultimately, the County Appliance Ban will diminish Plaintiffs' businesses and trades and substantially increase the cost for homes, lodging, and energy in the County—all despite federal law's express preemption of it.

8. In sum, the County Appliance Ban is plainly preempted by EPCA, is already inflicting substantial irreparable harm on Plaintiffs and their members, and will cause even more harm unless enjoined. Plaintiffs accordingly bring this action seeking a declaration that the County Appliance Ban is preempted by EPCA and an injunction preventing its enforcement.

## JURISDICTION AND VENUE

9. Jurisdiction is proper because, under 42 U.S.C. § 6306(c), federal district courts have express jurisdiction over suits brought by any adversely affected person concerning state compliance with EPCA. Additionally, under 28 U.S.C. § 1331, the Court has federal question jurisdiction to determine the claims involving EPCA.

10. This Court has personal jurisdiction over Montgomery County and authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

11. Venue in this Court is proper under 28 U.S.C. § 1391(b) because, among other things, (i) the actions violating federal law stated in this Complaint impose injury in the state of Maryland, where Plaintiffs or their members either reside and/or do business, and (ii) the law at issue will be enforced here.

**PARTIES**

12. Plaintiff National Association of Home Builders of the United States ("NAHB") is a nonprofit corporation organized under the laws of Nevada with its principal office in Washington, D.C. It represents the U.S. residential building construction industry and has approximately 140,000 members across all fifty states. NAHB's mission is to protect and provide housing opportunities for the American public while promoting the business interests of its members. Among NAHB's members are land developers, builders, vendors, trades, building owners, and product manufacturers. The NAHB has one or more members that do business in Montgomery County and are suffering or will imminently suffer harm to their profits and business operations as a result of the impending appliance ban. For example, one of NAHB's members has built over 4,000 homes since its founding in 1978, and "natural gas has been the preferred source for heating, hot water, cooking, and gas fireplaces for at least 90%" of its homeowners. Ex. 2, Am. Thomas E. Kettler Decl., ¶ 5. "The County Appliance Ban will put [the company] at an economic disadvantage, as potential customers may opt to purchase homes in other counties or in Virginia due to the ban." *Id.* Similarly, another one of NAHB's members "will be required to incur additional costs to comply with all-electric standards, which is likely to result in a decrease in new home construction. Furthermore, [the company's] clients, many of whom operate within strict budgetary constraints, may find themselves unable to afford new homes, as the all-electric requirements would exceed their financial means." Ex. 3, Am. Douglas Tyler Wood Decl., ¶ 5. Furthermore, both companies are long-time gas customers in Montgomery County, and having access to affordable gas services is important to them. Ex. 2, Am. Thomas E. Kettler Decl., ¶ 6; Ex. 3, Am. Douglas Tyler Wood Decl., ¶ 6. The County Appliance Ban is already eroding the pool

of gas customers by causing some would-be gas customers to choose electricity instead and will limit it further once it becomes an approved regulation. That reduced customer base means that existing gas customers like these companies will have to pay higher rates for gas service than they would otherwise pay. *Id.* Additionally, one of NAHB's members is an appliance manufacturer that sells gas appliances, "including energy-efficient tankless water heaters, home heating appliances, kitchen appliances, and gas clothes dryers[,]" in Montgomery County. Ex. 4, Am. Perry McGuire Decl., ¶ 2. The County Appliance Ban will harm this member, as the company "will face significant sales losses if new buildings and homes in Montgomery County can no longer use the gas appliances we manufacture and sell due to the County Appliance Ban." *Id.* at ¶ 5. The County Appliance Ban is inflicting real harm now by negatively affecting NAHB's members' financial operations and influencing their business decisions. Ex. 2, Am. Thomas E. Kettler Decl., ¶¶ 7-8; Ex. 3, Am. Douglas Tyler Wood Decl., ¶¶ 8-9; Ex. 4, Am. Perry McGuire Decl., ¶ 7.

13. Plaintiff Restaurant Law Center ("RLC") was officially established in 2016 as an independent public policy organization supporting the restaurant and food-service industry across the United States. While the RLC is its own independent organization with its own Board of Directors, all members in good standing with the National Restaurant Association and State Restaurant Associations are members of the RLC. As such, RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 14.7 million employees, or approximately 10% of the workforce in the United States. RLC's members include more than 500,000 restaurant businesses located across the United States, including businesses in Montgomery County. RLC's members will be harmed by the County Appliance Ban by making the rates they pay for gas service higher than they would otherwise be due to limiting

the County's gas customer base—both by causing some would-be gas customers to choose electricity instead and then later, once it becomes an approved regulation, by outright prohibiting gas as an option for some customers. Ex. 5, Am. Angelo Amador Decl., ¶ 7. Many RLC members run on thin margins, making any increase in business operations significant. *Id.* Many RLC members in Montgomery County are already struggling due to a variety of unfavorable economic conditions. *Id.* at ¶ 8. Montgomery County restaurant owners still have not fully recovered from the pandemic,[2] and many have already gone out of business. *Id.* The County Appliance Ban will further exacerbate these unfavorable economic conditions. *Id.* The County Appliance Ban is inflicting real harm now by negatively affecting RLC's members' financial operations and influencing their business decisions. *Id.* ¶ 9.

14. Plaintiff National Federation of Independent Business, Inc. ("NFIB") is the nation's leading small business advocacy association, representing members in all 50 states and Washington, D.C. NFIB's members will be harmed by the County Appliance Ban by making the rates they pay for gas service higher than they would otherwise be due to limiting the County's gas customer base—both by causing some would-be gas customers to choose electricity instead and then later, once it becomes as an approved regulation, by outright prohibiting gas as an option for some customers. For example, one of NFIB's members that faces such harm is a home management and maintenance company that uses natural gas to heat several warehouse spaces in Montgomery County in the winter. Ex. 6, Jim Vagonis Decl., ¶ 5. For this member, "[n]atural gas

---

[2] National Restaurant Association, *Restaurant employment resumed its upward trajectory*, (Apr. 5, 2024), https://restaurant.org/research-and-media/research/economists-notebook/analysis-commentary/restaurant-employment-resumed-its-upward-trajectory/ (showing that February 2024 restaurant employment compared to February 2020 was -4% or lower in Maryland).

is the best and most affordable approach to do this." *Id.* An increase in gas rates would therefore financially harm this member.

15. Plaintiff Maryland Building Industry Association ("MBIA") formed in 2014 as the result of a merger between two local associations with over 175 years of combined experience: the Home Builders Association of Maryland that covered the Baltimore area and the Maryland National-Capital Building Industry Association that covered the District of Columbia and Southern Maryland. MBIA is a local chapter of the NAHB. MBIA is a not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 employees, including home builders, remodelers, developers, and affiliate professional and service providers in the Maryland Counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Harford, Howard, Montgomery, Prince George's and St. Mary's, as well as Baltimore City, the Eastern Shore, and the District of Columbia. MBIA has one or more members that do business in Montgomery County and are suffering or will imminently suffer harm to their profits and business operations as a result of the impending appliance ban. For example, one of MBIA's members has built over 4,000 homes since its founding in 1978, and "natural gas has been the preferred source for heating, hot water, cooking, and gas fireplaces for at least 90%" of its homeowners. Ex. 2, Am. Thomas E. Kettler Decl., ¶ 5. "The County Appliance Ban will put [the company] at an economic disadvantage, as potential customers may opt to purchase homes in other counties or in Virginia due to the ban." *Id.* Similarly, another one of MBIA's members "will be required to incur additional costs to comply with all-electric standards, which is likely to result in a decrease in new home construction. Furthermore, [the company's] clients, many of whom operate within strict budgetary constraints, may find themselves unable to afford new homes, as the all-electric

requirements would exceed their financial means." Ex. 3, Am. Douglas Tyler Wood Decl., ¶ 5. Additionally, both companies are long-time gas customers in Montgomery County, and having access to affordable gas services is important to them. Ex. 2, Am. Thomas E. Kettler Decl., ¶ 6; Ex. 3, Am. Douglas Tyler Wood Decl., ¶ 6. The County Appliance Ban will limit the pool of gas customers—both by causing some would-be gas customers to choose electricity instead and then later, once it becomes an approved regulation, by outright prohibiting gas as an option for some customers—thereby forcing existing gas customers like these companies to pay higher rates for gas service than they would otherwise pay. *Id.* The County Appliance Ban is inflicting real harm now by negatively affecting MBIA's members' financial operations and influencing their business decisions. Ex. 2, Am. Thomas E. Kettler Decl., ¶¶ 7-8; Ex. 3, Am. Douglas Tyler Wood Decl., ¶¶ 8-9.

16. Plaintiff National Propane Gas Association ("NPGA") is a nonprofit corporation organized under the laws of New Jersey with its principal office in Washington, D.C. It represents the U.S. propane industry and has approximately 2,400 members across all fifty states, including members in Maryland. Its members include retail marketers of propane gas who deliver the fuel to the end user, propane producers, transporters and wholesalers, and manufacturers and distributors of equipment, containers, and appliances. NPGA members who do business in Maryland are suffering or will imminently suffer harm to their revenues and business operations as a result of the County Appliance Ban. In particular, the County Appliance Ban is causing some would-be gas customers to choose other energy sources instead and then later, once it becomes an approved regulation, will prohibit the gas option entirely in some cases. That will reduce the demand for the propane gas that NPGA's members sell, thereby impacting their revenue and profits. Ex. 7, Todd Holtzman

10

Decl., ¶¶ 5-6. The County Appliance Ban is inflicting real harm now by negatively affecting NPGA's members' financial operations and influencing their business decisions. *Id.* ¶ 7.

17. Plaintiff Washington Gas Light Company ("WGL") is a regulated public utility that provides natural gas service to more than 1.2 million customers in the District of Columbia, Maryland, and Virginia. This includes over 241,000 customers in Montgomery County, Maryland, which make up nearly 47% of WGL's Maryland customer base. WGL has been providing energy to residential, commercial, and industrial customers for 175 years. "The County Appliance Ban has caused the present loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers and existing customers over time. As a result, WGL's customer base will grow less than it would otherwise, resulting in higher rates for gas customers than they would have otherwise had." Ex. 8, Am. Donald "Blue" Jenkins Decl., ¶ 6. WGL has had conversations with business partners who have said they would want gas service from WGL if not for the County Appliance Ban. *Id.* at ¶ 7. WGL is also aware of "at least five Montgomery County construction projects that intend to use gas appliances with buildouts forecasted beyond 2026," and absent the County Appliance Ban, the company would anticipate similar growth in the future. *Id.* at ¶ 8. Additionally, "[b]y capping a portion of WGL's customer growth, the County Appliance Ban impedes [the company's] ability to spread the cost of new investment in maintaining the gas system, and instead concentrates those costs upon fewer and fewer customers than there otherwise would be. That results in increased rates than would otherwise occur for existing customers, who are forced to assume a greater share of the costs to maintain the gas system." *Id.* at ¶ 10. The result will be financial harm to and lower profits for WGL.

18. Plaintiff Philadelphia-Baltimore-Washington Laborers' District Council ("District

Council") is an affiliate of the Laborers International Union of North America ("LIUNA"), AFL-CIO, a 120-year-old labor organization with over 500,00 members throughout the United States and Canada. Ex. 9, Am. Ryan Boyer Decl., ¶ 2. The District Council has approximately 13,000 members, and nationally, one-third of construction work performed by LIUNA members is in the energy sector. *Id.* Local 11 represents approximately 800 workers who are laborers for utility construction contractors employed by WGL, such as NPL Construction and Skoda Contracting Company, 400 of whom regularly work in Montgomery County, Maryland. *Id.* at ¶ 3. Notably, District Council members who work on gas distribution lines are required to hold an operator qualification under Subpart G in 49 C.F.R. Part 195. *Id.* at ¶ 4. This valuable employment credential is applicable only to work on gas lines. *Id.* The County Appliance Ban—through its tamping down on the demand for gas now and in the future—will reduce the work performed by District Council members, leading to layoffs and the permanent loss of employment. *Id.* at ¶ 6. Furthermore, it will cause the gas industry in the local area to shrink, restricting District Council members' ability to find employment in the industry for which they have non-transferrable training and credentials. *Id.* Loss of their union employment would cause them to lose the ability to continue to earn valuable pension credits in union-sponsored pension plans. *Id.* Additionally, by calling into doubt the long-term future of gas-related trades, the County Appliance Ban makes those trades less attractive and likely is causing would-be gas workers to turn to other trades instead. *Id.* ¶ 8. That will only get worse when the County Appliance Ban becomes an approved regulation. *Id.* That translates in fewer members and weaker bargaining power for the District Council. *Id.* Also, many District Council local members are WGL customers. *Id.* at ¶ 7. The County Appliance Ban—both by causing some would-be gas customers to choose electricity instead and

then later, once it becomes an approved regulation, by outright prohibiting gas as an option for some customers—will limit the pool of gas customers, forcing existing gas customers like these local members to pay higher rates for gas service than they otherwise would pay. *Id.*

19. Plaintiff Teamsters Local 96 ("Local 96") is a union. Local 96 has approximately 600 members, all of whom are employed by Plaintiff WGL. Ex. 10, Am. Wilder Reed Decl., ¶ 3. As WGL employees, Local 96 members service the more than 240,000 WGL customers in Montgomery County, Maryland. *Id.* Among other things, Local 96 members conduct surveys of the existing gas infrastructure, replace and repair gas pipes, install gas lines, and read and install gas meters in customer's homes and businesses. *Id.* at ¶ 4. The County Appliance Ban—through its tamping down on the demand for gas now and in the future—will result in a decline of work performed by Local 96 members and will deprive Local 96 members of work. *Id.* at ¶ 6. The County Appliance Ban will therefore harm Local 96's members. *Id.* Also, by calling into doubt the long-term future of gas-related trades, the County Appliance Ban makes those trades less attractive and likely is causing would-be gas workers to turn to other trades instead. *Id.* ¶ 7. That will only get worse when the County Appliance Ban becomes an approved regulation. That translates in fewer members and weaker bargaining power for Local 96. *Id.* Additionally, the County Appliance Ban will require Local 96 to divert resources from its usual activities to providing its members with training to pursue new opportunities within their trade. *Id.* ¶ 6.

20. Defendant Montgomery County, Maryland is a charter county that adopted Montgomery County Bill 13-22.

21. An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendant concerning the validity of Montgomery County Bill 13-22. Plaintiffs contend that the

County Appliance Ban is preempted by EPCA. Plaintiffs believe, and on that basis allege, that Defendant disagrees with Plaintiffs' contentions and assert that the appliance ban is lawful and enforceable. Enforcement of the appliance ban will injure Plaintiffs and/or their members. Those injuries will be redressed by a favorable ruling from this Court.

22. The claims asserted herein are ripe for review because Plaintiffs are being injured by Montgomery County Bill 13-22 and also will suffer further injury from it in the future. Plaintiffs challenge the facial validity of Montgomery County Bill 13-22, thereby raising a legal question. When a question is "predominantly legal," there is generally no need to await further factual development. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). There is no set of circumstances under which Montgomery County Bill 13-22 would be valid under federal law.

**ALLEGATIONS**

**Montgomery County Bill 13-22's Ban on Federally Regulated Appliances**

23. Montgomery County Bill 13-22 sets into motion the process for banning the use of federally regulated appliances in new construction located in Montgomery County.

24. Specifically, Montgomery County Bill 13-22 requires the County Executive of Montgomery County to issue, by December 31, 2026 at latest, "all-electric building standards for new construction." Montgomery County Code § 8-14D. Then those regulations will be submitted to the County Council for approval. *See* Montgomery County Code §§ 2A-15, 8-14D.

25. "All-electric building" is defined as "a public or private building that contains no combustion equipment, or plumbing for combustion equipment, installed within the building or building site." Montgomery County Code § 8-14D. "Combustion equipment" is defined as "any

14

equipment or appliance used for space heating, service water heating, cooking, clothes drying and/or lighting that uses fuel gas or fuel oil." *Id.* This prohibits federally regulated gas appliances, which necessarily rely upon fuel combustion in their energy use.

26. "New construction" means "the construction of any new stand-alone building, with no remnants of any prior structure or physical connection to existing structures or outbuildings on the property." *Id.*

27. The Montgomery County Council adopted Montgomery County Bill 13-22 on December 2, 2022, and it was signed into law by County Executive Marc Elrich on December 12, 2022.

**EPCA Establishes National Binding Appliance Energy Regulations**

28. Montgomery County Bill 13-22 impermissibly regulates the energy use of gas appliances, which is an area that Congress directed the U.S. Department of Energy ("DOE") to regulate through the adoption of federal energy efficiency standards under EPCA. 42 U.S.C. § 6201 *et seq.*

29. EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources.

30. The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." S. Rep. No. 94-516, at 116-17 (1975).

31.  Since 1975, Congress has amended EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

32.  In its original form in 1975, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective. The legislative history makes clear Congress's intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

33.  Originally, EPCA permitted significant state involvement in appliance regulation. It allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard.

34.  In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic

petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal DOE in 1977 to coordinate a federal response to the nation's energy problems.

35.  One of these 1978 statutes passed as part of NEA was the National Energy Conservation and Policy Act ("NECPA"). NECPA amended the 1975 EPCA. Rather than relying exclusively on labeling, NECPA required DOE to prescribe minimum energy efficiency standards for certain products. NECPA also strengthened the preemption provisions in EPCA, allowing state regulations that were more stringent than federal regulations *only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce.

36.  Despite the NECPA's new requirements, DOE did not initially adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from State requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

37.  In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

38.  As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987).

Similarly, the reports about NAECA in the House of Representatives make clear that Congress wanted to "end an era of confusion and uncertainty" for the industry and "to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

39. Thus, NAECA contained "two basic provisions:" "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." *Id.*

40. After NAECA, federal law provided two routes for a state or local jurisdiction to qualify for an exception to EPCA preemption. First, as mentioned above, DOE can grant a waiver of preemption; but while states could seek permission to establish their own standards, "achieving the waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*

41. The second option to avoid preemption concerns consumer appliances, and it applies only to performance-based building codes for new construction. 42 U.S.C. § 6297(f). To qualify for this exception, the state code must meet a strict seven-part test, enumerated in 42 U.S.C. § 6297(f)(3). The House Report regarding NAECA explains that this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. 100-11, at 26. In addition, flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . .

. ." *Id.* Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10–11. To avoid preemption, among other requirements, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11. The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.*

42. In 1992, Congress amended EPCA once more through the Energy Policy Act of 1992. That amendment expanded the federal appliance program to include energy efficiency standards for industrial appliances as well as consumer appliances. Likewise, a pathway was added for a state building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i).

43. Thus, in its present form, EPCA covers both consumer and industrial appliances, and it sets federal standards for the energy use and efficiency of those products.

**EPCA Expressly Preempts Regulation of Consumer and Industrial Appliances**

44. EPCA expressly preempts state/local regulation of appliance energy use and efficiency, with only narrow exemptions. The statute sets out specific requirements that must be met to qualify for one of these narrow exemptions. In other words, Congress meant to preempt the entire field of

energy use and energy efficiency of covered appliances, leaving DOE to set nationwide standards and establishing detailed conditions that state regulations must meet to avoid preemption.

45.  EPCA's energy use and efficiency regulations apply to "covered products." EPCA defines "covered products" for consumers as the types of products listed in Section 6292 of the Act. 42 U.S.C. § 6291(2). Section 6292 in turn lists 19 types of defined covered products, including "water heaters,"  "furnaces," and "kitchen ranges and ovens." *Id.* § 6292(a). Section 6295 sets out the energy conservation standards for these covered products.

46. EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy . . . and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" *Id.* § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.* In other words, products which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular *unit* of the product has been purchased by an individual or by a business, and regardless of whether the products are used in a commercial building or a residential building. Some of the appliances regulated under Montgomery Bill 13-22 are considered "consumer products."

47.  The express preemption in EPCA's consumer product regulations states that as of "the effective date of an energy conservation standard established in or prescribed . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions. *Id.* § 6297(c).

48. "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ." *Id.* § 6291(4). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

49. Thus, EPCA's consumer standards preempt state regulations concerning the quantity of electricity or fossil fuels consumed by appliances (including water heaters and furnaces and gas stoves) which are regularly sold to individuals.

50. Similarly, EPCA also governs the energy efficiency and energy use of certain industrial appliances. *Id.* § 6311-17.

51. Like EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A).

52. "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use. . . ." *Id.* § 6311(4). The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

53. EPCA also prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. *Id.* § 6311(2)(B). Those products are "industrial" rather than "consumer" if they are "distributed in commerce for industrial or commercial use" to "any significant extent." *Id.* § 6311(2)(A).

54. Thus, EPCA's standards for consumer products and industrial equipment preempt state and local regulations concerning energy use or energy efficiency of heating equipment, water

heaters, furnaces, and gas stoves which are regularly sold for residential, industrial, or commercial use.

**EPCA Preempts Montgomery County Bill 13-22**

55. EPCA preempts Montgomery County Bill 13-22 because Montgomery County Bill 13-22 expressly concerns the energy use of EPCA-covered gas appliances which are regularly sold for residential, commercial, or industrial use, as it bans the use of entire classes of such appliances in newly constructed buildings in Montgomery County.

56. Montgomery County Bill 13-22 concerns the quantity of natural gas consumed by appliances because it sets into motion the process for prohibiting the installation of EPCA-covered products. As a result, Montgomery County Bill 13-22 requires that, aside from limited exemptions, *no* natural gas is used by such products. Stated another way, these provisions effectively require that the quantity of natural gas used by EPCA-covered products is zero, when the national standards promulgated by DOE specify levels of energy efficiency that are based on different, non-zero levels of gas energy use by such covered products. As a result, EPCA preempts Montgomery County Bill 13-22.

57. For consumer appliances, a state or local regulation is exempted from preemption if it "is in a building code for new construction" and meets seven specific requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3). The regulation is preempted unless it meets *all seven* of these requirements.

58. The seven requirements, taken together, are intended to allow only performance-based codes that give builders a choice about how to meet overall efficiency or conservation objectives, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another. *See* S. Rep. 100-6, at 10–11 (1987).

59. For new construction, the requirements are based on the typical structure of performance-based energy efficiency provisions in building codes, which establish overall energy efficiency or conservation measures for a building and specify different ways in which a builder or building owner can meet the required objectives.

60. Montgomery County Bill 13-22 does not meet all seven requirements listed in Section 6297(f)(3), and is thereby preempted. For example, the first requirement to avoid preemption is that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A). Montgomery County Bill 13-22 does not meet this requirement, because it does not set an "energy consumption or conservation objective for a building" that allows a builder to select items that, in combination, meet the objective. Instead, the builder cannot select *any* EPCA-covered gas appliance, no matter the energy use or efficiency of the appliance.

61. The second requirement is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver (which does not apply in this case). *Id.* § 6297(f)(3)(B). Montgomery County Bill 13-22 does not meet this requirement, because it requires the County Executive to issue regulations banning the use of EPCA-covered gas appliances that meet federal energy efficiency standards.

62. The third requirement is that "[t]he credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). Montgomery County Bill 13-22 does not meet this requirement, because it does not give credit "on a one-for-one equivalent energy use . . . basis" for

23

products that are more efficient than the federal standards require. Instead, Montgomery County Bill 13-22 bans the use of EPCA-covered consumer products.

63. The fifth requirement is that "[i]f the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds [federal energy efficiency standards for consumer products], there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, *except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard*." *Id.* § 6297(f)(3)(E) (emphasis added). Here, Montgomery County Bill 13-22 does not allow for any combination where builders can install EPCA-covered gas appliances that meet applicable EPCA efficiency standards.

64. Similar to the consumer product standards, EPCA contains only limited exemptions to the default rule of preemption of state regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(b)(2)(B).

65. A state building code regulation for new construction is preempted if it "require[s] that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1" *Id.* § 6316(b)(2)(B)(i).

66. Montgomery County Bill 13-22 does not meet this requirement, because it requires the County Executive to issue regulations banning EPCA-covered industrial appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

67. On information and belief, Montgomery County has not applied and cannot apply for a waiver from EPCA preemption from the U.S. Secretary of Energy, as would be required for an

24

exemption under 42 U.S.C. § 6297(d), because only states can apply for this waiver, and Montgomery County is not a state. However, even if Montgomery County could make such an application, it could not lawfully obtain such a waiver. EPCA prohibits the Secretary from granting a waiver where, as is the case here, "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver. *Id.* § 6297(d)(4).

### CAUSES OF ACTION

### COUNT ONE: FEDERAL PREEMPTION BY THE ENERGY POLICY AND CONSERVATION ACT

68. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

69. Montgomery County Bill 13-22 concerns the energy efficiency and energy use of EPCA-covered consumer and industrial appliances in new construction.

70. Montgomery County cannot apply for a waiver from the U.S. Secretary of Energy to be exempt from EPCA preemption, because Montgomery County is not a state.

71. Montgomery County Bill 13-22 does not fall within the exemption to preemption in EPCA, including because, inter alia:

    a. It does not permit builders to select items whose combined energy efficiencies meet an objective for total energy consumption but rather bans EPCA-covered gas appliances;

    b. It does not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards, insofar as they ban the use of EPCA-covered gas appliances, no matter their efficiency; and

c.  It requires the County Executive to issue regulations banning EPCA-covered gas appliances, even when they meet the federal efficiency standards.

72.  Montgomery County Bill 13-22 is therefore preempted by the federal EPCA.

73.  There is no set of circumstances under which Montgomery County Bill 13-22 would be valid.

74. Plaintiffs accordingly request that the Court declare that Montgomery County Bill 13-22 is preempted by EPCA and enjoin Defendant from enforcing the preempted Montgomery County Bill 13-22.

**PRAYER FOR RELIEF**

75. WHEREFORE, Plaintiffs pray for relief as follows:

76.  For a permanent injunction enjoining Defendant from enforcing or attempting to enforce Montgomery County Bill 13-22;

77.  For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331, that Montgomery County Bill 13-22 is preempted by federal law because it concerns the energy use of appliances covered by the federal Energy Policy and Conservation Act and is therefore void and unenforceable.

78. For costs of this suit, including reasonable attorney's fees; and

79.  For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ Scott Novak
Jeffrey S. Wettengel (Bar ID: 20383)
Scott Novak (Bar ID: 31357)
700 K St NW
Washington, DC 20001
(P) 202-639-1333
(F) 202-508-9334
jeff.wettengel@bakerbotts.com
scott.novak@bakerbotts.com

J. Mark Little (*pro hac vice*)
910 Louisiana St
Houston, TX 77098
(P) 713-229-1489
(F) 713-229-2789
mark.little@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Federation of Independent Business, Inc., Maryland Building Industry Association, National Propane Gas Association, and Washington Gas Light Company*


RESTAURANT LAW CENTER

/s/ Angelo Amador
Angelo Amador (*pro hac vice application forthcoming*)
2055 L St NW
Washington, DC 20036
(P) 202-331-5913
(F) 202-331-2429
AAmador@restaurant.org
*Counsel for Restaurant Law Center*

27

LIUNA, MID-ATLANTIC REGION

/s/ Brian Petruska
Brian Petruska (Bar ID: 16916)
1875 Explorer Dr, Ste. 920
Reston, VA 20190
(P) 703-860-4194
(F) 703-860-1865
bpetruska@maliuna.org
*Counsel for Philadelphia-Baltimore-Washington
Laborers' District Council*

MOONEY, GREEN, SAINDON, MURPHY &
WELCH, P.C

/s/ Lauren McDermott
Lauren McDermott (Bar ID: 19371)
1920 L St NW
Washington, DC 20036
(P) 202-783-0010
(F) 202-783-6088
lmcdermott@mooneygreen.com
*Counsel for Teamsters Local 96*

# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION OF HOME
BUILDERS OF THE UNITED STATES,
RESTAURANT LAW CENTER,
NATIONAL FEDERATION OF
INDEPENDENT BUSINESS, MARYLAND
BUILDING INDUSTRY ASSOCIATION,
NATIONAL PROPANE GAS
ASSOCIATION, WASHINGTON GAS
LIGHT COMPANY, PHILADELPHIA-
BALTIMORE-WASHINGTON
LABORERS' DISTRICT COUNCIL, and
TEAMSTERS LOCAL 96,

Case No. 8:24-CV-03024-PX

*Plaintiffs*,

v.

MONTGOMERY COUNTY, MARYLAND,

*Defendant*.

## AMENDED DECLARATION OF THOMAS E. KETTLER

1. My name is Thomas E. Kettler. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am the Owner and Vice President of Kettler Forlines, Inc., a homebuilder and land development company. We are located in Montgomery County and have been doing business within this county since 1978.

3. Kettler Forlines, Inc. is a member of the Maryland Building Industry Association and the National Association of Home Builders of the United States.

4. Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban") sets into motion the process for prohibiting the use of gas appliances

1

in the construction of new buildings in Montgomery County and instructs regulations to this end be issued by December 31, 2026 for approval by the County Council.

5. We have built over 4,000 homes since our founding in 1978, and natural gas has been the preferred source for heating, hot water, cooking, and gas fireplaces for at least 90% of our homeowners. The County Appliance Ban will put us at an economic disadvantage, as potential customers may opt to purchase homes in other counties or in Virginia due to the ban.

6. Our company is a long-time gas customer in Montgomery County. Having access to affordable energy, including gas services, is important to us. The elimination of natural gas and propane will create an energy utility monopoly for electric utility companies. And because the County Appliance Ban will limit the pool of gas customers, existing gas customers like us will be forced to pay higher rates for gas service than we otherwise would pay.

7. The decision whether to use gas in larger new developments must be made very early in the process—up to two years in advance of the actual building of homes in some cases. That long lead time means that the County Appliance Ban has an effect now on the choices builders and developers must make regarding the use of gas.

8. Due to these effects, the County Appliance Ban is negatively affecting our company's financial operations and influencing its business decisions.

2

9. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: _January 27, 2025_

Thomas E. Kettler
Vice President
Kettler Forlines, Inc.

Exhibit 5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION OF HOME
BUILDERS OF THE UNITED STATES,
RESTAURANT LAW CENTER,
NATIONAL FEDERATION OF
INDEPENDENT BUSINESS, MARYLAND
BUILDING INDUSTRY ASSOCIATION,
NATIONAL PROPANE GAS
ASSOCIATION, WASHINGTON GAS
LIGHT COMPANY, PHILADELPHIA-
BALTIMORE-WASHINGTON
LABORERS' DISTRICT COUNCIL, and
TEAMSTERS LOCAL 96,

          *Plaintiffs*,

v.

MONTGOMERY COUNTY, MARYLAND,

          *Defendant*.

**Case No. 8:24-CV-03024-PX**

## AMENDED DECLARATION OF DOUGLAS TYLER WOOD

1. My name is Douglas Tyler Wood. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am Production Manager of Castlewood Consulting, LLC, a custom builder. We are located in Montgomery County and do business within this county.

3. Castlewood Consulting, LLC is a member of the Maryland Building Industry Association and the National Association of Home Builders of the United States.

4. Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban") sets into motion the process for prohibiting the use of gas appliances in the construction of new buildings in Montgomery County and instructs regulations to this end be issued by December 31, 2026 for approval by the County Council.

5. The County Appliance Ban will have a detrimental effect on our company. We will be required to incur additional costs to comply with all-electric standards, which is likely to result in a decrease in new home construction. Furthermore, our clients, many of whom operate within strict budgetary constraints, may find themselves unable to afford new homes, as the all-electric requirements would exceed their financial means.

6. Our company is a long-time gas customer in Montgomery County. Having access to affordable energy, including gas services, is important to us. Affordable energy is crucial for our company, as we operate in a highly cost-sensitive environment. A significant increase in energy-related costs would strain our budget and limit our ability to maintain competitive pricing for our clients. The County Appliance Ban will limit the pool of gas customers, forcing existing gas customers like us to pay higher rates for gas service than we otherwise would pay.

7. Many of our customers also are on tight budgets, and rising energy costs would not only impact their affordability but also hinder their ability to invest in new home construction. Ensuring access to affordable energy allows us to meet demand for growth within the housing market.

8. The decision whether to use gas in a new custom home must be made early the process—up to one year in advance of the actual construction in some cases. That long lead time means that the County Appliance Ban has an effect now on the choices builders must make regarding the use of gas in custom homes.

9. Due to these effects, the County Appliance Ban is negatively affecting our company's financial operations and influencing its business decisions.

2

10. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: 1/27/25

Douglas Tyler Wood
Production Manager
Castlewood Consulting, LLC

3

# Exhibit 6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, MARYLAND BUILDING INDUSTRY ASSOCIATION, NATIONAL PROPANE GAS ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, <br><br> *Plaintiffs*, <br><br> v. <br><br> MONTGOMERY COUNTY, MARYLAND, <br><br> *Defendant*. | **Case No. 8:24-CV-03024-PX** |

**<u>AMENDED DECLARATION OF PERRY MCGUIRE</u>**

1. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am Vice President and General Counsel of Rinnai America Corporation. Rinnai America Corporation manufactures gas appliances, including energy-efficient tankless water heaters, home heating appliances, kitchen appliances, and gas clothes dryers. We sell these gas appliances throughout the United States, including in Montgomery County, Maryland.

3. Rinnai America Corporation is a member of the National Association of Home Builders of the United States.

4. Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban") sets into motion the process for prohibiting the use of gas appliances

1

in the construction of new buildings in Montgomery County and instructs regulations to this end be issued by December 31, 2026 for approval by the County Council.

5. Rinnai America Corporation will face significant sales losses if new buildings and homes in Montgomery County can no longer use the gas appliances we manufacture and sell due to the County Appliance Ban.

6. Rinnai America Corporation also will face significant sales losses if potential customers in Montgomery County choose to avoid gas appliances—including those we manufacture and sell—due to the County Appliance Ban.

7. Due to these effects, the County Appliance Ban is negatively affecting Rinnai America Corporation's financial operations and influencing its business decisions.

3

8. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: _____01/28/2025_____

_____

Perry McGuire
Vice President and General Counsel
Rinnai America Corporation

3

# Exhibit 7

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC., MARYLAND BUILDING INDUSTRY ASSOCIATION, NATIONAL PROPANE GAS ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, <br><br> *Plaintiffs*, <br><br> v. <br><br> MONTGOMERY COUNTY, MARYLAND. <br><br> *Defendant*. | **Case No. 8:24-CV-03024-PX** |

**AMENDED DECLARATION OF ANGELO AMADOR**

1. My name is Angelo Amador. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am the Executive Director of the Restaurant Law Center ("RLC"), a business association supporting the restaurant and food-service industry across the United States. While the RLC is an independent organization with its own Board of Directors, all members in good standing with its affiliate, the National Restaurant Association, are members of the RLC. As such, RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 15.5 million employees, or approximately 10% of the workforce of the United States. Our members are predominantly small businesses. Even restaurants with well-established brand names are often franchisees who own only one or several locations.

1

3.  The RLC's main purpose is to support the growth and development of the restaurant industry, which is the second largest private sector employer. RLC does so through numerous channels, including by conducting direct outreach efforts for our members, by hosting educational and informational meetings, seminars, and webinars, by submitting regulatory comments at the federal, state, and local level advocating for restaurant-friendly policies, and by helping our members navigate their legal and regulatory obligations.

4.  The RLC is the only independent public policy organization created specifically to represent the interests of the American foodservice industry in the judicial system and before quasi-judicial bodies like the National Labor Relations Board. The RLC regularly provides courts and agencies with the industry's perspective on legal issues that significantly impact its members and the health of the foodservice industry.

5.  As Executive Director of the RLC, I am responsible for managing and leading the RLC's efforts to advocate for restaurant-friendly policies and regulations at the federal level and in numerous state and local jurisdictions. I have been the Executive Director since the RLC was launched in 2016.

6.  I am providing this declaration to discuss the negative impacts upon RLC members of Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban"), which sets into motion the process for prohibiting the use of gas appliances in the construction of new buildings in Montgomery County and instructs regulations to this end be issued by December 31, 2026, at latest, for approval by the County Council.

7.  I have held multiple calls with RLC members to address their concerns arising from the County Appliance Ban. RLC members have told me that having access to affordable energy, including gas services, is important to them. Many RLC members run on thin margins, making

2

any increase in business operations significant and potentially devastating. The County Appliance Ban will limit the pool of gas customers, forcing existing gas customers who are RLC members to pay higher rates for gas service than they otherwise would pay.

8.   Notably, many RLC members in Montgomery County are already struggling due to a variety unfavorable economic conditions. Montgomery County restaurant owners still have not fully recovered from the pandemic,[1] and many have already gone out of business. The County Appliance Ban will further exacerbate these unfavorable economic conditions.

9.   Due to these effects, the County Appliance Ban is negatively affecting RLC's members' financial operations and influencing their business decisions.

10. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: <u>January 29, 2025</u>

Angelo I. Amador, Esq.
Executive Director
Restaurant Law Center

---

[1] National Restaurant Association, *Restaurant employment resumed its upward trajectory*, (Apr. 5, 2024), https://restaurant.org/research-and-media/research/economists-notebook/analysis-commentary/restaurant-employment-resumed-its-upward-trajectory/ (showing that February 2024 restaurant employment compared to February 2020 was -4% or lower in Maryland).

# Exhibit 8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC., MARYLAND BUILDING INDUSTRY ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, <br><br> *Plaintiffs*, <br><br> v. <br><br> MONTGOMERY COUNTY, MARYLAND, <br><br> *Defendant*. | **Case No.**  24-3024 |

**DECLARATION OF JIM VAGONIS**

1.   My name is Jim Vagonis. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.   I am President of Hassle Free Homes Services, Inc, a home management and maintenance company. We are located in Montgomery County and do business within this county.

3.   Hassle Free Homes Services, Inc. is a member of the National Federation of Independent Business (NFIB).

4.   Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban") prohibits the use of gas appliances in the construction of new

1

buildings in Montgomery County and instructs regulations to this end be issued by December 31, 2026.

5. Our company is a long-time gas customer in Montgomery County. Having access to affordable energy, including gas services, is important to us, as we have several warehouse spaces here in the county and use natural gas to keep them warm during the winter months. Natural gas is the best and most affordable approach to do this. The County Appliance Ban would increase energy-related costs for these warehouses, because the County Appliance Ban will limit the pool of gas customers, forcing existing gas customers like us to pay higher rates for gas service than we otherwise would pay.

6. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: __10/11/2024__

Jim Vagonis
President
Hassle Free Homes Services, Inc.

2

# Exhibit 9

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

NATIONAL ASSOCIATION OF HOME
BUILDERS OF THE UNITED STATES,
RESTAURANT LAW CENTER,
NATIONAL FEDERATION OF
INDEPENDENT BUSINESS, INC.,
MARYLAND BUILDING INDUSTRY
ASSOCIATION, NATIONAL PROPANE
GAS ASSOCIATION, WASHINGTON GAS
LIGHT COMPANY, PHILADELPHIA-
BALTIMORE-WASHINGTON
LABORERS' DISTRICT COUNCIL, and
TEAMSTERS LOCAL 96,

                *Plaintiffs*,

v.

MONTGOMERY COUNTY, MARYLAND.

                *Defendant*.

Case No. 8:24-CV-03024-PX

## DECLARATION OF TODD HOLTZMAN

1.     My name is Todd Holtzman. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.     I am General Manager of Holtzman Propane, which serves tens of thousands of residential, commercial, and agricultural customers with propane products and employing over 300 people. We do business within Montgomery County and have customers there.

3.     Holtzman Propane is a member of the National Propane Gas Association.

4.     Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban") sets into motion the process for prohibiting the use of gas appliances in the construction of new buildings in Montgomery County and instructs

1

regulations to this end be issued by December 31, 2026, at latest, for approval by the County Council.

5.     Holtzman Propane will face significant sales losses if new buildings and homes in Montgomery County can no longer use the propane products we sell due to the County Appliance Ban.

6.     Holtzman Propane also will face significant sales losses if potential customers in Montgomery County choose to avoid the propane products we sell due to the County Appliance Ban.

7.     Due to these effects, the County Appliance Ban is negatively affecting our company's financial operations and influencing its business decisions.

8.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: _____1 - 27 - 25_____

_____
Todd Holtzman
General Manager
Holtzman Propane

2

# Exhibit 10

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NATIONAL ASSOCIATION OF HOME
BUILDERS OF THE UNITED STATES,
RESTAURANT LAW CENTER,
NATIONAL FEDERATION OF
INDEPENDENT BUSINESS, INC.,
MARYLAND BUILDING INDUSTRY
ASSOCIATION, NATIONAL PROPANE
GAS ASSOCIATION, WASHINGTON GAS
LIGHT COMPANY, PHILADELPHIA-
BALTIMORE-WASHINGTON
LABORERS' DISTRICT COUNCIL, and
TEAMSTERS LOCAL 96,

                     *Plaintiffs*,

    v.

MONTGOMERY COUNTY, MARYLAND.

                     *Defendant*.

**Case No. 8:24-CV-03024-PX**

**AMENDED DECLARATION OF DONALD "BLUE" JENKINS**

1.  My name is Donald "Blue" Jenkins. I am Executive Vice President & President, Utilities, AltaGas and President, Washington Gas Light Company ("WGL").

2.  I have personal knowledge of the facts set out below, and I am competent to testify herein.

3.  WGL is a regulated public utility that provides natural gas service to more than 1.2 million customers in the District of Columbia, Maryland, and Virginia. This includes over 241,000 customers in Montgomery County, Maryland, which make up nearly 47% of WGL's Maryland customer base.

4.  As President, I am responsible for delivering on the company's commitment to customer satisfaction and operational excellence. This includes WGL's customer-facing functions, including the customer contact center, billing, and account management.

1

5. Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban") sets into motion the process for prohibiting the use of gas appliances in the construction of new buildings in Montgomery County and instructs regulations to this end be issued by December 31, 2026 for approval by the County Council.

6. The County Appliance Ban has caused the present loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers and existing customers over time. As a result, WGL's customer base will grow less than it would otherwise, resulting in higher rates for gas customers than they would have otherwise had.

7. Specifically, WGL has had conversations with our business partners who have said they would want gas service from WGL if not for the County Appliance Ban. Damien Hicks, Maryland Project Manager for Davis Utility Consultants, representing EYA, LLC, mentioned during a recent discussion about the ban that EYA, LLC will no longer use natural gas in their developments. "All electric from here on out," said Damien Hicks. In the past, EYA, LLC used natural gas in their projects.

8. Additionally, WGL is aware of at least five Montgomery County construction projects that intend to use gas appliances with buildouts forecasted beyond 2026. Absent the County Appliance Ban, we would anticipate similar growth in the future.

9. The County Appliance Ban limits a portion of WGL's customer growth. Customer growth is a crucial component of the utility business model. Each year, we make significant and necessary investments in our system to ensure safety, reliability, and resiliency. Customer growth helps to ensure that those costs can be spread over a growing customer base and helps to keep costs for all of our customers at an affordable level.

10. By capping a portion of WGL's customer growth, the County Appliance Ban impedes our ability to spread the cost of new investment in maintaining the gas system, and instead concentrates those costs upon fewer and fewer customers than there otherwise would be. That results in increased rates than would otherwise occur for existing customers, who are forced to assume a greater share of the costs to maintain the gas system.

11. I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on January 27, 2025

_____

Blue Jenkins (Jan 27, 2025 09:06 MST)
_____

Donald "Blue" Jenkins
Executive Vice President & President,
Utilities, AltaGas and President, Washington
Gas Light Company

3

# Exhibit 11

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC., MARYLAND BUILDING INDUSTRY ASSOCIATION, NATIONAL PROPANE GAS ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, <br><br> *Plaintiffs,* <br><br> v. <br><br> MONTGOMERY COUNTY, MARYLAND. <br><br> *Defendant.* | **Case No. 8:24-CV-03024-PX** |

## AMENDED DECLARATION OF RYAN BOYER

1.      My name is Ryan Boyer. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.      I am the Business Manager of the Philadelphia-Baltimore-Washington Laborers' District Council. The district council is an affiliate of the Laborers International Union of North America (LIUNA), AFL-CIO, a 120 year-old labor organization with over 500,000 members throughout the United States and Canada. The district council has approximately 13,000 members. Nationally, one-third of construction work performed by LIUNA members is in the energy sector.

3.      Local 11 represents approximately 800 workers who are laborers for utility construction contractors employed by Washington Gas Light Company, such as NPL Construction and Skoda Contracting Company, 400 of whom regularly work in Montgomery County, Maryland.

1

LIUNA members working for these companies install and replace services, install new mains and distribution pipes, and replace mains and distribution pipes throughout Montgomery County, Maryland. Many of our local members also are Washington Gas customers.

4. The members working on gas distributions lines are required to hold an operator qualification under Subpart G in 49 CFR Part 195. This valuable employment credential is applicable only to work on gas lines.

5. Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban") sets into motion the process for prohibiting the use of gas appliances in the construction of new buildings in Montgomery County and instructs regulations to this end be issued by December 31, 2026, at latest, for approval by the County Council.

6. The County Appliance Ban will reduce the work performed by our members, leading to layoffs and the permanent loss of employment. Furthermore, it will cause the gas industry in the local area to shrink, restricting our members' ability to find employment in the industry for which they have non-transferrable training and credentials. Furthermore, loss of their union employment would cause them to lose the ability to continue to earn valuable pension credits in union-sponsored pension plans.

7. The County Appliance Ban will limit the pool of gas customers, forcing existing gas customers like our members to pay higher rates for gas service than they otherwise would pay.

8. By calling into doubt the long-term future of gas-related trades, the County Appliance Ban makes those trades less attractive, which likely is causing would-be gas workers to turn to other trades instead. That will only get worse when the County Appliance Ban takes its

2

final form as an approved regulation. That translates in fewer members and weaker bargaining power for the district council.

9.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on:  /-28-25

Ryan Boyer
Business Manger
Philadelphia-Baltimore-Washington Laborers' District Council

3

# Exhibit 12

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, RESTAURANT LAW CENTER, NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC., MARYLAND BUILDING INDUSTRY ASSOCIATION, INC., NATIONAL PROPANE GAS ASSOCIATION, WASHINGTON GAS LIGHT COMPANY, PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL, and TEAMSTERS LOCAL 96, <br><br> *Plaintiffs*, <br><br> v. <br><br> MONTGOMERY COUNTY, MARYLAND. <br><br> *Defendant*. | **Case No. 8:24-CV-03024-PX** |

**AMENDED DECLARATION OF WILDER REED**

1. My name is Wilder Reed. I am over 18 years of age. The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2. I am President and Principal Executive Officer of Teamsters Local 96 ("Local 96"). In addition to being the Union President, I am employed in a full-time position by Washington Gas Light Company ("WGL") as a Service Technician.

3. Local 96 is a labor union with approximately 600 members, all of whom are employed in various positions at WGL. As employees of WGL, Local 96 members service the over 240,000 WGL customers in Montgomery County, Maryland.

1

Docusign Envelope ID: 43A977D9-62C4-47F7-9DCF-538A4A805F1D

4. Among other things, Local 96 members conduct surveys of the existing gas infrastructure, replace and repair gas pipes, install gas lines, and read and install gas meters in customer's homes and businesses.

5. Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban") sets into motion the process for prohibiting the use of gas appliances in the construction of new buildings in Montgomery County and instructs regulations to this end be issued by December 31, 2026, at latest, for approval by the County Council.

6. The County Appliance Ban will result in a decline of work performed by Local 96 members and will deprive Local 96 members of work. The County Appliance Ban will therefore harm Local 96's members. Additionally, the County Appliance Ban will require Local 96 to divert resources from its usual activities to providing its members with training to pursue new opportunities within their trade.

7. By calling into doubt the long-term future of gas-related trades, the County Appliance Ban makes those trades less attractive, which likely is causing would-be gas workers to turn to other trades instead. That will only get worse when the County Appliance Ban takes its final form as an approved regulation. That translates in fewer members and weaker bargaining power for the Local 96.

8. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

2

Executed on:  1/28/2025
            _____

DocuSigned by:

*Wilder Reed*
A02C5ED48A7A4D0...
_____

Wilder Reed
President
Teamsters Local 96

3