IN THE

# United States Court of Appeals for the Fourth Circuit

NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, *et al.*,

*Appellants*,

*v.*

MONTGOMERY COUNTY, MARYLAND,

*Respondent*.

On Appeal from the U.S. District Court for the
District of Maryland, No. 8:24-cv-03024-PX

## OPENING BRIEF OF APPELLANTS

Scott Novak
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 304-5099
scott.novak@bakerbotts.com

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Daniel B. Rankin
BAKER BOTTS L.L.P.
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for National Association of Home Builders of the United States,
Restaurant Law Center, National Federation of Independent Business, Inc.,
Maryland Building Industry Association, Washington Gas Light Company, and
National Propane Gas Association*

*Additional counsel and parties listed on next page*

Abigail V. Carter
BREDHOFF & KAISER, P.L.L.C.
805 15th St. NW, Ste. 1000
Washington, D.C. 20005
(202) 842-2600
acarter@bredhoff.com

*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

Lauren McDermott
MOONEY, GREEN, SAIDON, MURPHY & WELCH, P.C.
1920 L St. NW
Washington, D.C. 20036
(202) 783-0010
lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1449__      Caption: __Natl Assn of Home Builders v. Montgomery County, Maryland__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__National Association of Home Builders of the United States__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.     Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☑YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

    Kettler Forlines, Inc.; Castlewood Consulting, LLC; Rinnai America Corporation

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                Date:        April 23, 2026

Counsel for: National Association of Home Builder

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1449__        Caption: __Natl Assn of Home Builders v. Montgomery County, Maryland__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Maryland Building Industry Association__
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                     ☐YES ☑NO
      If yes, identify all such owners:



12/01/2019 SCC                          - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☑YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

    Kettler Forlines, Inc.; Castlewood Consulting, LLC

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                    Date: _____ April 23, 2026 _____

Counsel for: Maryland Building Industry Associatio

- 2 -

**Print to PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1449__          Caption: __Natl Assn of Home Builders v. Montgomery County, Maryland__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Restaurant Law Center__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☑YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:
    There is no such member.

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                    Date:      April 23, 2026

Counsel for: Restaurant Law Center

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1449__     Caption: __Natl Assn of Home Builders v. Montgomery County, Maryland__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Washington Gas Light Company__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.  Does party/amicus have any parent corporations?   ☑YES ☐NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    AltaGas Ltd. is the parent of AltaGas Services (U.S.) Inc., which is the parent of AltaGas Utility Holdings (U.S.) Inc., which is the parent of Wrangler 1 LLC, which is the parent of WGL Holdings, Inc., which is the parent of Wrangler SPE LLC, which is the parent of Washington Gas Light Company.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☑YES ☐NO
    If yes, identify all such owners:
    AltaGas Ltd. is the ultimate parent of Washington Gas Light Company and thus indirectly owns 10% or more of Washington Gas Light Company's stock.

12/01/2019 SCC                                    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                    Date: _____ April 23, 2026 _____

Counsel for: Washington Gas Light Company

- 2 -

**Print to PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1449__        Caption: __Natl Assn of Home Builders v. Montgomery County, Maryland__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__National Federation of Independent Business, Inc.__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                    - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☑YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

Hassle Free Homes Service, Inc.

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                    Date:        April 23, 2026

Counsel for: National Federation of Independent B

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1449__      Caption: __Natl Assn of Home Builders v. Montgomery County, Maryland__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__National Propane Gas Association__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                           ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
    other publicly held entity?                                              ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                          - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☑YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

Holtzman Propane

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                    Date:        April 23, 2026

Counsel for: National Propane Gas Association

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1449__        Caption: __Natl Assn of Home Builders v. Montgomery County, Maryland__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Philadelphia-Baltimore-Washington Laborers' District Council__
(name of party/amicus)

__a/k/a Metropolitan Area of Philadelphia/Baltimore/Washington Laborers' District Council ("MAPBWLDC")__

who is _____appellant_____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                          - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Abigail V. Carter                          Date:         04/23/2026

Counsel for: MAPBWLDC

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1449__      Caption: __Natl Assn of Home Builders v. Montgomery County, Maryland__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Teamsters Local 96__
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                         - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Lauren P. McDermott          Date: 4/27/2026

Counsel for: Teamsters Local 96

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Table of Contents ............................................................................................ iii

Table of Authorities....................................................................................... vi

Jurisdictional Statement ..................................................................................1

Issue Presented.................................................................................................2

Introduction ......................................................................................................3

Statement of the Case......................................................................................4

I.     Legal Background................................................................................4

       A.     The Energy Policy and Conservation Act ..............................4

       B.     The Ninth Circuit has held that EPCA preempts local gas bans...........6

II.    Factual Background .............................................................................8

       A.     The Montgomery County Gas Ban .......................................8

       B.     Plaintiffs challenge the County Gas Ban as preempted under EPCA..........................................................................10

       C.     The district court grants summary judgment in favor of the County.......................................................................11

Summary of Argument...................................................................................13

Standard of Review ........................................................................................15

Argument.........................................................................................................16

I.     EPCA preempts the County Gas Ban. ............................................16

       A.     EPCA's plain text establishes that it preempts the County Gas Ban.........................................................................16

1. The County Gas Ban "concern[s]" the "energy use" of gas appliances because it sets their maximum energy use at zero. ...................16

2. EPCA's preemption provision's use of the broadening term "concerning" confirms that it reaches outright prohibitions like the County Gas Ban. .......................................19

B. EPCA's structure, purpose, and history further confirm that it preempts the County Gas Ban. .....................................22

1. The building code exception establishes that EPCA preempts regulations like the County Gas Ban. ...................23

2. Numerous other EPCA provisions demonstrate that the County Gas Ban would imperil the statute's core goals. ..........27

3. EPCA's purpose and history further confirm that it preempts the County Gas Ban. ...................................29

C. The district court reached the opposite conclusion only by adopting an unreasonably narrow view of EPCA's preemption provision. ...............................................32

1. EPCA's preemptive reach extends beyond literal energy conservation standards. .........................................33

2. The County Gas Ban operates as the most stringent kind of energy conservation standard. ...............................35

3. The County Gas Ban remains preempted regardless of how one reads "energy use" and "point of use." .......................37

D. No exception or waiver applies to save the County Gas Ban from preemption. ...............................................42

II. The district court correctly held that Plaintiffs have standing and assert a ripe preemption claim. .....................................43

A. Plaintiffs have standing. .............................................43

B. Plaintiffs' preemption claim is ripe. .................................48

III.    Plaintiffs are entitled to declaratory and injunctive relief. ............................52

Conclusion ......................................................................................................55

Request for Oral Argument ................................................................................56

Certificate of Compliance ..................................................................................59

Certificate of Service ........................................................................................60

Cᴀsᴇs

*Air Evac EMS, Inc. v. Cheatham*,
   910 F.3d 751 (4th Cir. 2018) ....................................................................16

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015)..................................................................................53

*Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*,
   23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) ............................12

*Beck v. McDonald*,
   848 F.3d 262 (4th Cir. 2017) ....................................................................47

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
   683 F.3d 1144 (9th Cir. 2012) ..................................................................26

*Bonnie v. Dunbar*,
   157 F.4th 610 (4th Cir. 2025) ...................................................................15

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) ....................................................................43

*California Restaurant Association v. City of Berkeley*,
   89 F.4th 1094 (9th Cir. 2024) ................. 3, 6, 7, 8, 12, 22, 23, 31, 33, 41, 47, 50

*Centennial Life Ins. Co. v. Poston*,
   88 F.3d 255 (4th Cir. 1996) ......................................................................53

*Champion v. Ames*,
   188 U.S. 321 (1903)..................................................................................19

*Charter Fed. Sav. Bank v. Office of Thrift Supervision*,
   976 F.2d 203 (4th Cir. 1992) ....................................................................51

*Chevron USA Inc. v. Plaquemines Parish, La.*,
   146 S. Ct. 1052 (2026)..............................................................................20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ....................................................................47

*Cooksey v. Futrell*,
  721 F.3d 226 (4th Cir. 2013) ....................................................48, 50

*Davis v. Mich. Dep't of Treasury*,
  489 U.S. 803 (1989) ...................................................................37

*Dep't of Comm. v. New York*,
  588 U.S. 752 (2019) ...................................................................46

*Diamond Alternative Energy, LLC v. EPA*,
  606 U.S. 100 (2025) ...................................................................46

*Doe v. Duling*,
  782 F.2d 1202 (4th Cir. 1986) ....................................................48

*eBay Inc. v. MercExchange*,
  L.L.C., 547 U.S. 388 (2006) .......................................................53

*Env't Def. v. Duke Energy Corp.*,
  549 U.S. 561 (2007) ...................................................................39

*FDA v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) ...................................................................43

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ...................................................................30

*Friends for Ferrell Parkway, LLC v. Stasko*,
  282 F.3d 315 (4th Cir. 2002) ......................................................44

*Gray-Hopkins v. Prince George's County, Md.*,
  309 F.3d 224 (4th Cir. 2002) ......................................................54

*Great Lakes Gas Transmission Ltd. v. FERC*,
  984 F.2d 426 (D.C. Cir. 1993) ....................................................47

*Honeywell Int'l Inc. v. OPTO Elec. Co.*,
  135 F.4th 170 (4th Cir. 2025) .....................................................52

*Ingersoll-Rand Co. v. McClendon*,
498 U.S. 133 (1990) ........................................................................................20

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) ..................................................................................19, 20

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ............................................................................55

*Lowy v. Daniel Def., LLC*,
167 F.4th 175 (4th Cir. 2026) ........................................................................46

*Maryland Shall Issue, Inc. v. Hogan*,
971 F.3d 199 (4th Cir. 2020) .........................................................................44

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
312 U.S. 270 (1941) ........................................................................................53

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ..................................................................................48, 53

*Miller v. Brown*,
462 F.3d 312 (4th Cir. 2006) ...............................................................48, 49, 50

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) ..........................................................................55

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)....................................................................................20, 21

*Mountain Valley Pipeline, LLC v. W. Pocahontas Props. L.P.*,
918 F.3d 353 (4th Cir. 2019) .........................................................................54

*Mulhern Gas Co. v. Mosley*,
798 F. Supp. 3d 304 (N.D.N.Y. 2025)....................................................12, 47, 48

*Nat. Res. Def. Council v. EPA*,
735 F.3d 873 (9th Cir. 2013) .........................................................................48

*Nat'l Ass'n of Home Builders of the United States v. D.C.*,
No. 24-CV-02942, 2026 WL 837674 (D.D.C. Mar. 26, 2026) ..........................12

*Nken v. Holder*,
  556 U.S. 418 (2009)....................................................................................55

*North Dakota v. Heydinger*,
  825 F.3d 912 (8th Cir. 2016) ...................................................................52

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
  461 U.S. 190 (1983)...............................................................................51, 52

*Penn-America Ins. Co. v. Coffey*,
  368 F.3d 409 (4th Cir. 2004) ...................................................................53

*Pharm. Coal. for Patient Access v. United States*,
  126 F.4th 947 (4th Cir. 2025) ..................................................................40

*Philip Morris USA Inc. v. Scott*,
  561 U.S. 1301 (2010)................................................................................54

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
  579 U.S. 115 (2016)............................................................................15, 16

*Pulsifer v. United States*,
  601 U.S. 124 (2024)...........................................................................23, 26

*Rescue Army v. Mun. Court of L.A.*,
  331 U.S. 549 (1947)..................................................................................48

*Retail Indus. Leaders Ass'n v. Fielder*,
  475 F.3d 180 (4th Cir. 2007) ...................................................................49

*Roe v. Dep't of Def.*,
  947 F.3d 207 (4th Cir. 2020) ...................................................................55

*Rowe v. N.H. Motor Transp. Ass'n*,
  552 U.S. 364 (2008)............................................................................20, 21

*San Diego Gas & Electric Co. v. FERC*,
  913 F.3d 127 (D.C. Cir. 2019)..................................................................45

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983)....................................................................................21

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ...................................................................47, 48

*Thomas v. Union Carbide Agr. Prods. Co.*,
473 U.S. 568 (1985) ........................................................................49

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ........................................................................54

*United States v. Miller*,
604 U.S. 518 (2026) ........................................................................37

*United States v. Montejo*,
442 F.3d 213 (4th Cir. 2006) ..........................................................30

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ........................................................................39

*Whitaker v. Monroe Staffing Servs., LLC*,
42 F.4th 200 (4th Cir. 2022) ...........................................................51

*Wild Virginia v. Council on Env't Quality*,
56 F.4th 281 (4th Cir. 2022) ...........................................................48

**CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS**

U.S. Const. art. III ...............................................................46, 47, 48

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1331 .......................................................................................1

28 U.S.C. § 2201 .....................................................................................52

42 U.S.C. § 6291 ...............................................................17, 35, 36, 40

42 U.S.C. § 6292 .............................................................................17, 39

42 U.S.C. § 6293 .................................................................17, 25, 38, 41

42 U.S.C. § 6295 .............................. 5, 6, 16, 24, 25, 27, 29, 31, 39

42 U.S.C. § 6297 ............ 3, 5, 6, 7, 13, 17, 18, 19, 23, 25, 26, 27, 28, 29, 31, 34, 42

42 U.S.C. § 6311 ........................................................................17, 35, 38, 40

42 U.S.C. § 6314 ............................................................................17, 38, 41

42 U.S.C. § 6316 ........................................ 3, 5, 6, 13, 17, 18, 19, 23, 42

Montgomery County Code § 2A-15 ...........................................................9

Montgomery County Code § 8-14D ................................. 3, 8, 9, 10, 13, 18, 36, 49

Pub. L. No. 94-163, 89 Stat. 871 (1975)............................................4, 30, 34

Pub. L. No. 95-619, 92 Stat. 3206 (1978)...............................................30, 34

Pub. L. No. 100-12, 101 Stat. 103 (1987)...................................................4

10 C.F.R. § 430.32 .....................................................................6, 18, 35

**LEGISLATIVE MATERIALS**

S. Rep. No. 100-6 (1987) ....................................................4, 5, 28, 30, 31, 32

H.R. Rep. No. 100-11 (1987)..................................................................4, 30

**OTHER AUTHORITIES**

Black's Law Dictionary (5th ed. 1979) ...................................................20

DOE, *Standards and Test Procedures*,
https://www.energy.gov/eere/buildings/standards-and-test-procedures ..............6

Cambridge English Dictionary Online (2025).........................................41

Oxford English Dictionary Online (2022) ..............................................41

## JURISDICTIONAL STATEMENT

Montgomery County, Maryland, passed a law requiring the County Executive to issue regulations banning gas appliances in various commercial and residential buildings by December 31, 2026. JA83-84, JA337-342. Plaintiffs sued the County in Maryland federal court on October 17, 2024, asserting that the County's law was preempted by the Energy Policy and Conservation Act, 42 U.S.C. § 6201, *et seq.*, and seeking declaratory and injunctive relief. JA12-36. Because Plaintiffs' preemption claim arose under federal law, the district court had subject-matter jurisdiction over the suit pursuant to 28 U.S.C. § 1331.

After the parties cross-moved for summary judgment, the district court granted the County's motion and denied Plaintiffs' motion. JA422. The district court's memorandum opinion and final order were entered on March 25, 2026. JA434-435. The order disposed of all the parties' claims. JA434-435. Plaintiffs timely filed a notice of appeal on April 14, 2026. JA436. This Court accordingly has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether the federal Energy Policy and Conservation Act, which preempts any local regulation "concerning energy efficiency [or] energy use" of gas appliances, preempts the County's ban on the installation of gas appliances and their associated infrastructure in certain new buildings.

## INTRODUCTION

This is a straightforward case. The Energy Policy and Conservation Act ("EPCA") expressly preempts state and local laws "concerning the . . . energy use" of gas appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). Montgomery County Bill 13-22 (the "County Gas Ban")[1] orders the County Executive to promulgate regulations that ban the use of gas appliances in a wide variety of commercial and residential buildings. By prohibiting gas appliances from using any energy whatsoever—*i.e.*, setting their maximum allowed energy use at zero—the County Gas Ban plainly qualifies as a state or local law "concerning the . . . energy use" of gas appliances. Therefore, EPCA expressly preempts it. EPCA's text, structure, history, and purpose are all in accord on this point and confirm that EPCA preempts laws like the County Gas Ban. The Ninth Circuit followed this clear chain of reasoning to that conclusion when it struck down the City of Berkeley's similar gas ban in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). This Court should do the same, hold that EPCA preempts the County Gas Ban, and reverse the district court's contrary judgment.

---

[1] Codified at Montgomery County Code § 8-14D, which is reproduced at JA343.

**STATEMENT OF THE CASE**

## I. Legal Background

### A. The Energy Policy and Conservation Act

The Energy Policy and Conservation Act ("EPCA") was first passed in 1975 to create a national, comprehensive energy policy. *See* Pub. L. No. 94-163, 89 Stat. 871 (1975). As originally enacted, EPCA mandated that appliance manufacturers label their appliances with energy-efficiency standards, but permitted significant state involvement in appliance regulation. *See id.* § 327(b), 89 Stat. at 927. Since 1975, however, Congress has amended EPCA several times, progressively moving away from this laissez faire approach and toward binding federal appliance standards.

The most important of these amendments was the National Appliance Energy Conservation Act ("NAECA"). Pub. L. No. 100-12, 101 Stat. 103 (1987). NAECA was designed to "reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6 at 1 (1987). Through it, Congress sought to "end an era of confusion and uncertainty" for the appliance industry and to "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11 at 24 (1987); *see also* S. Rep. No. 100-6 at 4 (1987) (similar).

4

NAECA thus contained "two basic provisions": "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6 at 2 (1987). "In general, these national standards would preempt all State standards." *Id.* To that end, EPCA's current preemption provision regarding consumer appliances reads:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, **no State regulation concerning the energy efficiency, energy use,** or water use of **such covered product shall be effective with respect to such product** . . . .

42 U.S.C. § 6297(c) (emphases added).

After NAECA, federal law provided two routes for a state or local jurisdiction to avoid preemption. First, the Department of Energy ("DOE") can grant a waiver of preemption in limited circumstances. *Id.* § 6297(d). Second, there is an exception from preemption for certain performance-based building codes for new construction that meet a strict seven-part test enumerated in 42 U.S.C. § 6297(f)(3).

Congress later expanded the federal appliance program to industrial appliances and added a preemption provision to "**supersede any State or local regulation concerning the energy efficiency or energy use of a product** for which a standard is prescribed or established pursuant to [EPCA]." 42 U.S.C. § 6316(b)(2)(A) (emphasis added). Congress also provided an exception that

excepted certain building regulations from that preemption provision. 42 U.S.C. § 6316(b)(2)(B)(i).

Thus, in its present form, EPCA covers both consumer and industrial appliances, sets federal standards for the energy use and efficiency of those products, and preempts state regulations concerning those matters. Invoking its authority under EPCA, DOE has set energy conservation standards for all manner of consumer and industrial appliances. DOE, *Standards and Test Procedures*, https://www.energy.gov/eere/buildings/standards-and-test-procedures. To name a few, gas stoves, ovens, heaters, water heaters, and dryers are all subject to federal energy conservation standards DOE has promulgated under EPCA. *Id.*; 42 U.S.C. § 6295; 10 C.F.R. § 430.32.

### B. The Ninth Circuit has held that EPCA preempts local gas bans.

In *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), the Ninth Circuit became the first (and so far only) court of appeals to confront the question of whether EPCA preempts local gas bans. There, the City of Berkeley, California, passed a law "prohibiting the installation of natural gas piping within newly constructed buildings." *Id.* at 1098. Relying on the "text, structure, and context" of EPCA, *id.* at 1101, the Ninth Circuit held that the City's law was preempted as a local law "concerning the energy use" of EPCA-covered gas appliances, *id.* at 1098 (citing 42 U.S.C. § 6297(c)).

6

"Of critical importance" to this determination, the court wrote, was EPCA's exception to preemption for certain building codes, a piece of EPCA's "structure" which "demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the energy . . . use' of such products." *Id.* at 1101. The court then turned to the terms of the EPCA preemption provision itself, 42 U.S.C. § 6297(c), and interpreted them to mean that "EPCA preempts regulations, including building code requirements, that relate to 'the quantity of natural gas directly consumed by' certain consumer appliances at the place where those products are used," *id.* at 1101 (internal brackets and citations omitted).

With that understanding, the court rejected the City's "main contention" that "its Ordinance doesn't regulate 'energy use' because it bans natural gas rather than prescribes an affirmative 'quantity of energy.'" *Id.* at 1102. The City's argument "defies the ordinary meaning of 'quantity,'" the court said, "[a]nd it is well accepted in ordinary usage that 'zero' is a 'quantity.'" *Id.* "Thus, a building code regulation that imposes a total ban on natural gas is not exempt from EPCA just because it lowers the 'quantity of energy' consumed to 'zero.'" *Id.*

Notably, in reaching this conclusion, the Ninth Circuit confirmed that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Id.* at 1107. It followed that, given the

7

breadth of EPCA's preemption provision, the City could not so easily "evade preemption by merely moving one step in the energy chain [by] banning natural gas piping within those buildings." *Id.*

The Ninth Circuit declined to rehear the case en banc. *See Berkeley*, 89 F.4th at 1098.

## II.     Factual Background

### A.     The Montgomery County Gas Ban

With that legal background as context, consider the Montgomery County, Maryland law that is the focus of this appeal. Montgomery County Bill 13-22, entitled "Buildings – Comprehensive Building Decarbonization" (the "County Gas Ban"), effectively bans the use of gas in new buildings in the County. JA337-342. Indeed, the County admitted that aim below, explaining that the County Gas Ban seeks "the reduction of carbon dioxide and other greenhouse gas emissions from buildings by replacing the equipment in the building that uses fossil fuels with electric technology." D.Ct.Dkt.42-2 at 5.

The specifics of the law bear this out. The County Gas Ban orders the County Executive to issue, no later than December 31, 2026, regulations establishing "all-electric building standards for all new construction as part of the building code." Montgomery County Code § 8-14D(b). "All-electric building means a public or private building that contains no combustion equipment, or plumbing for

combustion equipment, installed within the building or building site." *Id.* § 8-14D(a). "Combustion equipment means any equipment or appliance used for space heating, service water heating, cooking, clothes drying and/or lighting that uses fuel gas or fuel oil." *Id.* And "[n]ew construction means the construction of any new standalone building, with no remnants of any prior structure or physical connection to existing structures or outbuildings on the property." *Id.* Putting those terms together, the County Gas Ban mandates that the County Executive issue regulations that ban gas in new construction in the County. The regulations will then go into effect once the County Council approves them.[2]

The County Gas Ban has a few limited exceptions. It does not apply, for example, to "emergency backup systems of buildings," *id.* § 8-14D(c)(1), "buildings used to treat sewage or food waste," *id.* § 8-14D(c)(3), crematories, *id.* § 8-14D(c)(8)(B), or hospitals, *id.* § 8-14D(c)(8)(D). Nor does it apply to "building permit applications submitted before December 31, 2027" for a limited subset of buildings (*i.e.*, certain housing developments that are predominantly moderately priced dwellings, schools, and residential buildings with four or more stories). Montgomery County Bill No. 13-22, § 3, JA337-342. The County Gas Ban also

---

[2] According to the terms of the County Gas Ban, the "County Executive must issue Method (1) regulations," Montgomery County Code § 8-14D(b), which are regulations that are approved by the County Council after public comment, *see id.* § 2A-15(f).

allows for potential exemptions for carbon-neutral buildings and where its application may result in "practical difficulty or undue hardship." Montgomery County Code § 8-14D(b)(1)-(2).

**B.**     **Plaintiffs challenge the County Gas Ban as preempted under EPCA.**

In October 2024, Plaintiffs—a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems for their livelihoods—filed suit seeking a declaration that the County Gas Ban is preempted by EPCA and an injunction against its enforcement. JA12, JA35. Plaintiffs and their members span a broad array of industries and labor, including construction, food service, and delivery related to gas and gas infrastructure. JA75-82. In support of their requests for declaratory and injunctive relief, Plaintiffs submitted multiple sworn declarations from their members, all attesting to the extensive harm that the County Gas Ban causes to their trades, industries, and jobs. JA129-162. That harm included delayed construction timelines, disrupted business plans, higher gas prices, and loss of customers and revenue. JA75-82.

After Plaintiffs filed an amended complaint, the County moved to dismiss, or in the alternative, for summary judgment, challenging not only Plaintiffs' interpretation of EPCA but also standing and ripeness. JA164-165. Plaintiffs responded to the County on each point and cross-moved for summary judgment,

requesting that the district court declare the County Gas Ban preempted by EPCA and enter an injunction prohibiting the County from enforcing it. JA347.

**C.  The district court grants summary judgment in favor of the County.**

The district court first dealt with the County's threshold justiciability arguments. With respect to standing, the district court concluded that Plaintiffs had sufficiently established an injury in fact resulting from the County Gas Ban—the only element of standing that the County challenged. JA164. The district court reached this conclusion by reviewing and crediting Plaintiffs' many declarations chronicling their harms, which confirmed that Plaintiffs' "injuries stemming from Bill 13-22 are neither remote nor speculative." JA426. With respect to ripeness, the district court held that the EPCA preemption issue was ripe for resolution, explaining that Plaintiffs' claim presented a "narrowly circumscribed and a well-defined question of law" that needed no further factual development to resolve. JA427. The district court further explained that withholding consideration of the claim would result in considerable hardship to Plaintiffs, as many of their detailed harms would continue and worsen in the absence of judicial resolution. JA428.

On the merits, the district court ultimately disagreed with Plaintiffs' interpretation of EPCA. Although the County Gas Ban prohibits EPCA-covered gas appliances from using any energy whatsoever, the district court nevertheless concluded that it did not "concern[]" gas appliances' "energy use" and so was not

11

preempted by EPCA. JA432. The district court acknowledged that the County Gas Ban "prohibits a category of appliances," but it found it dispositive that the prohibition operates "regardless of whether they meet the efficiency or labeling standards under the EPCA." JA431. Such outright prohibitions on the use of gas appliances were permissible in the district court's view because they do not "touch[] on" "efficiency standards, consumer labeling, or testing procedures relevant to covered appliances." JA431. The district court also focused on the precise meaning of the terms "energy use" and "point of use" as providing further support for its conclusion. JA432.

Notably, the district court expressly disagreed with the Ninth Circuit's preemption analysis in *Berkeley* and sided instead with the opinion dissenting from the denial of rehearing en banc in that case and the opinions of a few other district courts that have upheld similar building regulations against EPCA preemption challenges. *See* JA432-433 (citing *Berkeley*, 89 F.4th at 1120-23 (Friedland, J., dissenting from denial of rehearing en banc); *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025) (upholding similar New York state building regulation); *Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) (upholding similar New York City building regulation)); *see also Nat'l Ass'n of Home Builders*

*of the United States v. D.C.*, No. 24-CV-02942, 2026 WL 837674 (D.D.C. Mar. 26, 2026) (rejecting an EPCA challenge to a similar D.C. building regulation).

Accordingly, the district court granted the County summary judgment and denied Plaintiffs' cross-motion. JA435. This appeal followed. JA436.

## SUMMARY OF ARGUMENT

EPCA's preemption provision sweeps broadly, displacing any state or local regulation "concerning the . . . energy use" of a covered appliance. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). The County Gas Ban falls squarely within the scope of that preemption clause. By mandating "all-electric building standards" that prohibit "combustion equipment" and "plumbing for combustion equipment," Montgomery County Code § 8-14D(a)-(b), the County Gas Ban sets the maximum "energy use" of EPCA-covered gas appliances at zero, thus yielding the harshest possible kind of regulation "concerning" the "energy use" of those products.

EPCA's use of the broadening term "concerning"—the equivalent of "relating to" or "respecting"—warrants special emphasis. The Supreme Court has repeatedly held that such language significantly expands a federal statute's preemptive scope. Thus broadened, EPCA's expansive preemption provision easily reaches laws like the County Gas Ban that so strictly regulate the "energy use" of EPCA-covered products.

EPCA's structure, purpose, and history reinforce what its plain text provides.

13

EPCA's building code exception demonstrates that the statute's preemptive scope extends to building-level regulations, including to rather benign performance-based building codes that ban no appliances and instead set an overall energy consumption target for an entire building. If EPCA would preempt even those relatively gentle building regulations in the absence of the exception, then surely it preempts the far harsher County Gas Ban. Other provisions in EPCA evidence Congress's intent to ensure regulatory uniformity and protect product availability—goals that the County Gas Ban directly undermines. And EPCA's statutory history further shows Congress progressively clamping down on state regulatory departures to prevent the patchwork regulatory framework that the County Gas Ban would usher in.

Despite all the statutory indicia pointing toward preemption, the district court nevertheless held that EPCA did not preempt the County Gas Ban. But it did so only by adopting an unreasonably narrow view of EPCA's preemptive scope—one in which only literal energy conservation standards would be preempted. Congress, however, deliberately provided for the preemption not of only "energy conservation standards," but rather of all state and local regulations "concerning the . . . energy use" of covered appliances. Moreover, the district court's conclusion was wrong on its own terms. Even under its cramped view of EPCA, the County Gas Ban would still qualify for preemption because it is the most stringent kind of energy conservation standard—one that sets the maximum quantity of "energy use" at zero.

Additionally, although the district court focused intently on the definitions of the terms "energy use" and "point of use," its tunnel vision on those terms (to the exclusion of the rest of the text) proved futile because the County Gas Ban would be preempted under any conceivable definition of them.

To the extent the County continues to maintain, as it did below, that Plaintiffs lack standing or assert unripe claims, it is wrong on both counts. Plaintiffs are enduring ongoing, concrete harm from the County Gas Ban—including disrupted business decisions, delayed construction timelines, and lost customers and revenue—injuries the district court found sufficiently concrete and particularized to confer standing. The preemption question also is fit for judicial resolution now because (1) it is a purely legal question that will not be clarified by further factual development, and (2) withholding review would impose real hardship on Plaintiffs.

Accordingly, this Court should reverse the district court's judgment, hold that EPCA preempts the County Gas Ban, and grant Plaintiffs their requested declaratory and injunctive relief.

**STANDARD OF REVIEW**

This appeal turns on the meaning of EPCA. Questions of statutory interpretation are reviewed *de novo*. *Bonnie v. Dunbar*, 157 F.4th 610, 614 (4th Cir. 2025). And when, as here, the federal statute contains an express preemption provision, no presumption against preemption applies. *See Puerto Rico v. Franklin*

*Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) ("[B]ecause the statute 'contains an express pre-emption clause,' we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause[.]" (internal quotation marks omitted)). Instead, "the best course is simply to follow . . . the wording of the express preemption provision, without applying a presumption one way or the other." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018).

## ARGUMENT

### I.     EPCA preempts the County Gas Ban.

All the sources of legislative intent—EPCA's plain text, structure, context, history, and overarching purpose—point toward the same conclusion: that EPCA preempts the County Gas Ban. That results in a straightforward preemption analysis that provides a direct path for reversing the district court's contrary holding below.

### A.     EPCA's plain text establishes that it preempts the County Gas Ban.

EPCA's plain text provides all the Court needs to resolve the preemption question before it. It clearly establishes that the County Gas Ban—which prohibits in certain new buildings all appliances that use any gas energy whatsoever—is preempted as a local regulation "concerning the . . . energy use" of EPCA-covered appliances. 42 U.S.C. § 6297(c).

#### 1.     The County Gas Ban "concern[s]" the "energy use" of gas appliances because it sets their maximum energy use at zero.

EPCA's preemption provision broadly provides:

16

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, **no State regulation concerning the energy efficiency, energy use,** or water use of **such covered product shall be effective with respect to such product** . . . .

42 U.S.C. § 6297(c) (emphases added); *see also* 42 U.S.C. § 6316(b)(2)(A) (similarly preempting for industrial appliances "any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section").

Examining each of the key terms in that provision, "State regulation" includes local laws promulgated by "political subdivisions," such as Montgomery County, Maryland. 42 U.S.C. § 6297(a)(2). "Energy" includes "electricity[] or fossil fuels," such as natural gas. 42 U.S.C. §§ 6291(3), 6311(7). "Energy use" means "the quantity of energy directly consumed by a consumer product at point of use" for consumer products and as "the quantity of energy directly consumed by an article of industrial equipment at the point of use" for industrial products, "determined in accordance with test procedures" specified elsewhere in the statute. *Id.* §§ 6291(4), 6311(4). Those test procedures are designed to measure "energy use . . . during a representative average use cycle." *Id.* §§ 6293(b)(3), 6314(a)(2). Lastly, "covered product[s]" for which an "energy conservation standard [has been] established" include a wide variety of appliances—including gas stoves, ovens, heaters, water heaters, and dryers—that are covered by an EPCA energy conservation standard. 42

U.S.C. § 6291(1)-(2), 6292(a); 10 C.F.R. § 430.32. Putting that all together, EPCA preempts local laws "concerning" the "quantity"—*i.e.*, how much, if any—of "energy"—including "fossil fuels" such as natural gas—that can be "use[d]" by an EPCA-covered product.

The County Gas Ban runs into the teeth of that preemption provision. It has much to say about the "quantity" of "energy" that EPCA's covered gas appliances may "use." Specifically, by mandating "all-electric building standards" that ban both "combustion equipment" (*i.e.*, gas appliances) and "plumbing for combustion equipment" (*i.e.*, gas piping), Montgomery County Code § 8-14D(a)-(b), the County Gas Ban prohibits EPCA-covered gas appliances from using any gas energy whatsoever. Or, stated in terms of an energy conservation standard, the County Gas Ban sets the maximum "energy use" of EPCA-covered gas appliances at zero, as it prohibits any appliance that is designed to use more than zero gas energy. In fact, such appliances are doubly banned, both directly via the prohibition on combustion equipment and indirectly via the prohibition on the gas piping necessary for their use.

Thus, the County Gas Ban straightforwardly qualifies as a regulation "concerning the . . . energy use" of an EPCA-covered product. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). Indeed, it is one of the harshest kinds of such regulations because it does not merely seek to minimize the energy use of gas appliances, but rather

18

prohibits all appliances that use any gas energy whatsoever. *See Champion v. Ames*, 188 U.S. 321, 358 (1903) ("[R]egulation may sometimes . . . assume the form of prohibition . . . ."). That makes this an easy case, as the County Gas Ban falls within the heartland of EPCA's preemption provision.[3]

### 2. EPCA's preemption provision's use of the broadening term "concerning" confirms that it reaches outright prohibitions like the County Gas Ban.

The broadening effect of the term "concerning" further confirms that EPCA's preemptive scope reaches more than far enough to encompass the County Gas Ban. Congress could have employed narrower language—for example, preempting only regulations "of" the energy use of EPCA-covered appliances—but instead chose to preempt all regulations "*concerning* the . . . energy use" of EPCA-covered appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A) (emphasis added). That word choice substantially broadens the scope of EPCA preemption. *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018) (recognizing that Congress broadened a statute by specifying "statement respecting" rather than "statement of").

"'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Id.* Those terms mean "to stand in some relation; to have bearing

---

[3] Similarly, while the County Gas Ban most directly concerns the "energy use" of gas appliances, it also concerns their "energy efficiency," in that it plainly bans gas appliances with federally approved energy efficiency standards that inherently contemplate the combustion of gas.

or concern; to pertain; refer; to bring into association with or connection with."
*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)). "One thing can relate to another even if the connection is 'indirect' [or] . . . it was 'not specifically designed to affect' it." *Chevron USA Inc. v. Plaquemines Parish, Louisiana*, 146 S. Ct. 1052, 1060 (2026) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)). Such language "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," and courts therefore read it "expansively." *Appling*, 584 U.S. at 717. It "express[es] a broad pre-emptive purpose" and yields a "deliberately expansive" preemption provision with "expansive sweep" that is "conspicuous for its breadth." *Morales*, 504 U.S. at 383-84.

The Supreme Court has illustrated the broad reach of these kinds of preemption provisions. In *Rowe v. New Hampshire Motor Transportation Association*, for example, the Supreme Court held that a federal motor-carrier law with a "related to" provision preempted not only state laws that directly regulated motor carriers, but also those state laws with a "less direct" or "indirect" effect on motor carriers. 552 U.S. 364, 370, 372 (2008). Thus, in *Rowe*, it did not matter that the state law at issue there directly regulated only "shippers" and "retailers" rather than "carriers." *Id.* The key was that the state law "produce[d] the very effect that

20

the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." *Id.* Additionally, the Court explained, "to interpret the federal law to permit these, and similar, state [laws]" would produce the very "state regulatory patchwork" that Congress sought to foreclose. *Id.* at 373.

*Rowe*'s holding followed from the Court's prior decision in *Morales*, a case in which various states attempted to enforce consumer-protection laws against certain airline companies for their allegedly misleading advertising on airfares. 504 U.S. at 379. In the states' view, their consumer-protection laws avoided the "related to" preemption provision in the federal Airline Deregulation Act because their laws were of "general applicability" and did not "specifically address[] the airline industry." *Id.* at 386. The Court rejected this argument, observing that the states "ignore[d] the sweep of the 'relating to' language," *id.*, which, as the Court observed earlier, was "wide and inclusive," *id.* at 385. Granted, the Court acknowledged, some state laws may be "too tenuous, remote, or peripheral" to be preempted, but this was not a "borderline" case, so the Court "express[ed] no views about where it would be appropriate to draw the line." *Id.* at 390 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)).

Applying these teachings in the context of EPCA's preemption provision, the Ninth Circuit explained that, at the very least, "by using the term 'concerning,' Congress meant to expand preemption beyond direct or facial regulations of covered appliances." *Berkeley*, 89 F.4th at 1103. For example, "a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas 'concerns' the energy use of those products as much as a direct ban on the products themselves." *Id.* Just so. And a local regulation like the County Gas Ban that does that and then also goes a step further to ban the very presence of any appliances that use more than zero gas energy even more obviously "concern[s]" the "energy use" of EPCA-covered appliances. *See id.* at 1107 ("EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings.").

**B.**   **EPCA's structure, purpose, and history further confirm that it preempts the County Gas Ban.**

The other indicia of congressional intent confirm what the plain text of EPCA's preemption provision already makes clear. EPCA's other provisions, purpose, and history put an exclamation mark on the conclusion that the statute preempts the County Gas Ban.

22

### 1. The building code exception establishes that EPCA preempts regulations like the County Gas Ban.

EPCA's limited building code exception establishes that the statute's preemptive scope extends beyond direct regulation of appliances at the time of manufacture. 42 U.S.C. § 6297(f). That exception lists seven requirements that "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of [a] covered product" must meet to avoid preemption. *Id.* § 6297(f)(3).

To avoid reading this exception as a nullity, the implication must be that in the absence of this exception, EPCA's preemption provision would otherwise extend to at least some building codes. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction thus render[s] an entire subparagraph meaningless, this Court has noted, the canon against surplusage applies with special force." (internal quotation marks omitted)). As the Ninth Circuit put it, "subsection (f) demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the energy . . . use' of such products." *Berkeley*, 89 F.4th at 1101.[4] Accordingly, this

---

[4] EPCA's preemption provision for industrial appliances similarly provides that a "State or local building code for new construction" can avoid preemption if "the standard in the building code does not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i). The implication is

23

exception rules out a narrow conception of EPCA preemption that covers only direct regulation of appliances as manufactured. Instead, EPCA preemption must extend to laws like the County Gas Ban that operate at the building level as well. Any such building regulation that "concern[s]" the "energy use" of an EPCA-covered product—like a prohibition on appliances with an energy use rating above a specified kBtu/year[5] value—falls to EPCA preemption. The County Gas Ban, with its 0 kBtu/year limit on gas appliances, fits that bill.

But that actually undersells the importance of the building code exception. It is not just that EPCA preemption would apply to some building codes but for the exception. Rather, it is that but for the exception, EPCA preemption would apply to some building codes *that meet the seven requirements for the exception*. Consider those seven requirements:

(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

(B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title . . . .

---

similar—that without the exception, EPCA's preemption provision would extend to reach at least some subset of such building codes.

[5] "kBtu" stands for thousand British thermal units.

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title . . . is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard . . . .

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds [the] standard . . . , there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard . . . by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

42 U.S.C. § 6297(f)(3).

A building code that meets all of those requirements would be rather benign. It would set an "energy consumption or conservation objective for a building" and allow the public the freedom to "select[] items whose combined energy efficiencies meet the objective." *Id.* § 6297(f)(3)(A). It would also operate its credit system "on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C); *see also id.* § 6297(f)(3)(F). And perhaps most importantly here, it would not prohibit the use of any product that meets EPCA's energy conservation standards. *See* 42 U.S.C. §§ 6297(f)(3)(A), (B), (D), (E); *see Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1145 (9th Cir. 2012) ("Section 6297(f)(3)(B) is violated when the [building] code requires a builder, as a matter of law, to select a particular product or option."). Yet even some flexible, performance-based building codes that meet each of those requirements would be preempted by EPCA in the absence of the building code exception. Otherwise, the exception would be a nullity that serves no purpose. *See Pulsifer*, 601 U.S. at 143.

That illustrates the kind of regulations Congress intended EPCA's preemptive reach to encompass. Performance-based building codes that set building-wide energy consumption targets and do not prohibit any particular EPCA-compliant product still would "concern" the "energy use" of EPCA-covered products in at least some instances by virtue of their regulation of the building's energy use. Again, that is the necessary implication of the building code exception—that EPCA's

26

preemption provision extends this far on its face and that only the operation of the exception prevents such building codes from being preempted.

Now compare the County Gas Ban to those kinds of flexible building codes. It has no such flexibility. It offers no performance-based credit system that allows the public to choose their path to compliance. And, most importantly, it bans entire classes of EPCA-covered products. If some relatively gentle building codes that meet the seven requirements for the exception would be preempted, then this much harsher form of building regulation must be preempted as well.

### 2. Numerous other EPCA provisions demonstrate that the County Gas Ban would imperil the statute's core goals.

The building code exception is not the only provision that sheds light on EPCA's preemptive scope. Multiple other provisions also evidence EPCA's focus on ensuring regulatory uniformity and the availability of covered products for consumer use.

For example, DOE cannot promulgate a new conservation standard if doing so "is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States." 42 U.S.C. § 6295(o)(4); *see also id.* § 6297(d)(4) (placing a

similar limitation on DOE's ability to waive preemption for state regulations).[6] Nor can DOE waive preemption for a state regulation if doing so would "significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." *Id.* § 6297(d)(3). In conducting that analysis, DOE must consider not only the effect of the state regulation at issue, but also "the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have." *Id.* § 6297(d)(3)(D).

The County Gas Ban imperils what Congress sought to protect. It imposes real and significant financial burdens on local businesses and manufacturers—a consideration expressly spelled out in EPCA's preemption-waiver provision. *See id.* § 6297(d)(1)(C)(ii) (directing DOE to consider the "costs, benefits, burdens, and reliability" resulting from the local regulation). More broadly speaking, if bans like the County's are allowed to proliferate, appliance manufacturers would be forced to radically shift or add production lines—by redesigning and retooling them for electric appliances rather than gas ones, for example—in an attempt to accommodate

---

[6] The Senate Report provided an example of how these provisions would work in practice: "[The statute], upon a sufficient showing, would forbid a standard for small gas furnaces being set at a level that would increase the price to the point that the product would be noncompetitive and that would result in minimal demand for the product." S. Rep. No. 100-6, at 8-9 (1987).

discrete jurisdictions all over the nation. The sale and marketing of gas appliances would, in turn, become increasingly complex and economically burdensome, with no-go zones scattered across the country. *Cf. id.* § 6295(o)(2)(B)(i)(I) (directing DOE to evaluate, among other things, the "economic impact of the standards on the manufacturers" to determine whether the standards are "economically justified"). So would the servicing of gas appliances, as consumers in an area where new gas appliances are banned could find themselves hours away from a business that could repair their gas appliances. *Cf.* 42 U.S.C. § 6297(d)(3) (DOE cannot grant a preemption waiver if, *inter alia*, the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis.").

In short, the County Gas Ban is exactly the sort of local regulation that burdens operation of interstate commerce and prevents the uniform regulation that Congress sought to maintain in the appliance industry. If Congress denied that power even to DOE in exercising its core functions of promulgating standards and granting waivers, then surely it also intended to prevent localities from doing the same.

### 3. EPCA's purpose and history further confirm that it preempts the County Gas Ban.

EPCA's purpose and history provide yet more confirmation that the County Gas Ban is preempted. The several amendments to EPCA over the years, which have progressively clamped down on state regulatory departures and ratcheted up on

federal uniformity, further contextualize EPCA's broad preemptive scope. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (observing that, "over time . . . subsequent acts can shape or focus those meanings" of a statute); *United States v. Montejo*, 442 F.3d 213, 215 (4th Cir. 2006) ("[W]e look to the statutory language and structure and the legislative history and purpose of the statute."). As originally enacted in 1975, EPCA permitted differing state appliance regulations, so long as there was a demonstrated need, the regulations did not interfere with interstate commerce, and the regulations were more stringent than the federal standard. *See* Pub. L. No. 94-163, § 327(b)(2), 89 Stat. 871, 927 (1975). Three years later, Congress added the requirement that states also must obtain a waiver from DOE. *See* Pub. L. No. 95-619, § 424, 92 Stat. 3206, 3263-64 (1978). But in the ensuing years, as states frequently sought waivers from EPCA's preemption provision, Congress came to recognize "the problem of a growing patchwork of differing State regulations" across the country that had "increasingly complicate[d] [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). The parochial state regulatory regimes had, according to federal lawmakers, created "an era of confusion and uncertainty" for appliance manufacturers, who were forced to comply with "numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

Congress fixed this problem of balkanization by amending EPCA to centralize appliance regulation in DOE and strengthen EPCA's preemptive effect, both of which brought needed uniformity to the appliance industry. As a Senate report at the time put it, the overarching purpose of the amendments was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987). Nationalizing these standards and tightening waiver requirements benefited consumers as well. Rather than subjecting them to a "patchwork" of state regulations, Congress expressly sought to avoid any state deviation that would "result in the unavailability in the State of a product type or of products of a particular performance class." *Id.* at 2; *see* 42 U.S.C. §§ 6295(o)(4), 6297(d)(4).

Through these amendments, EPCA became a muscular federal regulatory regime that protects consumer choice from local regulatory deviations. Or, in the Ninth Circuit's words, "by enacting EPCA, Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses." *Berkeley*, 89 F.4th at 1103. Hence EPCA's broadly phrased preemption clause preempting any "State regulation concerning [covered appliances'] energy efficiency [or] energy use," 42 U.S.C.

§§ 6297(c); 6316(b)(2)(A), along with the stringent requirements for a waiver or exception, id. §§ 6297(d), (f); 6316(b)(2)(D).

The purpose and history of EPCA, in short, reinforce Congress's intent to preempt state regulations concerning appliances' energy use and energy efficiency. And they demonstrate, more specifically, that the County Gas Ban is exactly the sort of localized regulation that Congress sought to prevent. If allowed to stand, appliance manufacturers would once again be subjected to a "patchwork" of regulatory regimes across the nation. S. Rep. No. 100-6, at 4 (1987). Likewise, consumers and builders in all these jurisdictions would have the choice of gas appliances stripped from them, rendering those "covered products" effectively "unavailab[le]." *Id.* at 2. It is clear from EPCA's history and purpose that Congress intended to avoid all of this. That manifest intention bolsters the plain-text analysis discussed above and confirms that EPCA preempts the County Gas Ban.

C. **The district court reached the opposite conclusion only by adopting an unreasonably narrow view of EPCA's preemption provision.**

The district court avoided the straightforward conclusion that EPCA preempts the County Gas Ban through a series of interpretive errors that ranged from trying to limit EPCA's preemptive reach to only literal energy conservation standards in direct contravention of the statutory text and history to placing far too much emphasis on the largely irrelevant question of what precise definitions to apply to the terms "energy use" and "point of use." These errors thwarted Congress's clearly

expressed intent and warrant reversal.

### 1. EPCA's preemptive reach extends beyond literal energy conservation standards.

The district court recognized that the County Gas Ban "prohibits a category of appliances." JA431. That would seem to be the start of a short chain of reasoning that leads to the conclusion that EPCA preempts the County Gas Ban. Instead, however, the district court claimed that despite its prohibitive effect, the County Gas Ban "touches on none of th[e] efficiency standards, consumer labeling, or testing procedures relevant to covered appliances." JA431. In other words, the prohibition operated "regardless of whether [the appliances] meet the efficiency or labeling standards under the EPCA." JA431. It "simply directs consumers to one set of products with one set of federal efficiency standards (electric appliances) over another set of products with different federal efficiency standards (gas appliances)." JA431 (quoting *Berkeley*, 89 F.4th at 1123 (Friedland, J., dissenting from denial of rehearing en banc)). That, in the district court's view, does not "'concern' the energy use of a covered product." JA432.

Although the district court did not quite say so directly, it appears that it thought EPCA preempts only state and local regulations that literally are "efficiency standards, consumer labeling, or testing procedures relevant to covered appliances." JA431. But the statute does not say that.

To be fair, it used to read something close to that. The original 1975 version of EPCA's preemption provision extended to cover only state and local laws that "*provide for . . . any energy efficiency standard or similar requirement* with respect to energy efficiency or energy use of a covered product." Pub. L. No. 94-163, § 327(a)(2), 89 Stat. 871, 926-27 (1975) (emphasis added). Perhaps under that version there could have been some debate about what qualifies as a "similar requirement." But Congress made that a moot point in 1978 by replacing "similar requirement" with "other requirement respecting energy use or energy efficiency" of a covered product. Pub. L. No. 95-619, § 424(b), 92 Stat. 3206, 3263-64 (1978) (preempting state and local laws "which establish[] an energy efficiency standard or other requirement respecting energy use or energy efficiency of a type (or class) of covered products"). The result—especially given the use of the broadening term "respecting"—was a substantial expansion of EPCA's preemptive scope beyond energy conservation standards and similar requirements. The current version of EPCA's preemption provision, amended in 1987, is yet more expansive. It dispenses even with the reference to energy efficiency standards and instead broadly preempts all state and local laws "concerning the energy efficiency [or] energy use" of covered products. 42 U.S.C. § 6297(c).

The district court's cramped view of EPCA's preemptive scope cannot be squared with the preemption provision's present broad language and Congress's

34

deliberate move away from a narrower conception of it that was more tethered to energy conservation standards. There simply is no basis for contending that EPCA's preemptive scope encompasses only state and local laws that are "efficiency standards, consumer labeling, or testing procedures relevant to covered appliances." JA431. Maybe that view would have been defensible under the original version of EPCA's preemption provision, but it is incompatible with the expansive preemption provision that is on the books today.

### 2. The County Gas Ban operates as the most stringent kind of energy conservation standard.

What is more, even if EPCA preemption were cabined to state and local laws that operate as competing energy conservation standards, the County Gas Ban still would qualify for preemption because it does precisely that.

"Energy conservation standard" means "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use." 42 U.S.C. §§ 6291(6), 6311(18). For example, the energy conservation standard for "Gas Standalone Cooking Tops" specifies a "[m]aximum integrated annual energy consumption" of "1,770 kBtu/year." 10 C.F.R. § 430.32(j). Everyone agrees that the County could not require that those cooking tops instead have a maximum integrated annual energy consumption of, say, 1,000 kBtu/year. That would be a competing energy conservation standard that seeks to directly override DOE's standard. The result would be the same if the County tried to make the

35

standard 100 kBtu/year or even .0001 kBtu/year. Those, too, would be energy conservation standards that both the district court and the County would agree are preempted by EPCA.

Why would it be different when the County sets the standard at 0 kBtu/year? After all, that is what the County Gas Ban does. True, the County Gas Ban does not speak in the language of kilowatt-hours, Btus, or any other technical "energy use" measurement. But it nevertheless sets a "maximum quantity of energy use" standard for gas appliances just as a more traditional energy conservation standard would. 42 U.S.C. §§ 6291(6), 6311(18). By prohibiting gas use entirely, it sets that value at zero. Any gas appliance with an "energy use" of more than 0 kBtu/year is prohibited. That is what it means to ban "combustion equipment" and "plumbing for combustion equipment." Montgomery County Code § 8-14D(a). The County cannot sidestep EPCA by essentially creating a backdoor energy conservation standard that imposes an "energy use" limit of zero for EPCA-covered gas appliances.

Indeed, because the County Gas Ban prohibits entirely the use of any appliance that uses gas energy, it operates as the harshest possible type of energy conservation standard. Under it, no appliance that is designed and manufactured to use any gas energy may be operated in covered buildings. If that does not "concern" the "energy use" of gas appliances, it is hard to know what would.

### 3. The County Gas Ban remains preempted regardless of how one reads "energy use" and "point of use."

The district court also focused much of its analysis on the definitions of "energy use" and "point of use," JA431-432, but in doing so it missed the forest for the trees. The district court's definitional tunnel vision came at the expense of important statutory context and structure, including EPCA's exception for certain building codes and waiver provision, *see* § I.B-C, *supra*, neither of which even merited a mention in the district court's opinion. *See* JA428-433. Failing to address how its interpretation of EPCA's preemption provision made sense within the broader context of EPCA as a whole led the district court far astray on the central preemption question and contravened the Supreme Court's admonition that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *United States v. Miller*, 604 U.S. 518, 520 (2026) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

In any event, the key point—which the district court missed—is that the County Gas Ban would be preempted under any conceivable definition of those terms. So while Plaintiffs believe they have the better reading of them, it does not ultimately matter to the outcome here. The County Gas Ban is preempted either way.

Starting with "energy use," the district court and the County read that as a technical term that refers back to the supplied definition: "the quantity of energy directly consumed . . . at point of use, determined in accordance with test

37

procedures" that measure "energy use . . . during a representative average use cycle." 42 U.S.C. §§ 6291(4), 6293(b)(3), 6311(4), 6314(a)(2). That is a factory-floor, static value that can be displayed on the label of a product.

The County Gas Ban plainly "concern[s]" gas appliances' "energy use" in that sense. Specifically, it prohibits all gas appliances that have a value greater than 0 kBtu/year on their energy use labels—much like a less harsh energy conservation standard may prohibit gas appliances with an energy use value greater than, say, 100 kBtu/year. In that way, the County Gas Ban "concern[s]" how much energy gas appliances are designed and manufactured to use.

Notably, that conclusion also holds true under a conception of "energy use" that focuses on the actual use of energy in the real world. In truth, there is not all that much daylight between this conception of the term and the more technical definition. That, too, is closely linked to real-world usage because the test procedures must measure "energy use . . . during a representative average use cycle." 42 U.S.C. §§ 6293(b)(3), 6314(a)(2). But, for what it is worth, there is much reason to think that the "energy use" referred to in EPCA's preemption provision means actual use of energy in practice rather than a technical, factory-floor value.

To be sure, EPCA provides a technical definition for "energy use," but the presence of a statutory definition does not foreclose adopting the plain meaning of the term in certain circumstances. As the Supreme Court has recognized, "the

presumption of consistent usage 'readily yields' to context, and a statutory term—even one defined in the statute—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quoting *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)). As cases like *Utility Air Regulatory Group*, 573 U.S. at 319-20, and *Duke Energy*, 549 U.S. at 574, make clear, that approach is particularly appropriate where a particular term is used in multiple statutory provisions in multiple different senses.

That is the case here. Consider §§ 6292(b)(1)(B) and 6295(*l*)(1)(B). Those provisions mark the outer bounds of DOE's authority under EPCA, and both employ the term "energy use" to refer to the actual, real-world energy usage of a product rather than a technical, static value. Specifically, § 6292(b)(1)(B) permits DOE to classify a product as a covered product if, *inter alia*, the "average annual per-household *energy use* by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year." 42 U.S.C. § 6292(b)(1)(B) (emphasis added). Section 6295(*l*)(1)(B) similarly permits DOE to promulgate energy conservation standards for products if, *inter alia*, "the aggregate household *energy use* within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period." 42 U.S.C. § 6295(*l*)(1)(B) (emphasis added). Determining EPCA's preemptive scope involves

a similar analysis in that it too looks to demarcate the limits of EPCA's reach. Accordingly, "energy use" in this analogous context should carry the same meaning.

In any event, the key point is that the County Gas Ban is preempted under either conception of "energy use." Either way, gas appliances cannot use any gas energy whatsoever under the County Gas Ban: zero therms, zero Btus, zero anything. Framed in terms of the parties' differing views of the preemption provision, that means both prohibiting all gas appliances that have a figure greater than zero specified on their kBtu/year energy use labels and barring the actual use of any gas appliance in practice. So however "energy use" may be defined and measured for the particular EPCA-covered gas appliance at issue, the County Gas Ban "concern[s]" that "energy use" by dialing back its maximum to nil.

As for "point of use," the disagreement on its meaning matters even less. "Point of use" appears in the definition of "energy use." "Energy use" is defined as "the quantity of energy directly consumed . . . *at point of use*," as determined in accordance with the test procedures. 42 U.S.C. § 6291(4) (emphasis added); *see id.* § 6311(4). EPCA does not define "point of use," and "[t]his court generally gives undefined terms their ordinary or natural meanings." *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 953 (4th Cir. 2025). The plain and ordinary meaning of "point of use" is "the place where or time when a product or service is

used," Cambridge English Dictionary Online (2025)[7]; *see Berkeley*, 89 F.4th at 1101 ("'[P]oint of use' means the 'place where something is used.'" (quoting Oxford English Dictionary Online (2022))). Accordingly, the most natural reading of "point of use" here is that it tightens the focus on actual energy use of products in the real world, much like how the provision on the test procedures requires that they reflect real-world conditions "during a representative average use cycle." 42 U.S.C. §§ 6293(b)(3), 6314(a)(2).

The district court instead agreed with Judge Friedland that by using the term "point of use," "Congress was relying on the technical meaning of the term to convey that the 'energy use' of an appliance under EPCA does not include indirect energy consumption upstream in the supply chain." JA430 (quoting *Berkeley*, 89 F.4th at 1123 (Friedland, J., dissenting from denial of rehearing en banc)). Surely Congress would have supplied a definition if it had intended such a technical meaning, and yet one is conspicuously absent here.

The point, however, is that this disagreement on "point of use" is entirely academic. Whether it refers to the place where a product is used or to some technical specification regarding the omission of indirect energy consumption from the energy use value, the County Gas Ban would remain a regulation "concerning the . . . energy use" of EPCA-covered appliances.

---

[7] https://dictionary.cambridge.org/us/dictionary/english/point-of-use.

In sum, the district court's focus on these definitions at the expense of the broader preemption question was misplaced. The district court erred when it appeared to find those largely irrelevant definitional points to be dispositive. Under any conceivable definition of "energy use" and "point of use," the County Gas Ban is preempted.

**D.     No exception or waiver applies to save the County Gas Ban from preemption.**

The County has not claimed any waiver of or exception to EPCA preemption. DOE has not granted the County a preemption waiver for the County Gas Ban. Nor could it, because the County Gas Ban "significantly burden[s] manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." 42 U.S.C. § 6297(d)(3). The County Gas Ban also does not qualify for the building code exception to EPCA preemption because it fails many of the seven requirements. For example, the County Gas Ban does not establish an "energy consumption or conservation objective [that] is specified in terms of an estimated total consumption of energy" or "permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. §§ 6297(f)(3)(A), (F).[8] So no waiver or exception can save

---

[8] It is much the same for the exception for industrial appliances. To avoid preemption regarding industrial appliances, a state building code for new construction must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C.

the County Gas Ban from preemption.

**II.    The district court correctly held that Plaintiffs have standing and assert a ripe preemption claim.**

The County also contended below that Plaintiffs lacked standing and that their claim was not ripe for resolution. JA164. The district court swiftly dispatched these arguments. *See* JA424-428. This Court should do the same.

**A.    Plaintiffs have standing.**

The district court correctly held that Plaintiffs have standing. The elements of standing are well established: "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024). While all Plaintiffs are harmed by the County Gas Ban, as their declarations attest, "the Supreme Court has made it clear that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (internal quotation marks omitted). "Consequently, once it is established that at least one party has standing to bring the claim, no further inquiry is required as to another party's standing to bring that

---

§ 6316(b)(2)(B)(i). The County Gas Ban does not meet this requirement because its ban on EPCA-covered gas industrial appliances that use any gas energy whatsoever effectively requires them to have an impossible level of energy efficiency.

claim." *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209 (4th Cir. 2020), *as amended* (Aug. 31, 2020).

Below, the County challenged only one element of Plaintiffs' standing, injury in fact. JA164. An injury in fact means "an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (internal quotation marks omitted). The County attacked Plaintiffs' allegations of injury from various angles, all circling around the notion that Plaintiffs' future injuries were too speculative and distant to confer standing. JA164. The County repeatedly emphasized, for example, that the County Gas Ban's promised regulations were not yet in effect and that the threats to Plaintiffs' businesses, even if they were real, would not come to fruition for another few years. *See, e.g.*, D.Ct.Dkt. 42-2 at 20.

These arguments failed to persuade the district court, and understandably so. For one, the County entirely ignored Plaintiffs' *ongoing* harm. As Plaintiffs explained in their complaint, declarations, and cross-motion for summary judgment, JA75-82, JA347, JA387-420, the practical, real-world harms to Plaintiffs' trades and businesses do not suddenly spring into existence at the precise moment the County Executive issues the implementing regulations for the County Gas Ban. Rather, the very presence of the impending deadline has real effects on Plaintiffs now.

44

As one example, builders with "long lead times" on their construction projects must decide now whether they can build with their customers' preferred choice of natural gas. JA131. As the district court recognized, "[b]ecause builders such as Kettler must decide whether gas service and appliances will be used in new development as much [as] two years in advance of breaking ground, the injuries stemming from Bill 13-22 are neither remote nor speculative." JA426.

Gas utilities, appliance manufacturers, vendors, and unions are similarly enduring ongoing harm from the County Gas Ban. For example, Washington Gas Light Company (a gas utility), Rinnai America Corporation (a gas-appliance manufacturer), and Holtzman Propane (a propane vendor) are all facing significant and imminent declines in customers and revenue, *see* JA75, JA80, affecting in real time their investment-risk profiles and making them "less attractive investment[s]." *San Diego Gas & Electric Co. v. FERC*, 913 F.3d 127, 136 (D.C. Cir. 2019). That is real harm that the district court found to be "concrete and particularized." JA425. "[T]o find otherwise," the D.C. Circuit has held, "would ignore the reality of the long-range economic planning involved in the sound management of an enterprise." *Great Lakes Gas Transmission Ltd. v. FERC*, 984 F.2d 426, 431 (D.C. Cir. 1993).

This ongoing harm will only worsen once the County's regulations are promulgated by the end of this year, if not sooner. The County took issue with these forecasted harms, but they are based on a clear, logical, and predictable chain of

45

events. The Supreme Court confirmed just last year that these kinds of "predictable" harms, which are based on "commonsense economic inferences" about how local regulations affect markets, more than suffice for Article III standing purposes. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 116, 120 (2025) (holding that producers of gasoline had standing to challenge a state regulation requiring the electrification of vehicles because the regulation would likely reduce the purchase of gasoline-powered cars, which would likely reduce the purchase of fuel, which would likely affect the gasoline producers' bottom line). Indeed, this Court recognized just a few months ago that standing can be predicated on the "predictable effect" of a defendant's actions, *Lowy v. Daniel Def., LLC*, 167 F.4th 175, 195-96 (4th Cir. 2026), and it is predictable, if not virtually certain, that the County's ban on gas appliances will affect businesses and jobs that depend on demand for and availability of gas. This is not mere speculation but "instead . . . the predictable effect of Government action on the decisions of third parties," *Dep't of Comm. v. New York*, 588 U.S. 752, 768 (2019), informed by "commonsense economic principles [that] can be useful when evaluating Article III standing," *Diamond Alternative Energy*, 606 U.S. at 116 (internal quotation marks omitted).

The County also claimed that Plaintiffs' harm was not imminent enough, suggesting that the December 31, 2026, deadline was too distant for standing purposes. JA164. The County, however, never explained why or how that "certainly

46

impending" deadline crossed Article III bounds. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Nor could it, especially since the County has the prerogative to act any day *before* that deadline, which is now just months away.

In any event, whatever delay the County believes deprives this Court of jurisdiction is ultimately irrelevant. What matters for standing purposes is not some arbitrary time on the clock, but instead whether Plaintiffs' claims cross the speculative threshold. *See Beck v. McDonald*, 848 F.3d 262, 274 (4th Cir. 2017) (holding that harm is "sufficiently imminent" if the allegations "push the threatened injury . . . beyond the speculative"). As explained above, Plaintiffs' harms are far from speculative; they are likely, if not virtually certain, to worsen once the County Gas Ban's implementing regulations take effect.

Courts encountering standing arguments like the County's in similar gas-ban cases have reached the same conclusion. As one district court bluntly put it, "[t]o say that Plaintiffs cannot assert their right to sue at this stage merely because the date mandated by the Legislature for when the prohibition should be in the Codes is still six months away flies in the face of the longstanding ability of a plaintiff to sue for non-speculative and imminent future injuries." *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304, 322 (N.D.N.Y. 2025) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). The Ninth Circuit in *Berkeley* likewise rejected the City's argument that the plaintiffs lacked standing, reasoning that the gas ban there "pose[d]

a 'credible threat' of a 'probabilistic harm.'" *Id.* (quoting *Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013)). So too for the County Gas Ban.

For these reasons, the district court correctly concluded that Plaintiffs' "injuries are sufficiently concrete and imminent to confer standing." JA426.

## B.     Plaintiffs' preemption claim is ripe.

Plaintiffs' preemption claim is ripe as well. The ripeness analysis is similar to the standing inquiry because "there is an obvious overlap between these two questions." *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 293 (4th Cir. 2022).[9] "The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006) (quoting *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 584 (1947)). "Traditionally," this Court considers two factors to determine whether a claim is ripe: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (internal quotation marks omitted). Both factors establish ripeness here.

---

[9] *See also Susan B. Anthony List*, 573 U.S. at 158 ("Article III standing and ripeness issues in this case 'boil down to the same question.'" (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007))); *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) ("Our ripeness inquiry . . . is inextricably linked to our standing inquiry."); *Doe v. Duling*, 782 F.2d 1202, 1206 n.2 (4th Cir. 1986) (noting that "both doctrines require that those seeking a court's intervention face some actual or threatened injury to establish a case or controversy").

As for the first factor, the sole merits question in this case—whether EPCA preempts the County Gas Ban—is fit for judicial resolution. The Court need only determine whether EPCA preempts a ban on "combustion equipment[] or plumbing for combustion equipment" in new buildings. Montgomery County Code § 8-14D(a). That is a "clean-cut" controversy, *Miller*, 462 F.3d at 319, and presents a "purely legal" question that "will not be clarified by further factual development." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 581 (1985).

The County contested that below by arguing that the full scope of the County Gas Ban's regulations and potential exceptions are not yet known. JA164. While that may be true as a factual matter, it is beside the point as a legal matter. Whatever the County Gas Ban's precise metes and bounds end up being, it would remain preempted by EPCA as a local law concerning the energy use of gas appliances. There simply is no way to implement the County Gas Ban without running into the teeth of EPCA's preemption provision—a ripeness scenario that this Court has recognized before. *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007) (rejecting "[t]he Secretary's argument that the issues are unripe because the regulations under the Act have not been promulgated," noting that the "[r]egulations could not alter the Act's provisions, which clearly establish the healthcare spending and reporting requirements that RILA claims are invalid").

The district court saw through the County's argument on this score, observing that its "'exemption' argument misapprehends Plaintiffs' fundamental contention— that the Bill's complete ban on using gas appliances in new construction is preempted under the EPCA." JA427. That "question," the district court continued, "is narrowly circumscribed," "well-defined," and "fit for resolution now because if, as Plaintiffs urge, the EPCA preempts Bill 13-22, then no further regulatory work on the Bill's exceptions will matter." JA427.

Notably, the gas ban struck down in *Berkeley* did not apply to every single building in the city. *See* 89 F.4th at 1099 ("The Ordinance also exempts a new construction from its prohibition if it is in the 'public interest' or if it is 'not physically feasible.'"). Yet neither the panel opinion nor the dissent from the denial of rehearing en banc found that fact relevant to the EPCA preemption analysis. There, as here, the preemption question remains the same regardless of the nuances regarding the precise scope of the gas ban at issue. So there is no need to await further clarification of the County Gas Ban's precise reach before resolving the threshold EPCA preemption question.

The second factor—the "hardship to the parties of withholding court consideration," *Cooksey*, 721 F.3d at 240—also supports the ripeness of Plaintiffs' claim. "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] who would be compelled to act under threat of

enforcement of the challenged law." *Miller*, 462 F.3d at 319 (quoting *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992)). The threat here is immediate. The County's end-of-year deadline is looming just months away, and there is nothing preventing the County Executive from issuing the promised implementing regulations *before* the deadline comes to pass. *See* JA426 (district court noting that "the new building standards will not take effect until, at the *latest*, the end of this year."); *cf. Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 208 (4th Cir. 2022) ("[B]ecause ripeness is peculiarly a question of timing, we may look to factual developments that occurred after the complaint was filed to determine whether [the plaintiff's] claims were ripe for review at the time of the district court's judgment." (internal quotation marks omitted)).

Declining to consider the lawfulness of the County Gas Ban now would impose real hardship on Plaintiffs. It would allow the various harms that provide Plaintiffs standing—disrupted business decisions, JA79-80, JA131, JA135, JA139, JA144, JA150; delayed construction timelines, JA130, JA135, JA389, JA426; higher gas prices, JA73; and loss of jobs, customers, and revenue, JA75-82, JA425-426, JA428—to not only continue, but worsen. Indeed, due to the need for "considerable advance planning . . . decisions to be made now or in the short future may be affected" by the County Gas Ban. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (internal quotation marks

51

and citations omitted). For that reason, "requir[ing] the industry to proceed without knowing whether the [law] is valid would impose a palpable and considerable hardship." *Id.* at 201-02. Accordingly, "the issue of whether [it] is preempted by federal law should be decided now." *Id.* at 202.

In sum, "[t]he challenge is fit for review because the issues are predominantly legal, and the challenged prohibitions are *currently* causing hardship by interfering with the ability of plaintiffs . . . to plan, invest in, and conduct their business operations." *North Dakota v. Heydinger*, 825 F.3d 912, 918 (8th Cir. 2016). Thus, both factors in the ripeness analysis align to yield the conclusion that the district court reached below: "The matter is ripe for review." JA428.

## III. Plaintiffs are entitled to declaratory and injunctive relief.

The only question remaining is whether Plaintiffs meet the requirements for declaratory and injunctive relief. They do.

A federal court may grant a declaratory judgment when there is "a case of actual controversy within [its] jurisdiction" that satisfies "Article III's case-or-controversy requirement." *Honeywell Int'l Inc. v. OPTO Elec. Co.*, 135 F.4th 170, 181 n.8 (4th Cir. 2025) (quoting 28 U.S.C. § 2201(a)). "'Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Plaintiffs meet these basic requirements here. There is a substantial, ongoing controversy between the parties concerning the legality of the County Gas Ban. A declaratory judgment would "serve a useful purpose in clarifying and settling the legal relations in issue" and would "terminate and afford relief from the uncertainty, insecurity, and controversy" that the County Gas Ban wreaks on Plaintiffs and their livelihoods. *Penn-America Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004) (quoting *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996)).

As for injunctive relief, federal courts "may issue an injunction" against state officials "upon finding the [challenged] state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). To be entitled to permanent injunctive relief, Plaintiffs must show "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs satisfy each of those elements.

First, the County Gas Ban irreparably harms Plaintiffs. Plaintiffs will experience—and in some cases have already experienced—serious harms. These include lost customers, sales, and revenue; loss of employment; and increased expenses, including as a result of higher gas prices. JA129-162 (Plaintiffs' declarations chronicling these harms). Even purely "economic damages may constitute irreparable harm where," as here, "no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. L.P.*, 918 F.3d 353, 366 (4th Cir. 2019); *see also Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (economic losses may be considered irreparable "[i]f expenditures cannot be recouped"); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and concurring in the judgment) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." (emphasis in original)); *Gray-Hopkins v. Prince George's County, Md.*, 309 F.3d 224, 232 (4th Cir. 2002) (recognizing governmental immunity of Maryland counties and municipalities).

Second, there is no adequate remedy at law for Plaintiffs' harms. Plaintiffs' monetary losses cannot be made whole in an action at law against the County because the County has governmental immunity. *Gray-Hopkins*, 309 F.3d at 232. Without an injunction, moreover, Plaintiffs and their members will be denied the right to plan and conduct their lives and businesses unburdened by the prospect of

the enforcement of a preempted law. Money damages would do little to remedy that harm.

The third and fourth factors—the balance of harms and the public interest—merge where, as here, the government is the defendant. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As noted above, Plaintiffs and their members are suffering, and will continue to suffer, substantial harm. *See supra* Part II.A. The County, by contrast, will suffer no harm at all. That is because the County has no legitimate interest in enforcing a preempted law. By the same token, there is a substantial public interest in ensuring that federal law is followed, and that unlawful action is ended. *See Roe v. Dep't of Def.*, 947 F.3d 207, 230-31 (4th Cir. 2020) ("[T]he public undoubtedly has an interest in seeing its governmental institutions follow the law . . . ." (internal quotation marks omitted)). Indeed, "[i]f anything, the system is improved by such an injunction" against the enforcement of unlawful regulation. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (internal quotation marks omitted).

Thus, Plaintiffs satisfy all four factors for injunctive relief.

## CONCLUSION

For these reasons, Plaintiffs request that the Court reverse the district court's judgment and render judgment in Plaintiffs' favor, enter a declaratory judgment that the County Gas Ban is void and unenforceable because it is preempted by EPCA,

and enter a permanent injunction enjoining the County from enforcing or attempting to enforce its Gas Ban. Alternatively, Plaintiffs request that the Court reverse the district court's judgment and remand the case for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Fourth Circuit Rule 34(a) and Federal Rule of Appellate Procedure 34(a)(1), Plaintiffs submit that oral argument would be helpful in this case given the important preemption questions at issue that have split federal courts.

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ J. Mark Little*
J. Mark Little
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Scott Novak
700 K Street NW
Washington, D.C. 20001
(202) 639-1316
scott.novak@bakerbotts.com

Daniel Rankin
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Federation of Independent Business, Inc., Maryland Building Industry Association, Washington Gas Light Company, and National Propane Gas Association*

57

BREDHOFF & KAISER, P.L.L.C.

/s/ *Abigail V. Carter*
Abigail V. Carter
805 15th Street, NW, Ste. 1000
Washington, D.C. 20005
(202) 842-2600
acarter@bredhoff.com

*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

MOONEY, GREEN, SAIDON, MURPHY
& WELCH, P.C.

/s/ *Lauren McDermott*
Lauren McDermott
1920 L Street NW
Washington, DC 20036
(202) 783-0010
lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

58

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,835 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

*/s/ J. Mark Little*
J. Mark Little

## CERTIFICATE OF SERVICE

I certify that on May 26, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ J. Mark Little*
J. Mark Little