No. 26-1449

IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————————

NATIONAL ASSOCIATION OF HOME BUILDERS
OF THE UNITED STATES, ET AL.,

*Plaintiffs-Appellants*,

v.

MONTGOMERY COUNTY, MARYLAND,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the District of Maryland
(Paula Xinis, Judge)

———————————

**BRIEF OF APPELLEE MONTGOMERY COUNTY, MARYLAND**

———————————

John P. Markovs, County Attorney
Edward B. Lattner, Deputy County
    Attorney
Erin J. Ashbarry, Chief, Division of
    Government Operations
        Jacquelyn P. Allen, Assistant County
    Attorney
Kristen J. Nunley, Assistant County
    Attorney

Executive Office Building
101 Monroe Street, Third Floor
Rockville, Maryland 20850
240-777-6700

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ....................................................................................... iii

STATEMENT OF JURISDICTION..............................................................................1

STATEMENT OF THE ISSUES...................................................................................1

STATEMENT OF THE CASE.......................................................................................1

    Nature of the Case........................................................................................................1

    Statement of Facts.......................................................................................................3

        To Combat Global Warming, the County Adopts a Goal of Zero
        Greenhouse Gas Emissions by 2035 ........................................................3

        The County Enacts the Decarbonization Law to Meet the Zero
        Greenhouse Gas Emissions Goal and for Public Health Benefits. .......3

        The Decarbonization Law Mandates Exemptions to the
        All-Electric Building Standards ...........................................................7

        The Regulations Implementing All-Electric Building Standards
        Do Not Exist at Present ........................................................................10

        Plaintiffs File This Action in October 2024 to Challenge the
        Decarbonization Law As Preempted by EPCA. .................................12

        The District Court Rejects Plaintiffs' EPCA Preemption Claim........14

SUMMARY OF THE ARGUMENT .................................................................15

ARGUMENT ..................................................................................................16

Standard of Review..............................................................................................17

I.   Given the Absence of any Presently Enforceable Law, Plaintiffs' Claim is Not Ripe and They Lack Standing. ...............................................................17

    A.   This Case is Not Ripe as There is no Enforceable Law ......................18

    B.   Plaintiffs Cannot Demonstrate Injury in Fact by Regulations That Have Not Been Published for Public Comment, Let Alone Enacted and Taken Effect ....................................................................................23

II.  The District Court Correctly Determined that EPCA Does Not Preempt the County's Decarbonization Law................................................25

    A.   Federal Preemption Analysis Focuses on Congressional Intent.........25

    B.   The Plain Language of EPCA Demonstrates that the Decarbonization Law Falls Outside the Scope of EPCA's Express Preemption Provision .....................................................................28

    C.   The Legislative History of EPCA's Express Preemption Provision Demonstrates that the Decarbonization Law Falls Outside ECPA's Scope......................................................................34

    D.   The Decarbonization Law Does Not Conflict with EPCA Because it Does Not Frustrate Compliance with EPCA or Congressional Purposes......................................................................36

    E.   Plaintiffs' Remaining Arguments Cannot Escape or Alter The Plain Meaning of "Energy Use" or "Energy Efficiency" in EPCA's Preemption Clause ...........................................................37

        1.   The Term "Concerning" in the Preemption Clause Does Not Alter The Definitions of "Energy Use' or "Energy Efficiency" ...............................................................37

        2.   EPCA's Exception From Preemption for Building Codes Does Not Apply and Does not Expand the Scope of Preemption in Section 6297(c).......................................................38

3. Nothing in EPCA's Text or Legislative History Supports a Finding that Congress Enacted a Right to Use Natural Gas-Powered Appliances ................................ 40

4. "Point of Use" Must be Read in Context in EPCA ................. 43

5. As There were No Expansive Changes to EPCA's Preemption Clause, the Changes do Not Support Expansive Interpretation Beyond its Plain Meaning ............... 44

6. References to Energy Use in Provisions that Tell the Secretary When to Bring Products Under EPCA's Umbrella Are Not the Same as References to "the Energy Use" of an EPCA-Covered Product in the Preemption Provision ................................ 45

III. Plaintiffs Are Not Entitled to Injunctive Relief ................................ 48

CONCLUSION ................................ 52

CERTIFICATE OF COMPLIANCE ................................ 53

CERTIFICATE OF SERVICE ................................ 53

ADDENDUM ................................ Add. 1

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*, 585 U.S. 579 (2018). ................................................................50

*Adnet, Inc. v. Soni*, 66 F.4th 510 (4th Cir. 2023)................................................16, 17

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005) ...........................................35, 36

*AirEvac EMS, Inc. v. Cheatham*, 910 F.3d 751 (4th Cir. 2018)..............................27

*Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025), *appeal docketed*, No. 25-977 (2nd Cir. Apr. 21, 2025) ......................................... 32, 33, 34, 37, 38, 40, 43

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) ...............................17

*Bldg. Industry Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144 (9th Cir. 2012) ....................................................................39

*California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) ............. 2, 12, 13, 15, 31, 32, 33, 37, 40, 43, 44

*Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203 (4th Cir. 1992) ....................................................................18

*Commissioners of Easton v. Covey*, 74 Md. 262 (1891) ........................................26

*Commonwealth of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115 (2016)...............................................................................27, 42

*Commonwealth of Va. v. United States*, 926 F. Supp. 537 (E.D. Va. 1995), *aff'd*, 74 F.3d 517 (4th Cir. 1996)................................................................21

*Dan's City Used Cars, Inc. Pelkey*, 569 U.S. 251 (2013) ................................38, 39

*Davidson v. United Auto Credit Corp.*, 65 F.4th 124 (4th Cir. 2023)....................47

*Dean v. United States*, 556 U.S. 568 (2009)........................................................46

*Dep't of Agric. v. Kirtz*, 601 U.S. 42 (2024)....................................................46

*Doe v. Virginia Dep't of State Police*, 713 F.3d 745 (4th Cir. 2013).....................19

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006).................................................37

*Elizabeth Condo. Ass'n, et al. v. Montgomery Cnty., Md.*,
    Case No. 8:25-CV-01019-DLB (D.Md.)................................................................4

*Franks v. Ross*, 313 F.3d 184 (4th Cir. 2002).............................................18, 19

*Friends for Ferrell Parkway, LLC v. Stasko*,
    282 F.3d 315 (4th Cir. 2002) ...................................................23, 24, 25

*Jones v. Solomon*, 90 F.4th 198 (4th Cir. 2024) ...........................................17

*Liberty Univ., Inc. v. Lew*, 733 F.3d 72 (4th Cir. 2013) .............................25

*Lujan v. Defenders. of Wildlife*, 504 U.S. 555 (1992) ...............................24

*Maryland v. King*, 567 U.S. 1301 (2012) .......................................................51

*Maryland v. Louisiana*, 451 U.S. 725 (1981). ..............................................25

*Maryland Bldg. Industry Ass'n v. McIlwain*, No. 8:25-cv-00113-DLB,
    2026 WL 946235 (D. Md. Apr. 2, 2026),
    *appeal docketed*, No. 26-1552 (4th Cir. May 4, 2026) ...........................4, 32

*Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996) ..............................................26

*Metro. Wash. Airports Auth. v. Pan*, 106 F.4th 355 (4th Cir. 2024) .......................46

*Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006).................................................18, 19

*Miller v. Chicago & N.W. Transp. Co.*, 925 F. Supp. 583 (N.D. Ill. 1996) ...........26

*Mulhern Gas Co. v. Mosley*, 798 F.Supp.3d 304 (N.D.N.Y. 2025),
   *appeal docketed*, No. 25-2041
   (2nd Cir. Aug. 22, 2025).................................................. 15, 32, 33, 38, 39, 41

*Nat'l Ass'n of Home Builders of the United States v. District of Columbia*,
   No. 24-CV-02942 (ACR), 2026 WL 837674 (D.D.C. Mar. 26, 2026),
   *appeal docketed*, No. 26-7050
   (D.C. Circ. Apr. 14, 2026).......................................32, 33, 37, 39, 42

*Nat.'l Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355,
   (D.C. Cir. 1985)....................................................................35

*Nat'l Student Ass'n v. Hershey*, 412 F.2d 1103 (D.C. Cir. 1969) ...........................21

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................50

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998) ......................................21

*Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022)................................................27

*Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*,
   105 F.4th 554 (4th Cir. 2024)...............................................17, 18

*Palisades Collections, LLC v. Shorts*, 552 F.3d 327 (4th Cir. 2008) ......................48

*Penegar v. Liberty Mut. Ins. Co.*, 115 F.4th 294 (4th Cir. 2024) ......................23, 24

*Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir. 2005)....................................27

*Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007) ....................22

*Rinnai Amer. Corp. v. S. Coast Air Quality Mgmt. Dist.*,
   No. CV 24-10482 PA (PDX), 2025 WL 2427844
   (C.D. Cal. July 22, 2025).......................................................32

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)................................................29, 30

*S. Blasting Servs., Inc. v. Wilkes County*, 288 F.3d 584 (4th Cir. 2002)...........26, 27

*SAS Inst., Inc. v. World Programming Ltd.*,
    874 F.3d 370 (4th Cir. 2017). .......................................................17, 48, 49

*Sigley v. ND Fairmont LLC*, 129 F.4th 256 (4th Cir. 2025)..............................16, 17

*South Carolina v. United States*, 912 F.3d 720 (4th Cir. 2019) .............................17

*Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560 (2012). .................................43

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ....................................................23

*Van Buren v. United States*, 593 U.S. 374 (2021) .....................................................29

*Washington Gas Light Co. v. Prince George's Cnty. Council*,
    711 F.3d 412 (4th Cir. 2013) .........................................................................27

*Wild Virginia v. Council on Env't Quality*, 56 F.4th 281 (4th Cir. 2022)...............20

**Constitutional Provisions, Statutes, Ordinances, Rules, and Regulations**

**U.S. Constitution**

U.S. Const. art. IV, cl. 2 .....................................................................................25

**United States Code**

28 U.S.C. § 1291 .................................................................................................1

42 U.S.C. § 6291 ...............................................................................29, 30, 44, 48

42 U.S.C. § 6292 .........................................................................28, 45, 46, 47, 48

42 U.S.C. § 6293 ...........................................................................................29, 47

42 U.S.C. § 6294 ...........................................................................................29, 47

42 U.S.C. § 6295 ................................................................ 28, 40, 41, 45, 46, 47, 48

42 U.S.C. § 6296 ..................................................................................................34

42 U.S.C. § 6297 ........................................ 28, 35, 37, 38, 39, 40, 41, 42, 44, 46, 48

42 U.S.C. § 6314 ........................................................................................29, 47

42 U.S.C. § 6315 ........................................................................................29, 47

42 U.S.C. § 6316 ...........................................................................................28

Pub. Law No. 94-163, 89 Stat. 917 (1975) ..........................................................44

Pub. Law No. 100-12, 101 Stat. 103 (1987) .........................................................44

**Maryland Code**

Local Government § 13-901 ...........................................................................26

Public Safety §12-503 .................................................................................26

Public Safety § 12-504 ................................................................................26

**Code of Federal Regulations (C.F.R.)**

10 C.F.R. § 429.12 ......................................................................................29

10 C.F.R. Part 430 ......................................................................................29

10 C.F.R. § 430.32 ......................................................................................28

10 C.F.R. Part 431 ......................................................................................29

16 C.F.R. § 305.17 ......................................................................................29

**Code of Maryland Regulations (COMAR)**

COMAR § 09.12.51.05 .................................................................................26

**Montgomery County, Maryland Code**

§ 2-15 ...............................................................................................................10, 11

§ 8-14D...................................................................................6, 7, 8, 9, 10, 11

**Code of Montgomery County Regulations (COMCOR)**

COMCOR § 08.00.02.01. ..............................................................................8

**Legislative Authorities**

H.R. Rep. No. 94-340 (1975)....................................................................34, 35

S. Rep. No. 94-516 (1975) ..............................................................................36

H.R. Rep. 100-11 (1987)...........................................................................39, 45

S. Rep. No. 100-6 (1987) ..........................................................................35, 45

**Other Authorities**

47 Fed. Reg. 14, 424 (Apr. 2, 1982) ...............................................................43

Ben Grumbles, Maryland Commission on Climate Change, *A Roadmap for
    Decarbonizing the Residential and Commercial Building
    Sectors in Maryland*, Building Energy Transition Plan Appendix A,
    at 5 (Nov. 2021) ......................................................................................5

Am. Jur. 2d.....................................................................................................26

McQuillin Mun. Corp (3d. ed.).......................................................................26

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 as this is an appeal from a final decision entered by a district court.

## STATEMENT OF THE ISSUE

As the County's Decarbonization Law will limit the availability of natural gas in newly constructed buildings, and has no impact on national appliance efficiency standards set by federal law, did the District Court abuse its discretion when it denied Plaintiffs' request for a permanent injunction based upon federal preemption?

## STATEMENT OF THE CASE

**Nature of the Case**

Concerned with the environmental and health hazards of natural gas, the County enacted Bill 13-22, "Buildings–Comprehensive Building Decarbonization," (the "Decarbonization Law" or "Bill 13-22"). Effective March 13, 2023, Bill 13-22 requires the County Executive to issue a building code, in the form of regulations, by December 31, 2026, that restrict the use of any equipment or appliance that uses fuel gas or fuel oil in new construction, subject to many exemptions.

The Decarbonization Law is not presently enforceable; the regulations implementing the law and promulgating an all-electric building code have yet to be published. Even after publication by the County Executive, the regulations will only take effect after their transmittal to and approval by the County Council.

Despite the absence of any presently enforceable law, Plaintiffs—a group of trade associations, companies, and unions—brought this action to challenge the Decarbonization Law as preempted by the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422. EPCA sets national energy efficiency standards for appliances, requires appliance testing prior to sale to see if they meet those standards, and requires appliances to bear labels as to the appliance's energy efficiency.

Plaintiffs' challenge adopts the EPCA preemption analysis of *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) ("*Berkeley*"), a flawed Ninth Circuit panel decision. So flawed that eleven judges of that Court—including the chief judge—filed a dissent from rehearing en banc of that panel decision, urging future jurists to "not to repeat the panel opinion's mistakes." *Berkeley* at 1119. No federal court to date asked to follow *Berkeley*'s EPCA preemption analysis has done so, including the District Court here.

The District Court rejected Plaintiffs' claim, and *Berkeley*'s analysis, finding the Decarbonization Law has no impact on EPCA's efficiency standards, testing procedures, or labeling requirements.

These findings by the District Court were correct. The Decarbonization Law mandates a building code that regulates the type of energy available to power new buildings, not the quantity of energy an appliance consumes or an appliance's output

relative to the energy consumed. As the Decarbonization Law has no impact on EPCA's appliance efficiency standards or regulatory regime, this Court should affirm the District Court.

**Statement of Facts**

***To Combat Global Warming, the County Adopts a Goal of Zero Greenhouse Gas Emissions by 2035.***

In 2017, the County Council observed that global warming wrought "cataclysmic" changes to Earth, and that climate change "will cause an increase in water and food shortages, civil unrest, state failure, civil war and terrorism throughout the world, with no nation or region being immune from its effects, including Montgomery County." JA 183. The Council cited a strong scientific consensus that reduction of greenhouse gas emission and the attendant removal of excess carbon from the atmosphere could mitigate global warming. JA 183. The Council resolved to reduce greenhouse gas emissions in the County by 80% by 2027, and to reach 100% elimination of greenhouse gas emissions by 2035. JA 184. The Council called upon the County Executive and others to advise the Council on specific methods the County can take to accelerate its greenhouse gas emissions reduction goals. JA 184.

Steps taken to date by the County to implement the resolution include:

- A September 2020 law that provided a "green building" tax credit for new and existing energy efficient buildings;[1]

- In May 2022, the County enhanced its law setting energy performance standards for buildings in the County;[2] and

- Annual funding of approximately $20 million to the County's Green Bank, which encourages and provides financing for clean energy projects in the County.[3]

---

[1] *See* https://apps.montgomerycountymd.gov/ccllims/DownloadFilePage?FileName=2649_1_10947_Bill_10-20_Signed_20200929.pdf

[2] *See* https://apps.montgomerycountymd.gov/ccllims/DownloadFilePage?FileName=2707_1_20205_Bill_16-21_Signed_20220502.pdf. Four Plaintiffs from this case joined two others to challenge this County law as well based on EPCA preemption. *See Elizabeth Condo. Ass'n, et al. v. Montgomery Cnty., Md.*, Case No. 8:25-CV-01019-DLB (D. Md.). That case is now stayed pending the outcome of this Court's consideration of *Maryland Bldg. Industry Ass'n v. McIlwain*, No. 8:25-cv-00113-DLB, 2026 WL 946235 (D. Md. Apr. 2, 2026), *appeal docketed*, No. 26-1552 (4th Cir. May 4, 2026). *See* ECF No. 47, *Elizabeth Condo. Ass'n, et al. v. Montgomery Cnty., Md.*, Case No. 8:25-CV-01019-DLB (D. Md.).

[3] *See* Montgomery Cnty. Council, Agenda Item #3E, Introduction, June 14, 2022, Bill 13-22 – Buildings – Comprehensive Decarbonization at 9. JA 193. (available at: https://apps.montgomerycountymd.gov/ccllims/DownloadFilePage?FileName=2754_1_21273_Bill_13-2022_Introduction_20220614.pdf.)

***The County Enacts the Decarbonization Law to***
***Meet the Zero Greenhouse Gas Emissions Goal***
***and for Public Health Benefits.***

As a complement to those efforts, and consistent with a 2021 recommendation of the State of Maryland's Commission on Climate Change for all-electric buildings,[4] on June 14, 2022, the County Council introduced Bill 13-22, "Buildings —Comprehensive Building Decarbonization." JA 185-193. Building decarbonization is the reduction of carbon dioxide and other greenhouse gas emissions from buildings by replacing the equipment in the building that uses fossil fuels with electric technology.

Bill 13-22's introductory report noted that 50% of the County's total carbon emissions come from building inefficiencies.[5] JA 186. The County Council Staff

---

[4]     *See id.* JA 192-193. The State Commission recommended that the Maryland General Assembly require, "[t]he Maryland Building Code Administration to adopt a code that ensures that new buildings meet all water and space heating demand without the use of fossil fuels." *See* Ben Grumbles, Maryland Commission on Climate Change, *A Roadmap for Decarbonizing the Residential and Commercial Building Sectors in Maryland*, Building Energy Transition Plan Appendix A, at 5 (Nov. 2021). *See* https://mde.maryland.gov/programs/air/ClimateChange/MCCC/Documents/2021%20Annual%20Report%20Appendices%20FINAL.pdf

[5]     The Staff Report referenced a report by the Metropolitan Washington County of Governments. Those reports for all jurisdictions are online here: https://www.mwcog.org/documents/2022/12/27/community-wide-greenhouse-gas-emissions-inventory-summaries-featured-publications-greenhouse-gas/?DocumentId=11385%2C11385%2C11385%2C11385&pg=1. The referenced report specific to the County is at JA 194-195.

stated the Bill's goal is to ensure all-electric buildings standards will become part of the County's building code "for a zero-greenhouse gas emissions future." JA 191.

In addition to the climate benefits, the Bill's sponsors cited monetary, public safety, and public health benefits of decarbonized buildings. Specifically, they noted there is "mounting evidence" that decarbonized buildings are cheaper over the life of the building and are safer from explosion as they do not rely on highly flammable fossil fuels for energy. JA 193. Further, the Bills' sponsors noted that decarbonized buildings have healthier indoor air quality as they do not produce carbon monoxide and nitrogen oxide as byproducts. JA 193. Those pollutants have been shown to contribute to asthma in children, respiratory illness, cardiovascular disease, and premature death – a problem disproportionately affecting communities of color. JA 193.

After considering various amendments,[6] the County Council voted to adopt Bill 13-22. The County Executive signed Bill 13-22 on December 12, 2022, and it became effective March 13, 2023. JA 352-357. As codified, Bill 13-22 is Montgomery County Code § 8-14D, "Comprehensive Building Decarbonization."[7]

---

[6]     *See* Montgomery County Council, Agenda Item #15C, Action, November 29, 2022, Bill 13-22 – Buildings – Comprehensive Building Decarbonization, at 3-11. JA 198-206.

[7]     The complete Montgomery County Code is available online at: https://codelibrary.amlegal.com/codes/montgomerycounty/latest/overview.

Add. 7-9.

### *The Decarbonization Law Mandates Exemptions to the All-Electric Building Standards.*

The Decarbonization Law itself does not issue any all-electric building standards and there are no such standards presently in effect. Instead, the Decarbonization Law requires that the County Executive issue regulations by December 31, 2026, with all-electric building standards for new construction.[8]

The Decarbonization Law defines "all-electric building standards" to mean, "a public or private building that contains no combustion equipment, or plumbing for combustion equipment, installed within the building or building site." *See* County Code § 8-14D(a). Add. 7. "Combustion equipment" means, "any equipment or appliance used for space heating, service water heating, cooking, clothes drying

---

[8] *See* County Code § 8-14D(b); Bill 13-22 § 3. JA 356, Add. 7, Add. 9. "New construction" means "the construction of any new stand-alone building, with no remnants of any prior structure or physical connection to existing structures or outbuildings on the property." County Code § 8-14D(a). Add. 7.

The District Court mistakenly read Bill 13-22 as requiring the all-electric building code as applying to "major renovation[s]." JA 3. While the definition of "major renovation" and references to "major renovation" were in Bill 13-22 as introduced, the County Council deleted that term as reflected by the double brackets around it. JA 353 (Lines 13-16); JA 354 (Lines 26, 37); JA 356 (Line 76).

and/or lighting that uses fuel gas or fuel oil." *See id.*[9] Add. 7.

While the Decarbonization Law does not promulgate all-electric building standards, it dictates that the following will be exempt from to-be-issued standards:

- emergency backup systems in buildings required to have them;

- buildings used by utilities to generate electric power or steam;

- buildings used to treat sewage or waste;

- commercial kitchen equipment in restaurants;

- gas fireplaces;

- outdoor gas grills;

- applications for building permits prior to the effective date of the regulations;

- district combined heat and powers facilities;[10] and

- buildings used for the following purposes as defined in the County's zoning law:

---

[9] The terms "fuel gas" and "fuel oil" are not defined in the Decarbonization Law, or elsewhere in the County Code. The term "fuel gas" appears in the existing County regulations that adopt as the County's building code the 2018 International Building, Energy Conservation, Mechanical, Fuel-Gas, Residential, Swimming Pool and Spa and International Existing Building Codes, with certain exemptions not relevant here. *See* Code of Montgomery County Regulations ("COMCOR") § 08.00.02.01. The County's Regulations are available online at: https://codelibrary.amlegal.com/codes/montgomerycounty/latest/montgomeryco_m d_comcor/0-0-0-1.

[10] Although not defined in the Code, this an onsite energy generation system that simultaneously generates electricity and captures waste heat and uses it for a particular purpose, such as heating.

- o      manufacturing and production,

- o      crematories,

- o      life sciences,

- o      hospitals,

- o      farming, and

- o      farm alcohol production.

*See* County Code § 8-14D(c). Add. 7-8. The Decarbonization Law also exempts from the to-be-issued standards buildings meant to provide affordable housing ("moderately-priced dwelling units"), public or private schools, or residential buildings with four or more stories if their builder submits a building permit application prior to December 31, 2027. *See* Bill 13-22 § 3. Add. 9, JA 358.

The Decarbonization Law mandates that the regulations permit variation from the all-electric standards for buildings that achieve decarbonization but that are not all-electric. Specifically, the regulations must outline a "code modification process" for new buildings that are "carbon-neutral or net-zero." *See* County Code § 8-14D(b)(1). Add. 7, JA 203, JA 349. While the phrase "code modification process" is not defined, the County included this provision with an eye towards implementing a review process like the County's existing process for builders to obtain a

modification of the County's building code.[11] JA 349.

The Decarbonization Law provides that the regulations may include additional exemptions if all-electric building standards cannot be used "due to practical difficulty or undue hardship." *See* Code § 8-14D(b)(2). Add. 7.

### *The Regulations Implementing All-Electric Building Standards Do Not Exist at Present.*

The regulations to be promulgated under Decarbonization Law will be adopted via a method known as "Method 1" in the County. *See* County Code §§ 2A-15(f), 8-14D(b). Add. 3, 7. This means that the regulations will be published[12] and there will be an opportunity for public comment. *See* County Code §§ 2A-15(c), 2A-15(f) Method (1)(B). Add. 2, 3. After the comment period, the County Executive must submit the regulations to the County Council. *See* County Code § 2A-15(f) Method (1)(B). Add. 3. The regulations will not take effect until the County Council adopts the proposed regulations via a resolution. *See* County Code § 2A-15(f) Method (1) (A), (C). Add. 3.

---

[11] *See* https://www.montgomerycountymd.gov/department-permitting-services/about-us/divisions/customer-support-outreach-division/code-modification.

[12] The County publishes proposed regulations in the Montgomery County Register.
*See* https://www.montgomerycountymd.gov/office-county-executive/montgomery-county-register .

Significantly here, the County Code imposes no deadline for the County Council to act on Method 1 regulations once received from the "issuer," the County Executive. *See* County Code § 2A-15(f) Method (1); § 2A-13(f) (defining "issuer" to mean the County Executive or a person authorized by law to issue regulations). Add. 1, 3. This differs from Method 2 regulations, which require the County Council to affirmatively act within 60 days of receipt of a proposed Method 2 regulation; otherwise, the Method 2 regulation takes effect after 60 days. *See* County Code § 2A-15(f) Method (2) (B), (C), (E). Add. 4.

As introduced, Bill 13-22 required adoption of all-electric building standards by Method 2 regulation, with its attendant 60-day deadline. JA 189 (Lines 24-26). The County Council altered by amendment the "method" of regulation in Bill 13-22 from Method 2 to Method 1, thereby removing the 60-day clock for Council approval or disapproval of the regulations once received from the County Executive. JA 354 (Lines 24-25).

As of the date of this brief, the County Executive has not yet published proposed regulations to implement County Code § 8-14D. Contrary to Plaintiffs' characterization, the Decarbonization Law is not an "appliance ban." It does not apply to existing buildings that use natural gas, to newly constructed buildings that fall within the articulated exemptions, and its focuses solely on use of a particular energy source to power new buildings.

***Plaintiffs File This Action in October 2024 to Challenge the***
***Decarbonization Law As Preempted by EPCA.***

Plaintiffs initiated this action on October 22, 2024. *See* ECF No. 1. JA 27-84. Plaintiffs' original one-count Complaint sought a declaratory judgment that EPCA preempts the Decarbonization Law and an injunction against its enforcement. JA 48-50. Plaintiffs expressly cited *Berkeley*'s divisive analysis in their allegations. JA 29.

The parties agreed to a dispositive motions schedule after service of the original Complaint. The County moved to dismiss or in the alternative for summary judgment on January 8, 2025. *See* ECF No. 18. The County's motion pointed out that the original Complaint's affidavits attested incorrectly that Bill 13-22 itself issued the all-electric building standards for new construction. [13] *See* ECF No. 18-1 at 10 & n.7. The original Complaint as a result alleged, incorrectly, current enforcement of the Decarbonization Law.[14]

On January 17, 2025, the United States filed a Statement of Interest in support of the County's law and against EPCA preemption, attaching as Exhibits 1 and 2 the briefs it filed in *Berkeley* that also argued against EPCA preemption. *See* ECF Nos.

---

[13] *See* JA 53 ¶ 4; JA 57 ¶ 4; JA 61 ¶ 4; JA 65 ¶ 6; JA 68-69 ¶ 4; JA 72 ¶ 5; JA 76 ¶ 5; JA 80 ¶ 5.

[14] *See* JA 38 ¶ 21; JA 45 ¶ 54; JA 47 ¶ 59; JA 48 ¶ 64; JA 49 ¶ 69(c).

30, 30-1, 30-2.[15]

On January 29, 2025, Plaintiffs filed an Amended Complaint, again with one count seeking a declaratory judgment that EPCA preempts the Decarbonization Law, and a permanent injunction enjoining its enforcement.[16] JA 109-110. The Amended Complaint still relies on *Berkeley*, JA 87, but removes allegations of current enforcement. JA 114-141. While the Amended Complaint demands the costs of suit including reasonable attorney's fees, Plaintiffs conceded during dispositive motions briefing they are not entitled to such costs. ECF No. 51-1 at 42 n.7.

After Plaintiffs amended their complaint on January 29, 2025, the parties again agreed to a dispositive motions briefing schedule. *See* ECF Nos. 32, 34. On March 19, 2025, the United States withdrew its Statement of Interest. *See* ECF No. 39.

On March 31, 2026, the County again moved to dismiss or in the alternative for summary judgment. ECF No. 42, JA 5. The County moved for dismissal on the issues of ripeness and standing. *See* ECF No. 42-1 at 13-19. The County also argued it was entitled to summary judgment as a matter of law as EPCA does not preempt

---

[15]     Reversing itself, the United States filed an *amicus* brief before this Court that argues against its prior, withdrawn submission and for EPCA preemption. The County submits the United States had it right the first time.

[16]     Plaintiffs concede that this action is a facial challenge to the validity of Bill 13-22. ECF No. 32 ¶ 22. JA 98.

Bill 13-22. *See* ECF No. 42-1 at 20-28.

### *The District Court Rejects Plaintiffs' EPCA Preemption Claim.*

After opposition and a cross-motion for summary judgment from the Plaintiffs, which the County opposed, the District Court issued an opinion on March 25, 2026. JA 2-15. The District Court found that Plaintiffs' claims were ripe and that they had standing. JA 5-9.

The District Court also held that as a matter of law, EPCA does not preempt the County's Decarbonization Law as it is not a law concerning "energy use" or "energy efficiency" as defined by EPCA. JA 12-14. The District Court found "Bill 13-22's mandate for 'all-electric' new construction touches on none of [EPCA's] efficiency standards, consumer labeling, or testing procedures relevant to covered appliances." JA 12. Rejecting Plaintiffs' reading of the terms "energy use" and "point of use," the District Court observed EPCA "regulate[s] how manufacturers must label . . . products before the products enter the market" and that EPCA's regulations "would make little sense if 'energy use' refers to the quantity of energy used *after* the product was sold to the consumer." JA 13 (emphasis in original). The District Court also rejected Plaintiffs' broad construction of the word "concerning" in EPCA's preemption clause, observing that "Congress' use of the word 'concerning' does not create a limitless preemption; the regulation at issue must still relate to or be about or regarding the 'energy use' of a covered product for

preemption to apply" (quoting *Mulhern Gas Co., Inc. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y 2025) *appeal docketed*, No. 25-2041 (2nd Cir. Aug. 22, 2025)). JA 13.

In so holding, the District Court expressly agreed with Judge Friedland's *Berkeley* dissent from rehearing en banc, joined "several lower courts in adopting her construction," and cited decisions by three other federal trial courts rejecting the *Berkeley* panel's EPCA analysis. JA 14.

The District Court granted summary judgment to the County and denied Plaintiffs' cross-motion for summary judgment. JA 14. Plaintiffs now appeal that determination.

## SUMMARY OF THE ARGUMENT

While the County did not appeal the District Court's decision on the issues of ripeness and standing, a review of those jurisdictional questions by this Court will show Plaintiffs allege no present harm or enforcement actions by the County as the all-electric building code does not exist at present. As such, this Court need not reach the merits given the lack of present harm or any enforceable law at the present.

On the merits, the District Court should be affirmed as Plaintiffs fail to provide this Court with grounds to afford the extraordinary remedy of an injunction to prohibit enforcement of a democratically enacted law that has no impact whatsoever on EPCA's nationwide appliance efficiency standards.

15

EPCA's plain language prohibits state legislation concerning "energy use" and "energy efficiency," terms defined in EPCA. As the Decarbonization Law concerns neither, EPCA does not preempt the Decarbonization Law.

EPCA's legislative history demonstrates its purpose was to prevent a patchwork of state energy efficiency standards across the county for appliances. The Decarbonization Law, concerned with the energy source used to power new buildings, has no impact at all on appliance energy efficiency standards.

As Plaintiffs are not likely to succeed on the merits of their claim, the Court need not reach the remaining factors for a permanent injunction. Even if this Court considers those factors, they weigh against issuing an injunction. There is no irreparable harm here to Plaintiffs. Instead, Plaintiffs present the Court with vague predictions of the future impact of regulations which have yet to be promulgated.

The balance of the equities weighs against enjoining enforcement of the Decarbonization Law, enacted to protect public safety and health of County residents from the adverse effects of the use of fuel oil and fuel gas to power buildings.

## ARGUMENT

### Standard of Review

This Court reviews a district court's grant or denial of summary judgment de novo. *Adnet, Inc. v. Soni*, 66 F.4th 510, 514 (4th Cir. 2023). "Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law.'" *Sigley v. ND Fairmont LLC*, 129 F.4th 256, 260 (4th Cir. 2025), *cert. denied*, 145 S. Ct. 2736 (2025) (quoting Fed. R. Civ. P. 56(a)). Where the district court disposes of cross-motions for summary judgment, this Court considers each motion separately, resolving all factual disputes in the light most favorable to the party opposing that motion. *See Adnet*, 66 F.4th at 514. The Court may "[a]ffirm the grant of summary judgment on any ground that the law and the record permit." *Jones v. Solomon*, 90 F.4th 198, 214 (4th Cir. 2024) (quotation omitted).

This Court reviews a district court's denial of a permanent injunction for abuse of discretion. *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017). "A district court abuses its discretion when it relies on incorrect legal conclusions or clearly erroneous findings of fact, or otherwise acts arbitrarily or irrationally in its ruling." *Id.* (quotations and citations omitted).

## I.  Given the Absence of any Presently Enforceable Law, Plaintiffs' Claim is Not Ripe and They Lack Standing.

Standing and ripeness are jurisdictional questions. *See South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (citation omitted). This Court may reach the question of jurisdiction at any time. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review" (internal quotations and citation omitted)); *Outdoor*

*Advert. Ltd. P'ship v. Beaufort Cnty.*, 105 F.4th 554, 565-66 (4th Cir. 2024) ("[f]ederal courts are required to ensure that they have jurisdiction and must address standing problems even when the parties do not raise them").

### A. This Case is Not Ripe as There is no Enforceable Law.

Plaintiffs ask to enjoin a law that is not presently enforced based upon predictions of the future impact of unwritten regulations. The absence of any concrete facts to establish injury in fact, let alone irreparable harm to warrant the injunctive relief they seek, means this matter is not ripe for judicial review.

To determine whether the case is ripe, this Court must "balance 'the fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002) (quotation omitted).

"A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (citation omitted).

Hardship "[i]s measured by the immediacy of the threat and the burden imposed on the [plaintiffs] who would be compelled to act under threat of enforcement of the challenged law." *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992), *as amended* (Nov. 2, 1992). "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and

any future impact remains wholly speculative." *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quotation omitted). Plaintiffs bear the burden of proving ripeness. *See Miller*, 462 F.3d at 319.

Plaintiffs' allegations do not provide this Court with a case fit for judicial decision. All affidavits in support of the Amended Complaint admit there is no enforceable law, stating instead that Bill 13-22 "sets into motion the process" for enforceable regulations. JA 145-146 ¶ 4; JA 149 ¶ 4; JA 153-154 ¶ 4; JA 158 ¶ 6; 161-162 ¶ 4; JA 164-165 ¶ 4; JA 168 ¶ 5; JA 172 ¶ 5; JA176 ¶ 5. Their claim is uncertain as it is based upon unpublished regulations whose full scope, including exemptions, will not be known until they are adopted by the County Council. While the County Executive must publish the regulations by December 31, 2026, the Council has no deadline to adopt the regulations once transmitted to them. By participating in the legislative process, Plaintiffs may persuade the County Executive or the County Council to include exceptions or exemptions in the regulations that alter Plaintiffs' predicted harm. This case is not ripe until the regulations—and the full scope of any applicable exemptions—are adopted by the County Council. *See, e.g., Franks*, 313 F.3d at 195 (where county and state agency had "interwoven involvement" in a permitting process, controversy was not ripe until the completion of the final step of the process).

As a matter of law, the predicted, threatened, or potential harm asserted by Plaintiffs fails to establish hardship—an immediate threat or burden—to Plaintiffs. Plaintiffs' affidavits attest to hypotheticals: what "potential" or "would-be" customers "may" do (JA 146 ¶ 5, JA 168 ¶ 6); predict higher costs that will "likely" decrease house construction such that customers "may" not be able to afford new homes (JA 150 ¶ 5); and predict lost sales to "potential" customers if homes can no longer use gas appliances or propane gas appliances (JA 154 ¶ 5, JA 165 ¶¶ 5-6). Plaintiffs' predictions of future sales losses or decreased business are not yet ripened, actionable injuries. *See Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 296 (4th Cir. 2022) (injuries that are "contingent upon a decision to be made by a third party that has not yet acted" are not ripe (quotation omitted)).

Their affidavits also predict increased gas rates and what those rates "will" do or will "potentially" do to businesses or members of associations. JA 159 ¶ 7; JA 162 ¶ 5; JA 165 ¶¶ 5-6. The union Plaintiffs predict less work, employment, and pension credits for members, and predict members staying away from gas-related trades. JA 172 ¶¶ 6, 8; JA 176 ¶ 7. Plaintiff Washington Gas Light Company relies on a hearsay statement by one person to claim businesses will not use natural gas at all in future work. JA 168 ¶ 7. No Plaintiff cites existing or current hardship due to the Decarbonization Law. No Plaintiff provides numbers comparing business before and after the law's March 2023 effective date, or any statistics or percentages of the

20

present impact of the County's currently unwritten, unenforced all-electric building standard regulations.

The Decarbonization Law does not "[c]ommand anyone to do anything or to refrain from doing anything; [it does] not grant, withhold, or modify any formal legal license, power, or authority; [it does] not subject anyone to any civil or criminal liability; [it creates] no legal rights or obligation." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Plaintiffs will undergo no undue hardship if a decision is delayed. "[T]he mere existence of a statute, regulation, or articulated policy is ordinarily not enough to sustain a judicial challenge, even by one who reasonably believes that the law applies to him and will be enforced against him according to its terms." *Nat'l Student Ass'n v. Hershey*, 412 F.2d 1103, 1110 (D.C. Cir. 1969) (citation omitted)).

Even if Plaintiffs believe they must make planning decisions now to comply with future enforcement of the unwritten regulations, that does not in and of itself make their claim ripe. *See Commonwealth of Va. v. United States*, 926 F. Supp. 537, 545 (E.D. Va. 1995), *aff'd*, 74 F.3d 517 (4th Cir. 1996) (holding unripe where the discretionary sanctions being challenged had not yet been assessed). Moreover, Plaintiffs cannot attest with certainty that any proposed building project would not qualify for a code modification under the regulations, or be exempt due to another exception that may exist in regulations based upon practical difficulty or undue

hardship.

Plaintiffs cite *Retail Industry Leaders Association v. Fielder*, 475 F.3d 180 (4th Cir. 2007) as a case where the court found ripe for determination the legality of a law prior to the promulgation of required regulations. App. Br. at 49. Key to that determination however was the fact that to comply with the law's spending and reporting requirements, a party had to alter its accounting procedures and spending prior to the regulations' effective date. *See id.* at 188. This was sufficient for the Fourth Circuit to find imminent injury: the law itself created actual and present liability without any regulations. *See* 475 F.3d at 186-87.

Unlike *Retail Industry*, in this case, there is no similar requirement for any Plaintiff to take any action or alter any business practices before the Decarbonization Law's effective date. Plaintiffs' claims regarding present harm are based upon their predictions of future events and decisions by non-parties that may or may not happen —higher gas rates, loss of customers, or loss of trade union members—based upon an unwritten law. "An issue is not fit for review if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *See id.* at 188 (quotation omitted).

Plaintiffs' predictions of the impact of impending regulations are not actionable injuries. Because the full scope of the law will not be known until the regulations are promulgated and by extension the scope of any such ultimate harm

from enforcement, Plaintiffs can bring a challenge later, ***if at all***, should the harm become imminent and certain. For these reasons, Plaintiffs' claim is unripe.

**B.      Plaintiffs Cannot Demonstrate Injury in Fact by Regulations That Have Not Been Published for Public Comment, Let Alone Enacted and Taken Effect.**

Plaintiffs lack standing as their Amended Complaint alleges potential future injuries, which are wholly speculative and not imminent, are based upon unwritten regulations.

A plaintiff has standing if he can show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). An association has standing to bring suit *on behalf of its members* when: (1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit. *See Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002).

Any allegation of standing based upon risk of future harm must establish that the harm is "sufficiently imminent and substantial" to meet the concrete harm requirement. *See TransUnion* at 435. Plaintiffs bear the burden of establishing that they have standing. *See Penegar v. Liberty Mut. Ins. Co.*, 115 F.4th 294, 300 (4th

Cir. 2024).

Non-existent regulations with exemptions of undefined scope, as a matter of law, do not generate "concrete, particularized, and actual or imminent" harm to Plaintiffs. "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes," *TransUnion, LLC*, 594 U.S. at 423, and until the regulations are finalized and published, this is a hypothetical and abstract dispute. All Plaintiffs fail to satisfy the imminence prong of the standing analysis.

The Declarations on which Plaintiffs rely, discussed above, do not allege an injury in fact. Plaintiffs' conclusory and speculative statements that they *expect* sales will go down, that *potential* customers may purchase homes elsewhere, that employees *could* lose work, that gas-related trades *may* become less attractive, and that they *anticipate* energy-related costs to rise do not sufficiently plead an injury in fact. Plaintiffs state conclusory predictions. A potential threat of loss of customers or loss of work that may or may not occur someday in the future cannot satisfy the injury requirement for standing purposes. *See Lujan v. Defenders. of Wildlife*, 504 U.S. 555, 564 (1992) ("'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require"); *Friends for Ferrell Parkway*, 282 F.3d at 322 (holding injury was too speculative for purpose of standing when party relied on conjecture to hypothesize about the speculative

traffic effects that would materialize in two-to-three-years due to the City's failure to build a parkway).

No Plaintiff alleges that there are imminent costs associated with ensuring compliance in advance of the regulations becoming effective. *Cf. Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013) (holding that additional costs because of the administrative burden of assuring compliance before the effective date can satisfy imminent injury requirement for standing purposes).

As Plaintiffs fail to allege facts to satisfy the requirement that the injury in fact is actual or imminent, the Amended Complaint must be dismissed for lack of standing.

## II. The District Court Correctly Determined that EPCA Does Not Preempt the County's Decarbonization Law.

The District Court should be affirmed because EPCA does not preempt the Decarbonization Law, which has no impact at all on "energy use" or "energy efficiency" of appliances.

### A. Federal Preemption Analysis Focuses on Congressional Intent.

Under the Supremacy Clause of the U.S. Constitution, federal law is the "supreme Law of the Land." U.S. Const. art. IV, cl. 2. "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This assumption is strongest when Congress legislates in a field which the states have

traditionally occupied, such as when they exercise their traditional police power to legislate for health and safety of their residents. *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 485 (1996); *S. Blasting Servs., Inc. v. Wilkes County*, 288 F.3d 584, 590 (4th Cir. 2002)). State and local governments traditionally enact building codes such as the Decarbonization Law pursuant to their police powers to protect the public health and safety.[17] In Maryland, the State adopts international building codes as building performance standards and authorizes localities such as the County to adopt those same building codes or enhanced versions of those codes.[18]

---

[17]     *See S. Blasting Servs.*, 288 F.3d at 590 ("[s]tates have long possessed primary responsibility in our federal system for protecting the health and safety of their citizens"); *Miller v. Chicago & N.W. Transp. Co.*, 925 F. Supp. 583, 589 (N.D. Ill. 1996) (building codes are a field traditionally occupied by state and local law); *Commissioners of Easton v. Covey*, 74 Md. 262, 266 (1891) (power to regulate erection of new buildings exists under power to enact such ordinances as commissioners deem necessary and beneficial to town); 13 Am. Jur. 2d Buildings § 2 ("[a] municipality's enactment of a building code designed to protect the health, safety, and welfare of its people is a proper exercise of its police power"); Basis and purpose of municipal power, 7A McQuillin Mun. Corp. § 24:499 (3d ed.) ("[t]he view ordinarily is taken that municipal competency to enact reasonably necessary building regulations to protect public health and safety can be based on municipal police power, a general grant of power, or a general welfare clause").

[18]     *See* Md. Code Ann., Local Gov't 13-901(c)(2) (2013) (authorizing Montgomery County to adopt a building code): Md. Code Ann., Pub. Safety §§ 12-503 and 12-504 (2022) (requiring the State to adopt international building codes as building performance standards and permitting localities to adopt modifications to those standards); COMAR 09.12.51.05(b)(1)(a), (b)(1)(c) (2019) (localities may adopt modifications to State building standards or international codes, but may not adopt amendments that weaken the International Energy Conservation Code).

A federal law may, however, preempt state and local laws in three ways: "express preemption," by "field preemption," or by "conflict preemption." *See Pinney v. Nokia, Inc.*, 402 F.3d 430, 453 (4th Cir. 2005).[19] Plaintiffs here rely solely on an express preemption argument. JA 9-10.

In an express preemption analysis, "the text itself 'contains the best evidence of Congress' preemptive intent.'" *AirEvac EMS, Inc. v. Cheatham*, 910 F.3d 751, 761 (4th Cir. 2018) (quoting *Commonwealth of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016)). And Congressional purpose is the "ultimate touchstone" of the preemption analysis. *Washington Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 419 (4th Cir. 2013) (quotation omitted). To determine Congress' purpose, "the text of a law controls over purported legislative intentions unmoored from any statutory text," and courts "may not replace the actual text with speculation as to Congress' intent." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (quotation omitted).

---

[19] For the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws. *See S. Blasting Servs., Inc.*, 288 F.3d at 589.

**B.** **The Plain Language of EPCA Demonstrates that the Decarbonization Law Falls Outside the Scope of EPCA's Express Preemption Provision.**

When EPCA's key terms are read in the context of the statute, and technical terms are given their statutorily defined meaning, as opposed to improper colloquial meanings, the Decarbonization Law does not fall within the preemption provision of EPCA.

EPCA's preemption provisions provide that EPCA's appliance energy conservation program preempts a state regulation "concerning the energy efficiency [or] energy use…" of a "covered product" with a federal energy conservation standard in effect. 42 U.S.C. §§ 6297(c) (consumer), 6316(b)(2)(A) (industrial).[20] The term "covered product" means consumer product specified in 42 U.S.C. § 6292. *See* 42 U.S.C. §6291(2). Examples of consumer products include refrigerators, air conditioners, water heaters, furnaces, dishwashers, clothes washers, clothes dryers, kitchen ranges and ovens, and pool heaters. *See* 42 U.S.C. § 6292(a).

EPCA requires the Department of Energy ("DoE") to set energy conservation standards by regulation for covered products.[21] Before selling a covered product,

---

[20] EPCA addresses consumer and industrial appliances separately in different statutory provisions, but the preemptive clause text is substantially similar. *Cf.* 42 U.S.C. §§ 6297(c); 6316(b)(2)(A).

[21] *See* 42 U.S.C. § 6295; 10 C.F.R. § 430.32.

manufacturers must demonstrate it meets those standards using standardized testing procedures[22] and affix a label disclosing the product's "energy efficiency" and "energy use."[23]

EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with "test procedures" in another EPCA section. 42 U.S.C. § 6291(4). "Energy efficiency" is defined as, "the ratio of useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under" 42 U.S.C. § 6293.[24] *See* 42 U.S.C. § 6291(5). These definitions must govern the Court's analysis. *See Van Buren v. United States*, 593 U.S. 374, 387 (2021) ("[w]hen a statute includes an explicit definition of a term, [courts] must follow that definition, even if it varies from a term's ordinary meaning" (quotation omitted)); *Id.* at 388 n.7 (2021) (when a statute addresses a technical subject, words should not be given their ordinary meaning; rather "a specialized meaning is to be expected" (quotation omitted)); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (a statute must be read "[b]y

---

[22]     *See* 42 U.S.C. §§ 6293, 6314; 10 C.F.R. §§ 429.12, Parts 430 and 431.

[23]     *See* 42 U.S.C. §§ 6294, 6315; *see also, e.g.,* 16 C.F.R. § 305.17.

[24]     42 U.S.C. § 6293 lays out the process for new and amended testing procedures "designed to produce test results which measure energy efficiency, [and] energy use" for EPCA-covered products. *Id*. at (a)(3).

reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole").

Applying EPCA definitions for "energy use" and "energy efficiency," EPCA's preemption of a law "concerning the energy efficiency [or] energy use" does not preempt or implicate the Decarbonization Law. The Decarbonization Law does not address and has no impact on the quantity of energy consumed by an appliance or the ratio of an appliance's output to its "energy use." The Decarbonization Law addresses what type of energy will be available in new buildings, not how efficiently an appliance consumes that energy. Bill 13-22 is completely agnostic to and does not address the issue of appliance efficiency or the amount of fuel an appliance consumes.

Bill 13-22's legislative record also shows absolutely no consideration of or concern for appliance efficiency. JA 185-351. The legislative history demonstrates unequivocally that the County enacted Bill 13-22 pursuant to its police powers for purposes of public health and safety to remove greenhouse gases from the atmosphere and improve indoor air quality.

EPCA does not prohibit local laws that regulate which types of energy may be available in new construction. To that end, EPCA defines "energy" to mean "electricity, or fossil fuels,"[25] but EPCA's preemption clause does not prohibit a

---

[25] 42 U.S.C. § 6291(3).

30

state law "concerning the energy of a covered product." The preemption clause prohibits a "[S]tate regulation concerning the energy **use** [or] energy **efficiency**" of a covered product. EPCA does not limit the ability of localities to regulate types of fuel used to power buildings.

Plaintiffs contend that the Decarbonization Law is preempted because it regulates "energy use" because it "sets the maximum 'energy use' of EPCA-covered gas appliances at zero." App. Br. at 18. Plaintiffs fail, however, to utilize the prescribed definition of "energy use" in this statement. "Energy use" again means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures" set by EPCA. The Decarbonization Law does not in fact regulate the quantity of energy an appliance consumes during EPCA testing procedures or set that amount at zero. The Decarbonization Law's concern is the power source used to run the appliance.

Plaintiffs base their argument in this regard on *Berkeley*. That Court's decision is not binding precedent. Upon the City of Berkeley's petition for rehearing en banc, eleven judges joined in a written dissent from the denial of the en banc hearing. Specifically, Judge Friedland wrote "[i]n nearly a decade on the bench, I have never previously written or joined a dissent from a denial of rehearing en banc. I feel compelled to do so now to urge any future court that interprets the Energy Policy and Conservation Act not to repeat the panel opinion's mistakes." *Berkeley* at 1119

(Friedland, J., dissenting) (footnote omitted).

And to date, since *Berkeley*, every District Court judge—including the judge in this case—rejected claims advancing the *Berkeley* panel's analysis, and in so doing, rejected EPCA preemption challenges to state and local environmental laws that restrict natural gas in new construction,[26] prohibit nitrous oxide emissions from natural gas appliances,[27] or set building energy efficiency standards.[28]

Three federal district courts rejected *Berkeley*'s EPCA preemption analysis in challenges brought to natural gas restrictions in new construction, and by extension

---

[26] *Nat'l Ass'n of Home Builders of the United States v. District of Columbia*, No. 24-CV-02942 (ACR), 2026 WL 837674 (D.D.C. Mar. 26, 2026), *appeal docketed*, No. 26-7050 (D.C. Circ. Apr. 14, 2026) (EPCA does not preempt the Clean Energy D.C. Building Code Amendment Act of 2022, which requires certain newly constructed or improved buildings to operate as zero-energy by 2027); *Mulhern Gas Co. v. Mosley*, 798 F.Supp.3d 304 (N.D.N.Y. 2025)*, appeal docketed*, No. 25-2041 (2nd Cir. Aug. 22, 2025) (EPCA does not preempt a New York law prohibiting the installation of fossil fuel equipment and building systems in new buildings); *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025), *appeal docketed*, No. 25-977 (2nd Cir. Apr. 21, 2025) (EPCA does not preempt New York City's all-electric building law that prohibits natural gas in newly constructed residential buildings in the city).

[27] *See Rinnai Amer. Corp. v. S. Coast Air Quality Mgmt. Dist*., No. CV 24-10482 PA (PDX), 2025 WL 2427844 (C.D. Cal. July 22, 2025) (EPCA does not preempt a local jurisdiction's rule that prohibited nitrous oxide emissions for natural gas appliances).

[28] *See Maryland Bldg. Industry Ass'n v. McIlwain*, No. 8:25-cv-00113-DLB, 2026 WL 946235 (D. Md. Apr. 2, 2026), *appeal docketed*, No. 26-1552 (4th Cir. May 4, 2026) (EPCA does not preempt Maryland law setting building energy performance standards).

rejected the EPCA arguments advanced here by Plaintiffs. *See Nat'l Ass'n of Home Builders of the United States v. District of Columbia*, No. 24-CV-02942 (ACR), 2026 WL 837674 (D.D.C. Mar. 26, 2026), *appeal docketed*, No. 26-7050 (D.C. Circ. Apr. 14, 2026); *Mulhern Gas Co.*, 798 F.Supp.3d 304 (N.D.N.Y. July 23, 2025) *Mulhern Gas Co. v. Mosley*, 798 F.Supp.3d 304 (N.D.N.Y. 2025)*, appeal docketed*, No. 25-2041 (2nd Cir. Aug. 22, 2025); *Associationn of Contracting Plumbers of the City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. March 18, 2025), *appeal docketed,* No. 25-2041 (2nd Cir. Apr. 21, 2025).

For example, *Association of Contracting Plumbers* considered an EPCA preemption challenge to New York City's all-electric building law that prohibits natural gas in newly constructed residential buildings in the city. *See Ass'n of Contracting Plumbers*, 2025 WL 843619 at *1. The Court found EPCA did not preempt the City's law, and expressly rejected the *Berkeley* court's interpretation of "energy use." The Court made its finding for three reasons: (1) a product's "energy use" is determined before it is even placed into the hands of a consumer; (2) manufacturers must provide the Department of Energy information about covered products' "energy use," a compliance process that does not require monitoring of

consumers' use;[29] and (3) "energy use" must be included in a product's label before it is sold to a consumer. *See id.* at *5. After rejecting the colloquial use of the term "energy use," the Court found that New York City's law does not "concern" EPCA's energy conservation standards because it did not impact performance standards of covered products, but rather affects "[t]he type of fuel that a covered product may consume in certain settings, irrespective of that product's energy efficiency or use." *See id.* at *7.

Similar to New York City's law, the Decarbonization Law focuses on the type of fuel used, and sets no appliance efficiency performance standards. As the Decarbonization Law does not "concern" the federal efficiency standards, it is not preempted by EPCA.

### C. The Legislative History of EPCA's Express Preemption Provision Demonstrates that the Decarbonization Law Falls Outside ECPA's Scope

While this Court's analysis may end following review of the plain text of EPCA, a review of EPCA's legislative history similarly supports a conclusion that EPCA does not preempt the Decarbonization Law.

Congress first enacted EPCA in 1975 and required manufacturers to label their appliances with measures of energy use and efficiency. *See* H.R. Rep. No. 94-340,

---

[29] Citing *Berkeley* at 1122-23 (Friedland, J., dissenting). (citing 42 U.S.C. § 6296(d)(1)).

at 17 (1975). Congress went further and established a nationwide conservation program for appliances which required the U.S. Department of Energy (DoE) to prescribe minimum energy efficiency standards for certain covered products. *Nat.'l Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1362 n.1 (D.C. Cir. 1985). When the DoE did not follow through, manufacturer trade associations became frustrated by the patchwork of state regulations and negotiated with the Natural Resources Defense Council to create uniform national standards. S. Rep. No. 100-6, at 4 (1987). Congress amended EPCA to include the negotiated standards and added the preemption provision. 42 U.S.C. § 6297(c); *see also Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005) (finding the legislative history of EPCA demonstrates that "[C]ongress intended to preempt state energy efficiency standards, testing procedures, and consumer labeling requirements").

The Decarbonization Law does not deviate from or alter the uniform national appliance efficiency standards, testing procedures, or consumer labeling requirements. To that end, the only appliance manufacturer that is a plaintiff in this action does not complain of a need to change its appliance design, testing, or labeling practices, but rather predicts lost sales due to the Decarbonization Law. JA 154 ¶¶ 5, 6. Because the Decarbonization Law does not create competing or differing appliance conservation standards, the Decarbonization Law clearly does not fall

within the scope of EPCA preemption provision.

**D. The Decarbonization Law Does Not Conflict with EPCA Because it Does Not Frustrate Compliance with EPCA or Congressional Purposes.**

Nothing in the Decarbonization Law impacts the federal energy efficiency standards for appliances. Once the County's decarbonization regulations take effect, they will not dictate efficiency standards for appliances, and manufacturers will not face competing efficiency standards. Congress sought to eliminate competing efficiency standards with EPCA preemption provisions at issue here. That Congressional purpose and intent will still be honored if the Decarbonization Law—whose purpose is to reduce greenhouse gas emissions in the County—remains in effect and the County promulgates the regulations required to enforce it.

Plaintiffs admit EPCA has roots in the fuel energy crisis of the mid-1970s triggered by our nation's reliance on foreign oil. JA 99. EPCA was "designed, in part, to reduce the United States' "domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs.'" *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 498-99 (quoting S. Rep. No. 94-516 at 117 (1975)). The County enacted the Decarbonization Law not for purposes of conservation through setting appliance efficiency standards, but rather for purposes of public safety and health by reducing greenhouse gas emissions by restricting the use of one type of fossil fuel in new construction. The Decarbonization Law does

not create new or rival standards or require builders to install appliances that exceed the applicable federal efficiency standard. Moreover, Plaintiffs' arguments that by setting appliance efficiency standards to reduce domestic energy consumption means that Congress intended to mandate continued use of one type of fossil fuel to power appliances rings hollow and is not supported by the plain text of the law or any of its legislative history.

**E. Plaintiffs' Remaining Arguments Cannot Escape or Alter the Plain Meaning of "Energy Use" or "Energy Efficiency" in EPCA's Preemption Clause.**

**1. The Term "Concerning" in the Preemption Clause Does Not Alter the Definitions of "Energy Use" or "Energy Efficiency."**

Plaintiffs advocate for an expansive read of the term "concerning" in Section 6297(c). App. Br. at 19-22. This Court should reject Plaintiffs' request to interpret the term "concerning" in isolation and so broadly as to erase EPCA's definitions of "energy use" and "energy efficiency." *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (in statutory construction, interpretation of a word or phrase depends upon its context in a statute); *Berkeley* at 1125 (Friedland, J., dissenting) (use of the term "concerning" in Section 6297(c) "cannot transform the definition of 'energy use'"); *Nat'l Ass'n of Home Builders*, 2026 WL 837674 at * 9 (rejecting plaintiffs' interpretation of "concerning" in EPCA preemption clause as it risked "making preemption turn on infinite connections" (quotation omitted)); *Ass'n of Contracting*

*Plumbers*, 2025 WL 843619 at *5-*6 (declining to find that use of the term "concerning" in Section 6297(c) meant the EPCA preempted local regulation with no focus on the performance standards of covered products); *Mulhern Gas Co.*, 798 F. Supp. 3d at 326 (finding "use of the word 'concerning' [in Section 6297(c)] does not create a limitless preemption; the regulation at issue must still relate to or be about or regarding the 'energy use' of a covered product for preemption to apply").

As Plaintiffs admit, the phrase "concerning" is akin to the phrase "relating to" (App. Br. at 13, 19), and courts refuse to find that "the sky is the limit" for the scope of a preemption clause "relating to" the regulated subject matter. *See Dan's City Used Cars, Inc. Pelkey*, 569 U.S. 251, 260 (2013).

> **2. EPCA's Exception From Preemption for Building Codes Does Not Apply and Does not Expand the Scope of Preemption in Section 6297(c).**

After focusing on the word "concerning," Plaintiffs turn to EPCA's exception from preemption for local building codes found in Section 6297(f)(3). App. Br. at 23-27. These provisions except certain state and local building codes from EPCA's preemption. Plaintiffs argue that to avoid rendering the building code exception provisions "a nullity," this Court cannot read them narrowly to only cover direct regulation of appliance manufacturing, and that EPCA "preemption must extend to laws" like the County's "that operate at the building level as well." App. Br. at 23, 24.

This reasoning is flawed and divorced from the technical, detailed text of EPCA. The preemption provision—and by extension any need for an exception from it—applies only if a building code concerns the "energy use" or "energy efficiency" of a covered product. *See* 42 U.S.C. § 6297(f)(3) (exception to EPCA preemption is available under enumerated circumstances for a "local building code for new construction concerning the **energy efficiency** or **energy use** of . . . covered product[s]" (emphasis added)); *Mulhern Gas Co.*, 798 F.Supp.3d at 326 (building code exception provisions apply only "in situations where the underlying building code regulation is one concerning energy efficiency or energy use"). *See also Bldg. Industry Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1151 (9th Cir. 2012) (legislative history of Section 6297(f)(3) states its provisions "'are designed to ensure that [local] performance-based codes cannot expressly or effectively' require installation of higher energy efficiency products" (citing H.R. Rep. 100-11 at 26 (1987)). The Decarbonization Law needs no exception from preemption. It is not a building code and it concerns neither the "energy use" nor the "energy efficiency" of covered products.

Moreover, exceptions to preemption such as Section 6297(f)(3), "'while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the [preemptive] rule.'" *Nat'l Ass'n of Home Builders*, 2026 WL 837674 * 10 (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264 (2013)). The

39

language of the preemption clause itself—Section 6297(c)—should guide this Court's analysis, not an inapplicable exception to preemption.

The Decarbonization Law does not set any appliance efficiency standards, it is not preempted by EPCA, and it does not need the safe harbor of Section 6297(f)(3)'s exception to preemption for building codes.

### 3. Nothing in EPCA's Text or Legislative History Supports a Finding that Congress Enacted a Right to Use Natural Gas-Powered Appliances.

Plaintiffs' tortured reading of EPCA would ask this Court to find that ECPA's appliance energy conservation standards create an ongoing right to use natural gas-powered appliances. App. Br. at 31. While the text of EPCA's preemption provision "guarantees uniform appliance efficiency standards[,]" "it does not create a consumer right to use any covered appliance." *Berkeley* at 1121 (Friedland, J. dissenting). *See also Ass'n of Contracting Plumbers*, 2025 WL 843619 *5 (finding EPCA does not "grant consumers an absolute right to use" covered products).

Unable to secure preemption from the plain language of Section 6297(c), Plaintiffs argue other EPCA provisions are purportedly indicative of the scope of EPCA preemption. App. Br. at 27-29. Far from shedding light, these provisions have nothing to do with and do not alter the text of Section 6297(c).

Subsection 6295(o) sets the rules of the road for the DoE when prescribing new energy use standards. The fact that DoE cannot issue standards that remove

performance features currently available in covered products (§ 6295(o)(4)), and must take into account the economic impact of a new standard (§6295(o)(2)(B)(i)(I)), does not indicate Congressional intent to preempt a local building code that regulates energy available in new buildings and that is completely untethered to appliance efficiency standards. Nor does it indicate a focus to ensure "availability of covered products for consumer use." App. Br. 27. These provisions just reflect EPCA's concern as to what DoE must consider before issuing energy use standards. This does not broaden the scope of EPCA preemption.

Subsection 6297(d) comes into play when a state wants to use its own appliance energy conservation standard "with respect to energy use [or] energy efficiency," and wants an express waiver from the DoE of EPCA preemption. *See* 42 U.S.C. § 6297(d)(1)(A). The Decarbonization Law has no energy conservation standard, and does not address "energy use" or "energy efficiency," so these provisions are not applicable at all to the County. *See Mulhern Gas Co.*, 798 F. Supp. 3d at 327.

Nor do they assist this Court in understanding the scope of the plain meaning of the preemption clause in Section 6297(c). Plaintiffs invoke three provisions of Section 6297(d) that state when granting a waiver from preemption to a state for its appliance conservation standard, DoE must consider: (1) whether a state can prove its regulation's "energy or water savings" is preferable when assessed against

various factors; (2) whether the state regulation would significantly burden the "manufacturing, marketing, distribution, sale, or servicing" of a covered product on a national basis; (3) and whether the state regulation would result in the unavailability of a specific product type. 42 U.S.C. § 6297(d)(1)(C)(ii), (3), (4).

These restrictions on DoE's ability to grant waivers for appliance conservation standards do not mean a locality like the County cannot impose restrictions on the energy used in newly constructed buildings. "[L]ike an exception provision, a waiver provision cannot by itself establish the scope of a preemption provision." *Nat'l Ass'n of Home Builders*, 2026 WL 837674 *10 (quotation omitted). EPCA's apparent concern in Section 6297(d) about the burdens imposed on the marketplace or product availability by DoE waivers for state appliance energy conservation standards does not translate into EPCA prohibiting any other law that could possibly affect product availability or the marketplace. "Congress does not . . . hide elephants in mouseholes." *Commonwealth of Puerto Rico v. Franklin California Tax-free Tr.,* 579 U.S. 115, 127 (2016).

And even if the Court agrees that the purpose of these provisions is to ensure uniformity, the Decarbonization Law again has no impact on the uniformity of appliance efficiency standards as it sets none.

### 4. "Point of Use" Must be Read in Context in EPCA.

Plaintiffs advance use of a dictionary definition[30] for the term "point of use," which appears within the definition of "energy use" but is not defined by EPCA. App. Br. at 40-42. But "point of use" has meaning within the context of the statute.

To measure energy at the "point of use" means gauging an appliance's energy consumption from the pipe or outlet, or "site energy." A "point of use" energy measurement does not include "source energy" from the power plant that produced the energy or the energy required to deliver the energy to appliance. *See Berkeley* at 1123 (Friedland, J., dissenting); *Id.* at 1124 n.11 & n. 13 (citing two examples Department of Energy use for "point of use" that excludes source energy); *Ass'n of Contracting Plumbers*, 2025 WL 843619 *5 (discussing technical meaning of "point of use" in EPCA). *See also* 47 Fed. Reg. 14, 424, 14,427 (Apr. 2, 1982) (referring to "point of use" as "site energy" rather than "source energy").

Thus, ECPA's instruction to measure "energy use" at the "point of use" is an instruction to manufacturers that the measurement does not include "indirect energy consumption upstream of the supply chain." *See Berkeley* at 1123 (Friedland, J., dissenting). This was necessary because, "[o]ther regulators at the time *did* consider

---

[30] By using a current dictionary definition for "point of use," Plaintiffs incorporate yet another flaw in their statutory analysis. App. Br. at 40-41. Courts look to dictionary definitions in effect at the time of codification to construe undefined statutory terms. *See, e.g., Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

such indirect energy consumption ('source energy') when adopting energy standards." *See id.* (citation omitted).

Contrary to Plaintiffs' argument, "point of use" does not mean that appliances' "energy use" should be measured in buildings where the appliances are used.

**5.  As There were No Expansive Changes to EPCA's Preemption Clause, the Changes do Not Support Expansive Interpretation Beyond its Plain Meaning.**

Seeking further refuge from Section 6297(c)'s plain language, Plaintiffs highlight a purported difference between the current preemption language in Section 6297(c) and prior iterations of that preemption clause. App. Br. at 34-35; U.S. Br. 25-28. As an initial matter, "energy use" and "energy efficiency" appear in all of the preemption clause's iterations since its 1975 inception. *See* Pub. Law No. 94-163, 89 Stat. 917 (1975); App. Br. at 35. EPCA's preemption clauses in in 1975 and 1978 used the term "energy efficiency standard." In 1987, Congress changed the term "energy efficiency standard" to "energy conservation standard," modified the definition slightly (to add current Section 6291(6)(B), to include design requirements for certain products in the definition), and moved it to the title of the preemption section. *See* Pub. Law No. 100-12 §§ 2, 7, 101 Stat. 103, 118 (1987).

The plain text shows this was not a "substantial expansion" of the scope of preemption. App. Br. at 34. Further, Congress did not view the 1987 amendment to

the preemption clause as a major, expansive, or even substantive change. Both the House and Senate reports analyzing the 1987 law characterized the amended preemption clause as similar to existing preemption language. *See* H.R. Rep. No. 100-11 at 23 (1987) (characterizing the new language in Section 6297(c) as "follow[ing] substantially the preemption requirements in current EPCA"); S. Rep. No. 100-6 at 9 (1987) ("[n]ew section 327(c) states that on the effective date for each Federal energy conservation standard, that standard preempts State regulation, **as provided under current law**" (emphasis added)).

Under any incarnation of EPCA's preemption clause, the Decarbonization Law does not concern "energy use" and "energy efficiency," and is not preempted.

**6. References to Energy Use in Provisions That Tell the Secretary When to Bring Products Under EPCA's Umbrella Are Not the Same as References to "the Energy Use" of an EPCA-Covered Product in the Preemption Provision.**

Plaintiffs argue EPCA's definition of "energy use" should be read in a broader sense based upon what Plaintiffs assert to be a plain meaning use of that term elsewhere in EPCA, citing Section 6292(b)(1)(B) and Section 6295(*l*)(1)(B). App. Br. 38-40. This argument is meritless. Read in context, those terms have meanings as specific by EPCA.

Section 6292(b)(1)(B) states the Secretary of the Department of Energy may classify a product as a covered product (and therefore subject to the EPCA) if the

"**average annual per-household energy use** by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year." 42 U.S.C. § 6292(b)(1)(B) (emphasis added).

EPCA specifies that "energy use" in Section 6292(b) is distinct from the definition of "energy use" as it appears in the preemption provision, Section 6297(c). Specifically, Section 6292(b)(2), states that for purposes of that subsection (b):

> [t]he term "**average annual per-household energy** use with respect to a type of product" means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

42 U.S.C. § 6292(b)(2)(A) (emphasis added). This Court must give effect to the terms as separately defined. *See Dep't of Agric. v. Kirtz*, 601 U.S. 42, 59 (2024) (when Congress bothers to provide separate definitions for terms, courts must give them effect); *Dean v. United States*, 556 U.S. 568, 573 (2009) ("[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (quotation omitted); *Metro. Wash. Airports Auth. v. Pan*, 106 F.4th 355, 363 (4th Cir. 2024) (stating the Court "must give effect to" separately defined terms in the same statute).

Plaintiffs also point to 42 U.S.C. § 6295(*l*)(1)(B), which permits promulgation of standards by the Secretary if "the average per household energy use within the

United States by products of such type (or class) exceeded 150 kilowatt-hours (or its Btu equivalent) for any 12-month period ending before such determination." 42 U.S.C. § 6295(*l*)(1)(A) (emphasis added); App. Br. at 39. Although Section 6292(*l*) does not have the same definition specified in Section 6292(b)(2), its terms must be read in context. *See Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 128 (4th Cir. 2023) (in statutory interpretation, "[c]ontext often provides invaluable clues" to the meaning of words (quotation omitted)).

Reading both Section 6295(*l*)(1) and Section 6292(b)(2) in context reveal that both provisions apply before a product is brought within the scope of EPCA as a "covered product." Both sections list conditions for the Secretary to determine if a particular product should be treated as a covered product under EPCA. Then, after the Secretary determines EPCA applies to the product, the product must comply with EPCA: it must meet EPCA conservations standards (42 U.S.C. § 6295); and the product must be tested against those standards and be certified as meeting them. *See* 42 U.S.C. §§ 6293, 6314. The product must be labeled prior to sale accordingly. *See* 42 U.S.C §§ 6294, 6315. The provisions guiding the Secretary to determine if a product's energy consumption is so high it should be subject to EPCA do not and could not use "energy use" in the same manner: the defined term "energy use" only applies once a product is a "covered product" and goes through the gauntlet of compliance. After that, per the preemption provisions, state and local regulations

47

cannot interfere with the "energy use" or "energy efficiency" requirements for those covered products.

Finally, the term "energy use" in both Section 6292(b) and Section 6295(*l*)(1) is not preceded by the definite article "the." Under canons of statutory construction, use of the definite article "the" particularizes and limits the subject it precedes, as opposed to the indefinite articles "a" or "an."[31] Congress clearly meant to incorporate the definition of "energy use" as Congress preempts regulations concerning "the" energy use of a covered product in the preemption provision, Section 6297(c). Neither Section 6292(b) nor 6295(l)(1) refer to "*the* energy use" of a product, and neither invoke the definition for "energy use" in Section 6291(4).

## III. Plaintiffs Are Not Entitled to Injunctive Relief.

To be entitled to the equitable remedy of a permanent injunction, Plaintiffs must demonstrate: "(1) that [they] have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the [Plaintiffs] and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *SAS Inst., Inc. v. World Programming*

---

[31] *See Palisades Collections, LLC v. Shorts*, 552 F.3d 327, 339 n.1 (4th Cir. 2008) (Niemeyer, J., dissenting) (observing "[i]t is a rule of law well established that the **definite article** 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an'" (quotation omitted, emphasis in original)).

*Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017) (quotation omitted).

Satisfaction of these four factors is a "high bar, " and an injunction is a "drastic and extraordinary remedy" that should only be granted where "essential in order effectually to protect property rights against injuries otherwise irremediable." *Id.* (quotations and citations omitted).

Plaintiffs cannot establish irreparable harm by a law that is not presently enforced. All affiants predict what harm "will," "would," or "is likely" to occur once the unseen and unwritten regulations take effect and are enforceable. Speculation about future impact, with no empirical data or facts to back up the predictions, does not give rise to present, factual, irreparable harm.

This absence of any facts or specifics to support the allegations of current injury is glaring. Two labor unions predict fewer "would-be gas workers," with no numbers cited to back up their claims; there are no numbers quoted showing lower enrollment rates in gas training programs or a decrease in applications for positions in gas-related trades since the March 2023 effective date of the Decarbonization Law. JA 172-173 ¶ 8; JA 176 ¶ 7. Two builders claim present harm because they make decisions well in advance on new development – one claiming they decide 2 years out, the other 1 year out – without identifying a single development or planned potential development in fact impacted by the Decarbonization Law since its enactment. JA 146 ¶ 7; JA 150 ¶ 8. Affiants predict higher gas rates due to a lower

customer pool, but none claim a current, higher gas bill, and identify no communication from any gas provider of an intention to raise rates based upon the Decarbonization Law. Not a single affiant provides present, actual numbers of lost business, higher rates, fewer gas technician applications, or denied construction permits because of the Decarbonization Law.

Only one affiant, an employee of Washington Gas Light Company ("WGL"), identifies one customer who stated he will no longer use natural gas in developments because of Bill 13-22. JA 168 ¶ 7. One customer's hearsay statement of future intent based upon an unwritten and unenforced law—with no other information as to what percentage of WGL's business that customer represents—fails to meet the high bar of irreparable harm sufficient for this Court to act.

Given that Plaintiffs' only harm is all speculative, Plaintiffs cannot demonstrate that the remedy at law of a monetary award will fail to compensate them. There is nothing to compensate when not a single Plaintiff articulates any concrete, present loss.

Finally, the balance of the equities and the public interest weigh against an injunction. In the context of injunctive relief against the government, the balance of the equities and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A government's "[i]nability to enforce its duly enacted plans clearly inflicts irreparable harm." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). This is especially

50

true when the law involves public safety. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012). Plaintiffs cannot dispute that the County enacted the Decarbonization Law to protect public health and public safety. Enjoining the County's efforts to protect public health and safety is against the public interest and would inflict irreparable harm on the County.

Plaintiffs' main argument here—that there is no benefit in enforcing a preempted law—presumes they are correct on the merits of this case. As noted above, they are not. Nothing in the EPCA's text or legislative history indicates an intention to protect the availability of natural gas as an energy source for appliances. Everything in EPCA's text and legislative history indicates a desire to prevent a patchwork of local appliance efficiency standards. The Decarbonization Law has no impact on EPCA efficiency standards, and is not preempted by the EPCA.

# CONCLUSION

The District Court correctly held Plaintiffs are not entitled to injunctive relief and its decision should be affirmed by this Honorable Court.

Respectfully submitted,

/s/ *John P. Markovs*
John P. Markovs
County Attorney

/s/ *Edward B. Lattner*
Edward B. Lattner
Deputy County Attorney

/s/ *Erin J. Ashbarry*
Erin J. Ashbarry
Chief, Division of Government Operations

/s/ *Jacquelyn P. Allen*
Jacquelyn P. Allen
Assistant County Attorney

/s/ *Kristen J. Nunley*
Kristen J. Nunley
Assistant County Attorney

Executive Office Building
101 Monroe Street, Third Floor
Rockville, Maryland 20850
(240) 777-6700
(240) 777-6705 fax
*Counsel for Appellee Montgomery County, Maryland*

# CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

Certificate of Compliance With Length Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the length limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,829 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

s/ *Erin J. Ashbarry*
*Counsel for Appellee*
*Montgomery County, Maryland*
Dated: June 25, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of June, 2026, the foregoing Brief, Addendum, and Certificate of Compliance were served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the address listed below:

Scott Novak
Baker Botts L.L.P.
700 K Street NW
Washington, D.C. 20001
scott.novak@bakerbotts.com

J. Mark Little
Baker Botts L.L.P.
910 Louisiana Street
Houson, TX 77002
mark.little@bakerbotts.com

Daniel B. Rankin
Baker Botts L.L.P.
401 S. 1st Street, Suite 1300
Austin, TX 78704
Daniel.rankin@bakerbotts.com

*Counsel for National Association of Home Builders of the United States, Restaurant Law Center, National Federation of Independent Business, Inc., Maryland Building Industry Association, Washington Gas Light Company, and National Propane Gas Association*

Abigail V. Carter
Bredhoff & Kaiser, P.L.L.C.
805 15th St. NW, Suite 1000
Washington, D.C. 20005
acarter@bredhoff.com

*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

Lauren McDermott
Mooney, Green, Saidon, Murphy & Welch, P.C.
1920 L. St. NW
Washington, D.C. 20036
lmcdermott@mooneygreen.com

*Counsel for Teamsters Local 96*

/s/ *Erin J. Ashbarry*

Erin J. Ashbarry
*Counsel for Appellee*
*Montgomery County, Maryland*

54

# ADDENDUM

# Table of Contents

**Montgomery County Code**

Chapter 2A. Administrative Procedures Act

Article II. Regulations

§ 2A-12 Policy and scope of Article..............................................................Add. 1

§ 2A-13 Definitions ............................................................................Add. 1

§ 2A-15 Regulations ..........................................................................Add. 2

Chapter 8. Buildings

Article II. Administration

§ 8-14D Comprehensive Building Decarbonization.......................................Add. 7

**United States Code**

42 U.S.C. § 6291 ...............................................................................Add. 10

42 U.S.C. § 6292 ...............................................................................Add. 37

42 U.S.C. § 6293 ...............................................................................Add. 40

42 U.S.C. § 6294 ...............................................................................Add. 47

42 U.S.C. § 6295 ...............................................................................Add. 58

42 U.S.C. § 6296 ...............................................................................Add. 129

42 U.S.C. § 6297 ...............................................................................Add. 132

42 U.S.C. § 6314 .......................................................................Add. 142

42 U.S.C. § 6315 .......................................................................Add. 149

42 U.S.C. § 6316 .......................................................................Add. 153

**Chapter 2A. Administrative Procedures Act**

**Article II. Regulations**

**Sec. 2A-12. Policy and scope of Article.**

(a) *Purpose.* It is the purpose of this article to prescribe a single and consistent procedure for the adoption, review and repeal of regulations, and to provide a uniform procedure for their public notification and compilation.

(b) *Scope.* Unless otherwise provided, this article applies to all regulations. However, this Article does not apply to the County Council, meeting as the Board of Health, when it adopts a regulation.

(1984 L.M.C., ch. 24, § 1; 1994 L.M.C., ch. 15, § 1; 2000 L.M.C., ch. 25, § 1.)

**Sec. 2A-13. Definitions.**

(a) *In general.* Unless otherwise clearly indicated by the context, in this article the following words have the meanings indicated.

(b) *Administrative procedure* means a written directive concerning the internal management of one or more than one County agency or department.

(c) *CAO* means the chief administrative officer of the County.

(d) *COMCOR* means the Code of Montgomery County Regulations established under this article.

(e) *Executive order* means an order issued by the County Executive that directs a specific action.

(f) *Issuer* means:

    (1) The County Executive; or

    (2) A person or agency authorized by law to issue regulations.

(g)     *Register* means the Montgomery County Register established under this article.

(h)     *Regulation* means any rule or standard that an issuer by law is authorized to issue. Regulation includes any amendment to an existing regulation.

(1984 L.M.C., ch. 24, § 1; 1984, L.M.C., ch. 27, § 1; 1994 L.M.C., ch. 15, § 1.)

*     *     *

### Sec. 2A-15. Procedure for adoption of regulations.

(a)     *Requirement.* Before a regulation takes effect, the regulation must meet:

    (1)     The requirements of this Article; and

    (2)     Any other requirement imposed by law.

(b)     *Single subject requirement.* A proposed regulation must not contain more than one subject matter.

(c)     *Publication.* An issuer must publish in the Register:

    (1)     A summary of the proposed regulation;

    (2)     The place where a copy of the proposed regulation may be obtained;

    (3)     The date, time, and place of any public hearing;

    (4)     The name and address of a person to whom comments may be directed;

    (5)     The deadline for submitting comments;

    (6)     A citation of the Section of the County Code that authorizes the adoption of the regulation; and

    (7)     A reference to the procedural method used to adopt the regulation.

(d)     *Disclosure of amendments.* The text of any proposed or adopted regulation sent to the County Council must show by brackets and underlines (or any other

notation system approved by the Council) all amendments to any existing regulation.

(e)     *Hearing record and comments.* The issuer must attach to any proposed or adopted regulation sent to the County Council a copy of each written comment received after publication in the Register and a transcript or detailed summary of any public hearing.

(f)   *Procedures for approval.*

   (1)     Each regulation must be adopted under one of the 3 methods in this subsection. To amend or repeal an adopted regulation, an issuer must use the procedure under which the regulation was adopted.

   (2)     A law authorizing a regulation may specify that one of the 3 methods must be used.

   (3)     If the law does not specify that one of the 3 methods must be used, method (2) must be used.

   *Method (1)*

      (A)     A regulation proposed under this method is not adopted until the County Council approves it.

      (B)     The issuer must send a copy of the proposed regulation to the Council after the deadline for comments published in the Register.

      (C)     The Council by resolution may approve or disapprove the proposed regulation.

      (D)     If the Council approves the regulation, the regulation takes effect upon adoption of the resolution approving it or on a later date specified in the regulation.

*Method (2)*

(A) The issuer must send a copy of the proposed regulation to the County Council after the deadline for comments published in the Register.

(B) The Council by resolution may approve or disapprove the proposed regulation within 60 days after receiving it.

(C) If necessary to assure complete review, the Council by resolution may extend the deadline set under subparagraph (B).

(D) If the Council approves the regulation, the regulation takes effect upon adoption of the resolution approving it or on a later date specified in the regulation.

(E) If the Council does not approve or disapprove the proposed regulation within 60 days after receiving it, or by any later deadline set by resolution, the regulation is automatically approved.

(F) If a regulation is automatically approved under this method, the regulation takes effect the day after the deadline for approval or on a later date specified in the regulation.

*Method (3)*

(A) A regulation adopted under this method is not subject to County Council approval or disapproval.

(B) The issuer must send a copy of the adopted regulation to the Council after the deadline for comments published in the Register.

(C) The regulation takes effect when the Council receives it or on a later date specified in the regulation.

(g)     *Amendment of proposed regulation.* The issuer may amend a proposed regulation after sending it to the County Council if:

   (1)     The Council has not taken final action on the proposed regulation; and

   (2)     The amendment is within the advertised scope of the proposed regulation.

(h)     *Withdrawal of proposed regulation.* At any time before the County Council takes final action on a proposed regulation, the issuer may withdraw it.

(i)     *Publication of final action.* Within 45 days after final action is taken on a regulation, the issuer must:

   (1)     Publish the final action taken on the regulation; and

   (2)     Summarize any substantive changes made since the regulation was first published.

(j)  *Temporary regulations.*

   (1)     An issuer may adopt a temporary regulation under this subsection if:

      (A)     A public or fiscal emergency requires its adoption; or

      (B)     The public interest will be materially harmed if the regulation does not take effect immediately.

   (2)     A temporary regulation does not have to meet the publication and approval requirements of subsections (c) and (f), but the issuer must publish notice of the regulation's adoption in the next available issue of the Register.

   (3)     A temporary regulation is effective:

      (A)     (i)     When the County Council receives from the issuer a copy of the temporary regulation and an explanation why its immediate adoption without public comment or Council review is necessary; or

> > (ii) On a later date specified in the regulation and justified in the explanation; and
>
> (B) For not more than 90 days, as specified in the regulation. During this time, an adopted permanent regulation may immediately supersede a temporary regulation.

> (4) (A) The issuer may ask the Council once to extend the effective period of a temporary regulation for up to 90 more days.
>
> (B) The issuer must provide a compelling reason for an extension.
>
> (C) The Council must not extend a temporary regulation more than once.

> (5) (A) The Council by resolution may revoke a temporary regulation, effective when the resolution is adopted.
>
> (B) If the Council revokes a temporary regulation, the resolution must explain the reason.

> (6) If the Council revokes or does not extend a temporary regulation, the issuer or any other person authorized to issue regulations must not adopt a substantially similar temporary regulation within one year after the Council's action. However, within that year an issuer may propose a substantially similar temporary regulation to the Council, and the regulation will take effect only if the Council approves it by resolution.

(1984 L.M.C., ch. 24, § 1; 1984 L.M.C., ch. 27, § 1; 1987 L.M.C., ch. 36, § 1; 1994 L.M.C., ch. 15, § 1.)

*    *    *

**Chapter 8. Buildings**

**Article II. Administration**

**Sec. 8-14D. Comprehensive Building Decarbonization.**

(a)     *Definitions.* In this section, the following words have the meanings indicated:

*All-electric building* means a public or private building that contains no combustion equipment, or plumbing for combustion equipment, installed within the building or building site.

*Combustion equipment* means any equipment or appliance used for space heating, service water heating, cooking, clothes drying and/or lighting that uses fuel gas or fuel oil.

*New construction* means the construction of any new stand-alone building, with no remnants of any prior structure or physical connection to existing structures or outbuildings on the property.

(b)     *Standards.* The County Executive must issue Method (1) regulations to establish all-electric building standards for all new construction as part of the building code.

(1)     The regulations must include a code modification process. A code modification must only be granted if the resulting building is carbon-neutral or net-zero.

(2)     The regulations may include additional exemptions not listed in section 8-14D(c) if all-electric building standards cannot be applied to the system or use due to practical difficulty or undue hardship.

(c)     *Exemptions.* All-electric building standards do not apply to:

(1)     the emergency backup systems of buildings that require an emergency system and hence backup power;

(2)     buildings primarily used by a utility regulated by the Maryland Public Service Commission for the generation of electric power or steam;

(3)     buildings used to treat sewage or food waste;

(4)     commercial kitchen equipment in an eating and drinking establishment that satisfies the requirements of Chapter 15;

(5)     gas-powered fireplaces and gas-fired outdoor grills;

(6)     applications for building permits submitted to the Department prior to the effective date of the regulation;

(7)     district combined heat and powers facilities; and

(7)     buildings used for the following uses, as defined in Chapter 59:

    (A)     Manufacturing and Production uses;

    (B)     Crematory;

    (C)     Life Sciences;

    (D)     Hospital; and

    (E)     Farming and Farm Alcohol Production.

(d)     *Reports.*

(1)     The County Executive must submit a report to the County Council regarding the system capacity needs and investments required for an all-electric building code standard no later than September 30, 2024, and not before December 1, 2023. This report must include a review of any studies issued by the Public Service Commission and should include information provided by the utility companies that service Montgomery County.

(2)     The Department of Permitting Services must arrange for an annual audit that assesses a representative sample of new construction that complies with this section. The audit must include the number of applications submitted for new construction, the number of waivers granted, current electric rates for consumers, and an analysis of any alternative energy sources used. A complete copy of the audit findings

must be submitted to the County Council on June 1 each year, beginning June 1, 2028.

(2022 L.M.C., ch. 38, §1; 2023 L.M.C., ch. 21 , § 1.)

**Editor's note**—2022 L.M.C., ch. 38, §§ 2 and 3, as amended by 2023 L.M.C., ch. 21 , § 1, state:

Sec. 2. Effective Date. The County Executive must issue all-electric building standards for new construction no later than December 31, 2026.

Sec. 3. All-Electric Transition. Section 8-14D(b) of this Act must not apply to building permit applications submitted before December 31, 2027, for: (1) housing development projects where 50 percent or more of the dwelling units are moderately priced dwelling units as defined by Chapter 25A, or a similar instrument with a federal, state, or local government for the creation or preservation of income-restricted or market-rate affordable housing; (2) public or private schools; or (3) residential buildings with four or more stories.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A. Energy Conservation Program for Consumer Products Other than
        Automobiles (Refs & Annos)

42 U.S.C.A. § 6291

§ 6291. Definitions

Currentness

For purposes of this part:

**(1)** The term "consumer product" means any article (other than an automobile, as defined in section 32901(a)(3) of Title 49) of a type--

**(A)** which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and

**(B)** which, to any significant extent, is distributed in commerce for personal use or consumption by individuals;

without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual, except that such term includes fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, showerheads, faucets, water closets, and urinals distributed in commerce for personal or commercial use or consumption.

**(2)** The term "covered product" means a consumer product of a type specified in section 6292 of this title.

**(3)** The term "energy" means electricity, or fossil fuels. The Secretary may, by rule, include other fuels within the meaning of the term "energy" if he determines that such inclusion is necessary or appropriate to carry out the purposes of this chapter.

**(4)** The term "energy use" means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title.

**(5)** The term "energy efficiency" means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title.

**(6)** The term "energy conservation standard" means--

Add. 010

**(A)** a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use, for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title; or

**(B)** a design requirement for the products specified in paragraphs (6), (7), (8), (10), (15), (16), (17), and (20) of section 6292(a) of this title; and

includes any other requirements which the Secretary may prescribe under section 6295(r) of this title.

**(7)** The term "estimated annual operating cost" means the aggregate retail cost of the energy which is likely to be consumed annually, and in the case of showerheads, faucets, water closets, and urinals, the aggregate retail cost of water and wastewater treatment services likely to be incurred annually, in representative use of a consumer product, determined in accordance with section 6293 of this title.

**(8)** The term "measure of energy consumption" means energy use, energy efficiency, estimated annual operating cost, or other measure of energy consumption.

**(9)** The term "class of covered products" means a group of covered products, the functions or intended uses of which are similar (as determined by the Secretary).

**(10)** The term "manufacture" means to manufacture, produce, assemble or import.

**(11)** The terms "import" and "importation" mean to import into the customs territory of the United States.

**(12)** The term "manufacturer" means any person who manufactures a consumer product.

**(13)** The term "retailer" means a person to whom a consumer product is delivered or sold, if such delivery or sale is for purposes of sale or distribution in commerce to purchasers who buy such product for purposes other than resale.

**(14)** The term "distributor" means a person (other than a manufacturer or retailer) to whom a consumer product is delivered or sold for purposes of distribution in commerce.

**(15)(A)** The term "private labeler" means an owner of a brand or trademark on the label of a consumer product which bears a private label.

Add. 011

**(B)** A consumer product bears a private label if (i) such product (or its container) is labeled with the brand or trademark of a person other than a manufacturer of such product, (ii) the person with whose brand or trademark such product (or container) is labeled has authorized or caused such product to be so labeled, and (iii) the brand or trademark of a manufacturer of such product does not appear on such label.

**(16)** The terms "to distribute in commerce" and "distribution in commerce" mean to sell in commerce, to import, to introduce or deliver for introduction into commerce, or to hold for sale or distribution after introduction into commerce.

**(17)** The term "commerce" means trade, traffic, commerce, or transportation--

  **(A)** between a place in a State and any place outside thereof, or

  **(B)** which affects trade, traffic, commerce, or transportation described in subparagraph (A).

**(18)** The term "Commission" means the Federal Trade Commission.

**(19)** The term "AV" is the adjusted volume for refrigerators, refrigerator-freezers, and freezers, as defined in the applicable test procedure prescribed under section 6293 of this title.

**(20)** The term "annual fuel utilization efficiency" means the efficiency descriptor for furnaces and boilers, determined using test procedures prescribed under section 6293 of this title and based on the assumption that all--

  **(A)** weatherized warm air furnaces or boilers are located out-of-doors;

  **(B)** warm air furnaces which are not weatherized are located indoors and all combustion and ventilation air is admitted through grills or ducts from the outdoors and does not communicate with air in the conditioned space; and

  **(C)** boilers which are not weatherized are located within the heated space.

**(21)** The term "central air conditioner" means a product, other than a packaged terminal air conditioner, which--

  **(A)** is powered by single phase electric current;

  **(B)** is air-cooled;

Add. 012

**(C)** is rated below 65,000 Btu per hour;

**(D)** is not contained within the same cabinet as a furnace the rated capacity of which is above 225,000 Btu per hour; and

**(E)** is a heat pump or a cooling only unit.

**(22)** The term "efficiency descriptor" means the ratio of the useful output to the total energy input, determined using the test procedures prescribed under section 6293 of this title and expressed for the following products in the following terms:

**(A)** For furnaces and direct heating equipment, annual fuel utilization efficiency.

**(B)** For room air conditioners, energy efficiency ratio.

**(C)** For central air conditioning and central air conditioning heat pumps, seasonal energy efficiency ratio.

**(D)** For water heaters, energy factor.

**(E)** For pool heaters, thermal efficiency.

**(23)** The term "furnace" means a product which utilizes only single-phase electric current, or single-phase electric current or DC current in conjunction with natural gas, propane, or home heating oil, and which--

**(A)** is designed to be the principal heating source for the living space of a residence;

**(B)** is not contained within the same cabinet with a central air conditioner whose rated cooling capacity is above 65,000 Btu per hour;

**(C)** is an electric central furnace, electric boiler, forced-air central furnace, gravity central furnace, or low pressure steam or hot water boiler; and

**(D)** has a heat input rate of less than 300,000 Btu per hour for electric boilers and low pressure steam or hot water boilers and less than 225,000 Btu per hour for forced-air central furnaces, gravity central furnaces, and electric central furnaces.

**(24)** The terms "heat pump" or "reverse cycle" mean a product, other than a packaged terminal heat pump, which--

**(A)** consists of one or more assemblies;

Add. 013

**(B)** is powered by single phase electric current;

**(C)** is rated below 65,000 Btu per hour;

**(D)** utilizes an indoor conditioning coil, compressors, and refrigerant-to-outdoor-air heat exchanger to provide air heating; and

**(E)** may also provide air cooling, dehumidifying, humidifying circulating, and air cleaning.

**(25)** The term "pool heater" means an appliance designed for heating nonpotable water contained at atmospheric pressure, including heating water in swimming pools, spas, hot tubs and similar applications.

**(26)** The term "thermal efficiency of pool heaters" means a measure of the heat in the water delivered at the heater outlet divided by the heat input of the pool heater as measured under test conditions specified in section 2.8.1 of the American National Standard for Gas Fired Pool Heaters, Z21.56-1986, or as may be prescribed by the Secretary.

**(27)** The term "water heater" means a product which utilizes oil, gas, or electricity to heat potable water for use outside the heater upon demand, including--

**(A)** storage type units which heat and store water at a thermostatically controlled temperature, including gas storage water heaters with an input of 75,000 Btu per hour or less, oil storage water heaters with an input of 105,000 Btu per hour or less, and electric storage water heaters with an input of 12 kilowatts or less;

**(B)** instantaneous type units which heat water but contain no more than one gallon of water per 4,000 Btu per hour of input, including gas instantaneous water heaters with an input of 200,000 Btu per hour or less, oil instantaneous water heaters with an input of 210,000 Btu per hour or less, and electric instantaneous water heaters with an input of 12 kilowatts or less; and

**(C)** heat pump type units, with a maximum current rating of 24 amperes at a voltage no greater than 250 volts, which are products designed to transfer thermal energy from one temperature level to a higher temperature level for the purpose of heating water, including all ancillary equipment such as fans, storage tanks, pumps, or controls necessary for the device to perform its function.

Add. 014

**(28)** The term "weatherized warm air furnace or boiler" means a furnace or boiler designed for installation outdoors, approved for resistance to wind, rain, and snow, and supplied with its own venting system.

**(29)(A)** The term "fluorescent lamp ballast" means a device which is used to start and operate fluorescent lamps by providing a starting voltage and current and limiting the current during normal operation.

**(B)** The term "ANSI standard" means a standard developed by a committee accredited by the American National Standards Institute.

**(C)** The term "ballast efficacy factor" means the relative light output divided by the power input of a fluorescent lamp ballast, as measured under test conditions specified in ANSI standard C82.2-1984, or as may be prescribed by the Secretary.

**(D)(i)** The term "F40T12 lamp" means a nominal 40 watt tubular fluorescent lamp which is 48 inches in length and one-and-a-half inches in diameter, and conforms to ANSI standard C78.81-2003 (Data Sheet 7881-ANSI-1010-1).

**(ii)** The term "F96T12 lamp" means a nominal 75 watt tubular fluorescent lamp which is 96 inches in length and one-and-a-half inches in diameter, and conforms to ANSI standard C78.81-2003 (Data Sheet 7881-ANSI-3007-1).

**(iii)** The term "F96T12HO lamp" means a nominal 110 watt tubular fluorescent lamp which is 96 inches in length and one-and-a-half inches in diameter, and conforms to ANSI standard C78.81-2003 (Data Sheet 7881-ANSI-1019-1).

**(E)** The term "input current" means the root-mean-square (RMS) current in amperes delivered to a fluorescent lamp ballast.

**(F)** The term "luminaire" means a complete lighting unit consisting of a fluorescent lamp or lamps, together with parts designed to distribute the light, to position and protect such lamps, and to connect such lamps to the power supply through the ballast.

**(G)** The term "ballast input voltage" means the rated input voltage of a fluorescent lamp ballast.

**(H)** The term "nominal lamp watts" means the wattage at which a fluorescent lamp is designed to operate.

Add. 015

**(I)** The term "power factor" means the power input divided by the product of ballast input voltage and input current of a fluorescent lamp ballast, as measured under test conditions specified in ANSI standard C82.2-1984, or as may be prescribed by the Secretary.

**(J)** The term "power input" means the power consumption in watts of a ballast and fluorescent lamp or lamps, as determined in accordance with the test procedures specified in ANSI standard C82.2-1984, or as may be prescribed by the Secretary.

**(K)** The term "relative light output" means the light output delivered through the use of a ballast divided by the light output delivered through the use of a reference ballast, expressed as a percent, as determined in accordance with the test procedures specified in ANSI standard C82.2-1984, or as may be prescribed by the Secretary.

**(L)** The term "residential building" means a structure or portion of a structure which provides facilities or shelter for human residency, except that such term does not include any multifamily residential structure of more than three stories above grade.

**(M)** The term "F34T12 lamp" (also known as a "F40T12/ES lamp") means a nominal 34 watt tubular fluorescent lamp that is 48 inches in length and 1 ½ inches in diameter, and conforms to ANSI standard C78.81-2003 (Data Sheet 7881-ANSI-1006-1).

**(N)** The term "F96T12/ES lamp" means a nominal 60 watt tubular fluorescent lamp that is 96 inches in length and 1 ½ inches in diameter, and conforms to ANSI standard C78.81-2003 (Data Sheet 7881-ANSI-3006-1).

**(O)** The term "F96T12HO/ES lamp" means a nominal 95 watt tubular fluorescent lamp that is 96 inches in length and 1 ½ inches in diameter, and conforms to ANSI standard C78.81-2003 (Data Sheet 7881-ANSI-1017-1).

**(P)** The term "replacement ballast" means a ballast that--

**(i)** is designed for use to replace an existing ballast in a previously installed luminaire;

**(ii)** is marked "FOR REPLACEMENT USE ONLY";

**(iii)** is shipped by the manufacturer in packages containing not more than 10 ballasts; and

**(iv)** has output leads that when fully extended are a total length that is less than the length of the lamp with which the ballast is intended to be operated.

Add. 016

**(30)(A)** Except as provided in subparagraph (E), the term "fluorescent lamp" means a low pressure mercury electric-discharge source in which a fluorescing coating transforms some of the ultraviolet energy generated by the mercury discharge into light, including only the following:

**(i)** Any straight-shaped lamp (commonly referred to as 4-foot medium bi-pin lamps) with medium bi-pin bases of nominal overall length of 48 inches and rated wattage of 28 or more.

**(ii)** Any U-shaped lamp (commonly referred to as 2-foot U-shaped lamps) with medium bi-pin bases of nominal overall length between 22 and 25 inches and rated wattage of 28 or more.

**(iii)** Any rapid start lamp (commonly referred to as 8-foot high output lamps) with recessed double contact bases of nominal overall length of 96 inches and 0.800 nominal amperes, as defined in ANSI C78.1-1978 and related supplements.

**(iv)** Any instant start lamp (commonly referred to as 8-foot slimline lamps) with single pin bases of nominal overall length of 96 inches and rated wattage of 52 or more, as defined in ANSI C78.3-1978 (R1984) and related supplement ANSI C78.3a-1985.

**(B)** The term "general service fluorescent lamp" means fluorescent lamps which can be used to satisfy the majority of fluorescent applications, but does not include any lamp designed and marketed for the following nongeneral lighting applications:

**(i)** Fluorescent lamps designed to promote plant growth.

**(ii)** Fluorescent lamps specifically designed for cold temperature installations.

**(iii)** Colored fluorescent lamps.

**(iv)** Impact-resistant fluorescent lamps.

**(v)** Reflectorized or aperture lamps.

**(vi)** Fluorescent lamps designed for use in reprographic equipment.

**(vii)** Lamps primarily designed to produce radiation in the ultra-violet region of the spectrum.

**(viii)** Lamps with a color rendering index of 87 or greater.

Add. 017

**(C)** Except as provided in subparagraph (E), the term "incandescent lamp" means a lamp in which light is produced by a filament heated to incandescence by an electric current, including only the following:

**(i)** Any lamp (commonly referred to as lower wattage nonreflector general service lamps, including any tungsten-halogen lamp) that has a rated wattage between 30 and 199 watts, has an E26 medium screw base, has a rated voltage or voltage range that lies at least partially within 115 and 130 volts, and is not a reflector lamp.

**(ii)** Any lamp (commonly referred to as a reflector lamp) which is not colored or designed for rough or vibration service applications, that contains an inner reflective coating on the outer bulb to direct the light, an R, PAR, ER, BR, BPAR, or similar bulb shapes with E26 medium screw bases, a rated voltage or voltage range that lies at least partially within 115 and 130 volts, a diameter which exceeds 2.25 inches, and has a rated wattage that is 40 watts or higher.

**(iii)** Any general service incandescent lamp (commonly referred to as a high- or higher-wattage lamp) that has a rated wattage above 199 watts (above 205 watts for a high wattage reflector lamp).

**(D) General service incandescent lamp**

**(i) In general**

The term "general service incandescent lamp" means a standard incandescent or halogen type lamp that--

**(I)** is intended for general service applications;

**(II)** has a medium screw base;

**(III)** has a lumen range of not less than 310 lumens and not more than 2,600 lumens or, in the case of a modified spectrum lamp, not less than 232 lumens and not more than 1,950 lumens; and

**(IV)** is capable of being operated at a voltage range at least partially within 110 and 130 volts.

**(ii) Exclusions**

The term "general service incandescent lamp" does not include the following incandescent lamps:

Add. 018

**(I)** An appliance lamp.

**(II)** A black light lamp.

**(III)** A bug lamp.

**(IV)** A colored lamp.

**(V)** An infrared lamp.

**(VI)** A left-hand thread lamp.

**(VII)** A marine lamp.

**(VIII)** A marine signal service lamp.

**(IX)** A mine service lamp.

**(X)** A plant light lamp.

**(XI)** A reflector lamp.

**(XII)** A rough service lamp.

**(XIII)** A shatter-resistant lamp (including a shatter-proof lamp and a shatter-protected lamp).

**(XIV)** A sign service lamp.

**(XV)** A silver bowl lamp.

**(XVI)** A showcase lamp.

**(XVII)** A 3-way incandescent lamp.

**(XVIII)** A traffic signal lamp.

**(XIX)** A vibration service lamp.

**(XX)** A G shape lamp (as defined in ANSI C78.20-2003 and C79.1-2002[1] with a diameter of 5 inches or more.

Add. 019

**(XXI)** A T shape lamp (as defined in ANSI C78.20-2003 and C79.1-2002) and[2] that uses not more than 40 watts or has a length of more than 10 inches.

**(XXII)** A B, BA, CA, F, G16- ½, G-25, G30, S, or M-14 lamp (as defined in ANSI C79.1-2002 and ANSI C78.20-2003) of 40 watts or less.

**(E)** The terms "fluorescent lamp" and "incandescent lamp" do not include any lamp excluded by the Secretary, by rule, as a result of a determination that standards for such lamp would not result in significant energy savings because such lamp is designed for special applications or has special characteristics not available in reasonably substitutable lamp types.

**(F)** The term "incandescent reflector lamp" means a lamp described in subparagraph (C)(ii).

**(G)** The term "average lamp efficacy" means the lamp efficacy readings taken over a statistically significant period of manufacture with the readings averaged over that period.

**(H)** The term "base" means the portion of the lamp which connects with the socket as described in ANSI C81.61-1990.

**(I)** The term "bulb shape" means the shape of lamp, especially the glass bulb with designations for bulb shapes found in ANSI C79.1-1980 (R1984).

**(J)** The term "color rendering index" or "CRI" means the measure of the degree of color shift objects undergo when illuminated by a light source as compared with the color of those same objects when illuminated by a reference source of comparable color temperature.

**(K)** The term "correlated color temperature" means the absolute temperature of a blackbody whose chromaticity most nearly resembles that of the light source.

**(L)** The term "IES" means the Illuminating Engineering Society of North America.

**(M)** The term "lamp efficacy" means the lumen output of a lamp divided by its wattage, expressed in lumens per watt (LPW).

**(N)** The term "lamp type" means all lamps designated as having the same electrical and lighting characteristics and made by one manufacturer.

Add. 020

**(O)** The term "lamp wattage" means the total electrical power consumed by a lamp in watts, after the initial seasoning period referenced in the appropriate IES standard test procedure and including, for fluorescent, arc watts plus cathode watts.

**(P)** The terms "life" and "lifetime" mean length of operating time of a statistically large group of lamps between first use and failure of 50 percent of the group in accordance with test procedures described in the IES Lighting Handbook-Reference Volume.

**(Q)** The term "lumen output" means total luminous flux (power) of a lamp in lumens, as measured in accordance with applicable IES standards as determined by the Secretary.

**(R)** The term "tungsten-halogen lamp" means a gas-filled tungsten filament incandescent lamp containing a certain proportion of halogens in an inert gas.

**(S)(i)** The term "medium base compact fluorescent lamp" means an integrally ballasted fluorescent lamp with a medium screw base and a rated input voltage of 115 to 130 volts and which is designed as a direct replacement for a general service incandescent lamp.

**(ii)** The term "medium base compact fluorescent lamp" does not include--

**(I)** any lamp that is--

**(aa)** specifically designed to be used for special purpose applications; and

**(bb)** unlikely to be used in general purpose applications, such as the applications described in subparagraph (D); or

**(II)** any lamp not described in subparagraph (D) that is excluded by the Secretary, by rule, because the lamp is--

**(aa)** designed for special applications; and

**(bb)** unlikely to be used in general purpose applications.

**(T) Appliance lamp**

The term "appliance lamp" means any lamp that--

**(i)** is specifically designed to operate in a household appliance and has a maximum wattage of 40 watts, including an oven lamp, refrigerator lamp, and vacuum cleaner lamp; and

Add. 021

**(ii)** when sold at retail, is designated and marketed for the intended application, with--

**(I)** the designation on the lamp packaging; and

**(II)** marketing materials that identify the lamp as being for appliance use.

### (U) Candelabra base incandescent lamp

The term "candelabra base incandescent lamp" means a lamp that uses candelabra screw base as described in ANSI C81.61-2006, Specifications for Electric Bases, common designations E11 and E12.

### (V) Intermediate base incandescent lamp

The term "intermediate base incandescent lamp" means a lamp that uses an intermediate screw base as described in ANSI C81.61-2006, Specifications for Electric Bases, common designation E17.

### (W) Modified spectrum

The term "modified spectrum" means, with respect to an incandescent lamp, an incandescent lamp that--

**(i)** is not a colored incandescent lamp; and

**(ii)** when operated at the rated voltage and wattage of the incandescent lamp--

**(I)** has a color point with (x,y) chromaticity coordinates on the Commission Internationale de l'Eclairage (C.I.E.) 1931 chromaticity diagram that lies below the black-body locus; and

**(II)** has a color point with (x,y) chromaticity coordinates on the C.I.E. 1931 chromaticity diagram that lies at least 4 MacAdam steps (as referenced in IESNA LM16) distant from the color point of a clear lamp with the same filament and bulb shape, operated at the same rated voltage and wattage.

### (X) Rough service lamp

The term "rough service lamp" means a lamp that--

Add. 022

**(i)** has a minimum of 5 supports with filament configurations that are C-7A, C-11, C-17, and C-22 as listed in Figure 6-12 of the 9th edition of the IESNA Lighting handbook, or similar configurations where lead wires are not counted as supports; and

**(ii)** is designated and marketed specifically for "rough service" applications, with--

**(I)** the designation appearing on the lamp packaging; and

**(II)** marketing materials that identify the lamp as being for rough service.

## (Y) 3-way incandescent lamp

The term "3-way incandescent lamp" includes an incandescent lamp that--

**(i)** employs 2 filaments, operated separately and in combination, to provide 3 light levels; and

**(ii)** is designated on the lamp packaging and marketing materials as being a 3-way incandescent lamp.

## (Z) Shatter-resistant lamp, shatter-proof lamp, or shatter-protected lamp

The terms "shatter-resistant lamp", "shatter-proof lamp", and "shatter-protected lamp" mean a lamp that--

**(i)** has a coating or equivalent technology that is compliant with NSF/ANSI 51 and is designed to contain the glass if the glass envelope of the lamp is broken; and

**(ii)** is designated and marketed for the intended application, with--

**(I)** the designation on the lamp packaging; and

**(II)** marketing materials that identify the lamp as being shatter-resistant, shatter-proof, or shatter-protected.

## (AA) Vibration service lamp

The term "vibration service lamp" means a lamp that--

**(i)** has filament configurations that are C-5, C-7A, or C-9, as listed in Figure 6-12 of the 9th Edition of the IESNA Lighting Handbook or similar configurations;

Add. 023

**(ii)** has a maximum wattage of 60 watts;

**(iii)** is sold at retail in packages of 2 lamps or less; and

**(iv)** is designated and marketed specifically for vibration service or vibration-resistant applications, with--

    **(I)** the designation appearing on the lamp packaging; and

    **(II)** marketing materials that identify the lamp as being vibration service only.

**(BB) General service lamp**

  **(i) In general**

The term "general service lamp" includes--

    **(I)** general service incandescent lamps;

    **(II)** compact fluorescent lamps;

    **(III)** general service light-emitting diode (LED or OLED) lamps; and

    **(IV)** any other lamps that the Secretary determines are used to satisfy lighting applications traditionally served by general service incandescent lamps.

  **(ii) Exclusions**

The term "general service lamp" does not include--

    **(I)** any lighting application or bulb shape described in any of subclauses (I) through (XXII) of subparagraph (D)(ii); or

    **(II)** any general service fluorescent lamp or incandescent reflector lamp.

**(CC) Light-emitting diode; LED**

  **(i) In general**

The terms "light-emitting diode" and "LED" means a p-n junction solid state device the radiated output of which is a function of the physical construction, material used, and exciting current of the device.

Add. 024

**(ii) Output**

The output of a light-emitting diode may be in--

**(I)** the infrared region;

**(II)** the visible region; or

**(III)** the ultraviolet region.

**(DD) Organic light-emitting diode; OLED**

The terms "organic light-emitting diode" and "OLED" mean a thin-film light-emitting device that typically consists of a series of organic layers between 2 electrical contacts (electrodes).

**(EE) Colored incandescent lamp**

The term "colored incandescent lamp" means an incandescent lamp designated and marketed as a colored lamp that has--

**(i)** a color rendering index of less than 50, as determined according to the test method given in C.I.E. publication 13.3-1995; or

**(ii)** a correlated color temperature of less than 2,500K, or greater than 4,600K, where correlated temperature is computed according to the Journal of Optical Society of America, Vol. 58, pages 1528-1595 (1986).

**(31)(A)** The term "water use" means the quantity of water flowing through a showerhead, faucet, water closet, or urinal at point of use, determined in accordance with test procedures under section 6293 of this title.

**(B)** The term "ASME" means the American Society of Mechanical Engineers.

**(C)** The term "ANSI" means the American National Standards Institute.

**(D)** The term "showerhead" means any showerhead (including a handheld showerhead), except a safety shower showerhead.

**(E)** The term "faucet" means a lavatory faucet, kitchen faucet, metering faucet, or replacement aerator for a lavatory or kitchen faucet.

Add. 025

**(F)** The term "water closet" has the meaning given such term in ASME A112.19.2M-1990, except such term does not include fixtures designed for installation in prisons.

**(G)** The term "urinal" has the meaning given such term in ASME A112.19.2M-1990, except such term does not include fixtures designed for installation in prisons.

**(H)** The terms "blowout", "flushometer tank", "low consumption", and "flushometer valve" have the meaning given such terms in ASME A112.19.2M-1990.

**(32)** The term "battery charger" means a device that charges batteries for consumer products, including battery chargers embedded in other consumer products.

**(33)(A)** The term "commercial prerinse spray valve" means a handheld device designed and marketed for use with commercial dishwashing and ware washing equipment that sprays water on dishes, flatware, and other food service items for the purpose of removing food residue before cleaning the items.

**(B)** The Secretary may modify the definition of "commercial prerinse spray valve" by rule--

  **(i)** to include products--

    **(I)** that are extensively used in conjunction with commercial dishwashing and ware washing equipment;

    **(II)** the application of standards to which would result in significant energy savings; and

    **(III)** the application of standards to which would meet the criteria specified in section 6295(o)(4) of this title; and

  **(ii)** to exclude products--

    **(I)** that are used for special food service applications;

    **(II)** that are unlikely to be widely used in conjunction with commercial dishwashing and ware washing equipment; and

    **(III)** the application of standards to which would not result in significant energy savings.

Add. 026

**(34)** The term "dehumidifier" means a self-contained, electrically operated, and mechanically encased assembly consisting of--

**(A)** a refrigerated surface (evaporator) that condenses moisture from the atmosphere;

**(B)** a refrigerating system, including an electric motor;

**(C)** an air-circulating fan; and

**(D)** means for collecting or disposing of the condensate.

**(35)(A)** The term "distribution transformer" means a transformer that--

**(i)** has an input voltage of 34.5 kilovolts or less;

**(ii)** has an output voltage of 600 volts or less; and

**(iii)** is rated for operation at a frequency of 60 Hertz.

**(B)** The term "distribution transformer" does not include--

**(i)** a transformer with multiple voltage taps, the highest of which equals at least 20 percent more than the lowest;

**(ii)** a transformer that is designed to be used in a special purpose application and is unlikely to be used in general purpose applications, such as a drive transformer, rectifier transformer, auto-transformer, Uninterruptible Power System transformer, impedance transformer, regulating transformer, sealed and nonventilating transformer, machine tool transformer, welding transformer, grounding transformer, or testing transformer; or

**(iii)** any transformer not listed in clause (ii) that is excluded by the Secretary by rule because--

**(I)** the transformer is designed for a special application;

**(II)** the transformer is unlikely to be used in general purpose applications; and

**(III)** the application of standards to the transformer would not result in significant energy savings.

**(36) External power supply**

Add. 027

**(A) External power supply**

**(i) In general**

The term "external power supply" means an external power supply circuit that is used to convert household electric current into DC current or lower-voltage AC current to operate a consumer product.

**(ii) Exclusion**

The term "external power supply" does not include a power supply circuit, driver, or device that is designed exclusively to be connected to, and power--

**(I)** light-emitting diodes providing illumination;

**(II)** organic light-emitting diodes providing illumination; or

**(III)** ceiling fans using direct current motors.

**(B) Active mode**

The term "active mode" means the mode of operation when an external power supply is connected to the main electricity supply and the output is connected to a load.

**(C) Class A external power supply**

**(i) In general**

The term "class A external power supply" means a device that--

**(I)** is designed to convert line voltage AC input into lower voltage AC or DC output;

**(II)** is able to convert to only 1 AC or DC output voltage at a time;

**(III)** is sold with, or intended to be used with, a separate end-use product that constitutes the primary load;

**(IV)** is contained in a separate physical enclosure from the end-use product;

**(V)** is connected to the end-use product via a removable or hard-wired male/female electrical connection, cable, cord, or other wiring; and

Add. 028

**(VI)** has nameplate output power that is less than or equal to 250 watts.

**(ii) Exclusions**

The term "class A external power supply" does not include any device that--

**(I)** requires Federal Food and Drug Administration listing and approval as a medical device in accordance with section 360c of Title 21; or

**(II)** powers the charger of a detachable battery pack or charges the battery of a product that is fully or primarily motor operated.

**(D) No-load mode**

The term "no-load mode" means the mode of operation when an external power supply is connected to the main electricity supply and the output is not connected to a load.

**(37)** The term "illuminated exit sign" means a sign that--

**(A)** is designed to be permanently fixed in place to identify an exit; and

**(B)** consists of an electrically powered integral light source that--

**(i)** illuminates the legend "EXIT" and any directional indicators; and

**(ii)** provides contrast between the legend, any directional indicators, and the background.

**(38)** The term "low-voltage dry-type distribution transformer" means a distribution transformer that--

**(A)** has an input voltage of 600 volts or less;

**(B)** is air-cooled; and

**(C)** does not use oil as a coolant.

**(39)** The term "pedestrian module" means a light signal used to convey movement information to pedestrians.

Add. 029

**(40)** The term "refrigerated bottled or canned beverage vending machine" means a commercial refrigerator that cools bottled or canned beverages and dispenses the bottled or canned beverages on payment.

**(41)** The term "standby mode" means the lowest power consumption mode, as established on an individual product basis by the Secretary, that--

**(A)** cannot be switched off or influenced by the user; and

**(B)** may persist for an indefinite time when an appliance is--

**(i)** connected to the main electricity supply; and

**(ii)** used in accordance with the instructions of the manufacturer.

**(42)** The term "torchiere" means a portable electric lamp with a reflector bowl that directs light upward to give indirect illumination.

**(43)** The term "traffic signal module" means a standard 8-inch (200mm) or 12-inch (300mm) traffic signal indication that--

**(A)** consists of a light source, a lens, and all other parts necessary for operation; and

**(B)** communicates movement messages to drivers through red, amber, and green colors.

**(44)** The term "transformer" means a device consisting of 2 or more coils of insulated wire that transfers alternating current by electromagnetic induction from 1 coil to another to change the original voltage or current value.

**(45)(A)** The term "unit heater" means a self-contained fan-type heater designed to be installed within the heated space.

**(B)** The term "unit heater" does not include a warm air furnace.

**(46) High intensity discharge lamp**

**(A) In general**

The term "high intensity discharge lamp" means an electric-discharge lamp in which--

**(i)** the light-producing arc is stabilized by the arc tube wall temperature; and

Add. 030

**(ii)** the arc tube wall loading is in excess of 3 Watts/cm$^2$.

### (B) Inclusions

The term "high intensity discharge lamp" includes mercury vapor, metal halide, and high-pressure sodium lamps described in subparagraph (A).

## (47) Mercury vapor lamp

### (A) In general

The term "mercury vapor lamp" means a high intensity discharge lamp in which the major portion of the light is produced by radiation from mercury typically operating at a partial vapor pressure in excess of 100,000 Pa (approximately 1 atm).

### (B) Inclusions

The term "mercury vapor lamp" includes clear, phosphor-coated, and self-ballasted screw base lamps described in subparagraph (A).

## (48) Mercury vapor lamp ballast

The term "mercury vapor lamp ballast" means a device that is designed and marketed to start and operate mercury vapor lamps intended for general illumination by providing the necessary voltage and current.

**(49)** The term "ceiling fan" means a nonportable device that is suspended from a ceiling for circulating air via the rotation of fan blades.

**(50)** The term "ceiling fan light kit" means equipment designed to provide light from a ceiling fan that can be--

**(A)** integral, such that the equipment is attached to the ceiling fan prior to the time of retail sale; or

**(B)** attachable, such that at the time of retail sale the equipment is not physically attached to the ceiling fan, but may be included inside the ceiling fan at the time of sale or sold separately for subsequent attachment to the fan.

**(51)** The term "medium screw base" means an Edison screw base identified with the prefix E-26 in the "American National Standard for Electric Lamp Bases", ANSI/IEC C81.61-2003, published by the American National Standards Institute.

Add. 031

**(52) Detachable battery**

The term "detachable battery" means a battery that is--

**(A)** contained in a separate enclosure from the product; and

**(B)** intended to be removed or disconnected from the product for recharging.

**(53) Specialty application mercury vapor lamp ballast**

The term "specialty application mercury vapor lamp ballast" means a mercury vapor lamp ballast that--

**(A)** is designed and marketed for operation of mercury vapor lamps used in quality inspection, industrial processing, or scientific use, including fluorescent microscopy and ultraviolet curing; and

**(B)** in the case of a specialty application mercury vapor lamp ballast, the label of which--

    **(i)** provides that the specialty application mercury vapor lamp ballast is "For specialty applications only, not for general illumination"; and

    **(ii)** specifies the specific applications for which the ballast is designed.

**(54) BPAR incandescent reflector lamp**

The term "BPAR incandescent reflector lamp" means a reflector lamp as shown in figure C78.21-278 on page 32 of ANSI C78.21-2003.

**(55) BR incandescent reflector lamp; BR30; BR40**

**(A) BR incandescent reflector lamp**

The term "BR incandescent reflector lamp" means a reflector lamp that has--

    **(i)** a bulged section below the major diameter of the bulb and above the approximate baseline of the bulb, as shown in figure 1 (RB) on page 7 of ANSI C79.1-1994, incorporated by reference in section 430.22 of title 10, Code of Federal Regulations (as in effect on December 19, 2007); and

Add. 032

**(ii)** a finished size and shape shown in ANSI C78.21-1989, including the referenced reflective characteristics in part 7 of ANSI C78.21-1989, incorporated by reference in section 430.22 of title 10, Code of Federal Regulations (as in effect on December 19, 2007).

### (B) BR30

The term "BR30" means a BR incandescent reflector lamp with a diameter of 30/8ths of an inch.

### (C) BR40

The term "BR40" means a BR incandescent reflector lamp with a diameter of 40/8ths of an inch.

## (56) ER incandescent reflector lamp; ER30; ER40

### (A) ER incandescent reflector lamp

The term "ER incandescent reflector lamp" means a reflector lamp that has--

**(i)** an elliptical section below the major diameter of the bulb and above the approximate baseline of the bulb, as shown in figure 1 (RE) on page 7 of ANSI C79.1-1994, incorporated by reference in section 430.22 of title 10, Code of Federal Regulations (as in effect on December 19, 2007); and

**(ii)** a finished size and shape shown in ANSI C78.21-1989, incorporated by reference in section 430.22 of title 10, Code of Federal Regulations (as in effect on December 19, 2007).

### (B) ER30

The term "ER30" means an ER incandescent reflector lamp with a diameter of 30/8ths of an inch.

### (C) ER40

The term "ER40" means an ER incandescent reflector lamp with a diameter of 40/8ths of an inch.

## (57) R20 incandescent reflector lamp

Add. 033

The term "R20 incandescent reflector lamp" means a reflector lamp that has a face diameter of approximately 2.5 inches, as shown in figure 1(R) on page 7 of ANSI C79.1-1994.

## (58) Ballast

The term "ballast" means a device used with an electric discharge lamp to obtain necessary circuit conditions (voltage, current, and waveform) for starting and operating.

## (59) Ballast efficiency

### (A) In general

The term "ballast efficiency" means, in the case of a high intensity discharge fixture, the efficiency of a lamp and ballast combination, expressed as a percentage, and calculated in accordance with the following formula: Efficiency = $P_{out}/P_{in}$.

### (B) Efficiency formula

For the purpose of subparagraph (A)--

(i) $P_{out}$ shall equal the measured operating lamp wattage;

(ii) $P_{in}$ shall equal the measured operating input wattage;

(iii) the lamp, and the capacitor when the capacitor is provided, shall constitute a nominal system in accordance with the ANSI Standard C78.43-2004;

(iv) for ballasts with a frequency of 60 Hz, $P_{in}$ and $P_{out}$ shall be measured after lamps have been stabilized according to section 4.4 of ANSI Standard C82.6-2005 using a wattmeter with accuracy specified in section 4.5 of ANSI Standard C82.6-2005; and

(v) for ballasts with a frequency greater than 60 Hz, $P_{in}$ and $P_{out}$ shall have a basic accuracy of $\pm 0.5$ percent at the higher of--

(I) 3 times the output operating frequency of the ballast; or

(II) 2 kHz for ballast with a frequency greater than 60 Hz.

### (C) Modification

Add. 034

The Secretary may, by rule, modify the definition of "ballast efficiency" if the Secretary determines that the modification is necessary or appropriate to carry out the purposes of this chapter.

## (60) Electronic ballast

The term "electronic ballast" means a device that uses semiconductors as the primary means to control lamp starting and operation.

## (61) General lighting application

The term "general lighting application" means lighting that provides an interior or exterior area with overall illumination.

## (62) Metal halide ballast

The term "metal halide ballast" means a ballast used to start and operate metal halide lamps.

## (63) Metal halide lamp

The term "metal halide lamp" means a high intensity discharge lamp in which the major portion of the light is produced by radiation of metal halides and their products of dissociation, possibly in combination with metallic vapors.

## (64) Metal halide lamp fixture

The term "metal halide lamp fixture" means a light fixture for general lighting application designed to be operated with a metal halide lamp and a ballast for a metal halide lamp.

## (65) Probe-start metal halide ballast

The term "probe-start metal halide ballast" means a ballast that--

**(A)** starts a probe-start metal halide lamp that contains a third starting electrode (probe) in the arc tube; and

**(B)** does not generally contain an igniter but instead starts lamps with high ballast open circuit voltage.

## (66) Pulse-start metal halide ballast

Add. 035

## (A) In general

The term "pulse-start metal halide ballast" means an electronic or electromagnetic ballast that starts a pulse-start metal halide lamp with high voltage pulses.

## (B) Starting process

For the purpose of subparagraph (A)--

(i) lamps shall be started by first providing a high voltage pulse for ionization of the gas to produce a glow discharge; and

(ii) to complete the starting process, power shall be provided by the ballast to sustain the discharge through the glow-to-arc transition.

## CREDIT(S)

(Pub.L. 94-163, Title III, § 321, Dec. 22, 1975, 89 Stat. 917; Pub.L. 95-619, Title VI, § 691(b)(2), Nov. 9, 1978, 92 Stat. 3288; Pub.L. 100-12, § 2, Mar. 17, 1987, 101 Stat. 103; Pub.L. 100-357, § 2(a), June 28, 1988, 102 Stat. 671; Pub.L. 102-486, Title I, § 123(b), Oct. 24, 1992, 106 Stat. 2817; Pub.L. 105-388, § 5(a)(2), Nov. 13, 1998, 112 Stat. 3478; Pub.L. 109-58, Title I, § 135(a), Aug. 8, 2005, 119 Stat. 624; Pub.L. 110-140, Title III, §§ 301(a), 316(a)(1), (b), (c)(1), 321(a)(1), 322(a), 324(a), Dec. 19, 2007, 121 Stat. 1549, 1572, 1573, 1587, 1591; Pub.L. 112-210, § 10(a)(6), (7), (10), Dec. 18, 2012, 126 Stat. 1524, 1525; Pub.L. 115-115, § 2(a), (c)(1), Jan. 12, 2018, 131 Stat. 2280, 2281.)

Notes of Decisions (1)

---

## Footnotes

[1] So in original. Probably should be followed by a closing parenthesis.

[2] So in original. The word "and" probably should not appear.

42 U.S.C.A. § 6291, 42 USCA § 6291
Current through P.L. 119-99. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 036

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A. Energy Conservation Program for Consumer Products Other than Automobiles (Refs & Annos)

42 U.S.C.A. § 6292

§ 6292. Coverage

Effective: December 20, 2007

Currentness

**(a) In general**

The following consumer products, excluding those consumer products designed solely for use in recreational vehicles and other mobile equipment, are covered products:

**(1)** Refrigerators, refrigerator-freezers, and freezers which can be operated by alternating current electricity, excluding--

  **(A)** any type designed to be used without doors; and

  **(B)** any type which does not include a compressor and condenser unit as an integral part of the cabinet assembly.

**(2)** Room air conditioners.

**(3)** Central air conditioners and central air conditioning heat pumps.

**(4)** Water heaters.

**(5)** Furnaces.

**(6)** Dishwashers.

**(7)** Clothes washers.

**(8)** Clothes dryers.

**(9)** Direct heating equipment.

**(10)** Kitchen ranges and ovens.

**(11)** Pool heaters.

Add. 037

**(12)** Television sets.

**(13)** Fluorescent lamp ballasts.

**(14)** General service fluorescent lamps, general service incandescent lamps, and incandescent reflector lamps.

**(15)** Showerheads, except safety shower showerheads.

**(16)** Faucets.

**(17)** Water closets.

**(18)** Urinals.

**(19)** Metal halide lamp fixtures.

**(20)** Any other type of consumer product which the Secretary classifies as a covered product under subsection (b).

## (b) Special classification of consumer product

**(1)** The Secretary may classify a type of consumer product as a covered product if he determines that--

**(A)** classifying products of such type as covered products is necessary or appropriate to carry out the purposes of this chapter, and

**(B)** average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.

**(2)** For purposes of this subsection:

**(A)** The term "average annual per-household energy use with respect to a type of product" means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

**(B)** The Btu equivalent of one kilowatt-hour is 3,412 British thermal units.

Add. 038

**(C)** The term "household" shall be defined under rules of the Secretary.

**CREDIT(S)**

(Pub.L. 94-163, Title III, § 322, Dec. 22, 1975, 89 Stat. 918; Pub.L. 95-619, Title VI, § 691(b)(2), Nov. 9, 1978, 92 Stat. 3288; Pub.L. 100-12, §§ 3, 11(b)(1), Mar. 17, 1987, 101 Stat. 105, 125; Pub.L. 100-357, § 2(b), June 28, 1988, 102 Stat. 672; Pub.L. 102-486, Title I, § 123(c), Oct. 24, 1992, 106 Stat. 2821; Pub.L. 105-388, § 5(a)(3), Nov. 13, 1998, 112 Stat. 3478; Pub.L. 110-140, Title III, §§ 321(a)(2), 324(b), Dec. 19, 2007, 121 Stat. 1577, 1593.)

42 U.S.C.A. § 6292, 42 USCA § 6292
Current through P.L. 119-99. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 039

United States Code Annotated
   Title 42. The Public Health and Welfare
      Chapter 77. Energy Conservation (Refs & Annos)
         Subchapter III. Improving Energy Efficiency
            Part A. Energy Conservation Program for Consumer Products Other than Automobiles (Refs & Annos)

42 U.S.C.A. § 6293

§ 6293. Test procedures

Effective: December 20, 2007

Currentness

**(a) General rule**

All test procedures and related determinations prescribed or made by the Secretary with respect to any covered product (or class thereof) which are in effect on March 17, 1987, shall remain in effect until the Secretary amends such test procedures and related determinations under subsection (b).

**(b) Amended and new procedures**

**(1) Test procedures**

**(A) Amendment**

At least once every 7 years, the Secretary shall review test procedures for all covered products and--

**(i)** amend test procedures with respect to any covered product, if the Secretary determines that amended test procedures would more accurately or fully comply with the requirements of paragraph (3); or

**(ii)** publish notice in the Federal Register of any determination not to amend a test procedure.

**(B)** The Secretary may, in accordance with the requirements of this subsection, prescribe test procedures for any consumer product classified as a covered product under section 6292(b) of this title.

**(C)** The Secretary shall direct the National Institute of Standards and Technology to assist in developing new or amended test procedures.

**(2)** If the Secretary determines, on his own behalf or in response to a petition by any interested person, that a test procedure should be prescribed or amended, the Secretary

Add. 040

shall promptly publish in the Federal Register proposed test procedures and afford interested persons an opportunity to present oral and written data, views, and arguments with respect to such procedures. The comment period shall not be less than 60 days and may be extended for good cause shown to not more than 270 days. In prescribing or amending a test procedure, the Secretary shall take into account such information as the Secretary determines relevant to such procedure, including technological developments relating to energy use or energy efficiency of the type (or class) of covered products involved.

**(3)** Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, water use (in the case of showerheads, faucets, water closets and urinals), or estimated annual operating cost of a covered product during a representative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.

**(4)** If the test procedure is a procedure for determining estimated annual operating costs, such procedure shall provide that such costs shall be calculated from measurements of energy use or, in the case of showerheads, faucets, water closets, or urinals, water use in a representative average use cycle or period of use, as determined by the Secretary, and from representative average unit costs of the energy needed to operate such product during such cycle, or in the case of showerheads, faucets, water closets, or urinals, representative average unit costs of water and wastewater treatment service resulting from the operation of such products during such cycle. The Secretary shall provide information to manufacturers with respect to representative average unit costs of energy, water, and wastewater treatment.

**(5)** With respect to fluorescent lamp ballasts manufactured on or after January 1, 1990, and to which standards are applicable under section 6295 of this title, the Secretary shall prescribe test procedures that are in accord with ANSI standard C82.2-1984 or other test procedures determined appropriate by the Secretary.

**(6)** With respect to fluorescent lamps and incandescent reflector lamps to which standards are applicable under subsection (i) of section 6295 of this title, the Secretary shall prescribe test procedures, to be carried out by accredited test laboratories, that take into consideration the applicable IES or ANSI standard.

**(7)(A)** Test procedures for showerheads and faucets to which standards are applicable under subsection (j) of section 6295 of this title shall be the test procedures specified in ASME A112.18.1M-1989 for such products.

**(B)** If the test procedure requirements of ASME A112.18.1M-1989 are revised at any time and approved by ANSI, the Secretary shall amend the test procedures established

Add. 041

by subparagraph (A) to conform to such revised ASME/ANSI requirements unless the Secretary determines, by rule, that to do so would not meet the requirements of paragraph (3).

**(8)(A)** Test procedures for water closets and urinals to which standards are applicable under subsection (k) of section 6295 of this title shall be the test procedures specified in ASME A112.19.6-1990 for such products.

**(B)** If the test procedure requirements of ASME A112.19.6-1990 are revised at any time and approved by ANSI, the Secretary shall amend the test procedures established by subparagraph (A) to conform to such revised ASME/ANSI requirements unless the Secretary determines, by rule, that to do so would not meet the requirements of paragraph (3).

**(9)** Test procedures for illuminated exit signs shall be based on the test method used under version 2.0 of the Energy Star program of the Environmental Protection Agency for illuminated exit signs.

**(10)(A)** Test procedures for distribution transformers and low voltage dry-type distribution transformers shall be based on the "Standard Test Method for Measuring the Energy Consumption of Distribution Transformers" prescribed by the National Electrical Manufacturers Association (NEMA TP 2-1998).

**(B)** The Secretary may review and revise the test procedures established under subparagraph (A).

**(C)** For purposes of section 6317(a) of this title, the test procedures established under subparagraph (A) shall be considered to be the testing requirements prescribed by the Secretary under section 6317(a)(1) of this title for distribution transformers for which the Secretary makes a determination that energy conservation standards would--

  **(i)** be technologically feasible and economically justified; and

  **(ii)** result in significant energy savings.

**(11)** Test procedures for traffic signal modules and pedestrian modules shall be based on the test method used under the Energy Star program of the Environmental Protection Agency for traffic signal modules, as in effect on August 8, 2005.

**(12)(A)** Test procedures for medium base compact fluorescent lamps shall be based on the test methods for compact fluorescent lamps used under the August 9, 2001, version

Add. 042

of the Energy Star program of the Environmental Protection Agency and the Department of Energy.

**(B)** Except as provided in subparagraph (C), medium base compact fluorescent lamps shall meet all test requirements for regulated parameters of section 6295(cc)[1] of this title.

**(C)** Notwithstanding subparagraph (B), if manufacturers document engineering predictions and analysis that support expected attainment of lumen maintenance at 40 percent rated life and lamp lifetime, medium base compact fluorescent lamps may be marketed before completion of the testing of lamp life and lumen maintenance at 40 percent of rated life.

**(13)** Test procedures for dehumidifiers shall be based on the test criteria used under the Energy Star Program Requirements for Dehumidifiers developed by the Environmental Protection Agency, as in effect on August 8, 2005, unless revised by the Secretary pursuant to this section.

**(14)** The test procedure for measuring flow rate for commercial prerinse spray valves shall be based on American Society for Testing and Materials Standard F2324, entitled "Standard Test Method for Pre-Rinse Spray Valves".

**(15)** The test procedure for refrigerated bottled or canned beverage vending machines shall be based on American National Standards Institute/ American Society of Heating, Refrigerating and Air-Conditioning Engineers Standard 32.1-2004, entitled "Methods of Testing for Rating Vending Machines for Bottled, Canned or Other Sealed Beverages".

**(16)(A)(i)** Test procedures for ceiling fans shall be based on the "Energy Star Testing Facility Guidance Manual: Building a Testing Facility and Performing the Solid State Test Method for ENERGY STAR Qualified Ceiling Fans, Version 1.1" published by the Environmental Protection Agency.

**(ii)** Test procedures for ceiling fan light kits shall be based on the test procedures referenced in the Energy Star specifications for Residential Light Fixtures and Compact Fluorescent Light Bulbs, as in effect on August 8, 2005.

**(B)** The Secretary may review and revise the test procedures established under subparagraph (A).

**(17) Class A external power supplies**

Add. 043

Test procedures for class A external power supplies shall be based on the "Test Method for Calculating the Energy Efficiency of Single-Voltage External AC-DC and AC-AC Power Supplies" published by the Environmental Protection Agency on August 11, 2004, except that the test voltage specified in section 4(d) of that test method shall be only 115 volts, 60 Hz.

**(18) Metal halide lamp ballasts**

Test procedures for metal halide lamp ballasts shall be based on ANSI Standard C82.6-2005, entitled "Ballasts for High Intensity Discharge Lamps--Method of Measurement".

## (c) Restriction on certain representations

**(1)** No manufacturer, distributor, retailer, or private labeler may make any representation--

**(A)** in writing (including a representation on a label); or

**(B)** in any broadcast advertisement,

with respect to the energy use or efficiency or, in the case of showerheads, faucets, water closets, and urinals, water use of a covered product to which a test procedure is applicable under subsection (a) or the cost of energy consumed by such product, unless such product has been tested in accordance with such test procedure and such representation fairly discloses the results of such testing.

**(2)** Effective 180 days after an amended or new test procedure applicable to a covered product is prescribed or established under subsection (b), no manufacturer, distributor, retailer, or private labeler may make any representation--

**(A)** in writing (including a representation on a label); or

**(B)** in any broadcast advertisement,

with respect to energy use or efficiency or, in the case of showerheads, faucets, water closets, and urinals, water use of such product or cost of energy consumed by such product, unless such product has been tested in accordance with such amended or new test procedures and such representation fairly discloses the results of such testing.

**(3)** On the petition of any manufacturer, distributor, retailer, or private labeler, filed not later than the 60th day before the expiration of the period involved, the 180-day period referred to in paragraph (2) may be extended by the Secretary with respect to the

Add. 044

petitioner (but in no event for more than an additional 180 days) if the Secretary determines that the requirements of paragraph (2) would impose an undue hardship on such petitioner.

**(d) Case in which test procedure is not required**

**(1)** The Secretary is not required to publish and prescribe test procedures for a covered product (or class thereof) if the Secretary determines, by rule, that test procedures cannot be developed which meet the requirements of subsection (b)(3) and publishes such determination in the Federal Register, together with the reasons therefor.

**(2)** For purposes of section 6297 of this title, a determination under paragraph (1) with respect to any covered product or class shall have the same effect as would a standard prescribed for a covered product (or class).

**(e) Amendment of standard**

**(1)** In the case of any amended test procedure which is prescribed pursuant to this section, the Secretary shall determine, in the rulemaking carried out with respect to prescribing such procedure, to what extent, if any, the proposed test procedure would alter the measured energy efficiency, measured energy use, or measured water use of any covered product as determined under the existing test procedure.

**(2)** If the Secretary determines that the amended test procedure will alter the measured efficiency or measured use, the Secretary shall amend the applicable energy conservation standard during the rulemaking carried out with respect to such test procedure. In determining the amended energy conservation standard, the Secretary shall measure, pursuant to the amended test procedure, the energy efficiency, energy use, or water use of a representative sample of covered products that minimally comply with the existing standard. The average of such energy efficiency, energy use, or water use levels determined under the amended test procedure shall constitute the amended energy conservation standard for the applicable covered products.

**(3)** Models of covered products in use before the date on which the amended energy conservation standard becomes effective (or revisions of such models that come into use after such date and have the same energy efficiency, energy use, or water use characteristics) that comply with the energy conservation standard applicable to such covered products on the day before such date shall be deemed to comply with the amended energy conservation standard.

Add. 045

**(4)** The Secretary's authority to amend energy conservation standards under this subsection shall not affect the Secretary's obligation to issue final rules as described in section 6295 of this title.

## (f) Additional consumer and commercial products

**(1)** Not later than 2 years after August 8, 2005, the Secretary shall prescribe testing requirements for refrigerated bottled or canned beverage vending machines.

**(2)** To the maximum extent practicable, the testing requirements prescribed under paragraph (1) shall be based on existing test procedures used in industry.

### CREDIT(S)
(Pub.L. 94-163, Title III, § 323, Dec. 22, 1975, 89 Stat. 919; Pub.L. 95-619, Title IV, §§ 421, 425(a), Title VI, § 691(b)(2), Nov. 9, 1978, 92 Stat. 3257, 3265, 3288; Pub.L. 100-12, § 4, Mar. 17, 1987, 101 Stat. 105; Pub.L. 100-357, § 2(c), June 28, 1988, 102 Stat. 672; Pub.L. 100-418, Title V, § 5115(c), Aug. 23, 1988, 102 Stat. 1433; Pub.L. 102-486, Title I, § 123(d), Oct. 24, 1992, 106 Stat. 2821; Pub.L. 109-58, Title I, § 135(b), Aug. 8, 2005, 119 Stat. 627; Pub.L. 110-140, Title III, §§ 301(b), 302(a), 324(c), Dec. 19, 2007, 121 Stat. 1550, 1551, 1593.)

---

### Footnotes

[1]     So in original. Probably should be section "6295(bb)".

42 U.S.C.A. § 6293, 42 USCA § 6293
Current through P.L. 119-99.  Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A. Energy Conservation Program for Consumer Products Other than Automobiles (Refs & Annos)

42 U.S.C.A. § 6294

§ 6294. Labeling

Effective: January 12, 2018
Currentness

**(a) In general**

**(1)** The Commission shall prescribe labeling rules under this section applicable to all covered products of each of the types specified in paragraphs (1), (2), (4), (6), and (8) through (12) of section 6292(a) of this title, except to the extent that, with respect to any such type (or class thereof), the Commission determines under the second sentence of subsection (b)(5) that labeling in accordance with this section is not technologically or economically feasible.

**(2)(A)** The Commission shall prescribe labeling rules under this section applicable to all covered products of each of the types specified in paragraphs (3), (5), and (7) of section 6292(a) of this title, except to the extent that with respect to any such type (or class thereof), the Commission determines under the second sentence of subsection (b)(5) that labeling in accordance with this section is not technologically or economically feasible or is not likely to assist consumers in making purchasing decisions.

**(B)** The Commission shall prescribe labeling rules under this section applicable to the covered product specified in paragraph (13) of section 6292(a) of this title and to which standards are applicable under section 6295 of this title. Such rules shall provide that the labeling of any fluorescent lamp ballast manufactured on or after January 1, 1990, will indicate conspicuously, in a manner prescribed by the Commission under subsection (b) by July 1, 1989, a capital letter "E" printed within a circle on the ballast and on the packaging of the ballast or of the luminaire into which the ballast has been incorporated.

Add. 047

**(C) Metal halide lamp fixtures**

**(i) In general**

The Commission shall issue labeling rules under this section applicable to the covered product specified in section 6292(a)(19) of this title and to which standards are applicable under section 6295 of this title.

**(ii) Labeling**

The rules shall provide that the labeling of any metal halide lamp fixture manufactured on or after the later of January 1, 2009, or the date that is 270 days after December 19, 2007, shall indicate conspicuously, in a manner prescribed by the Commission under subsection (b) by July 1, 2008, a capital letter "E" printed within a circle on the packaging of the fixture, and on the ballast contained in the fixture.

**(D)(i)** Not later than 18 months after October 24, 1992, the Commission shall prescribe labeling rules under this section applicable to general service fluorescent lamps, medium base compact fluorescent lamps, and general service incandescent lamps. Except as provided in clause (ii), such rules shall provide that the labeling of any general service fluorescent lamp, medium base compact fluorescent lamp, and general service incandescent lamp manufactured after the 12-month period beginning on the date of the publication of such rule shall indicate conspicuously on the packaging of the lamp, in a manner prescribed by the Commission under subsection (b), such information as the Commission deems necessary to enable consumers to select the most energy efficient lamps which meet their requirements. Labeling information for incandescent lamps shall be based on performance when operated at 120 volts input, regardless of the rated lamp voltage.

**(ii)** If the Secretary determines that compliance with the standards specified in section 6295(i) of this title for any lamp will result in the discontinuance of the manufacture of such lamp, the Commission may exempt such lamp from the labeling rules prescribed under clause (i).

**(iii) Rulemaking to consider effectiveness of lamp labeling**

**(I) In general**

Not later than 1 year after December 19, 2007, the Commission shall initiate a rulemaking to consider--

Add. 048

**(aa)** the effectiveness of current lamp labeling for power levels or watts, light output or lumens, and lamp lifetime; and

**(bb)** alternative labeling approaches that will help consumers to understand new high-efficiency lamp products and to base the purchase decisions of the consumers on the most appropriate source that meets the requirements of the consumers for lighting level, light quality, lamp lifetime, and total lifecycle cost.

### (II) Completion

The Commission shall--

**(aa)** complete the rulemaking not later than the date that is 30 months after December 19, 2007; and

**(bb)** consider reopening the rulemaking not later than 180 days before the effective dates of the standards for general service incandescent lamps established under section 6295(i)(1)(A) of this title, if the Commission determines that further labeling changes are needed to help consumers understand lamp alternatives.

**(E)(i)** Not later than one year after October 24, 1992, the Commission shall prescribe labeling rules under this section for showerheads and faucets to which standards are applicable under subsection (j) of section 6295 of this title. Such rules shall provide that the labeling of any showerhead or faucet manufactured after the 12-month period beginning on the date of the publication of such rule shall be consistent with the marking and labeling requirements of ASME A112.18.1M-1989, except that each showerhead and flow restricting or controlling spout-end device shall bear a permanent legible marking indicating the flow rate, expressed in gallons per minute (gpm) or gallons per cycle (gpc), and the flow rate value shall be the actual flow rate or the maximum flow rate specified by the standards established in subsection (j) of section 6295 of this title.

**(ii)** If the marking and labeling requirements of ASME A112.18.1M-1989 are revised at any time and approved by ANSI, the Commission shall amend the labeling rules established pursuant to clause (i) to be consistent with such revised ASME/ANSI requirements unless such requirements are inconsistent with the purposes of this chapter or the requirement specified in clause (i) requiring each showerhead and flow restricting or controlling spout-end device to bear a permanent legible marking indicating the flow rate of such product.

**(F)(i)** Not later than one year after October 24, 1992, the Commission shall prescribe labeling rules under this section for water closets and urinals to which standards are

Add. 049

applicable under subsection (k) of section 6295 of this title. Such rules shall provide that the labeling of any water closet or urinal manufactured after the 12-month period beginning on the date of the publication of such rule shall be consistent with the marking and labeling requirements of ASME A112.19.2M-1990, except that each fixture (and flushometer valve associated with such fixture) shall bear a permanent legible marking indicating the water use, expressed in gallons per flush (gpf), and the water use value shall be the actual water use or the maximum water use specified by the standards established in subsection (k) of section 6295 of this title.

**(ii)** If the marking and labeling requirements of ASME A112.19.2M-1990 are revised at any time and approved by ANSI, the Commission shall amend the labeling rules established pursuant to clause (i) to be consistent with such revised ASME/ANSI requirements unless such requirements are inconsistent with the purposes of this chapter or the requirement specified in clause (i) requiring each fixture and flushometer valve to bear a permanent legible marking indicating the water use of such fixture or flushometer valve.

**(iii)** Any labeling rules prescribed under this subparagraph before January 1, 1997, shall provide that, with respect to any gravity tank-type white 2-piece toilet which has a water use greater than 1.6 gallons per flush (gpf), any printed matter distributed or displayed in connection with such product (including packaging and point of sale material, catalog material, and print advertising) shall include, in a conspicuous manner, the words "For Commercial Use Only".

**(G)(i)** Not later than 90 days after August 8, 2005, the Commission shall initiate a rulemaking to consider--

**(I)** the effectiveness of the consumer products labeling program in assisting consumers in making purchasing decisions and improving energy efficiency; and

**(II)** changes to the labeling rules (including categorical labeling) that would improve the effectiveness of consumer product labels.

**(ii)** Not later than 2 years after August 8, 2005, the Commission shall complete the rulemaking initiated under clause (i).

**(H)(i)** Not later than 18 months after August 8, 2005, the Commission shall issue by rule, in accordance with this section, labeling requirements for the electricity used by ceiling fans to circulate air in a room.

**(ii)** The rule issued under clause (i) shall apply to products manufactured after the later of--

Add. 050

**(I)** January 1, 2009; or

**(II)** the date that is 60 days after the final rule is issued.

## (I) Labeling requirements

### (i) In general

Subject to clauses (ii) through (iv), not later than 18 months after the date of issuance of applicable Department of Energy testing procedures, the Commission, in consultation with the Secretary and the Administrator of the Environmental Protection Agency (acting through the Energy Star program), shall, by regulation, prescribe labeling or other disclosure requirements for the energy use of--

**(I)** televisions;

**(II)** personal computers;

**(III)** cable or satellite set-top boxes;

**(IV)** stand-alone digital video recorder boxes; and

**(V)** personal computer monitors.

### (ii) Alternate testing procedures

In the absence of applicable testing procedures described in clause (i) for products described in subclauses (I) through (V) of that clause, the Commission may, by regulation, prescribe labeling or other disclosure requirements for a consumer product category described in clause (i) if the Commission--

**(I)** identifies adequate non-Department of Energy testing procedures for those products; and

**(II)** determines that labeling of, or other disclosures relating to, those products is likely to assist consumers in making purchasing decisions.

### (iii) Deadline and requirements for labeling

**(I) Deadline**

Add. 051

Not later than 18 months after the date of promulgation of any requirements under clause (i) or (ii), the Commission shall require labeling of, or other disclosure requirements for, electronic products described in clause (i).

### (II) Requirements

The requirements prescribed under clause (i) or (ii) may include specific requirements for each electronic product to be labeled with respect to the placement, size, and content of Energy Guide labels.

### (iv) Determination of feasibility

Clause (i) or (ii) shall not apply in any case in which the Commission determines that labeling in accordance with this subsection--

(I) is not technologically or economically feasible; or

(II) is not likely to assist consumers in making purchasing decisions.

(3) The Commission may prescribe a labeling rule under this section applicable to covered products of a type specified in paragraph (20) of section 6292(a) of this title (or a class thereof) if--

(A) the Commission or the Secretary has made a determination with respect to such type (or class thereof) that labeling in accordance with this section will assist purchasers in making purchasing decisions,

(B) the Secretary has prescribed test procedures under section 6293(b)(1)(B) of this title for such type (or class thereof), and

(C) the Commission determines with respect to such type (or class thereof) that application of labeling rules under this section to such type (or class thereof) is economically and technologically feasible.

(4) Any determination under this subsection shall be published in the Federal Register.

(5)(A) For covered products described in subsections (u) through (ff) of section 6295 of this title, after a test procedure has been prescribed under section 6293 of this title, the Secretary or the Commission, as appropriate, may prescribe, by rule, under this section labeling requirements for the products.

Add. 052

**(B)** In the case of products to which TP-1 standards under section 6295(y) of this title apply, labeling requirements shall be based on the "Standard for the Labeling of Distribution Transformer Efficiency" prescribed by the National Electrical Manufacturers Association (NEMA TP-3) as in effect on August 8, 2005.

**(C)** In the case of dehumidifiers covered under section 6295(dd) of this title, the Commission shall not require an "Energy Guide" label.

**(6) Authority to include additional product categories**

The Commission may, by regulation, require labeling or other disclosures in accordance with this subsection for any consumer product not specified in this subsection or section 6292 of this title if the Commission determines that labeling for the product is likely to assist consumers in making purchasing decisions.

**(b) Rules in effect; new rules**

**(1)(A)** Any labeling rule in effect on March 17, 1987, shall remain in effect until amended, by rule, by the Commission.

**(B)** After March 17, 1987, and not later than 30 days after the date on which a proposed test procedure applicable to a covered product of any of the types specified in paragraphs (1) through (13), and paragraphs (15) through (20) of section 6292(a) of this title (or class thereof) is prescribed under section 6293(b) of this title, the Commission shall publish a proposed labeling rule applicable to such type (or class thereof).

**(2)** The Commission shall afford interested persons an opportunity to present written or oral data, views, and comments with respect to the proposed labeling rules published under paragraph (1). The period for such presentations shall not be less than 45 days.

**(3)** Not earlier than 45 days nor later than 60 days after the date on which test procedures are prescribed under section 6293(b) of this title with respect to covered products of any type (or class thereof) specified in paragraphs (1) through (12) of section 6292(a) of this title, the Commission shall prescribe labeling rules with respect to covered products of such type (or class thereof). Not earlier than 45 days after the date on which test procedures are prescribed under section 6293(b) of this title with respect to covered products of a type specified in paragraph (20) of section 6292(a) of this title, the Commission may prescribe labeling rules with respect to covered products of such type (or class thereof).

**(4)** A labeling rule prescribed under paragraph (3) shall take effect not later than 3 months after the date of prescription of such rule, except that such rules may take effect

Add. 053

not later than 6 months after such date of prescription if the Commission determines that such extension is necessary to allow persons subject to such rules adequate time to come into compliance with such rules.

**(5)** The Commission may delay the publication of a proposed labeling rule, or the prescription of a labeling rule, beyond the dates specified in paragraph (1) or (3), if it determines that it cannot publish proposed labeling rules or prescribe labeling rules which meet the requirements of this section on or prior to the date specified in the applicable paragraph and publishes such determination in the Federal Register, together with the reasons therefor. In any such case, it shall publish proposed labeling rules or prescribe labeling rules for covered products of such type (or class thereof) as soon as practicable unless it determines (A) that labeling in accordance with this section is not economically or technically feasible, or (B) in the case of a type specified in paragraphs (3), (5), and (7) of section 6292(a) of this title, that labeling in accordance with this section is not likely to assist consumers in purchasing decisions. Any such determination shall be published in the Federal Register, together with the reasons therefor. This paragraph shall not apply to the prescription of a labeling rule with respect to covered products of a type specified in paragraph (20) of section 6292(a) of this title.

**(c) Content of label**

**(1)** Subject to paragraph (6), a rule prescribed under this section shall require that each covered product in the type or class of covered products to which the rule applies bear a label which discloses--

**(A)** the estimated annual operating cost of such product (determined in accordance with test procedures prescribed under section 6293 of this title), except that if--

**(i)** the Secretary determines that disclosure of estimated annual operating cost is not technologically feasible, or

**(ii)** the Commission determines that such disclosure is not likely to assist consumers in making purchasing decisions or is not economically feasible,

the Commission shall require disclosure of a different useful measure of energy consumption (determined in accordance with test procedures prescribed under section 6293 of this title); and

**(B)** information respecting the range of estimated annual operating costs for covered products to which the rule applies; except that if the Commission requires disclosure under subparagraph (A) of a measure of energy consumption different from estimated

Add. 054

annual operating cost, then the label shall disclose the range of such measure of energy consumption of covered products to which such rule applies.

**(2)** A rule under this section shall include the following:

**(A)** A description of the type or class of covered products to which such rule applies.

**(B)** Subject to paragraph (6), information respecting the range of estimated annual operating costs or other useful measure of energy consumption (determined in such manner as the rule may prescribe) for such type or class of covered products.

**(C)** A description of the test procedures under section 6293 of this title used in determining the estimated annual operating costs or other measure of energy consumption of the type or class of covered products.

**(D)** A prototype label and directions for displaying such label.

**(3)** A rule under this section shall require that the label be displayed in a manner that the Commission determines is likely to assist consumers in making purchasing decisions and is appropriate to carry out this part. The Commission may permit a tag to be used in lieu of a label in any case in which the Commission finds that a tag will carry out the purposes for which the label was intended.

**(4)** A rule under this section applicable to a covered product may require disclosure, in any printed matter displayed or distributed at the point of sale of such product, of any information which may be required under this section to be disclosed on the label of such product. Requirements under this paragraph shall not apply to any broadcast advertisement or any advertisement in any newspaper, magazine, or other periodical.

**(5)** The Commission may require that a manufacturer of a covered product to which a rule under this section applies--

**(A)** include on the label,

**(B)** separately attach to the product, or

**(C)** ship with the product,

additional information relating to energy consumption, including instructions for the maintenance, use, or repair of the covered product, if the Commission determines that such additional information would assist consumers in making purchasing decisions

Add. 055

or in using such product, and that such requirement would not be unduly burdensome to manufacturers.

**(6)** The Commission may delay the effective date of the requirement specified in paragraph (1)(B) of this subsection applicable to a type or class of covered product, insofar as it requires the disclosure on the label of information respecting range of a measure of energy consumption, for not more than 12 months after the date on which the rule under this section is first applicable to such type or class, if the Commission determines that such information will not be available within an adequate period of time before such date.

**(7)** Paragraphs (1), (2), (3), (5), and (6) of this subsection shall not apply to the covered product specified in paragraphs (13), (14), (15), (16), (17), and (18) of section 6292(a) of this title.

**(8)** If a manufacturer of a covered product specified in paragraph (15) or (17) of section 6292(a) of this title elects to provide a label for such covered product conveying the estimated annual operating cost of such product or the range of estimated annual operating costs for the type or class of such product--

**(A)** such estimated cost or range of costs shall be determined in accordance with test procedures prescribed under section 6293 of this title;

**(B)** the format of such label shall be in accordance with a format prescribed by the Commission; and

**(C)** such label shall be displayed in a manner, prescribed by the Commission, to be likely to assist consumers in making purchasing decisions and appropriate to carry out the purposes of this chapter.

**(9) Discretionary application**

The Commission may apply paragraphs (1), (2), (3), (5), and (6) of this subsection to the labeling of any product covered by paragraph (2)(I) or (6) of subsection (a).

**(d) Effective date**

A rule under this section (or an amendment thereto) shall not apply to any covered product the manufacture of which was completed prior to the effective date of such rule or amendment, as the case may be.

**(e) Study of certain products**

Add. 056

The Secretary, in consultation with the Commission, shall study consumer products for which labeling rules under this section have not been proposed, in order to determine (1) the aggregate energy consumption of such products, and (2) whether the imposition of labeling requirements under this section would be feasible and useful to consumers in making purchasing decisions. The Secretary shall include the results of such study in the annual report under section 6308 of this title.

## (f) Consultation

The Secretary and the Commission shall consult with each other on a continuing basis as may be necessary or appropriate to carry out their respective responsibilities under this part. Before the Commission makes any determination under subsection (a)(1), it shall obtain the views of the Secretary and shall take such views into account in making such determination.

## (g) Other authority of the Commission

Until such time as labeling rules under this section take effect with respect to a type or class of covered product, this section shall not affect any authority of the Commission under the Federal Trade Commission Act to require labeling with respect to energy consumption of such type or class of covered product.

## CREDIT(S)

(Pub.L. 94-163, Title III, § 324, Dec. 22, 1975, 89 Stat. 920; Pub.L. 95-619, Title IV, § 425(b), (c), Title VI, § 691(b)(2), Nov. 9, 1978, 92 Stat. 3265, 3288; Pub.L. 100-12, § 11(a)(1), (b)(2), Mar. 17, 1987, 101 Stat. 124, 125; Pub.L. 100-357, § 2(d), June 28, 1988, 102 Stat. 672; Pub.L. 102-486, Title I, § 123(e), Oct. 24, 1992, 106 Stat. 2822; Pub.L. 105-388, § 5(a)(4), Nov. 13, 1998, 112 Stat. 3478; Pub.L. 109-58, Title I, § 137, Aug. 8, 2005, 119 Stat. 645; Pub.L. 110-140, Title III, §§ 321(b), 324(d), 325, Dec. 19, 2007, 121 Stat. 1584, 1593, 1595; Pub.L. 112-210, § 10(a)(12), Dec. 18, 2012, 126 Stat. 1525; Pub.L. 115-115, § 2(c)(2), Jan. 12, 2018, 131 Stat. 2281.)

42 U.S.C.A. § 6294, 42 USCA § 6294
Current through P.L. 119-99. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 057

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A. Energy Conservation Program for Consumer Products Other than Automobiles (Refs & Annos)

42 U.S.C.A. § 6295

§ 6295. Energy conservation standards

Effective: December 27, 2020

Currentness

**(a) Purposes**

The purposes of this section are to--

**(1)** provide Federal energy conservation standards applicable to covered products; and

**(2)** authorize the Secretary to prescribe amended or new energy conservation standards for each type (or class) of covered product.

**(b) Standards for refrigerators, refrigerator-freezers, and freezers**

**(1)** The following is the maximum energy use allowed in kilowatt hours per year for the following products (other than those described in paragraph (2)) manufactured on or after January 1, 1990:

|  | Energy Standards Equations |
|---|---|
| Refrigerators and Refrigerator-Freezers with manual defrost.... | $16.3\ AV + 316$ |
| Refrigerator-Freezers--partial automatic defrost ....................... | $21.8\ AV + 429$ |
| Refrigerator-Freezers--automatic defrost with: |  |
| Top mounted freezer without ice ................................................ | $23.5\ AV + 471$ |
| Side mounted freezer without ice ................................................ | $27.7\ AV + 488$ |

Add. 058

| | |
|---|---|
| Bottom mounted freezer without ice............................................. | 27.7 AV + 488 |
| Top mounted freezer with through the door ice service ............. | 26.4 AV + 535 |
| Side mounted freezer with through the door ice.......................... | 30.9 AV + 547 |
| Upright Freezers with: | |
| Manual defrost ............................................................. | 10.9 AV + 422 |
| Automatic defrost......................................................... | 16.0 AV + 623 |
| Chest Freezers and all other freezers .......................... | 14.8 AV + 223 |

**(2)** The standards described in paragraph (1) do not apply to refrigerators and refrigerator-freezers with total refrigerated volume exceeding 39 cubic feet or freezers with total refrigerated volume exceeding 30 cubic feet.

**(3)(A)(i)** The Secretary shall publish a proposed rule, no later than July 1, 1988, to determine if the standards established by paragraph (1) should be amended. The Secretary shall publish a final rule no later than July 1, 1989, which shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1993. If such a final rule is not published before January 1, 1990, any amendment of such standards shall apply to products manufactured on or after January 1, 1995. Nothing in this subsection provides any justification or defense for a failure by the Secretary to comply with the nondiscretionary duty to publish final rules by the dates stated in this paragraph.

**(ii)(I)** If the Secretary does not publish a final rule before January 1, 1990, relating to the revision of the energy conservation standards for refrigerators, refrigerator-freezers and freezers, the regulations which established standards for such products and were promulgated by the California Energy Commission on December 14, 1984, to be effective January 1, 1992 (or any amendments to such standards that are not more stringent than the standards in the original regulations), shall apply in California to such products, effective beginning January 1, 1993, and shall not be preempted after such effective date by any energy conservation standard established in this section or prescribed, on or after January 1, 1990, under this section.

**(II)** If the Secretary does not publish a final rule before January 1, 1992, relating to the revision of the energy conservation standards for refrigerators, refrigerator-freezers and freezers, State regulations which apply to such products manufactured on or after January

1, 1995, shall apply to such products until the effective date of a rule issued under this section with respect to such products.

**(B)** After the publication of a final rule under subparagraph (A), the Secretary shall publish a final rule no later than five years after the date of publication of the previous final rule. The Secretary shall determine in such rule whether to amend the standards in effect for the products described in paragraph (1).

**(C)** Any amendment prescribed under subparagraph (B) shall apply to products manufactured after a date which is five years after--

**(i)** the effective date of the previous amendment; or

**(ii)** if the previous final rule did not amend the standards, the earliest date by which the previous amendment could have been effective;

except that in no case may any amended standard apply to products manufactured within three years after publication of the final rule establishing such amended standard.

### (4) Refrigerators and freezers manufactured on or after January 1, 2014

#### (A) In general

Not later than December 31, 2010, the Secretary shall publish a final rule determining whether to amend the standards in effect for refrigerators, refrigerator-freezers, and freezers manufactured on or after January 1, 2014.

#### (B) Amended standards

The final rule shall contain any amended standards.

### (c) Standards for room air conditioners

**(1)** The energy efficiency ratio of room air conditioners shall be not less than the following for products manufactured on or after January 1, 1990:

| Product Class: | Ratio |
|---|---|
| **Without Reverse Cycle and With Louvered Sides:** | |
| Less than 6,000 Btu.......................................................................... | 8.0 |

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

6,000 to 7,999 Btu................................................................................. 8.5

8,000 to 13,999 Btu.............................................................................. 9.0

14,000 to 19,999 Btu............................................................................ 8.8

20,000 and more Btu............................................................................ 8.2

Without Reverse Cycle and Without Louvered Sides:

Less than 6,000 Btu.............................................................................. 8.0

6,000 to 7,999 Btu................................................................................. 8.5

8,000 to 13,999 Btu.............................................................................. 8.5

14,000 to 19,999 Btu............................................................................ 8.5

20,000 and more Btu............................................................................ 8.2

With Reverse Cycle and With Louvered Sides...................................... 8.5

With Reverse Cycle, Without Louvered Sides....................................... 8.0

**(2)(A)** The Secretary shall publish a final rule no later than January 1, 1992, to determine if the standards established under paragraph (1) should be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1995.

**(B)** After January 1, 1992, the Secretary shall publish a final rule no later than five years after the date of publication of a previous final rule. The Secretary shall determine in such rule whether to amend the standards in effect for room air conditioners.

**(C)** Any amendment prescribed under subparagraph (B) shall apply to products manufactured after a date which is five years after--

  **(i)** the effective date of the previous amendment; or

  **(ii)** if the previous final rule did not amend the standards, the earliest date by which a previous amendment could have been effective;

Add. 061

except that in no case may any amended standard apply to products manufactured within three years after publication of the final rule establishing such amended standard.

**(d) Standards for central air conditioners and heat pumps**

**(1)** The seasonal energy efficiency ratio of central air conditioners and central air conditioning heat pumps shall be not less than the following:

**(A)** Split Systems: 10.0 for products manufactured on or after January 1, 1992.

**(B)** Single Package Systems: 9.7 for products manufactured on or after January 1, 1993.

**(2)** The heating seasonal performance factor of central air conditioning heat pumps shall be not less than the following:

**(A)** Split Systems: 6.8 for products manufactured on or after January 1, 1992.

**(B)** Single Package Systems: 6.6 for products manufactured on or after January 1, 1993.

**(3)(A)** The Secretary shall publish a final rule no later than January 1, 1994, to determine whether the standards established under paragraph (1) should be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1999. The Secretary shall publish a final rule no later than January 1, 1994, to determine whether the standards established under paragraph (2) shall be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 2002.

**(B)** The Secretary shall publish a final rule after January 1, 1994, and no later than January 1, 2001, to determine whether the standards in effect for central air conditioners and central air conditioning heat pumps should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 2006.

**(4) Standards for through-the-wall central air conditioners, through-the-wall central air conditioning heat pumps, and small duct, high velocity systems**

**(A) Definitions**

In this paragraph:

**(i) Small duct, high velocity system**

Add. 062

The term "small duct, high velocity system" means a heating and cooling product that contains a blower and indoor coil combination that--

**(I)** is designed for, and produces, at least 1.2 inches of external static pressure when operated at the certified air volume rate of 220-350 CFM per rated ton of cooling; and

**(II)** when applied in the field, uses high velocity room outlets generally greater than 1,000 fpm that have less than 6.0 square inches of free area.

**(ii) Through-the-wall central air conditioner; through-the-wall central air conditioning heat pump**

The terms "through-the-wall central air conditioner" and "through-the-wall central air conditioning heat pump" mean a central air conditioner or heat pump, respectively, that is designed to be installed totally or partially within a fixed-size opening in an exterior wall, and--

**(I)** is not weatherized;

**(II)** is clearly and permanently marked for installation only through an exterior wall;

**(III)** has a rated cooling capacity no greater than 30,000 Btu/hr;

**(IV)** exchanges all of its outdoor air across a single surface of the equipment cabinet; and

**(V)** has a combined outdoor air exchange area of less than 800 square inches (split systems) or less than 1,210 square inches (single packaged systems) as measured on the surface area described in subclause (IV).

**(iii) Revision**

The Secretary may revise the definitions contained in this subparagraph through publication of a final rule.

**(B) Small-duct high-velocity systems**

**(i) Seasonal energy efficiency ratio**

Add. 063

The seasonal energy efficiency ratio for small-duct high-velocity systems shall be not less than--

>> **(I)** 11.00 for products manufactured on or after January 23, 2006; and

>> **(II)** 12.00 for products manufactured on or after January 1, 2015.

> **(ii) Heating seasonal performance factor**

> The heating seasonal performance factor for small-duct high-velocity systems shall be not less than--

>> **(I)** 6.8 for products manufactured on or after January 23, 2006; and

>> **(II)** 7.2 for products manufactured on or after January 1, 2015.

**(C) Subsequent rulemakings**

The Secretary shall conduct subsequent rulemakings for through-the-wall central air conditioners, through-the-wall central air conditioning heat pumps, and small duct, high velocity systems as part of any rulemaking under this section used to review or revise standards for other central air conditioners and heat pumps.

**(e) Standards for water heaters; pool heaters; direct heating equipment**

**(1)** The energy factor of water heaters shall be not less than the following for products manufactured on or after January 1, 1990:

| | |
|---|---|
| **(A)** Gas Water Heater: | .62-(.0019 x Rated Storage Volume in gallons) |
| **(B)** Oil Water Heater: | .59-(.0019 x Rated Storage Volume in gallons) |
| **(C)** Electric Water Heater: | .95-(.00132 x Rated Storage Volume in gallons) |

**(2)** The thermal efficiency of pool heaters manufactured on or after January 1, 1990, shall not be less than 78 percent.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(3)** The efficiencies of gas direct heating equipment manufactured on or after January 1, 1990, shall be not less than the following:

Wall

    Fan type

        Up to 42,000 Btu/hour................................................... ............... 73% AFUE

        Over 42,000 Btu/hour.................................................. ............... 74% AFUE

    Gravity type

        Up to 10,000 Btu/hour................................................... ............... 59% AFUE

        Over 10,000 Btu/hour up to 12,000 Btu/hour .................... ............... 60% AFUE

        Over 12,000 Btu/hour up to 15,000 Btu/hour .................... ............... 61% AFUE

        Over 15,000 Btu/hour up to 19,000 Btu/hour .................... ............... 62% AFUE

        Over 19,000 Btu/hour up to 27,000 Btu/hour .................... ............... 63% AFUE

        Over 27,000 Btu/hour up to 46,000 Btu/hour .................... ............... 64% AFUE

        Over 46,000 Btu/hour................................................... ............... 65% AFUE

Floor

        Up to 37,000 Btu/hour................................................... ............... 56% AFUE

        Over 37,000 Btu/hour.................................................. ............... 57% AFUE

Room

        Up to 18,000 Btu/hour................................................... ............... 57% AFUE

        Over 18,000 Btu/hour up to 20,000 Btu/hour .................... ............... 58% AFUE

        Over 20,000 Btu/hour up to 27,000 Btu/hour ................... ............... 63% AFUE

Add. 065

Over 27,000 Btu/hour up to 46,000 Btu/hour ..................... ................ 64% AFUE

Over 46,000 Btu/hour........................................................ ................ 65% AFUE

**(4)(A)** The Secretary shall publish final rules no later than January 1, 1992, to determine whether the standards established by paragraph (1), (2), or (3) for water heaters, pool heaters, and direct heating equipment should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 1995.

**(B)** The Secretary shall publish a final rule no later than January 1, 2000, to determine whether standards in effect for such products should be amended. Such rule shall provide that any such amendment shall apply to products manufactured on or after January 1, 2005.

**(5) Uniform efficiency descriptor for covered water heaters**

**(A) Definitions**

In this paragraph:

**(i) Covered water heater**

The term "covered water heater" means--

**(I)** a water heater; and

**(II)** a storage water heater, instantaneous water heater, and unfired hot water storage tank (as defined in section 6311 of this title).

**(ii) Final rule**

The term "final rule" means the final rule published under this paragraph.

**(B) Publication of final rule**

Not later than 1 year after December 18, 2012, the Secretary shall publish a final rule that establishes a uniform efficiency descriptor and accompanying test methods for covered water heaters.

**(C) Purpose**

The purpose of the final rule shall be to replace with a uniform efficiency descriptor--

Add. 066

**(i)** the energy factor descriptor for water heaters established under this subsection; and

**(ii)** the thermal efficiency and standby loss descriptors for storage water heaters, instantaneous water heaters, and unfired water storage tanks established under section 6313(a)(5) of this title.

## (D) Effect of final rule

### (i) In general

Notwithstanding any other provision of this subchapter, effective beginning on the effective date of the final rule, the efficiency standard for covered water heaters shall be denominated according to the efficiency descriptor established by the final rule.

### (ii) Effective date

The final rule shall take effect 1 year after the date of publication of the final rule under subparagraph (B).

## (E) Conversion factor

### (i) In general

The Secretary shall develop a mathematical conversion factor for converting the measurement of efficiency for covered water heaters from the test procedures in effect on December 18, 2012, to the new energy descriptor established under the final rule.

### (ii) Application

The conversion factor shall apply to models of covered water heaters affected by the final rule and tested prior to the effective date of the final rule.

### (iii) Effect on efficiency requirements

The conversion factor shall not affect the minimum efficiency requirements for covered water heaters otherwise established under this subchapter.

### (iv) Use

Add. 067

During the period described in clause (v), a manufacturer may apply the conversion factor established by the Secretary to rerate existing models of covered water heaters that are in existence prior to the effective date of the rule described in clause (v)(II) to comply with the new efficiency descriptor.

**(v) Period**

Clause (iv) shall apply during the period--

**(I)** beginning on the date of publication of the conversion factor in the Federal Register; and

**(II)** ending on the later of 1 year after the date of publication of the conversion factor, or December 31, 2015.

**(F) Exclusions**

The final rule may exclude a specific category of covered water heaters from the uniform efficiency descriptor established under this paragraph if the Secretary determines that the category of water heaters--

**(i)** does not have a residential use and can be clearly described in the final rule; and

**(ii)** are[1] effectively rated using the thermal efficiency and standby loss descriptors applied (as of December 18, 2012) to the category under section 6313(a)(5) of this title.

**(G) Options**

The descriptor set by the final rule may be--

**(i)** a revised version of the energy factor descriptor in use as of December 18, 2012;

**(ii)** the thermal efficiency and standby loss descriptors in use as of that date;

**(iii)** a revised version of the thermal efficiency and standby loss descriptors;

**(iv)** a hybrid of descriptors; or

**(v)** a new approach.

Add. 068

**(H) Application**

The efficiency descriptor and accompanying test method established under the final rule shall apply, to the maximum extent practicable, to all water heating technologies in use as of December 18, 2012, and to future water heating technologies.

**(I) Participation**

The Secretary shall invite interested stakeholders to participate in the rulemaking process used to establish the final rule.

**(J) Testing of alternative descriptors**

In establishing the final rule, the Secretary shall contract with the National Institute of Standards and Technology, as necessary, to conduct testing and simulation of alternative descriptors identified for consideration.

**(K) Existing covered water heaters**

A covered water heater shall be considered to comply with the final rule on and after the effective date of the final rule and with any revised labeling requirements established by the Federal Trade Commission to carry out the final rule if the covered water heater--

**(i)** was manufactured prior to the effective date of the final rule; and

**(ii)** complied with the efficiency standards and labeling requirements in effect prior to the final rule.

**(6) Additional standards for grid-enabled water heaters**

**(A) Definitions**

In this paragraph:

**(i) Activation lock**

The term "activation lock" means a control mechanism (either a physical device directly on the water heater or a control system integrated into the water heater) that is locked by default and contains a physical, software, or digital communication that must be activated with an activation key to enable the product to operate at its designed specifications and capabilities and without which activation the product

Add. 069

will provide not greater than 50 percent of the rated first hour delivery of hot water certified by the manufacturer.

**(ii) Grid-enabled water heater**

The term "grid-enabled water heater" means an electric resistance water heater that--

**(I)** has a rated storage tank volume of more than 75 gallons;

**(II)** is manufactured on or after April 16, 2015;

**(III)** has--

**(aa)** an energy factor of not less than 1.061 minus the product obtained by multiplying--

**(AA)** the rated storage volume of the tank, expressed in gallons; and

**(BB)** 0.00168; or

**(bb)** an equivalent alternative standard prescribed by the Secretary and developed pursuant to paragraph (5)(E);

**(IV)** is equipped at the point of manufacture with an activation lock; and

**(V)** bears a permanent label applied by the manufacturer that--

**(aa)** is made of material not adversely affected by water;

**(bb)** is attached by means of non-water-soluble adhesive; and

**(cc)** advises purchasers and end-users of the intended and appropriate use of the product with the following notice printed in 16.5 point Arial Narrow Bold font:

"IMPORTANT INFORMATION: This water heater is intended only for use as part of an electric thermal storage or demand response program. It will not provide adequate hot water unless enrolled in such a program and activated by your utility company or another program operator. Confirm the availability of a program in your local area before purchasing or installing this product.".

**(B) Requirement**

Add. 070

The manufacturer or private labeler shall provide the activation key for a grid-enabled water heater only to a utility or other company that operates an electric thermal storage or demand response program that uses such a grid-enabled water heater.

**(C) Reports**

**(i) Manufacturers**

The Secretary shall require each manufacturer of grid-enabled water heaters to report to the Secretary annually the quantity of grid-enabled water heaters that the manufacturer ships each year.

**(ii) Operators**

The Secretary shall require utilities and other demand response and thermal storage program operators to report annually the quantity of grid-enabled water heaters activated for their programs using forms of the Energy Information Agency or using such other mechanism that the Secretary determines appropriate after an opportunity for notice and comment.

**(iii) Confidentiality requirements**

The Secretary shall treat shipment data reported by manufacturers as confidential business information.

**(D) Publication of information**

**(i) In general**

In 2017 and 2019, the Secretary shall publish an analysis of the data collected under subparagraph (C) to assess the extent to which shipped products are put into use in demand response and thermal storage programs.

**(ii) Prevention of product diversion**

If the Secretary determines that sales of grid-enabled water heaters exceed by 15 percent or greater the quantity of such products activated for use in demand response and thermal storage programs annually, the Secretary shall, after opportunity for notice and comment, establish procedures to prevent product diversion for non-program purposes.

Add. 071

**(E) Compliance**

**(i) In general**

Subparagraphs (A) through (D) shall remain in effect until the Secretary determines under this section that--

**(I)** grid-enabled water heaters do not require a separate efficiency requirement; or

**(II)** sales of grid-enabled water heaters exceed by 15 percent or greater the quantity of such products activated for use in demand response and thermal storage programs annually and procedures to prevent product diversion for non-program purposes would not be adequate to prevent such product diversion.

**(ii) Effective date**

If the Secretary exercises the authority described in clause (i) or amends the efficiency requirement for grid-enabled water heaters, that action will take effect on the date described in subsection (m)(4)(A)(ii).

**(iii) Consideration**

In carrying out this section with respect to electric water heaters, the Secretary shall consider the impact on thermal storage and demand response programs, including any impact on energy savings, electric bills, peak load reduction, electric reliability, integration of renewable resources, and the environment.

**(iv) Requirements**

In carrying out this paragraph, the Secretary shall require that grid-enabled water heaters be equipped with communication capability to enable the grid-enabled water heaters to participate in ancillary services programs if the Secretary determines that the technology is available, practical, and cost-effective.

**(f) Standards for furnaces and boilers**

**(1)** Furnaces (other than furnaces designed solely for installation in mobile homes) manufactured on or after January 1, 1992, shall have an annual fuel utilization efficiency of not less than 78 percent, except that--

Add. 072

**(A)** boilers (other than gas steam boilers) shall have an annual fuel utilization efficiency of not less than 80 percent and gas steam boilers shall have an annual fuel utilization efficiency of not less than 75 percent; and

**(B)** the Secretary shall prescribe a final rule not later than January 1, 1989, establishing an energy conservation standard--

**(i)** which is for furnaces (other than furnaces designed solely for installation in mobile homes) having an input of less than 45,000 Btu per hour and manufactured on or after January 1, 1992;

**(ii)** which provides that the annual fuel utilization efficiency of such furnaces shall be a specific percent which is not less than 71 percent and not more than 78 percent; and

**(iii)** which the Secretary determines is not likely to result in a significant shift from gas heating to electric resistance heating with respect to either residential construction or furnace replacement.

**(2)** Furnaces which are designed solely for installation in mobile homes and which are manufactured on or after September 1, 1990, shall have an annual fuel utilization efficiency of not less than 75 percent.

**(3) Boilers**

**(A) In general**

Subject to subparagraphs (B) and (C), boilers manufactured on or after September 1, 2012, shall meet the following requirements:

| Boiler Type | Minimum Annual Fuel Utilization Efficiency | Design Requirements |
|---|---|---|
| Gas Hot Water ............... | 82% | No Constant Burning Pilot, Automatic Means for Adjusting Water Temperature |

Add. 073

| | | |
|---|---|---|
| Gas Steam....................... | 80% | No Constant Burning Pilot |
| Oil Hot Water ................ | 84% | Automatic Means for Adjusting Temperature |
| Oil Steam....................... | 82% | None |
| Electric Hot Water......... | None | Automatic Means for Adjusting Temperature |
| Electric Steam .............. | None | None |

**(B) Automatic means for adjusting water temperature**

**(i) In general**

The manufacturer shall equip each gas, oil, and electric hot water boiler (other than a boiler equipped with a tankless domestic water heating coil) with automatic means for adjusting the temperature of the water supplied by the boiler to ensure that an incremental change in inferred heat load produces a corresponding incremental change in the temperature of water supplied.

**(ii) Single input rate**

For a boiler that fires at 1 input rate, the requirements of this subparagraph may be satisfied by providing an automatic means that allows the burner or heating element to fire only when the means has determined that the inferred heat load cannot be met by the residual heat of the water in the system.

**(iii) No inferred heat load**

When there is no inferred heat load with respect to a hot water boiler, the automatic means described in clauses (i) and (ii) shall limit the temperature of the water in the boiler to not more than 140 degrees Fahrenheit.

**(iv) Operation**

A boiler described in clause (i) or (ii) shall be operable only when the automatic means described in clauses (i), (ii), and (iii) is installed.

**(C) Exception**

Add. 074

A boiler that is manufactured to operate without any need for electricity or any electric connection, electric gauges, electric pumps, electric wires, or electric devices shall not be required to meet the requirements of this paragraph.

**(4)(A)** The Secretary shall publish a final rule no later than January 1, 1992, to determine whether the standards established by paragraph (2) for mobile home furnaces should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 1994.

**(B)** The Secretary shall publish a final rule no later than January 1, 1994, to determine whether the standards established by this subsection for furnaces (including mobile home furnaces) should be amended. Such rule shall provide that any amendment shall apply to products manufactured on or after January 1, 2002.

**(C)** After January 1, 1997, and before January 1, 2007, the Secretary shall publish a final rule to determine whether standards in effect for such products should be amended. Such rule shall contain such amendment, if any, and provide that any amendment shall apply to products manufactured on or after January 1, 2012.

**(D)** Notwithstanding any other provision of this chapter, if the requirements of subsection (o) are met, not later than December 31, 2013, the Secretary shall consider and prescribe energy conservation standards or energy use standards for electricity used for purposes of circulating air through duct work.

**(g) Standards for dishwashers; clothes washers; clothes dryers; fluorescent lamp ballasts**

**(1)** Dishwashers manufactured on or after January 1, 1988, shall be equipped with an option to dry without heat.

**(2)** All rinse cycles of clothes washers shall include an unheated water option, but may have a heated water rinse option, for products manufactured on or after January 1, 1988.

**(3)** Gas clothes dryers shall not be equipped with a constant burning pilot for products manufactured on or after January 1, 1988.

**(4)(A)** The Secretary shall publish final rules no later than January 1, 1990, to determine if the standards established under this subsection for products described in paragraphs (1), (2), and (3) should be amended. Such rules shall provide that any amendment shall apply to products the manufacture of which is completed on or after January 1, 1993.

Add. 075

**(B)** After January 1, 1990, the Secretary shall publish a final rule no later than five years after the date of publication of the previous final rule. The Secretary shall determine in such rule whether to amend the standards in effect for such products.

**(C)** Any such amendment shall apply to products manufactured after a date which is five years after--

**(i)** the effective date of the previous amendment; or

**(ii)** if the previous final rule did not amend the standard, the earliest date by which a previous amendment could have been in effect;

except that in no case may any amended standard apply to products manufactured within three years after publication of the final rule establishing such standard.

**(5)** Except as provided in paragraph (6), each fluorescent lamp ballast--

**(A)(i)** manufactured on or after January 1, 1990;

**(ii)** sold by the manufacturer on or after April 1, 1990; or

**(iii)** incorporated into a luminaire by a luminaire manufacturer on or after April 1, 1991; and

**(B)** designed--

**(i)** to operate at nominal input voltages of 120 or 277 volts;

**(ii)** to operate with an input current frequency of 60 Hertz; and

**(iii)** for use in connection with an F40T12, F96T12, or F96T12HO lamps;

shall have a power factor of 0.90 or greater and shall have a ballast efficacy factor not less than the following:

| Application for Operation of | Ballast Input Voltage | Total Nominal Lamp Watts | Ballast Efficacy Factor |
|---|---|---|---|
| one F40T12 lamp ......................................... | 120 | 40 | 1.805 |

Add. 076

| | | | |
|---|---|---|---|
| | 277 | 40 | 1.805 |
| two F40T12 lamps .............................................. | 120 | 80 | 1.060 |
| | 277 | 80 | 1.050 |
| two F96T12 lamps .............................................. | 120 | 150 | 0.570 |
| | 277 | 150 | 0.570 |
| two F96T12HO lamps........................................ | 120 | 220 | 0.390 |
| | 277 | 220 | 0.390 |

**(6)** The standards described in paragraph (5) do not apply to (A) a ballast which is designed for dimming or for use in ambient temperatures of 0° F or less, or (B) a ballast which has a power factor of less than 0.90 and is designed and labeled for use only in residential building applications.

**(7)(A)** The Secretary shall publish a final rule no later than January 1, 1992, to determine if the standards established under paragraph (5) should be amended, including whether such standards should be amended so that they would be applicable to ballasts described in paragraph (6) and other fluorescent lamp ballasts. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1995.

**(B)** After January 1, 1992, the Secretary shall publish a final rule no later than five years after the date of publication of a previous final rule. The Secretary shall determine in such rule whether to amend the standards in effect for fluorescent lamp ballasts, including whether such standards should be amended so that they would be applicable to additional fluorescent lamp ballasts.

**(C)** Any amendment prescribed under subparagraph (B) shall apply to products manufactured after a date which is five years after--

  **(i)** the effective date of the previous amendment; or

  **(ii)** if the previous final rule did not amend the standards, the earliest date by which a previous amendment could have been effective;

except that in no case may any amended standard apply to products manufactured within three years after publication of the final rule establishing such amended standard.

Add. 077

**(8)(A)** Each fluorescent lamp ballast (other than replacement ballasts or ballasts described in subparagraph (C))--

  **(i)(I)** manufactured on or after July 1, 2009;

  **(II)** sold by the manufacturer on or after October 1, 2009; or

  **(III)** incorporated into a luminaire by a luminaire manufacturer on or after July 1, 2010; and

  **(ii)** designed--

    **(I)** to operate at nominal input voltages of 120 or 277 volts;

    **(II)** to operate with an input current frequency of 60 Hertz; and

    **(III)** for use in connection with F34T12 lamps, F96T12/ES lamps, or F96T12HO/ES lamps;

  shall have a power factor of 0.90 or greater and shall have a ballast efficacy factor of not less than the following:

| Application for operation of | Ballast input voltage | Total nominal lamp watts | Ballast efficacy factor |
| --- | --- | --- | --- |
| One F34T12 lamp | 120/277 | 34 | 2.61 |
| Two F34T12 lamps | 120/277 | 68 | 1.35 |
| Two F96T12/ES lamps | 120/277 | 120 | 0.77 |
| Two F96T12HO/ES lamps | 120/277 | 190 | 0.42. |

**(B)** The standards described in subparagraph (A) shall apply to all ballasts covered by subparagraph (A)(ii) that are manufactured on or after July 1, 2010, or sold by the manufacturer on or after October 1, 2010.

**(C)** The standards described in subparagraph (A) do not apply to--

Add. 078

**(i)** a ballast that is designed for dimming to 50 percent or less of the maximum output of the ballast;

**(ii)** a ballast that is designed for use with 2 F96T12HO lamps at ambient temperatures of negative 20°F or less and for use in an outdoor sign; or

**(iii)** a ballast that has a power factor of less than 0.90 and is designed and labeled for use only in residential applications.

## (9) Residential clothes washers manufactured on or after January 1, 2011

### (A) In general

A top-loading or front-loading standard-size residential clothes washer manufactured on or after January 1, 2011, shall have--

**(i)** a Modified Energy Factor of at least 1.26; and

**(ii)** a water factor of not more than 9.5.

### (B) Amendment of standards

#### (i) In general

Not later than December 31, 2011, the Secretary shall publish a final rule determining whether to amend the standards in effect for clothes washers manufactured on or after January 1, 2015.

#### (ii) Amended standards

The final rule shall contain any amended standards.

## (10) Residential dishwashers manufactured on or after January 1, 2010

### (A) In general

A dishwasher manufactured on or after January 1, 2010, shall--

**(i)** for a standard size dishwasher not exceed 355 kWh/year and 6.5 gallons per cycle; and

Add. 079

**(ii)** for a compact size dishwasher not exceed 260 kWh/year and 4.5 gallons per cycle.

### (B) Amendment of standards

#### (i) In general

Not later than January 1, 2015, the Secretary shall publish a final rule determining whether to amend the standards for dishwashers manufactured on or after January 1, 2018.

#### (ii) Amended standards

The final rule shall contain any amended standards.

## (h) Standards for kitchen ranges and ovens

**(1)** Gas kitchen ranges and ovens having an electrical supply cord shall not be equipped with a constant burning pilot for products manufactured on or after January 1, 1990.

**(2)(A)** The Secretary shall publish a final rule no later than January 1, 1992, to determine if the standards established for kitchen ranges and ovens in this subsection should be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after January 1, 1995.

**(B)** The Secretary shall publish a final rule no later than January 1, 1997, to determine whether standards in effect for such products should be amended. Such rule shall apply to products manufactured on or after January 1, 2000.

## (i) General service fluorescent lamps, general service incandescent lamps, intermediate base incandescent lamps, candelabra base incandescent lamps, and incandescent reflector lamps

### (1) Standards

#### (A) Definition of effective date

In this paragraph (other than subparagraph (D)), the term "effective date" means, with respect to each type of lamp specified in a table contained in subparagraph (B), the last day of the period of months corresponding to that type of lamp (as specified in the table) that follows October 24, 1992.

Add. 080

## (B) Minimum standards

Each of the following general service fluorescent lamps and incandescent reflector lamps manufactured after the effective date specified in the tables contained in this paragraph shall meet or exceed the following lamp efficacy and CRI standards:

### FLUORESCENT LAMPS

| Lamp Type | Nominal Lamp Wattage | Minimum CRI | Minimum Average Lamp Efficacy (LPW) | Effective Date (Period of Months) |
|---|---|---|---|---|
| 4-foot medium bi-pin . | >35 W | 69 | 75.0 | 36 |
| | ≤35 W | 45 | 75.0 | 36 |
| 2-foot U-shaped.......... | >35 W | 69 | 68.0 | 36 |
| | ≤35 W | 45 | 64.0 | 36 |
| 8-foot slimline ............ | 65 W | 69 | 80.0 | 18 |
| | ≤65 W | 45 | 80.0 | 18 |
| 8-foot high output....... | >100 W | 69 | 80.0 | 18 |
| | ≤100 W | 45 | 80.0 | 18 |

Add. 081

**INCANDESCENT REFLECTOR LAMPS**

| Nominal Lamp Wattage | Minimum Average Lamp Efficacy (LPW) | Effective Date (Period of Months) |
|---|---|---|
| 40-50 ............................................................. | 10.5 | 36 |
| 51-66 ............................................................. | 11.0 | 36 |
| 67-85 ............................................................. | 12.5 | 36 |
| 86-115............................................................ | 14.0 | 36 |
| 116-155.......................................................... | 14.5 | 36 |
| 156-205 ......................................................... | 15.0 | 36 |

**(C) Exemptions**

The standards specified in subparagraph (B) shall not apply to the following types of incandescent reflector lamps:

**(i)** Lamps rated at 50 watts or less that are ER30, BR30, BR40, or ER40 lamps.

**(ii)** Lamps rated at 65 watts that are BR30, BR40, or ER40 lamps.

**(iii)** R20 incandescent reflector lamps rated 45 watts or less.

**(D) Effective dates**

**(i) ER, BR, and BPAR lamps**

The standards specified in subparagraph (B) shall apply with respect to ER incandescent reflector lamps, BR incandescent reflector lamps, BPAR incandescent reflector lamps, and similar bulb shapes on and after January 1, 2008.

**(ii) Lamps between 2.25-2.75 inches in diameter**

Add. 082

The standards specified in subparagraph (B) shall apply with respect to incandescent reflector lamps with a diameter of more than 2.25 inches, but not more than 2.75 inches, on and after the later of January 1, 2008, or the date that is 180 days after December 19, 2007.

**(2)** Notwithstanding section 6302(a)(5) of this title and section 6302(b) of this title, it shall not be unlawful for a manufacturer to sell a lamp which is in compliance with the law at the time such lamp was manufactured.

**(3)** Not less than 36 months after October 24, 1992, the Secretary shall initiate a rulemaking procedure and shall publish a final rule not later than the end of the 54-month period beginning on October 24, 1992, to determine if the standards established under paragraph (1) should be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after the 36-month period beginning on the date such final rule is published.

**(4)** Not less than eight years after October 24, 1992, the Secretary shall initiate a rulemaking procedure and shall publish a final rule not later than nine years and six months after October 24, 1992, to determine if the standards in effect for fluorescent lamps and incandescent lamps should be amended. Such rule shall contain such amendment, if any, and provide that the amendment shall apply to products manufactured on or after the 36-month period beginning on the date such final rule is published.

**(5)** Not later than the end of the 24-month period beginning on the date labeling requirements under section 6294(a)(2)(C) of this title become effective, the Secretary shall initiate a rulemaking procedure to determine if the standards in effect for fluorescent lamps and incandescent lamps should be amended so that they would be applicable to additional general service fluorescent[2] and shall publish, not later than 18 months after initiating such rulemaking, a final rule including such amended standards, if any. Such rule shall provide that the amendment shall apply to products manufactured after a date which is 36 months after the date such rule is published.

**(6) Standards for general service lamps**

 **(A) Rulemaking before January 1, 2014**

  **(i) In general**

  Not later than January 1, 2014, the Secretary shall initiate a rulemaking procedure to determine whether--

Add. 083

**(I)** standards in effect for general service lamps should be amended to establish more stringent standards than the standards specified in paragraph (1)(A); and

**(II)** the exemptions for certain incandescent lamps should be maintained or discontinued based, in part, on exempted lamp sales collected by the Secretary from manufacturers.

### (ii) Scope

The rulemaking--

**(I)** shall not be limited to incandescent lamp technologies; and

**(II)** shall include consideration of a minimum standard of 45 lumens per watt for general service lamps.

### (iii) Amended standards

If the Secretary determines that the standards in effect for general service incandescent lamps should be amended, the Secretary shall publish a final rule not later than January 1, 2017, with an effective date that is not earlier than 3 years after the date on which the final rule is published.

### (iv) Phased-in effective dates

The Secretary shall consider phased-in effective dates under this subparagraph after considering--

**(I)** the impact of any amendment on manufacturers, retiring and repurposing existing equipment, stranded investments, labor contracts, workers, and raw materials; and

**(II)** the time needed to work with retailers and lighting designers to revise sales and marketing strategies.

### (v) Backstop requirement

If the Secretary fails to complete a rulemaking in accordance with clauses (i) through (iv) or if the final rule does not produce savings that are greater than or equal to the savings from a minimum efficacy standard of 45 lumens per watt, effective beginning January 1, 2020, the Secretary shall prohibit the sale of any

Add. 084

general service lamp that does not meet a minimum efficacy standard of 45 lumens per watt.

**(vi) State preemption**

Neither section 6297(b) of this title nor any other provision of law shall preclude California or Nevada from adopting, effective beginning on or after January 1, 2018--

**(I)** a final rule adopted by the Secretary in accordance with clauses (i) through (iv);

**(II)** if a final rule described in subclause (I) has not been adopted, the backstop requirement under clause (v); or

**(III)** in the case of California, if a final rule described in subclause (I) has not been adopted, any California regulations relating to these covered products adopted pursuant to State statute in effect as of December 19, 2007.

**(B) Rulemaking before January 1, 2020**

**(i) In general**

Not later than January 1, 2020, the Secretary shall initiate a rulemaking procedure to determine whether--

**(I)** standards in effect for general service incandescent lamps should be amended to reflect lumen ranges with more stringent maximum wattage than the standards specified in paragraph (1)(A); and

**(II)** the exemptions for certain incandescent lamps should be maintained or discontinued based, in part, on exempted lamp sales data collected by the Secretary from manufacturers.

**(ii) Scope**

The rulemaking shall not be limited to incandescent lamp technologies.

**(iii) Amended standards**

If the Secretary determines that the standards in effect for general service incandescent lamps should be amended, the Secretary shall publish a final rule not

Add. 085

later than January 1, 2022, with an effective date that is not earlier than 3 years after the date on which the final rule is published.

### (iv) Phased-in effective dates

The Secretary shall consider phased-in effective dates under this subparagraph after considering--

**(I)** the impact of any amendment on manufacturers, retiring and repurposing existing equipment, stranded investments, labor contracts, workers, and raw materials; and

**(II)** the time needed to work with retailers and lighting designers to revise sales and marketing strategies.

**(7)(A)** With respect to any lamp to which standards are applicable under this subsection or any lamp specified in section 6317 of this title, the Secretary shall inform any Federal entity proposing actions which would adversely impact the energy consumption or energy efficiency of such lamp of the energy conservation consequences of such action. It shall be the responsibility of such Federal entity to carefully consider the Secretary's comments.

**(B)** Notwithstanding subsection (n)(1), the Secretary shall not be prohibited from amending any standard, by rule, to permit increased energy use or to decrease the minimum required energy efficiency of any lamp to which standards are applicable under this subsection if such action is warranted as a result of other Federal action (including restrictions on materials or processes) which would have the effect of either increasing the energy use or decreasing the energy efficiency of such product.

**(8)** Not later than the date on which standards established pursuant to this subsection become effective, or, with respect to high-intensity discharge lamps covered under section 6317 of this title, the effective date of standards established pursuant to such section, each manufacturer of a product to which such standards are applicable shall file with the Secretary a laboratory report certifying compliance with the applicable standard for each lamp type. Such report shall include the lumen output and wattage consumption for each lamp type as an average of measurements taken over the preceding 12-month period. With respect to lamp types which are not manufactured during the 12-month period preceding the date such standards become effective, such report shall be filed with the Secretary not later than the date which is 12 months after the date manufacturing is commenced and shall include the lumen output and wattage consumption for each such lamp type as an average of measurements taken during such 12-month period.

Add. 086

## (j) Standards for showerheads and faucets

**(1)** The maximum water use allowed for any showerhead manufactured after January 1, 1994, is 2.5 gallons per minute when measured at a flowing water pressure of 80 pounds per square inch. Any such showerhead shall also meet the requirements of ASME/ANSI A112.18.1M-1989, 7.4.3(a).

**(2)** The maximum water use allowed for any of the following faucets manufactured after January 1, 1994, when measured at a flowing water pressure of 80 pounds per square inch, is as follows:

| | |
|---|---|
| Lavatory faucets | 2.5 gallons per minute |
| Lavatory replacement aerators | 2.5 gallons per minute |
| Kitchen faucets | 2.5 gallons per minute |
| Kitchen replacement aerators | 2.5 gallons per minute |
| Metering faucets | 0.25 gallons per cycle |

**(3)(A)** If the maximum flow rate requirements or the design requirements of ASME/ANSI Standard A112.18.1M-1989 are amended to improve the efficiency of water use of any type or class of showerhead or faucet and are approved by ANSI, the Secretary shall, not later than 12 months after the date of such amendment, publish a final rule establishing an amended uniform national standard for that product at the level specified in the amended ASME/ANSI Standard A112.18.1M and providing that such standard shall apply to products manufactured after a date which is 12 months after the publication of such rule, unless the Secretary determines, by rule published in the Federal Register, that adoption of a uniform national standard at the level specified in such amended ASME/ANSI Standard A112.18.1M--

**(i)** is not technologically feasible and economically justified under subsection (o);

**(ii)** is not consistent with the maintenance of public health and safety; or

**(iii)** is not consistent with the purposes of this chapter.

**(B)(i)** As part of the rulemaking conducted under subparagraph (A), the Secretary shall also determine if adoption of a uniform national standard for any type or class of

Add. 087

showerhead or faucet more stringent than such amended ASME/ANSI Standard A112.18.1M--

**(I)** would result in additional conservation of energy or water;

**(II)** would be technologically feasible and economically justified under subsection (o); and

**(III)** would be consistent with the maintenance of public health and safety.

**(ii)** If the Secretary makes an affirmative determination under clause (i), the final rule published under subparagraph (A) shall waive the provisions of section 6297(c) of this title with respect to any State regulation concerning the water use or water efficiency of such type or class of showerhead or faucet if such State regulation--

**(I)** is more stringent than amended ASME/ANSI Standard A112.18.1M for such type or class of showerhead or faucet and the standard in effect for such product on the day before the date on which a final rule is published under subparagraph (A); and

**(II)** is applicable to any sale or installation of all products in such type or class of showerhead or faucet.

**(C)** If, after any period of five consecutive years, the maximum flow rate requirements of the ASME/ANSI standard for showerheads are not amended to improve the efficiency of water use of such products, or after any such period such requirements for faucets are not amended to improve the efficiency of water use of such products, the Secretary shall, not later than six months after the end of such five-year period, publish a final rule waiving the provisions of section 6297(c) of this title with respect to any State regulation concerning the water use or water efficiency of such type or class of showerhead or faucet if such State regulation--

**(i)** is more stringent than the standards in effect for such type of class of showerhead or faucet; and

**(ii)** is applicable to any sale or installation of all products in such type or class of showerhead or faucet.

**(k) Standards for water closets and urinals**

**(1)(A)** Except as provided in subparagraph (B), the maximum water use allowed in gallons per flush for any of the following water closets manufactured after January 1, 1994, is the following:

Add. 088

Gravity tank-type toilets............................................................................ 1.6 gpf.

Flushometer tank toilets ............................................................................ 1.6 gpf.

Electromechanical hydraulic toilets ........................................................... 1.6 gpf.

Blowout toilets ......................................................................................... 3.5 gpf.

**(B)** The maximum water use allowed for any gravity tank-type white 2-piece toilet which bears an adhesive label conspicuous upon installation consisting of the words "Commercial Use Only" manufactured after January 1, 1994, and before January 1, 1997, is 3.5 gallons per flush.

**(C)** The maximum water use allowed for flushometer valve toilets, other than blowout toilets, manufactured after January 1, 1997, is 1.6 gallons per flush.

**(2)** The maximum water use allowed for any urinal manufactured after January 1, 1994, is 1.0 gallon per flush.

**(3)(A)** If the maximum flush volume requirements of ASME Standard A112.19.6-1990 are amended to improve the efficiency of water use of any low consumption water closet or low consumption urinal and are approved by ANSI, the Secretary shall, not later than 12 months after the date of such amendment, publish a final rule establishing an amended uniform national standard for that product at the level specified in amended ASME/ANSI Standard A112.19.6 and providing that such standard shall apply to products manufactured after a date which is one year after the publication of such rule, unless the Secretary determines, by rule published in the Federal Register, that adoption of a uniform national standard at the level specified in such amended ASME/ANSI Standard A112.19.6--

  **(i)** is not technologically feasible and economically justified under subsection (o);

  **(ii)** is not consistent with the maintenance of public health and safety; or

  **(iii)** is not consistent with the purposes of this chapter.

**(B)(i)** As part of the rulemaking conducted under subparagraph (A), the Secretary shall also determine if adoption of a uniform national standard for any type or class of low consumption water closet or low consumption urinal more stringent than such amended ASME/ANSI Standard A112.19.6 for such product--

Add. 089

**(I)** would result in additional conservation of energy or water;

**(II)** would be technologically feasible and economically justified under subsection (o); and

**(III)** would be consistent with the maintenance of public health and safety.

**(ii)** If the Secretary makes an affirmative determination under clause (i), the final rule published under subparagraph (A) shall waive the provisions of section 6297(c) of this title with respect to any State regulation concerning the water use or water efficiency of such type or class of low consumption water closet or low consumption urinal if such State regulation--

**(I)** is more stringent than amended ASME/ANSI Standard A112.19.6 for such type or class of low consumption water closet or low consumption urinal and the standard in effect for such product on the day before the date on which a final rule is published under subparagraph (A); and

**(II)** is applicable to any sale or installation of all products in such type or class of low consumption water closet or low consumption urinal.

**(C)** If, after any period of five consecutive years, the maximum flush volume requirements of the ASME/ANSI standard for low consumption water closets are not amended to improve the efficiency of water use of such products, or after any such period such requirements for low consumption urinals are not amended to improve the efficiency of water use of such products, the Secretary shall, not later than six months after the end of such five-year period, publish a final rule waiving the provisions of section 6297(c) of this title with respect to any State regulation concerning the water use or water efficiency of such type or class of water closet or urinal if such State regulation--

**(i)** is more stringent than the standards in effect for such type or class of water closet or urinal; and

**(ii)** is applicable to any sale or installation of all products in such type or class of water closet or urinal.

**(l) Standards for other covered products**

**(1)** The Secretary may prescribe an energy conservation standard for any type (or class) of covered products of a type specified in paragraph (20) of section 6292(a) of this title

Add. 090

if the requirements of subsections (o) and (p) are met and the Secretary determines that--

**(A)** the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt-hours (or its Btu equivalent) for any 12-month period ending before such determination;

**(B)** the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period;

**(C)** substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and

**(D)** the application of a labeling rule under section 6294 of this title to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible and economically justified.

**(2)** Any new or amended standard for covered products of a type specified in paragraph (20) of section 6292(a) of this title shall not apply to products manufactured within five years after the publication of a final rule establishing such standard.

**(3)** The Secretary may, in accordance with subsections (o) and (p), prescribe an energy conservation standard for television sets. Any such standard may not become effective with respect to products manufactured before January 1, 1992.

**(4) Energy efficiency standards for certain lamps**

**(A) In general**

The Secretary shall prescribe an energy efficiency standard for rough service lamps, vibration service lamps, 3-way incandescent lamps, 2,601-3,300 lumen general service incandescent lamps, and shatter-resistant lamps in accordance with this paragraph.

**(B) Benchmarks**

Not later than 1 year after December 19, 2007, the Secretary, in consultation with the National Electrical Manufacturers Association, shall--

Add. 091

**(i)** collect actual data for United States unit sales for each of calendar years 1990 through 2006 for each of the 5 types of lamps described in subparagraph (A) to determine the historical growth rate of the type of lamp; and

**(ii)** construct a model for each type of lamp based on coincident economic indicators that closely match the historical annual growth rate of the type of lamp to provide a neutral comparison benchmark to model future unit sales after calendar year 2006.

### (C) Actual sales data

### (i) In general

Effective for each of calendar years 2010 through 2025, the Secretary, in consultation with the National Electrical Manufacturers Association, shall--

**(I)** collect actual United States unit sales data for each of 5 types of lamps described in subparagraph (A); and

**(II)** not later than 90 days after the end of each calendar year, compare the lamp sales in that year with the sales predicted by the comparison benchmark for each of the 5 types of lamps described in subparagraph (A).

### (ii) Continuation of tracking

### (I) Determination

Not later than January 1, 2023, the Secretary shall determine if actual sales data should be tracked for the lamp types described in subparagraph (A) after calendar year 2025.

### (II) Continuation

If the Secretary finds that the market share of a lamp type described in subparagraph (A) could significantly erode the market share for general service lamps, the Secretary shall continue to track the actual sales data for the lamp type.

### (D) Rough service lamps

### (i) In general

Add. 092

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Effective beginning with the first year that the reported annual sales rate for rough service lamps demonstrates actual unit sales of rough service lamps that achieve levels that are at least 100 percent higher than modeled unit sales for that same year, the Secretary shall--

**(I)** not later than 90 days after the end of the previous calendar year, issue a finding that the index has been exceeded; and

**(II)** not later than the date that is 1 year after the end of the previous calendar year, complete an accelerated rulemaking to establish an energy conservation standard for rough service lamps.

## (ii) Backstop requirement

If the Secretary fails to complete an accelerated rulemaking in accordance with clause (i)(II), effective beginning 1 year after the date of the issuance of the finding under clause (i)(I), the Secretary shall require rough service lamps to--

**(I)** have a shatter-proof coating or equivalent technology that is compliant with NSF/ANSI 51 and is designed to contain the glass if the glass envelope of the lamp is broken and to provide effective containment over the life of the lamp;

**(II)** have a maximum 40-watt limitation; and

**(III)** be sold at retail only in a package containing 1 lamp.

## (E) Vibration service lamps

## (i) In general

Effective beginning with the first year that the reported annual sales rate for vibration service lamps demonstrates actual unit sales of vibration service lamps that achieve levels that are at least 100 percent higher than modeled unit sales for that same year, the Secretary shall--

**(I)** not later than 90 days after the end of the previous calendar year, issue a finding that the index has been exceeded; and

**(II)** not later than the date that is 1 year after the end of the previous calendar year, complete an accelerated rulemaking to establish an energy conservation standard for vibration service lamps.

Add. 093

### (ii) Backstop requirement

If the Secretary fails to complete an accelerated rulemaking in accordance with clause (i)(II), effective beginning 1 year after the date of the issuance of the finding under clause (i)(I), the Secretary shall require vibration service lamps to--

**(I)** have a maximum 40-watt limitation; and

**(II)** be sold at retail only in a package containing 1 lamp.

### (F) 3-way incandescent lamps

### (i) In general

Effective beginning with the first year that the reported annual sales rate for 3-way incandescent lamps demonstrates actual unit sales of 3-way incandescent lamps that achieve levels that are at least 100 percent higher than modeled unit sales for that same year, the Secretary shall--

**(I)** not later than 90 days after the end of the previous calendar year, issue a finding that the index has been exceeded; and

**(II)** not later than the date that is 1 year after the end of the previous calendar year, complete an accelerated rulemaking to establish an energy conservation standard for 3-way incandescent lamps.

### (ii) Backstop requirement

If the Secretary fails to complete an accelerated rulemaking in accordance with clause (i)(II), effective beginning 1 year after the date of issuance of the finding under clause (i)(I), the Secretary shall require that--

**(I)** each filament in a 3-way incandescent lamp meet the new maximum wattage requirements for the respective lumen range established under subsection (i)(1)(A); and

**(II)** 3-way lamps be sold at retail only in a package containing 1 lamp.

### (G) 2,601-3,300 lumen general service incandescent lamps

Effective beginning with the first year that the reported annual sales rate demonstrates actual unit sales of 2,601-3,300 lumen general service incandescent lamps in the

lumen range of 2,601 through 3,300 lumens (or, in the case of a modified spectrum, in the lumen range of 1,951 through 2,475 lumens) that achieve levels that are at least 100 percent higher than modeled unit sales for that same year, the Secretary shall impose--

**(i)** a maximum 95-watt limitation on general service incandescent lamps in the lumen range of 2,601 through 3,300 lumens; and

**(ii)** a requirement that those lamps be sold at retail only in a package containing 1 lamp.

### (H) Shatter-resistant lamps

### (i) In general

Effective beginning with the first year that the reported annual sales rate for shatter-resistant lamps demonstrates actual unit sales of shatter-resistant lamps that achieve levels that are at least 100 percent higher than modeled unit sales for that same year, the Secretary shall--

**(I)** not later than 90 days after the end of the previous calendar year, issue a finding that the index has been exceeded; and

**(II)** not later than the date that is 1 year after the end of the previous calendar year, complete an accelerated rulemaking to establish an energy conservation standard for shatter-resistant lamps.

### (ii) Backstop requirement

If the Secretary fails to complete an accelerated rulemaking in accordance with clause (i)(II), effective beginning 1 year after the date of issuance of the finding under clause (i)(I), the Secretary shall impose--

**(I)** a maximum wattage limitation of 40 watts on shatter resistant lamps; and

**(II)** a requirement that those lamps be sold at retail only in a package containing 1 lamp.

### (I) Rulemakings before January 1, 2025

### (i) In general

Add. 095

Except as provided in clause (ii), if the Secretary issues a final rule prior to January 1, 2025, establishing an energy conservation standard for any of the 5 types of lamps for which data collection is required under any of subparagraphs (D) through (G), the requirement to collect and model data for that type of lamp shall terminate unless, as part of the rulemaking, the Secretary determines that continued tracking is necessary.

**(ii) Backstop requirement**

If the Secretary imposes a backstop requirement as a result of a failure to complete an accelerated rulemaking in accordance with clause (i)(II) of any of subparagraphs (D) through (G),[3] the requirement to collect and model data for the applicable type of lamp shall continue for an additional 2 years after the effective date of the backstop requirement.

## (m) Amendment of standards

### (1) In general

Not later than 6 years after issuance of any final rule establishing or amending a standard, as required for a product under this part, the Secretary shall publish--

**(A)** a notice of the determination of the Secretary that standards for the product do not need to be amended, based on the criteria established under subsection (n)(2); or

**(B)** a notice of proposed rulemaking including new proposed standards based on the criteria established under subsection (o) and the procedures established under subsection (p).

### (2) Notice

If the Secretary publishes a notice under paragraph (1), the Secretary shall--

**(A)** publish a notice stating that the analysis of the Department is publicly available; and

**(B)** provide an opportunity for written comment.

### (3) Amendment of standard; new determination

**(A) Amendment of standard**

Add. 096

Not later than 2 years after a notice is issued under paragraph (1)(B), the Secretary shall publish a final rule amending the standard for the product.

**(B) New determination**

Not later than 3 years after a determination under paragraph (1)(A), the Secretary shall make a new determination and publication under subparagraph (A) or (B) of paragraph (1).

**(4) Application to products**

**(A) In general**

Except as provided in subparagraph (B), an amendment prescribed under this subsection shall apply to--

**(i)** with respect to refrigerators, refrigerator-freezers, freezers, room air conditioners, dishwashers, clothes washers, clothes dryers, fluorescent lamp ballasts, and kitchen ranges and ovens, such a product that is manufactured after the date that is 3 years after publication of the final rule establishing an applicable standard; and

**(ii)** with respect to central air conditioners, heat pumps, water heaters, pool heaters, direct heating equipment, and furnaces, such a product that is manufactured after the date that is 5 years after publication of the final rule establishing an applicable standard.

**(B) Other new standards**

A manufacturer shall not be required to apply new standards to a product with respect to which other new standards have been required during the prior 6-year period.

**(5) Reports**

The Secretary shall promptly submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Energy and Natural Resources of the Senate--

**(A)** a progress report every 180 days on compliance with this section, including a specific plan to remedy any failures to comply with deadlines for action established under this section; and

Add. 097

**(B)** all required reports to the Court or to any party to the Consent Decree in State of New York v Bodman, Consolidated Civil Actions No. 05 Civ. 7807 and No. 05 Civ. 7808.

## (n) Petition for amended standard

**(1)** With respect to each covered product described in paragraphs (1) through (11), and in paragraphs (13) and (14) of section 6292(a) of this title, any person may petition the Secretary to conduct a rulemaking to determine for a covered product if the standards contained either in the last final rule required under subsections (b) through (i) of this section or in a final rule published under this section should be amended.

**(2)** The Secretary shall grant a petition if he finds that it contains evidence which, assuming no other evidence were considered, provides an adequate basis for amending the standards under the following criteria--

**(A)** amended standards will result in significant conservation of energy;

**(B)** amended standards are technologically feasible; and

**(C)** amended standards are cost effective as described in subsection (o)(2)(B)(i)(II).

The grant of a petition by the Secretary under this subsection creates no presumption with respect to the Secretary's determination of any of the criteria in a rulemaking under this section.

## (3) Notice of decision

Not later than 180 days after the date of receiving a petition, the Secretary shall publish in the Federal Register a notice of, and explanation for, the decision of the Secretary to grant or deny the petition.

## (4) New or amended standards

Not later than 3 years after the date of granting a petition for new or amended standards, the Secretary shall publish in the Federal Register--

**(A)** a final rule that contains the new or amended standards; or

**(B)** a determination that no new or amended standards are necessary.

Add. 098

**(5)** An amendment prescribed under this subsection shall apply to products manufactured after a date which is 5 years after--

**(A)** the effective date of the previous amendment pursuant to this part; or

**(B)** if the previous final rule published under this part did not amend the standard, the earliest date by which a previous amendment could have been in effect, except that in no case may an amended standard apply to products manufactured within 3 years (for refrigerators, refrigerator-freezers, and freezers, room air conditioners, dishwashers, clothes washers, clothes dryers, fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, and kitchen ranges and ovens) or 5 years (for central air conditioners and heat pumps, water heaters, pool heaters, direct heating equipment and furnaces) after publication of the final rule establishing a standard.

## (o) Criteria for prescribing new or amended standards

**(1)** The Secretary may not prescribe any amended standard which increases the maximum allowable energy use, or, in the case of showerheads, faucets, water closets, or urinals, water use, or decreases the minimum required energy efficiency, of a covered product.

**(2)(A)** Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency, or, in the case of showerheads, faucets, water closets, or urinals, water efficiency, which the Secretary determines is technologically feasible and economically justified.

**(B)(i)** In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed its burdens by, to the greatest extent practicable, considering--

**(I)** the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;

**(II)** the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;

**(III)** the total projected amount of energy, or as applicable, water, savings likely to result directly from the imposition of the standard;

Add. 099

**(IV)** any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;

**(V)** the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

**(VI)** the need for national energy and water conservation; and

**(VII)** other factors the Secretary considers relevant.

**(ii)** For purposes of clause (i)(V), the Attorney General shall make a determination of the impact, if any, of any lessening of competition likely to result from such standard and shall transmit such determination, not later than 60 days after the publication of a proposed rule prescribing or amending an energy conservation standard, in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

**(iii)** If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard level will be less than three times the value of the energy, and as applicable, water, savings during the first year that the consumer will receive as a result of the standard, as calculated under the applicable test procedure, there shall be a rebuttable presumption that such standard level is economically justified. A determination by the Secretary that such criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified.

**(3)** The Secretary may not prescribe an amended or new standard under this section for a type (or class) of covered product if--

**(A)** for products other than dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens, a test procedure has not been prescribed pursuant to section 6293 of this title with respect to that type (or class) of product; or

**(B)** the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy or, in the case of showerheads, faucets, water closets, or urinals, water, or that the establishment of such standard is not technologically feasible or economically justified.

Add. 100

For purposes of section 6297 of this title, a determination under subparagraph (B) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class).

**(4)** The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

**(5)** The Secretary may set more than 1 energy conservation standard for products that serve more than 1 major function by setting 1 energy conservation standard for each major function.

**(6) Regional standards for furnaces, central air conditioners, and heat pumps**

**(A) In general**

In any rulemaking to establish a new or amended standard, the Secretary may consider the establishment of separate standards by geographic region for furnaces (except boilers), central air conditioners, and heat pumps.

**(B) National and regional standards**

**(i) National standard**

If the Secretary establishes a regional standard for a product, the Secretary shall establish a base national standard for the product.

**(ii) Regional standards**

If the Secretary establishes a regional standard for a product, the Secretary may establish more restrictive standards for the product by geographic region as follows:

**(I)** For furnaces, the Secretary may establish 1 additional standard that is applicable in a geographic region defined by the Secretary.

Add. 101

**(II)** For any cooling product, the Secretary may establish 1 or 2 additional standards that are applicable in 1 or 2 geographic regions as may be defined by the Secretary.

**(C) Boundaries of geographic regions**

**(i) In general**

Subject to clause (ii), the boundaries of additional geographic regions established by the Secretary under this paragraph shall include only contiguous States.

**(ii) Alaska and Hawaii**

The States of Alaska and Hawaii may be included under this paragraph in a geographic region that the States are not contiguous to.

**(iii) Individual States**

Individual States shall be placed only into a single region under this paragraph.

**(D) Prerequisites**

In establishing additional regional standards under this paragraph, the Secretary shall--

**(i)** establish additional regional standards only if the Secretary determines that--

**(I)** the establishment of additional regional standards will produce significant energy savings in comparison to establishing only a single national standard; and

**(II)** the additional regional standards are economically justified under this paragraph; and

**(ii)** consider the impact of the additional regional standards on consumers, manufacturers, and other market participants, including product distributors, dealers, contractors, and installers.

**(E) Application; effective date**

**(i) Base national standard**

Any base national standard established for a product under this paragraph shall--

Add. 102

**(I)** be the minimum standard for the product; and

**(II)** apply to all products manufactured or imported into the United States on and after the effective date for the standard.

### (ii) Regional standards

Any additional and more restrictive regional standard established for a product under this paragraph shall apply to any such product installed on or after the effective date of the standard in States in which the Secretary has designated the standard to apply.

## (F) Continuation of regional standards

### (i) In general

In any subsequent rulemaking for any product for which a regional standard has been previously established, the Secretary shall determine whether to continue the establishment of separate regional standards for the product.

### (ii) Regional standard no longer appropriate

Except as provided in clause (iii), if the Secretary determines that regional standards are no longer appropriate for a product, beginning on the effective date of the amended standard for the product--

**(I)** there shall be 1 base national standard for the product with Federal enforcement; and

**(II)** State authority for enforcing a regional standard for the product shall terminate.

### (iii) Regional standard appropriate but standard or region changed

#### (I) State no longer contained in region

Subject to subclause (III), if a State is no longer contained in a region in which a regional standard that is more stringent than the base national standard applies, the authority of the State to enforce the regional standard shall terminate.

Add. 103

**(II) Standard or region revised so that existing regional standard equals base national standard**

If the Secretary revises a base national standard for a product or the geographic definition of a region so that an existing regional standard for a State is equal to the revised base national standard--

**(aa)** the authority of the State to enforce the regional standard shall terminate on the effective date of the revised base national standard; and

**(bb)** the State shall be subject to the revised base national standard.

**(III) Standard or region revised so that existing regional standard equals base national standard**

If the Secretary revises a base national standard for a product or the geographic definition of a region so that the standard for a State is lower than the previously approved regional standard, the State may continue to enforce the previously approved standard level.

**(iv) Waiver of federal preemption**

Nothing in this paragraph diminishes the authority of a State to enforce a State regulation for which a waiver of Federal preemption has been granted under section 6297(d) of this title.

**(G) Enforcement**

**(i) Base national standard**

**(I) In general**

The Secretary shall enforce any base national standard.

**(II) Trade association certification programs**

In enforcing the base national standard, the Secretary shall use, to the maximum extent practicable, national standard nationally recognized certification programs of trade associations.

**(ii) Regional standards**

Add. 104

**(I) Enforcement plan**

Not later than 90 days after the date of the issuance of a final rule that establishes a regional standard, the Secretary shall initiate a rulemaking to develop and implement an effective enforcement plan for regional standards for the products that are covered by the final rule.

**(II) Responsible entities**

Any rules regarding enforcement of a regional standard shall clearly specify which entities are legally responsible for compliance with the standards and for making any required information or labeling disclosures.

**(III) Final rule**

Not later than 15 months after the date of the issuance of a final rule that establishes a regional standard for a product, the Secretary shall promulgate a final rule covering enforcement of regional standards for the product.

**(IV) Incorporation by States and localities**

A State or locality may incorporate any Federal regional standard into State or local building codes or State appliance standards.

**(V) State enforcement**

A State agency may seek enforcement of a Federal regional standard in a Federal court of competent jurisdiction.

**(H) Information disclosure**

**(i) In general**

Not later than 90 days after the date of the publication of a final rule that establishes a regional standard for a product, the Federal Trade Commission shall undertake a rulemaking to determine the appropriate 1 or more methods for disclosing information so that consumers, distributors, contractors, and installers can easily determine whether a specific piece of equipment that is installed in a specific building is in conformance with the regional standard that applies to the building.

**(ii) Methods**

Add. 105

A method of disclosing information under clause (i) may include--

(I) modifications to the Energy Guide label; or

(II) other methods that make it easy for consumers and installers to use and understand at the point of installation.

### (iii) Completion of rulemaking

The rulemaking shall be completed not later 15 months after the date of the publication of a final rule that establishes a regional standard for a product.

## (p) Procedure for prescribing new or amended standards

Any new or amended energy conservation standard shall be prescribed in accordance with the following procedure:

(1) A proposed rule which prescribes an amended or new energy conservation standard or prescribes no amendment or no new standard for a type (or class) of covered products shall be published in the Federal Register. In prescribing any such proposed rule with respect to a standard, the Secretary shall determine the maximum improvement in energy efficiency or maximum reduction in energy use that is technologically feasible for each type (or class) of covered products. If such standard is not designed to achieve such efficiency or use, the Secretary shall state in the proposed rule the reasons therefor.

(2) After the publication of such proposed rulemaking, the Secretary shall, in accordance with section 6306 of this title, afford interested persons an opportunity, during a period of not less than 60 days, to present oral and written comments (including an opportunity to question those who make such presentations, as provided in such section) on matters relating to such proposed rule, including--

(A) whether the standard to be prescribed is economically justified (taking into account those factors which the Secretary must consider under subsection (o)(2)) or will result in the effects described in subsection (o)(4);

(B) whether the standard will achieve the maximum improvement in energy efficiency which is technologically feasible;

(C) if the standard will not achieve such improvement, whether the reasons for not achieving such improvement are adequate; and

Add. 106

**(D)** whether such rule should prescribe a level of energy use or efficiency which is higher or lower than that which would otherwise apply in the case of any group of products within the type (or class) that will be subject to such standard.

**(3)** A final rule prescribing an amended or new energy conservation standard or prescribing no amended or new standard for a type (or class) of covered products shall be published as soon as is practicable, but not less than 90 days, after publication of the proposed rule in the Federal Register.

**(4) Direct final rules**

**(A) In general**

On receipt of a statement that is submitted jointly by interested persons that are fairly representative of relevant points of view (including representatives of manufacturers of covered products, States, and efficiency advocates), as determined by the Secretary, and contains recommendations with respect to an energy or water conservation standard--

**(i)** if the Secretary determines that the recommended standard contained in the statement is in accordance with subsection (o) or section 6313(a)(6)(B) of this title, as applicable, the Secretary may issue a final rule that establishes an energy or water conservation standard and is published simultaneously with a notice of proposed rulemaking that proposes a new or amended energy or water conservation standard that is identical to the standard established in the final rule to establish the recommended standard (referred to in this paragraph as a "direct final rule"); or

**(ii)** if the Secretary determines that a direct final rule cannot be issued based on the statement, the Secretary shall publish a notice of the determination, together with an explanation of the reasons for the determination.

**(B) Public comment**

The Secretary shall solicit public comment for a period of at least 110 days with respect to each direct final rule issued by the Secretary under subparagraph (A)(i).

**(C) Withdrawal of direct final rules**

**(i) In general**

Add. 107

Not later than 120 days after the date on which a direct final rule issued under subparagraph (A)(i) is published in the Federal Register, the Secretary shall withdraw the direct final rule if--

**(I)** the Secretary receives 1 or more adverse public comments relating to the direct final rule under subparagraph (B)(i)[4] or any alternative joint recommendation; and

**(II)** based on the rulemaking record relating to the direct final rule, the Secretary determines that such adverse public comments or alternative joint recommendation may provide a reasonable basis for withdrawing the direct final rule under subsection (o), section 6313(a)(6)(B) of this title, or any other applicable law.

**(ii) Action on withdrawal**

On withdrawal of a direct final rule under clause (i), the Secretary shall--

**(I)** proceed with the notice of proposed rulemaking published simultaneously with the direct final rule as described in subparagraph (A)(i); and

**(II)** publish in the Federal Register the reasons why the direct final rule was withdrawn.

**(iii) Treatment of withdrawn direct final rules**

A direct final rule that is withdrawn under clause (i) shall not be considered to be a final rule for purposes of subsection (o).

**(D) Effect of paragraph**

Nothing in this paragraph authorizes the Secretary to issue a direct final rule based solely on receipt of more than 1 statement containing recommended standards relating to the direct final rule.

**(q) Special rule for certain types or classes of products**

**(1)** A rule prescribing an energy conservation standard for a type (or class) of covered products shall specify a level of energy use or efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary determines that covered products within such group--

Add. 108

**(A)** consume a different kind of energy from that consumed by other covered products within such type (or class); or

**(B)** have a capacity or other performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard from that which applies (or will apply) to other products within such type (or class).

In making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate.

**(2)** Any rule prescribing a higher or lower level of energy use or efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.

**(r) Inclusion in standards of test procedures and other requirements**

Any new or amended energy conservation standard prescribed under this section shall include, where applicable, test procedures prescribed in accordance with section 6293 of this title and may include any requirement which the Secretary determines is necessary to assure that each covered product to which such standard applies meets the required minimum level of energy efficiency or maximum quantity of energy use specified in such standard.

**(s) Determination of compliance with standards**

Compliance with, and performance under, the energy conservation standards (except for design standards authorized by this part) established in, or prescribed under, this section shall be determined using the test procedures and corresponding compliance criteria prescribed under section 6293 of this title.

**(t) Small manufacturer exemption**

**(1)** Subject to paragraph (2), the Secretary may, on application of any manufacturer, exempt such manufacturer from all or part of the requirements of any energy conservation standard established in or prescribed under this section for any period not longer than the 24-month period beginning on the date such rule becomes effective, if the Secretary finds that the annual gross revenues of such manufacturer from all its operations (including the manufacture and sale of covered products) does not exceed $8,000,000 for the 12-month period preceding the date of the application. In making such finding with respect to any manufacturer, the Secretary shall take into account the

Add. 109

annual gross revenues of any other person who controls, is controlled by, or is under common control with, such manufacturer.

**(2)** The Secretary may not exercise the authority granted under paragraph (1) with respect to any type (or class) of covered product subject to an energy conservation standard under this section unless the Secretary makes a finding, after obtaining the written views of the Attorney General, that a failure to allow an exemption under paragraph (1) would likely result in a lessening of competition.

## (u) Battery charger and external power supply electric energy consumption

**(1)(A)** Not later than 18 months after August 8, 2005, the Secretary shall, after providing notice and an opportunity for comment, prescribe, by rule, definitions and test procedures for the power use of battery chargers and external power supplies.

**(B)** In establishing the test procedures under subparagraph (A), the Secretary shall--

**(i)** consider existing definitions and test procedures used for measuring energy consumption in standby mode and other modes; and

**(ii)** assess the current and projected future market for battery chargers and external power supplies.

**(C)** The assessment under subparagraph (B)(ii) shall include--

**(i)** estimates of the significance of potential energy savings from technical improvements to battery chargers and external power supplies; and

**(ii)** suggested product classes for energy conservation standards.

**(D)** Not later than 18 months after August 8, 2005, the Secretary shall hold a scoping workshop to discuss and receive comments on plans for developing energy conservation standards for energy use for battery chargers and external power supplies.

**(E) External power supplies and battery chargers**

**(i) Energy conservation standards**

**(I) External power supplies**

Add. 110

Not later than 2 years after August 8, 2005, the Secretary shall issue a final rule that determines whether energy conservation standards shall be issued for external power supplies or classes of external power supplies.

**(II) Battery chargers**

Not later than July 1, 2011, the Secretary shall issue a final rule that prescribes energy conservation standards for battery chargers or classes of battery chargers or determine that no energy conservation standard is technically feasible and economically justified.

**(ii)** For each product class, any energy conservation standards issued under clause (i) shall be set at the lowest level of energy use that--

**(I)** meets the criteria and procedures of subsections (o), (p), (q), (r), (s), and (t); and

**(II)** would result in significant overall annual energy savings, considering standby mode and other operating modes.

**(2)** The Secretary and the Administrator shall collaborate and develop programs (including programs under section 6294a of this title and other voluntary industry agreements or codes of conduct) that are designed to reduce standby mode energy use.

**(3) Efficiency standards for class A external power supplies**

**(A) In general**

Subject to subparagraphs (B) through (E), a class A external power supply manufactured on or after the later of July 1, 2008, or December 19, 2007, shall meet the following standards:

| Active Mode | |
| --- | --- |
| Nameplate Output | Required Efficiency (decimal equivalent of a percentage) |
| Less than 1 watt | 0.5 times the Nameplate Output |

Add. 111

| From 1 watt to not more than 51 watts | The sum of 0.09 times the Natural Logarithm of the Nameplate Output and 0.5 |
| --- | --- |
| Greater than 51 watts | 0.85 |

| No-Load Mode | |
| --- | --- |
| Nameplate Output | Maximum Consumption |
| Not more than 250 watts | 0.5 watts |

**(B) Noncovered supplies**

A class A external power supply shall not be subject to subparagraph (A) if the class A external power supply is--

**(i)** manufactured during the period beginning on July 1, 2008, and ending on June 30, 2015; and

**(ii)** made available by the manufacturer as a service part or a spare part for an end-use product--

**(I)** that constitutes the primary load; and

**(II)** was manufactured before July 1, 2008.

**(C) Marking**

Any class A external power supply manufactured on or after the later of July 1, 2008 or December 19, 2007, shall be clearly and permanently marked in accordance with the External Power Supply International Efficiency Marking Protocol, as referenced in the "Energy Star Program Requirements for Single Voltage External AC-DC and AC-AC Power Supplies, version 1.1" published by the Environmental Protection Agency.

**(D) Amendment of standards**

Add. 112

### (i) Final rule by July 1, 2011

#### (I) In general

Not later than July 1, 2011, the Secretary shall publish a final rule to determine whether the standards established under subparagraph (A) should be amended.

#### (II) Administration

The final rule shall--

(aa) contain any amended standards; and

(bb) apply to products manufactured on or after July 1, 2013.

### (ii) Final rule by July 1, 2021

#### (I) In general

Not later than July 1, 2021 the Secretary shall publish a final rule to determine whether the standards then in effect should be amended.

#### (II) Administration

The final rule shall--

(aa) contain any amended standards; and

(bb) apply to products manufactured on or after July 1, 2023.

## (E) Nonapplication of no-load mode energy efficiency standards to external power supplies for certain security or life safety alarms or surveillance systems

### (i) Definition of security or life safety alarm or surveillance system

In this subparagraph:

#### (I) In general

The term "security or life safety alarm or surveillance system" means equipment designed and marketed to perform any of the following functions (on a continuous basis):

Add. 113

**(aa)** Monitor, detect, record, or provide notification of intrusion or access to real property or physical assets or notification of threats to life safety.

**(bb)** Deter or control access to real property or physical assets, or prevent the unauthorized removal of physical assets.

**(cc)** Monitor, detect, record, or provide notification of fire, gas, smoke, flooding, or other physical threats to real property, physical assets, or life safety.

**(II) Exclusion**

The term "security or life safety alarm or surveillance system" does not include any product with a principal function other than life safety, security, or surveillance that--

**(aa)** is designed and marketed with a built-in alarm or theft-deterrent feature; or

**(bb)** does not operate necessarily and continuously in active mode.

**(ii) Nonapplication of no-load mode requirements**

The No-Load Mode energy efficiency standards established by this paragraph shall not apply to an external power supply manufactured before the effective date of the amendment under subparagraph (D)(ii) that--

**(I)** is an AC-to-AC external power supply;

**(II)** has a nameplate output of 20 watts or more;

**(III)** is certified to the Secretary as being designed to be connected to a security or life safety alarm or surveillance system component; and

**(IV)** on establishment within the External Power Supply International Efficiency Marking Protocol, as referenced in the "Energy Star Program Requirements for Single Voltage External Ac-DC and Ac-Ac Power Supplies", published by the Environmental Protection Agency, of a distinguishing mark for products described in this clause, is permanently marked with the distinguishing mark.

**(iii) Administration**

In carrying out this subparagraph, the Secretary shall--

**(I)** require, with appropriate safeguard for the protection of confidential business information, the submission of unit shipment data on an annual basis; and

**(II)** restrict the eligibility of external power supplies for the exemption provided under this subparagraph on a finding that a substantial number of the external power supplies are being marketed to or installed in applications other than security or life safety alarm or surveillance systems.

### (iv) Treatment in rule

In the rule under subparagraph (D)(ii) and subsequent amendments the Secretary may treat some or all external power supplies designed to be connected to a security or life safety alarm or surveillance system as a separate product class or may extend the nonapplication under clause (ii).

## (4) End-use products

An energy conservation standard for external power supplies shall not constitute an energy conservation standard for the separate end-use product to which the external power supply is connected.

## (5) Exempt supplies

### (A) February 10, 2014, rule

### (i) In general

An external power supply shall not be subject to the final rule entitled "Energy Conservation Program: Energy Conservation Standards for External Power Supplies", published at 79 Fed. Reg. 7845 (February 10, 2014), if the external power supply--

**(I)** is manufactured during the period beginning on February 10, 2016, and ending on February 10, 2020;

**(II)** is marked in accordance with the External Power Supply International Efficiency Marking Protocol, as in effect on February 10, 2016;

**(III)** meets, where applicable, the standards under paragraph (3)(A), and has been certified to the Secretary as meeting International Efficiency Level IV or higher of

Add. 115

the External Power Supply International Efficiency Marking Protocol, as in effect on February 10, 2016; and

**(IV)** is made available by the manufacturer as a service part or a spare part for an end-use product that--

  **(aa)** constitutes the primary load; and

  **(bb)** was manufactured before February 10, 2016.

### (ii) Reporting

The Secretary may require manufacturers of products exempted pursuant to clause (i) to report annual total units shipped as service and spare parts that fall below International Efficiency Level VI.

### (iii) Limitation of exemption

The Secretary may issue a rule, after providing public notice and opportunity for public comment, to limit the applicability of the exemption established under clause (i) if the Secretary determines that the exemption is resulting in a significant reduction of the energy savings that would otherwise result from the final rule described in such clause.

## (B) Amended standards

### (i) In general

The Secretary may exempt an external power supply from any amended standard under this subsection if the external power supply--

**(I)** is manufactured within four years of the compliance date of the amended standard;

**(II)** complies with applicable marking requirements adopted by the Secretary prior to the amendment;

**(III)** meets the standards that were in effect prior to the amendment; and

**(IV)** is made available by the manufacturer as a service part or a spare part for an end-use product that--

Add. 116

**(aa)** constitutes the primary load; and

**(bb)** was manufactured before the compliance date of the amended standard.

### (ii) Reporting

The Secretary may require manufacturers of a product exempted pursuant to clause (i) to report annual total units shipped as service and spare parts that do not meet the amended standard.

### (v) Refrigerated beverage vending machines

**(1)** Not later than 4 years after August 8, 2005, the Secretary shall prescribe, by rule, energy conservation standards for refrigerated bottle or canned beverage vending machines.

**(2)** In establishing energy conservation standards under this subsection, the Secretary shall use the criteria and procedures prescribed under subsections (o) and (p).

**(3)** Any energy conservation standard prescribed under this subsection shall apply to products manufactured 3 years after the date of publication of a final rule establishing the energy conservation standard.

### (w) Illuminated exit signs

An illuminated exit sign manufactured on or after January 1, 2006, shall meet the version 2.0 Energy Star Program performance requirements for illuminated exit signs prescribed by the Environmental Protection Agency.

### (x) Torchieres

A torchiere manufactured on or after January 1, 2006--

**(1)** shall consume not more than 190 watts of power; and

**(2)** shall not be capable of operating with lamps that total more than 190 watts.

### (y) Low voltage dry-type distribution transformers

The efficiency of a low voltage dry-type distribution transformer manufactured on or after January 1, 2007, shall be the Class I Efficiency Levels for distribution transformers specified in table 4-2 of the "Guide for Determining Energy Efficiency for Distribution

Add. 117

Transformers" published by the National Electrical Manufacturers Association (NEMA TP-1-2002).

**(z) Traffic signal modules and pedestrian modules**

Any traffic signal module or pedestrian module manufactured on or after January 1, 2006, shall--

**(1)** meet the performance requirements used under the Energy Star program of the Environmental Protection Agency for traffic signals, as in effect on August 8, 2005; and

**(2)** be installed with compatible, electrically connected signal control interface devices and conflict monitoring systems.

**(aa) Unit heaters**

A unit heater manufactured on or after the date that is 3 years after August 8, 2005, shall--

**(1)** be equipped with an intermittent ignition device; and

**(2)** have power venting or an automatic flue damper.

**(bb) Medium base compact fluorescent lamps**

**(1)** A bare lamp and covered lamp (no reflector) medium base compact fluorescent lamp manufactured on or after January 1, 2006, shall meet the following requirements prescribed by the August 9, 2001, version of the Energy Star Program Requirements for Compact Fluorescent Lamps, Energy Star Eligibility Criteria, Energy-Efficiency Specification issued by the Environmental Protection Agency and Department of Energy:

**(A)** Minimum initial efficacy.

**(B)** Lumen maintenance at 1000 hours.

**(C)** Lumen maintenance at 40 percent of rated life.

**(D)** Rapid cycle stress test.

**(E)** Lamp life.

Add. 118

**(2)** The Secretary may, by rule, establish requirements for color quality (CRI), power factor, operating frequency, and maximum allowable start time based on the requirements prescribed by the August 9, 2001, version of the Energy Star Program Requirements for Compact Fluorescent Lamps.

**(3)** The Secretary may, by rule--

**(A)** revise the requirements established under paragraph (2); or

**(B)** establish other requirements, after considering energy savings, cost effectiveness, and consumer satisfaction.

## (cc) Dehumidifiers

**(1)** Dehumidifiers manufactured on or after October 1, 2007, shall have an Energy Factor that meets or exceeds the following values:

| Product Capacity (pints/day): | Minimum Energy Factor (Liters/kWh) |
|---|---|
| 25.00 or less | 1.00 |
| 25.01-35.00 | 1.20 |
| 35.01-54.00 | 1.30 |
| 54.01-74.99 | 1.50 |
| 75.00 or more | 2.25. |

**(2) Dehumidifiers manufactured on or after October 1, 2012**

Dehumidifiers manufactured on or after October 1, 2012, shall have an Energy Factor that meets or exceeds the following values:

| Product Capacity (pints/day): | Minimum Energy Factor(liters/kWh) |
|---|---|
| Up to 35.00 | 1.35 |

Add. 119

35.01-45.00 ................................................................. ............................ 1.50

45.01-54.00 ................................................................. ............................ 1.60

54.01-75.00 ................................................................. ............................ 1.70

Greater than 75.00.................................................. ............................ 2.5.

## (dd) Commercial prerinse spray valves

Commercial prerinse spray valves manufactured on or after January 1, 2006, shall have a flow rate of not more than 1.6 gallons per minute.

## (ee) Mercury vapor lamp ballasts

Mercury vapor lamp ballasts (other than specialty application mercury vapor lamp ballasts) shall not be manufactured or imported after January 1, 2008.

## (ff) Ceiling fans and ceiling fan light kits

(1)(A) All ceiling fans manufactured on or after January 1, 2007, shall have the following features:

(i) Fan speed controls separate from any lighting controls.

(ii) Adjustable speed controls (either more than 1 speed or variable speed).

(iii) The capability of reversible fan action, except for--

(I) fans sold for industrial applications;

(II) fans sold for outdoor applications; and

(III) cases in which safety standards would be violated by the use of the reversible mode.

(B) The Secretary may define the exceptions described in clause (iv) in greater detail, but shall not substantively expand the exceptions.

(2)(A) Ceiling fan light kits with medium screw base sockets manufactured on or after January 1, 2007, shall be packaged with screw-based lamps to fill all screw base sockets.

Add. 120

**(B)** The screw-based lamps required under subparagraph (A) shall--

**(i)** meet the Energy Star Program Requirements for Compact Fluorescent Lamps, version 3.0, issued by the Department of Energy; or

**(ii)** use light sources other than compact fluorescent lamps that have lumens per watt performance at least equivalent to comparably configured compact fluorescent lamps meeting the Energy Star Program Requirements described in clause (i).

**(3)** Ceiling fan light kits with pin-based sockets for fluorescent lamps manufactured on or after January 1, 2007 shall--

**(A)** meet the Energy Star Program Requirements for Residential Light Fixtures version 4.0 issued by the Environmental Protection Agency; and

**(B)** be packaged with lamps to fill all sockets.

**(4)(A)** By January 1, 2007, the Secretary shall consider and issue requirements for any ceiling fan lighting kits other than those covered in paragraphs (2) and (3), including candelabra screw base sockets.

**(B)** The requirements issued under subparagraph (A) shall be effective for products manufactured 2 years after the date of the final rule.

**(C)** If the Secretary fails to issue a final rule by the date specified in subparagraph (A), any type of ceiling fan lighting kit described in subparagraph (A) that is manufactured after January 1, 2009--

**(i)** shall not be capable of operating with lamps that total more than 190 watts; and

**(ii)** shall be packaged with lamps to fill all sockets.

**(5)(A)** After January 1, 2010, the Secretary may consider, and issue, if the requirements of subsections (o) and (p) are met, amended energy efficiency standards for ceiling fan light kits.

**(B)** Any amended standards issued under subparagraph (A) shall apply to products manufactured not earlier than 2 years after the date of publication of the final rule establishing the amended standard.

Add. 121

**(6)(A)** Notwithstanding any other provision of this chapter, the Secretary may consider, and issue, if the requirements of subsections (o) and (p) are met, energy efficiency or energy use standards for electricity used by ceiling fans to circulate air in a room.

**(B)** In issuing the standards under subparagraph (A), the Secretary shall consider--

**(i)** exempting, or setting different standards for, certain product classes for which the primary standards are not technically feasible or economically justified; and

**(ii)** establishing separate exempted product classes for highly decorative fans for which air movement performance is a secondary design feature.

**(C)(i)** Large-diameter ceiling fans manufactured on or after January 21, 2020, shall--

**(I)** not be required to meet minimum ceiling fan efficiency in terms of ratio of the total airflow to the total power consumption as described in the final rule titled "Energy Conservation Program: Energy Conservation Standards for Ceiling Fans" (82 Fed. Reg. 6826 (January 19, 2017)); and

**(II)** have a CFEI greater than or equal to--

**(aa)** 1.00 at high speed; and

**(bb)** 1.31 at 40 percent speed or the nearest speed that is not less than 40 percent speed.

**(ii)** For purposes of this subparagraph, the term "CFEI" means the Fan Energy Index for large-diameter ceiling fans, calculated in accordance with ANSI/AMCA Standard 208-18 titled "Calculation of the Fan Energy Index", with the following modifications:

**(I)** Using an Airflow Constant ($Q_0$) of 26,500 cubic feet per minute.

**(II)** Using a Pressure Constant ($P_0$) of 0.0027 inches water gauge.

**(III)** Using a Fan Efficiency Constant ($\eta_0$) of 42 percent.

**(7)** Section 6297 of this title shall apply to the products covered in paragraphs (1) through (4) beginning on August 8, 2005, except that any State or local labeling requirement for ceiling fans prescribed or enacted before August 8, 2005, shall not be preempted until the labeling requirements applicable to ceiling fans established under section 6294 of this title take effect.

Add. 122

**(gg) Standby mode energy use**

**(1) Definitions**

**(A) In general**

Unless the Secretary determines otherwise pursuant to subparagraph (B), in this subsection:

**(i) Active mode**

The term "active mode" means the condition in which an energy-using product--

**(I)** is connected to a main power source;

**(II)** has been activated; and

**(III)** provides 1 or more main functions.

**(ii) Off mode**

The term "off mode" means the condition in which an energy-using product--

**(I)** is connected to a main power source; and

**(II)** is not providing any standby or active mode function.

**(iii) Standby mode**

The term "standby mode" means the condition in which an energy-using product--

**(I)** is connected to a main power source; and

**(II)** offers 1 or more of the following user-oriented or protective functions:

**(aa)** To facilitate the activation or deactivation of other functions (including active mode) by remote switch (including remote control), internal sensor, or timer.

**(bb)** Continuous functions, including information or status displays (including clocks) or sensor-based functions.

Add. 123

**(B) Amended definitions**

The Secretary may, by rule, amend the definitions under subparagraph (A), taking into consideration the most current versions of Standards 62301 and 62087 of the International Electrotechnical Commission.

## (2) Test procedures

**(A) In general**

Test procedures for all covered products shall be amended pursuant to section 6293 of this title to include standby mode and off mode energy consumption, taking into consideration the most current versions of Standards 62301 and 62087 of the International Electrotechnical Commission, with such energy consumption integrated into the overall energy efficiency, energy consumption, or other energy descriptor for each covered product, unless the Secretary determines that--

**(i)** the current test procedures for a covered product already fully account for and incorporate the standby mode and off mode energy consumption of the covered product; or

**(ii)** such an integrated test procedure is technically infeasible for a particular covered product, in which case the Secretary shall prescribe a separate standby mode and off mode energy use test procedure for the covered product, if technically feasible.

**(B) Deadlines**

The test procedure amendments required by subparagraph (A) shall be prescribed in a final rule no later than the following dates:

**(i)** December 31, 2008, for battery chargers and external power supplies.

**(ii)** March 31, 2009, for clothes dryers, room air conditioners, and fluorescent lamp ballasts.

**(iii)** June 30, 2009, for residential clothes washers.

**(iv)** September 30, 2009, for residential furnaces and boilers.

**(v)** March 31, 2010, for residential water heaters, direct heating equipment, and pool heaters.

Add. 124

**(vi)** March 31, 2011, for residential dishwashers, ranges and ovens, microwave ovens, and dehumidifiers.

**(C) Prior product standards**

The test procedure amendments adopted pursuant to subparagraph (B) shall not be used to determine compliance with product standards established prior to the adoption of the amended test procedures.

**(3) Incorporation into standard**

**(A) In general**

Subject to subparagraph (B), based on the test procedures required under paragraph (2), any final rule establishing or revising a standard for a covered product, adopted after July 1, 2010, shall incorporate standby mode and off mode energy use into a single amended or new standard, pursuant to subsection (o), if feasible.

**(B) Separate standards**

If not feasible, the Secretary shall prescribe within the final rule a separate standard for standby mode and off mode energy consumption, if justified under subsection (o).

**(hh) Metal halide lamp fixtures**

**(1) Standards**

**(A) In general**

Subject to subparagraphs (B) and (C), metal halide lamp fixtures designed to be operated with lamps rated greater than or equal to 150 watts but less than or equal to 500 watts shall contain--

**(i)** a pulse-start metal halide ballast with a minimum ballast efficiency of 88 percent;

**(ii)** a magnetic probe-start ballast with a minimum ballast efficiency of 94 percent; or

**(iii)** a nonpulse-start electronic ballast with--

Add. 125

**(I)** a minimum ballast efficiency of 92 percent for wattages greater than 250 watts; and

**(II)** a minimum ballast efficiency of 90 percent for wattages less than or equal to 250 watts.

## (B) Exclusions

The standards established under subparagraph (A) shall not apply to--

**(i)** fixtures with regulated lag ballasts;

**(ii)** fixtures that use electronic ballasts that operate at 480 volts; or

**(iii)** fixtures that--

**(I)** are rated only for 150 watt lamps;

**(II)** are rated for use in wet locations, as specified by the National Electrical Code 2002, section 410.4(A); and

**(III)** contain a ballast that is rated to operate at ambient air temperatures above 50°C, as specified by UL 1029-2001.

## (C) Application

The standards established under subparagraph (A) shall apply to metal halide lamp fixtures manufactured on or after the later of--

**(i)** January 1, 2009; or

**(ii)** the date that is 270 days after December 19, 2007.

## (2) Final rule by January 1, 2012

### (A) In general

Not later than January 1, 2012, the Secretary shall publish a final rule to determine whether the standards established under paragraph (1) should be amended.

### (B) Administration

Add. 126

The final rule shall--

**(i)** contain any amended standard; and

**(ii)** apply to products manufactured on or after January 1, 2015.

**(3) Final rule by January 1, 2019**

**(A) In general**

Not later than January 1, 2019, the Secretary shall publish a final rule to determine whether the standards then in effect should be amended.

**(B) Administration**

The final rule shall--

**(i)** contain any amended standards; and

**(ii)** apply to products manufactured after January 1, 2022.

**(4) Design and performance requirements**

Notwithstanding any other provision of law, any standard established pursuant to this subsection may contain both design and performance requirements.

**(ii) Application date**

Section 6297 of this title applies--

**(1)** to products for which energy conservation standards are to be established under subsection (l), (u), or (v) beginning on the date on which a final rule is issued by the Secretary, except that any State or local standard prescribed or enacted for the product before the date on which the final rule is issued shall not be preempted until the energy conservation standard established under subsection (l), (u), or (v) for the product takes effect; and

**(2)** to products for which energy conservation standards are established under subsections (w) through (hh) on August 8, 2005, except that any State or local standard prescribed or enacted before August 8, 2005, shall not be preempted until the energy conservation standards established under subsections (w) through (hh) take effect.

Add. 127

## CREDIT(S)

(Pub.L. 94-163, Title III, § 325, Dec. 22, 1975, 89 Stat. 923; Pub.L. 94-385, Title I, § 161, Aug. 14, 1976, 90 Stat. 1140; Pub.L. 95-619, Title IV, § 422, Nov. 9, 1978, 92 Stat. 3259; Pub.L. 100-12, § 5, Mar. 17, 1987, 101 Stat. 107; Pub.L. 100-357, § 2(e), June 28, 1988, 102 Stat. 673; Pub.L. 102-486, Title I, § 123(f), Oct. 24, 1992, 106 Stat. 2824; Pub.L. 105-388, § 5(a)(5), Nov. 13, 1998, 112 Stat. 3478; Pub.L. 109-58, Title I, § 135(c), Aug. 8, 2005, 119 Stat. 629; Pub.L. 110-140, Title III, §§ 301(c), 303 to 305(a), 306(a), 307, 308(a), 309 to 311(a), 316(c)(2), (d), 321(a)(3), 322(b), 324(e), Dec. 19, 2007, 121 Stat. 1550, 1552, 1553, 1556, 1559 to 1561, 1563, 1573, 1577, 1588, 1593; Pub.L. 111-360, § 1, Jan. 4, 2011, 124 Stat. 4051; Pub.L. 112-210, §§ 3, 5(a), (c), 10(a)(1), (8), (11), (b)(1), Dec. 18, 2012, 126 Stat. 1514, 1517, 1519, 1522, 1524, 1525; Pub.L. 113-263, § 2, Dec. 18, 2014, 128 Stat. 2937; Pub.L. 114-11, Title II, § 201(1), Apr. 30, 2015, 129 Stat. 186; Pub.L. 115-78, § 2, Nov. 2, 2017, 131 Stat. 1256; Pub.L. 115-115, § 2(c)(3), Jan. 12, 2018, 131 Stat. 2281; Pub.L. 116-260, Div. Z, Title I, § 1008(a), Dec. 27, 2020, 134 Stat. 2437.)

---

### Footnotes

[1] So in original. Probably should be "is".

[2] So in original. Probably should be followed by the word "lamps".

[3] So in original. Subpar. (G) does not contain a cl. (i)(II).

[4] So in original. Probably should be "subparagraph (A)(i)".

42 U.S.C.A. § 6295, 42 USCA § 6295
Current through P.L. 119-99. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 77. Energy Conservation (Refs & Annos)
Subchapter III. Improving Energy Efficiency
Part A. Energy Conservation Program for Consumer Products Other than Automobiles (Refs & Annos)

42 U.S.C.A. § 6296

## § 6296. Requirements of manufacturers

Currentness

**(a) In general**

Each manufacturer of a covered product to which a rule under section 6294 of this title applies shall provide a label which meets, and is displayed in accordance with, the requirements of such rule. If such manufacturer or any distributor, retailer, or private labeler of such product advertises such product in a catalog from which it may be purchased, such catalog shall contain all information required to be displayed on the label, except as otherwise provided by rule of the Commission. The preceding sentence shall not require that a catalog contain information respecting a covered product if the distribution of such catalog commenced before the effective date of the labeling rule under section 6294 of this title applicable to such product.

**(b) Notification**

**(1)** Each manufacturer of a covered product to which a rule under section 6294 of this title applies shall notify the Secretary or the Commission--

**(A)** not later than 60 days after the date such rule takes effect, of the models in current production (and starting serial numbers of those models) to which such rule applies; and

**(B)** prior to commencement of production, of all models subsequently produced (and starting serial numbers of those models) to which such rule applies.

**(2)** If requested by the Secretary or Commission, the manufacturer of a covered product to which a rule under section 6294 of this title applies shall provide, within 30 days of the date of the request, the data from which the information included on the label and required by the rule was derived. Data shall be kept on file by the manufacturer for a period specified in the rule.

**(3)** When requested--

Add. 129

**(A)** by the Secretary for purposes of ascertaining whether a product subject to a standard established in or prescribed under section 6295 of this title is in compliance with that standard, or

**(B)** by the Commission for purposes of ascertaining whether the information set out on a label of a product, as required under section 6294 of this title, is accurate,

each manufacturer of such a product shall supply at his expense a reasonable number of such covered products to any laboratory designated by the Secretary or the Commission, as the case may be. Any reasonable charge levied by the laboratory for such testing shall be borne by the United States, if and to the extent provided in appropriation Acts.

**(4)** Each manufacturer of a covered product to which a rule under section 6294 of this title applies shall annually, at a time specified by the Commission, supply to the Commission relevant data respecting energy consumption or water use developed in accordance with the test procedures applicable to such product under section 6293 of this title.

**(5)** A rule under section 6293, 6294, or 6295 of this title may require the manufacturer or his agent to permit a representative designated by the Commission or the Secretary to observe any testing required by this part and inspect the results of such testing.

**(c) Deadline**

Each manufacturer shall use labels reflecting the range data required to be disclosed under section 6294(c)(1)(B) of this title after the expiration of 60 days following the date of publication of any revised table of ranges unless the rule under section 6294 of this title provides for a later date. The Commission may not require labels be changed to reflect revised tables of ranges more often than annually.

**(d) Information requirements**

**(1)** For purposes of carrying out this part, the Secretary may require, under this part or other provision of law administered by the Secretary, each manufacturer of a covered product to submit information or reports to the Secretary with respect to energy efficiency, energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use of such covered product and the economic impact of any proposed energy conservation standard, as the Secretary determines may be necessary to establish and revise test procedures, labeling rules, and energy conservation standards for such product and to insure compliance with the requirements of this part. In making any determination under this paragraph, the Secretary shall consider existing public sources of information, including nationally recognized certification programs of trade associations.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(2)** The Secretary shall exercise authority under this section in a manner designed to minimize unnecessary burdens on manufacturers of covered products.

**(3)** The provisions of section 796(d) of Title 15 shall apply with respect to information obtained under this subsection to the same extent and in the same manner as they apply with respect to energy information obtained under section 796 of Title 15.

### CREDIT(S)

(Pub.L. 94-163, Title III, § 326, Dec. 22, 1975, 89 Stat. 926; Pub.L. 95-619, Title IV, § 425(d), Title VI, § 691(b)(2), Nov. 9, 1978, 92 Stat. 3265, 3288; Pub.L. 100-12, §§ 6, 11(a)(2), (b)(3), Mar. 17, 1987, 101 Stat. 117, 125; Pub.L. 102-486, Title I, § 123(g), Oct. 24, 1992, 106 Stat. 2829.)

42 U.S.C.A. § 6296, 42 USCA § 6296
Current through P.L. 119-99. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A. Energy Conservation Program for Consumer Products Other than Automobiles (Refs & Annos)

42 U.S.C.A. § 6297

§ 6297. Effect on other law

Currentness

**(a) Preemption of testing and labeling requirements**

**(1)** Effective on March 17, 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product if--

**(A)** such State regulation requires testing or the use of any measure of energy consumption, water use, or energy descriptor in any manner other than that provided under section 6293 of this title; or

**(B)** such State regulation requires disclosure of information with respect to the energy use, energy efficiency, or water use of any covered product other than information required under section 6294 of this title.

**(2)** For purposes of this section, the following definitions apply:

**(A)** The term "State regulation" means a law, regulation, or other requirement of a State or its political subdivisions. With respect to showerheads, faucets, water closets, and urinals, such term shall also mean a law, regulation, or other requirement of a river basin commission that has jurisdiction within a State.

**(B)** The term "river basin commission" means--

**(i)** a commission established by interstate compact to apportion, store, regulate, or otherwise manage or coordinate the management of the waters of a river basin; and

**(ii)** a commission established under section 1962b(a) of this title.

**(b) General rule of preemption for energy conservation standards before Federal standard becomes effective for product**

Add. 132

Effective on March 17, 1987, and ending on the effective date of an energy conservation standard established under section 6295 of this title for any covered product, no State regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision--

**(1)(A)** was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent lamp ballasts, was prescribed or enacted before June 28, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent or incandescent lamps, flow rate requirements for showerheads or faucets, or water use requirements for water closets or urinals, was prescribed or enacted before October 24, 1992; or

**(B)** in the case of any portion of any regulation that establishes requirements for general service incandescent lamps, intermediate base incandescent lamps, or candelabra base lamps, was enacted or adopted by the State of California or Nevada before December 4, 2007, except that--

**(i)** the regulation adopted by the California Energy Commission with an effective date of January 1, 2008, shall only be effective until the effective date of the Federal standard for the applicable lamp category under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title; and

**(ii)** the States of California and Nevada may, at any time, modify or adopt a State standard for general service lamps to conform with Federal standards with effective dates no earlier than 12 months prior to the Federal effective dates prescribed under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title, at which time any prior regulations adopted by the State of California or Nevada shall no longer be effective.

**(2)** is a State procurement regulation described in subsection (e);

**(3)** is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

**(4)** is a regulation prohibiting the use in pool heaters of a constant burning pilot, or is a regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable, or is a regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those to which section 6295(i) of this title is applicable, or is a regulation (or portion thereof) regulating showerheads or faucets other than those to which section 6295(j) of this title

Add. 133

is applicable or regulating lavatory faucets (other than metering faucets) for installation in public places, or is a regulation (or portion thereof) regulating water closets or urinals other than those to which section 6295(k) of this title is applicable;

**(5)** is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d);

**(6)** is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets; or

**(7)** is a regulation (or portion thereof) concerning the water efficiency or water use of low consumption flushometer valve water closets.

**(c) General rule of preemption for energy conservation standards when Federal standard becomes effective for product**

Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation--

**(1)** is a regulation described in paragraph (2) or (4) of subsection (b), except that a State regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary under paragraph (7) of such section and is applicable to such ballasts, except that a State regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those for which section 6295(i) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary and is applicable to such lamps;

**(2)** is a regulation which has been granted a waiver under subsection (d);

**(3)** is in a building code for new construction described in subsection (f)(3);

**(4)** is a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992;

**(5)** is a regulation concerning the water use of lavatory or kitchen faucets adopted by the State of Rhode Island prior to October 24, 1992;

Add. 134

**(6)** is a regulation (or portion thereof) concerning the water efficiency or water use of gravity tank-type low consumption water closets for installation in public places, except that such a regulation shall be effective only until January 1, 1997; or

**(7)(A)** is a regulation concerning standards for commercial prerinse spray valves adopted by the California Energy Commission before January 1, 2005; or

**(B)** is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations with changes in American Society for Testing and Materials Standard F2324;

**(8)(A)** is a regulation concerning standards for pedestrian modules adopted by the California Energy Commission before January 1, 2005; or

**(B)** is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations to changes in the Institute for Transportation Engineers standards, entitled "Performance Specification: Pedestrian Traffic Control Signal Indications"; and

**(9)** is a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission on or before January 1, 2011, except that--

**(A)** if the Secretary fails to issue a final rule within 180 days after the deadlines for rulemakings in section 6295(hh) of this title, notwithstanding any other provision of this section, preemption shall not apply to a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission--

**(i)** on or before July 1, 2015, if the Secretary fails to meet the deadline specified in section 6295(hh)(2) of this title; or

**(ii)** on or before July 1, 2022, if the Secretary fails to meet the deadline specified in section 6295(hh)(3) of this title.

**(d) Waiver of Federal preemption**

**(1)(A)** Any State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard under section 6295 of this title may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

Add. 135

**(B)** Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State or river basin commission has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests.

**(C)** For purposes of this subsection, the term "unusual and compelling State or local energy or water interests" means interests which--

**(i)** are substantially different in nature or magnitude than those prevailing in the United States generally; and

**(ii)** are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy or water savings or production, including reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast, and, with respect to a State regulation for which a petition has been submitted to the Secretary which provides for any energy conservation standard or requirement with respect to water use of a covered product, within the context of the water supply and groundwater management plan, water quality program, and comprehensive plan (if any) of the State or river basin commission for improving, developing, or conserving a waterway affected by water supply development.

**(2)** The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

**(3)** The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In

Add. 136

determining whether to make such finding, the Secretary shall evaluate all relevant factors, including--

(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction--

(i) in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

(ii) in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

(D) the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

(4) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a rule for other classes (or types).

(5) No final rule prescribed by the Secretary under this subsection may--

(A) permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

Add. 137

**(B)** become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 6295 of this title for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in addition to the other requirements of this subsection the State has established, by a preponderance of the evidence, that--

**(i)** there exists within the State an energy emergency condition or, if the State regulation provides for an energy conservation standard or other requirement with respect to the water use of a covered product for which there is a Federal energy conservation standard under subsection (j) or (k) of section 6295 of this title, a water emergency condition, which--

**(I)** imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy or, in the case of a water emergency condition, water or wastewater treatment, to its residents at less than prohibitive costs; and

**(II)** cannot be substantially alleviated by the importation of energy or, in the case of a water emergency condition, by the importation of water, or by the use of interconnection agreements; and

**(ii)** the State regulation is necessary to alleviate substantially such condition.

**(6)** In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to section 6295 of this title, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

**(e) Exception for certain State procurement standards**

Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.

Add. 138

**(f) Exception for certain building code requirements**

**(1)** A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product.

**(2)** A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product if the code does not require that the energy efficiency of such covered product exceed--

  **(A)** the applicable minimum efficiency requirement in a national voluntary consensus standard; or

  **(B)** the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5),

whichever is higher.

**(3)** Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

  **(A)** The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

  **(B)** The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

  **(C)** The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy

Add. 139

conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

**(D)** If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

**(E)** If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

**(F)** The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

**(G)** The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

**(4)(A)** Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

**(B)** If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 6295 of this title and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be

Add. 140

applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

## (g) No warranty

Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

### CREDIT(S)

(Pub.L. 94-163, Title III, § 327, Dec. 22, 1975, 89 Stat. 926; Pub.L. 95-619, Title IV, § 424, Nov. 9, 1978, 92 Stat. 3263; Pub.L. 100-12, § 7, Mar. 17, 1987, 101 Stat. 117; Pub.L. 100-357, § 2(f), June 28, 1988, 102 Stat. 674; Pub.L. 102-486, Title I, § 123(h), Oct. 24, 1992, 106 Stat. 2829; Pub.L. 109-58, Title I, § 135(d), Aug. 8, 2005, 119 Stat. 634; Pub.L. 110-140, Title III, §§ 321(d), 324(f), Dec. 19, 2007, 121 Stat. 1585, 1594; Pub.L. 112-210, § 10(a)(9), Dec. 18, 2012, 126 Stat. 1524.)

42 U.S.C.A. § 6297, 42 USCA § 6297
Current through P.L. 119-99. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A-1. Certain Industrial Equipment (Refs & Annos)

42 U.S.C.A. § 6314

§ 6314. Test procedures

Currentness

**(a) Prescription by Secretary; requirements**

 **(1) Test procedures**

  **(A)[1] Amendment**

  At least once every 7 years, the Secretary shall conduct an evaluation of each class of covered equipment and--

   **(i)** if the Secretary determines that amended test procedures would more accurately or fully comply with the requirements of paragraphs (2) and (3), shall prescribe test procedures for the class in accordance with this section; or

   **(ii)** shall publish notice in the Federal Register of any determination not to amend a test procedure.

**(2)** Test procedures prescribed in accordance with this section shall be reasonably designed to produce test results which reflect energy efficiency, energy use, and estimated operating costs of a type of industrial equipment (or class thereof) during a representative average use cycle (as determined by the Secretary), and shall not be unduly burdensome to conduct.

**(3)** If the test procedure is a procedure for determining estimated annual operating costs, such procedure shall provide that such costs shall be calculated from measurements of energy use in a representative average-use cycle (as determined by the Secretary), and from representative average unit costs of the energy needed to operate such equipment during such cycle. The Secretary shall provide information to manufacturers of covered equipment respecting representative average unit costs of energy.

**(4)(A)** With respect to small commercial package air conditioning and heating equipment, large commercial package air conditioning and heating equipment, very large commercial package air conditioning and heating equipment, packaged terminal air conditioners,

Add. 142

packaged terminal heat pumps, warm-air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks to which standards are applicable under section 6313 of this title, the test procedures shall be those generally accepted industry testing procedures or rating procedures developed or recognized by the Air-Conditioning, Heating, and Refrigeration Institute or by the American Society of Heating, Refrigerating and Air Conditioning Engineers, as referenced in ASHRAE/IES Standard 90.1 and in effect on June 30, 1992.

**(B)** If such an industry test procedure or rating procedure for small commercial package air conditioning and heating equipment, large commercial package air conditioning and heating equipment, very large commercial package air conditioning and heating equipment, packaged terminal air conditioners, packaged terminal heat pumps, warm-air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, or unfired hot water storage tanks is amended, the Secretary shall amend the test procedure for the product as necessary to be consistent with the amended industry test procedure or rating procedure unless the Secretary determines, by rule, published in the Federal Register and supported by clear and convincing evidence, that to do so would not meet the requirements for test procedures described in paragraphs (2) and (3) of this subsection.

**(C)** If the Secretary prescribes a rule containing such a determination, the rule may establish an amended test procedure for such product that meets the requirements of paragraphs (2) and (3) of this subsection. In establishing any amended test procedure under this subparagraph or subparagraph (B), the Secretary shall follow the procedures and meet the requirements specified in section 6293(e) of this title.

**(5)(A)** With respect to electric motors to which standards are applicable under section 6313 of this title, the test procedures shall be the test procedures specified in NEMA Standards Publication MG1-1987 and IEEE Standard 112 Test Method B for motor efficiency, as in effect on October 24, 1992.

**(B)** If the test procedure requirements of NEMA Standards Publication MG-1987 and IEEE Standard 112 Test Method B for motor efficiency are amended, the Secretary shall amend the test procedures established by subparagraph (A) to conform to such amended test procedure requirements unless the Secretary determines, by rule, published in the Federal Register and supported by clear and convincing evidence, that to do so would not meet the requirements for test procedures described in paragraphs (2) and (3) of this subsection.

**(C)** If the Secretary prescribes a rule containing such a determination, the rule may establish amended test procedures for such electric motors that meets the requirements of paragraphs (2) and (3) of this subsection. In establishing any amended test procedure

Add. 143

under this subparagraph or subparagraph (B), the Secretary shall follow the procedures and meet the requirements specified in section 6293(e) of this title.

**(6)(A)(i)** In the case of commercial refrigerators, freezers, and refrigerator-freezers, the test procedures shall be--

  **(I)** the test procedures determined by the Secretary to be generally accepted industry testing procedures; or

  **(II)** rating procedures developed or recognized by the ASHRAE or by the American National Standards Institute.

**(ii)** In the case of self-contained refrigerators, freezers, and refrigerator-freezers to which standards are applicable under paragraphs (2) and (3) of section 6313(c) of this title, the initial test procedures shall be the ASHRAE 117 test procedure that is in effect on January 1, 2005.

**(B)(i)**[2] In the case of commercial refrigerators, freezers, and refrigerator-freezers with doors covered by the standards adopted in February 2002, by the California Energy Commission, the rating temperatures shall be the integrated average temperature of 38 degrees F (± 2 degrees F) for refrigerator compartments and 0 degrees F (± 2 degrees F) for freezer compartments.

**(C)** The Secretary shall issue a rule in accordance with paragraphs (2) and (3) to establish the appropriate rating temperatures for the other products for which standards will be established under section 6313(c)(4) of this title.

**(D)** In establishing the appropriate test temperatures under this subparagraph, the Secretary shall follow the procedures and meet the requirements under section 6293(e) of this title.

**(E)(i)** Not later than 180 days after the publication of the new ASHRAE 117 test procedure, if the ASHRAE 117 test procedure for commercial refrigerators, freezers, and refrigerator-freezers is amended, the Secretary shall, by rule, amend the test procedure for the product as necessary to ensure that the test procedure is consistent with the amended ASHRAE 117 test procedure, unless the Secretary makes a determination, by rule, and supported by clear and convincing evidence, that to do so would not meet the requirements for test procedures under paragraphs (2) and (3).

**(ii)** If the Secretary determines that 180 days is an insufficient period during which to review and adopt the amended test procedure or rating procedure under clause (i), the Secretary shall publish a notice in the Federal Register stating the intent of the Secretary

Add. 144

to wait not longer than 1 additional year before putting into effect an amended test procedure or rating procedure.

**(F)(i)** If a test procedure other than the ASHRAE 117 test procedure is approved by the American National Standards Institute, the Secretary shall, by rule--

**(I)** review the relative strengths and weaknesses of the new test procedure relative to the ASHRAE 117 test procedure; and

**(II)** based on that review, adopt one new test procedure for use in the standards program.

**(ii)** If a new test procedure is adopted under clause (i)--

**(I)** section 6293(e) of this title shall apply; and

**(II)** subparagraph (B) shall apply to the adopted test procedure.

**(7)(A)** In the case of automatic commercial ice makers, the test procedures shall be the test procedures specified in Air-Conditioning, Heating, and Refrigeration Institute Standard 810-2003, as in effect on January 1, 2005.

**(B)(i)** If Air-Conditioning, Heating, and Refrigeration Institute Standard 810-2003 is amended, the Secretary shall amend the test procedures established in subparagraph (A) as necessary to be consistent with the amended Air-Conditioning, Heating, and Refrigeration Institute Standard, unless the Secretary determines, by rule, published in the Federal Register and supported by clear and convincing evidence, that to do so would not meet the requirements for test procedures under paragraphs (2) and (3).

**(ii)** If the Secretary issues a rule under clause (i) containing a determination described in clause (ii), the rule may establish an amended test procedure for the product that meets the requirements of paragraphs (2) and (3).

**(C)** The Secretary shall comply with section 6293(e) of this title in establishing any amended test procedure under this paragraph.

**(8)** With respect to commercial clothes washers, the test procedures shall be the same as the test procedures established by the Secretary for residential clothes washers under section 6295(g) of this title.

### **(9) Walk-in coolers and walk-in freezers**

Add. 145

### (A) In general

For the purpose of test procedures for walk-in coolers and walk-in freezers:

**(i)** The R value shall be the 1/K factor multiplied by the thickness of the panel.

**(ii)** The K factor shall be based on ASTM test procedure C518-2004.

**(iii)** For calculating the R value for freezers, the K factor of the foam at 20°F (average foam temperature) shall be used.

**(iv)** For calculating the R value for coolers, the K factor of the foam at 55°F (average foam temperature) shall be used.

### (B) Test procedure

### (i) In general

Not later than January 1, 2010, the Secretary shall establish a test procedure to measure the energy-use of walk-in coolers and walk-in freezers.

### (ii) Computer modeling

The test procedure may be based on computer modeling, if the computer model or models have been verified using the results of laboratory tests on a significant sample of walk-in coolers and walk-in freezers.

## (b) Publication in Federal Register; presentment of oral and written data, views, and arguments by interested persons

Before prescribing any final test procedures under this section, the Secretary shall--

**(1)** publish proposed test procedures in the Federal Register; and

**(2)** afford interested persons an opportunity (of not less than 45 days' duration) to present oral and written data, views, and arguments on the proposed test procedures.

## (c) Reevaluations

**(1)** The Secretary shall, not later than 3 years after the date of prescribing a test procedure under this section (and from time to time thereafter), conduct a reevaluation of such procedure and, on the basis of such reevaluation, shall determine if such test procedure

Add. 146

should be amended. In conducting such reevaluation, the Secretary shall take into account such information as he deems relevant, including technological developments relating to the energy efficiency of the type (or class) of covered equipment involved.

**(2)** If the Secretary determines under paragraph (1) that a test procedure should be amended, he shall promptly publish in the Federal Register proposed test procedures incorporating such amendments and afford interested persons an opportunity to present oral and written data, views, and arguments. Such comment period shall not be less than 45 days' duration.

**(d) Prohibited representations**

**(1)** Effective 180 days (or, in the case of small commercial package air conditioning and heating equipment, large commercial package air conditioning and heating equipment, very large commercial package air conditioning and heating equipment, commercial refrigerators, freezers, and refrigerator-freezers, automatic commercial ice makers, commercial clothes washers, packaged terminal air conditioners, packaged terminal heat pumps, warm-air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks, 360 days) after a test procedure rule applicable to any covered equipment is prescribed under this section, no manufacturer, distributor, retailer, or private labeler may make any representation--

  **(A)** in writing (including any representation on a label), or

  **(B)** in any broadcast advertisement,

respecting the energy consumption of such equipment or cost of energy consumed by such equipment, unless such equipment has been tested in accordance with such test procedure and such representation fairly discloses the results of such testing.

**(2)** On the petition of any manufacturer, distributor, retailer, or private labeler, filed not later than the 60th day before the expiration of the period involved, the 180-day period referred to in paragraph (1) may be extended by the Secretary with respect to the petitioner (but in no event for more than an additional 180 days) if he finds that the requirements of paragraph (1) would impose on such petitioner an undue hardship (as determined by the Secretary).

**(e) Assistance by National Institute of Standards and Technology**

The Secretary may direct the National Institute of Standards and Technology to provide such assistance as the Secretary deems necessary to carry out his responsibilities under this part, including the development of test procedures.

Add. 147

## CREDIT(S)

(Pub.L. 94-163, Title III, § 343, as added Pub.L. 95-619, Title IV, § 441(a), Nov. 9, 1978, 92 Stat. 3270; amended Pub.L. 100-418, Title V, § 5115(c), Aug. 23, 1988, 102 Stat. 1433; Pub.L. 102-486, Title I, § 122(b), (f)(2), Oct. 24, 1992, 106 Stat. 2808, 2817; Pub.L. 109-58, Title I, § 136(f), Aug. 8, 2005, 119 Stat. 641; Pub.L. 110-140, Title III, §§ 302(b), 312(c), Dec. 19, 2007, 121 Stat. 1552, 1566; Pub.L. 112-210, § 10(a)(2), (c)(2), Dec. 18, 2012, 126 Stat. 1522, 1525.)

## Footnotes

[1] So in original. No subpar. (B) has been enacted.

[2] So in original. No cl. (ii) was enacted.

42 U.S.C.A. § 6314, 42 USCA § 6314
Current through P.L. 119-99. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A-1. Certain Industrial Equipment (Refs & Annos)

42 U.S.C.A. § 6315

§ 6315. Labeling

Effective: December 20, 2007

Currentness

**(a) Prescription by Secretary**

If the Secretary has prescribed test procedures under section 6314 of this title for any class of covered equipment, he shall prescribe a labeling rule applicable to such class of covered equipment in accordance with the following provisions of this section.

**(b) Disclosure of energy efficiency of articles of covered equipment**

A labeling rule prescribed in accordance with this section shall require that each article of covered equipment which is in the type (or class) of industrial equipment to which such rule applies, discloses by label, the energy efficiency of such article, determined in accordance with test procedures under section 6314 of this title. Such rule may also require that such disclosure include the estimated operating costs and energy use, determined in accordance with test procedures under section 6314 of this title.

**(c) Inclusion of requirements**

A rule prescribed in accordance with this section shall include such requirements as the Secretary determines are likely to assist purchasers in making purchasing decisions, including--

**(1)** requirements and directions for display of any label,

**(2)** requirements for including on any label, or separately attaching to, or shipping with, the covered equipment, such additional information relating to energy efficiency, energy use, and other measures of energy consumption, including instructions for the maintenance, use, or repair of the covered equipment, as the Secretary determines necessary to provide adequate information to purchasers, and

Add. 149

**(3)** requirements that printed matter which is displayed or distributed at the point of sale of such equipment shall disclose such information as may be required under this section to be disclosed on the label of such equipment.

## (d) Labeling rules applicable to electric motors

Subject to subsection (h), not later than 12 months after the Secretary establishes test procedures for electric motors under section 6314 of this title, the Secretary shall prescribe labeling rules under this section applicable to electric motors taking into consideration NEMA Standards Publication MG1-1987. Such rules shall provide that the labeling of any electric motor manufactured after the 12-month period beginning on the date the Secretary prescribes such labeling rules, shall--

**(1)** indicate the energy efficiency of the motor on the permanent nameplate attached to such motor;

**(2)** prominently display the energy efficiency of the motor in equipment catalogs and other material used to market the equipment; and

**(3)** include such other markings as the Secretary determines necessary solely to facilitate enforcement of the standards established for electric motors under section 6313 of this title.

## (e) Labeling rules for air conditioning and heating equipment

Subject to subsection (h), not later than 12 months after the Secretary establishes test procedures for small commercial package air conditioning and heating equipment, large commercial package air conditioning and heating equipment, very large commercial package air conditioning and heating equipment, commercial refrigerators, freezers, and refrigerator-freezers, automatic commercial ice makers, commercial clothes washers, walk-in coolers and walk-in freezers, packaged terminal air conditioners, packaged terminal heat pumps, warm-air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks under section 6314 of this title, the Secretary shall prescribe labeling rules under this section for such equipment. Such rules shall provide that the labeling of any small commercial package air conditioning and heating equipment, large commercial package air conditioning and heating equipment, very large commercial package air conditioning and heating equipment, commercial refrigerators, freezers, and refrigerator-freezers, automatic commercial ice makers, commercial clothes washers, walk-in coolers and walk-in freezers, packaged terminal air conditioner, packaged terminal heat pump, warm-air furnace, packaged boiler, storage water heater, instantaneous water heater, and unfired hot water storage tank manufactured after the 12-month period beginning on the date the Secretary prescribes such rules shall--

Add. 150

**(1)** indicate the energy efficiency of the equipment on the permanent nameplate attached to such equipment or other nearby permanent marking;

**(2)** prominently display the energy efficiency of the equipment in new equipment catalogs used by the manufacturer to advertise the equipment; and

**(3)** include such other markings as the Secretary determines necessary solely to facilitate enforcement of the standards established for such equipment under section 6313 of this title.

**(f) Consultation with Federal Trade Commission**

Before prescribing any labeling rules for a type (or class) of covered equipment, the Secretary shall consult with, and obtain the written views of, the Federal Trade Commission with respect to such rules. The Federal Trade Commission shall promptly provide such written views upon the request of the Secretary.

**(g) Publication in Federal Register; presentment of oral and written data, views, and arguments of interested persons**

**(1)** Before prescribing any labeling rules under this section, the Secretary shall--

**(A)** publish proposed labeling rules in the Federal Register, and

**(B)** afford interested persons an opportunity (of not less than 45 days' duration) to present oral and written data, views, and arguments on the proposed rules.

**(2)** A labeling rule prescribed under this section shall take effect not later than 3 months after the date of prescription of such rule, except that such rules may take effect not later than 6 months after such date of prescription if the Secretary determines that such extension is necessary to allow persons subject to such rules adequate time to come into compliance with such rules.

**(h) Restrictions on Secretary's authority to promulgate rules**

The Secretary shall not promulgate labeling rules for any class of industrial equipment unless he has determined that--

**(1)** labeling in accordance with this section is technologically and economically feasible with respect to such class;

Add. 151

**(2)** significant energy savings will likely result from such labeling; and

**(3)** labeling in accordance with this section is likely to assist consumers in making purchasing decisions.

## (i) Tests for accuracy of information contained on labels

When requested by the Secretary, any manufacturer of industrial equipment to which a rule under this section applies shall supply at the manufacturer's expense a reasonable number of articles of such covered equipment to any laboratory or testing facility designated by the Secretary, or permit representatives of such laboratory or facility to test such equipment at the site where it is located, for purposes of ascertaining whether the information set out on the label, or otherwise required to be disclosed, as required under this section, is accurate. Any reasonable charge levied by the laboratory or facility for such testing shall be borne by the United States, if and to the extent provided in appropriations Acts.

## (j) Products completed prior to effective date of rules

A labeling rule under this section shall not apply to any article of covered equipment the manufacture of which was completed before the effective date of such rule.

## (k) Labeling authority under Federal Trade Commission Act

Until such time as labeling rules under this section take effect with respect to a type (or class) of covered equipment, this section shall not affect any authority of the Commission under the Federal Trade Commission Act to require labeling with respect to energy consumption of such type (or class) of covered equipment.

**CREDIT(S)**

(Pub.L. 94-163, Title III, § 344, as added Pub.L. 95-619, Title IV, § 441(a), Nov. 9, 1978, 92 Stat. 3271; amended Pub.L. 102-486, Title I, § 122(c), Oct. 24, 1992, 106 Stat. 2809; Pub.L. 109-58, Title I, § 136(g), Aug. 8, 2005, 119 Stat. 643; Pub.L. 110-140, Title III, § 312(d), Dec. 19, 2007, 121 Stat. 1567.)

42 U.S.C.A. § 6315, 42 USCA § 6315
Current through P.L. 119-99. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 152

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 77. Energy Conservation (Refs & Annos)
      Subchapter III. Improving Energy Efficiency
        Part A-1. Certain Industrial Equipment (Refs & Annos)

42 U.S.C.A. § 6316

§ 6316. Administration, penalties, enforcement, and preemption

Currentness

**(a)** The provisions of section 6296(a), (b), and (d) of this title, the provisions of subsections (l) through (s) of section 6295 of this title, and section[1] 6297 through 6306 of this title shall apply with respect to this part (other than the equipment specified in subparagraphs (B), (C), (D), (I), (J), and (K) of section 6311(1) of this title) to the same extent and in the same manner as they apply in part B. In applying such provisions for the purposes of this part--

**(1)** references to sections 6293, 6294, and 6295 of this title shall be considered as references to sections 6314, 6315, and 6313 of this title, respectively;

**(2)** references to "this part" shall be treated as referring to part A-1;

**(3)** the term "equipment" shall be substituted for the term "product";

**(4)** the term "Secretary" shall be substituted for "Commission" each place it appears (other than in section 6303(c) of this title);

**(5)** section 6297(a) of this title shall be applied, in the case of electric motors, as if the National Appliance Energy Conservation Act of 1987 was the Energy Policy Act of 1992;

**(6)** section 6297(b)(1) of this title shall be applied as if electric motors were fluorescent lamp ballasts and as if the National Appliance Energy Conservation Amendments of 1988 were the Energy Policy Act of 1992;

**(7)** section 6297(b)(4) of this title shall be applied as if electric motors were fluorescent lamp ballasts and as if paragraph (5) of section 6295(g) of this title were section 6313 of this title;

**(8)** notwithstanding any other provision of law, a regulation or other requirement adopted by a State or subdivision of a State contained in a State or local building code

Add. 153

for new construction concerning the energy efficiency or energy use of an electric motor covered under this part is not superseded by the standards for such electric motor established or prescribed under section 6313(b) of this title if such regulation or requirement is identical to the standards established or prescribed under such section;

**(9)** in the case of commercial clothes washers, section 6297(b)(1) of this title shall be applied as if the National Appliance Energy Conservation Act of 1987 was the Energy Policy Act of 2005; and

**(10)** section 6297 of this title shall apply with respect to the equipment described in section 6311(1)(L) of this title beginning on the date on which a final rule establishing an energy conservation standard is issued by the Secretary, except that any State or local standard prescribed or enacted for the equipment before the date on which the final rule is issued shall not be preempted until the energy conservation standard established by the Secretary for the equipment takes effect.

**(b)(1)** The provisions of section 6295(p)(4) of this title, section 6296(a), (b), and (d) of this title, section 6297(a) of this title, and sections 6298 through 6306 of this title shall apply with respect to the equipment specified in subparagraphs (B), (C), (D), (I), (J), and (K) of section 6311(1) of this title to the same extent and in the same manner as they apply in part B. In applying such provisions for the purposes of such equipment, paragraphs (1), (2), (3), and (4) of subsection (a) shall apply.

**(2)(A)** A standard prescribed or established under section 6313(a) of this title shall, beginning on the effective date of such standard, supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section.

**(B)** Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede a standard for such a product contained in a State or local building code for new construction if--

**(i)** the standard in the building code does not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1; and

**(ii)** the standard in the building code does not take effect prior to the effective date of the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1.

**(C)** Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede the standards established by the State of

Add. 154

California set forth in Table C-6, California Code of Regulations, Title 24, Part 2, Chapter 2-53, for water-source heat pumps below 135,000 Btu per hour (cooling capacity) that become effective on January 1, 1993.

**(D)** Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede a State regulation which has been granted a waiver by the Secretary. The Secretary may grant a waiver pursuant to the terms, conditions, criteria, procedures, and other requirements specified in section 6297(d) of this title.

**(c)** With respect to any electric motor to which standards are applicable under section 6313(b) of this title, the Secretary shall require manufacturers to certify, through an independent testing or certification program nationally recognized in the United States, that such motor meets the applicable standard.

**(d)(1)** Except as provided in paragraphs (2) and (3), section 6297 of this title shall apply with respect to very large commercial package air conditioning and heating equipment to the same extent and in the same manner as section 6297 of this title applies under part B on August 8, 2005.

**(2)** Any State or local standard issued before August 8, 2005, shall not be preempted until the standards established under section 6313(a)(9) of this title take effect on January 1, 2010.

**(e)(1)(A)** Subsections (a), (b), and (d) of section 6296 of this title, subsections (m) through (s) of section 6295 of this title, and sections 6298 through 6306 of this title shall apply with respect to commercial refrigerators, freezers, and refrigerator-freezers to the same extent and in the same manner as those provisions apply under part B.

**(B)** In applying those provisions to commercial refrigerators, freezers, and refrigerator-freezers, paragraphs (1), (2), (3), and (4) of subsection (a) shall apply.

**(2)(A)** Section 6297 of this title shall apply to commercial refrigerators, freezers, and refrigerator-freezers for which standards are established under paragraphs (2) and (3) of section 6313(c) of this title to the same extent and in the same manner as those provisions apply under part B on August 8, 2005, except that any State or local standard issued before August 8, 2005, shall not be preempted until the standards established under paragraphs (2) and (3) of section 6313(c) of this title take effect.

**(B)** In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

Add. 155

**(3)(A)** Section 6297 of this title shall apply to commercial refrigerators, freezers, and refrigerator-freezers for which standards are established under section 6313(c)(4) of this title to the same extent and in the same manner as the provisions apply under part B on the date of publication of the final rule by the Secretary, except that any State or local standard issued before the date of publication of the final rule by the Secretary shall not be preempted until the standards take effect.

**(B)** In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

**(4)(A)** If the Secretary does not issue a final rule for a specific type of commercial refrigerator, freezer, or refrigerator-freezer within the time frame specified in section 6313(c)(5) of this title, subsections (b) and (c) of section 6297 of this title shall not apply to that specific type of refrigerator, freezer, or refrigerator-freezer for the period beginning on the date that is 2 years after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering the specific type of refrigerator, freezer, or refrigerator-freezer.

**(B)** Any State or local standard issued before the date of publication of the final rule shall not be preempted until the final rule takes effect.

**(5)(A)** In the case of any commercial refrigerator, freezer, or refrigerator-freezer to which standards are applicable under paragraphs (2) and (3) of section 6313(c) of this title, the Secretary shall require manufacturers to certify, through an independent, nationally recognized testing or certification program, that the commercial refrigerator, freezer, or refrigerator-freezer meets the applicable standard.

**(B)** The Secretary shall, to the maximum extent practicable, encourage the establishment of at least 2 independent testing and certification programs.

**(C)** As part of certification, information on equipment energy use and interior volume shall be made available to the Secretary.

**(f)(1)(A)(i)** Except as provided in clause (ii), section 6297 of this title shall apply to automatic commercial ice makers for which standards have been established under section 6313(d)(1) of this title to the same extent and in the same manner as the section applies under part B on August 8, 2005.

**(ii)** Any State standard issued before August 8, 2005, shall not be preempted until the standards established under section 6313(d)(1) of this title take effect.

Add. 156

**(B)** In applying section 6297 of this title to the equipment under subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

**(2)(A)(i)** Except as provided in clause (ii), section 6297 of this title shall apply to automatic commercial ice makers for which standards have been established under section 6313(d)(2) of this title to the same extent and in the same manner as the section applies under part B on the date of publication of the final rule by the Secretary.

**(ii)** Any State standard issued before the date of publication of the final rule by the Secretary shall not be preempted until the standards established under section 6313(d)(2) of this title take effect.

**(B)** In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

**(3)(A)** If the Secretary does not issue a final rule for a specific type of automatic commercial ice maker within the time frame specified in section 6313(d) of this title, subsections (b) and (c) of section 6297 of this title shall no longer apply to the specific type of automatic commercial ice maker for the period beginning on the day after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering the specific type of automatic commercial ice maker.

**(B)** Any State standard issued before the publication of the final rule shall not be preempted until the standards established in the final rule take effect.

**(4)(A)** The Secretary shall monitor whether manufacturers are reducing harvest rates below tested values for the purpose of bringing non-complying equipment into compliance.

**(B)** If the Secretary finds that there has been a substantial amount of manipulation with respect to harvest rates under subparagraph (A), the Secretary shall take steps to minimize the manipulation, such as requiring harvest rates to be within 5 percent of tested values.

**(g)(1)(A)** If the Secretary does not issue a final rule for commercial clothes washers within the timeframe specified in section 6313(e)(2) of this title, subsections (b) and (c) of section 6297 of this title shall not apply to commercial clothes washers for the period beginning on the day after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering commercial clothes washers.

Add. 157

**(B)** Any State or local standard issued before the date on which the Secretary publishes a final rule shall not be preempted until the standards established under section 6313(e)(2) of this title take effect.

**(2)** The Secretary shall undertake an educational program to inform owners of laundromats, multifamily housing, and other sites where commercial clothes washers are located about the new standard, including impacts on washer purchase costs and options for recovering those costs through coin collection.

## (h) Walk-in coolers and walk-in freezers

### (1) Covered types

#### (A) Relationship to other law

##### (i) In general

Except as otherwise provided in this subsection, section 6297 of this title shall apply to walk-in coolers and walk-in freezers for which standards have been established under paragraphs (1), (2), and (3) of section 6313(f) of this title to the same extent and in the same manner as the section applies under part B on December 19, 2007.

##### (ii) State standards

Any State standard prescribed before December 19, 2007, shall not be preempted until the standards established under paragraphs (1) and (2) of section 6313(f) of this title take effect.

#### (B) Administration

In applying section 6297 of this title to equipment under subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

### (2) Final rule not timely

#### (A) In general

If the Secretary does not issue a final rule for a specific type of walk-in cooler or walk-in freezer within the timeframe established under paragraph (4) or (5) of section 6313(f) of this title, subsections (b) and (c) of section 6297 of this title shall no longer apply to the specific type of walk-in cooler or walk-in freezer during the period--

Add. 158

**(i)** beginning on the day after the scheduled date for a final rule; and

**(ii)** ending on the date on which the Secretary publishes a final rule covering the specific type of walk-in cooler or walk-in freezer.

**(B) State standards**

Any State standard issued before the publication of the final rule shall not be preempted until the standards established in the final rule take effect.

**(3) California**

Any standard issued in the State of California before January 1, 2011, under title 20 of the California Code of Regulations, that refers to walk-in coolers and walk-in freezers, for which standards have been established under paragraphs (1), (2), and (3) of section 6313(f) of this title, shall not be preempted until the standards established under section 6313(f)(4) of this title take effect.

**CREDIT(S)**

(Pub.L. 94-163, Title III, § 345, as added Pub.L. 95-619, Title IV, § 441(a), Nov. 9, 1978, 92 Stat. 3272; amended Pub.L. 102-486, Title I, § 122(e), Oct. 24, 1992, 106 Stat. 2815; Pub.L. 105-388, § 5(a)(7), Nov. 13, 1998, 112 Stat. 3478; Pub.L. 109-58, Title I, § 136(h), Aug. 8, 2005, 119 Stat. 643; Pub.L. 110-140, Title III, §§ 308(b), 312(e), Dec. 19, 2007, 121 Stat. 1561, 1567; Pub.L. 112-210, § 10(a)(5), Dec. 18, 2012, 126 Stat. 1524.)

**Footnotes**

[1]    So in original. Probably should be "sections".

42 U.S.C.A. § 6316, 42 USCA § 6316
Current through P.L. 119-99.  Some statute sections may be more current, see credits for details.

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.