**26-1449**

IN THE UNITED STATES COURT OF APPEALS FOR THE
FOURTH CIRCUIT

National Association of Home Builders of the United States et al.,

*Plaintiffs-Appellants,*

v.

Montgomery County, Maryland,

*Defendant-Appellee*

On Appeal from the United States District Court for the
District of Maryland

**BRIEF OF *AMICUS CURIAE* PUBLIC HEALTH LAW CENTER
SUPPORTING DEFENDANT-APPELLEE AND AFFIRMANCE**

<div style="margin-left:50%">

Daniel Carpenter-Gold
Jamie Long

Public Health Law Center
875 Summit Ave.
St. Paul, MN 55105
(651) 290-6329

*Attorneys for* Amicus Curiae *Public
Health Law Center*

</div>

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1449__    Caption: __National Association of Home Builders et al. v. Montgomery County__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Public Health Law Center__
(name of party/amicus)

_____

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

12/01/2019 SCC                                    - 1 -

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____      Date: _____7/1/26_____

Counsel for: Public Health Law Center

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

STATEMENT OF IDENTIFICATION................................................................... 1

SUMMARY OF ARGUMENT .............................................................................. 1

ARGUMENT .......................................................................................................... 3

    I.    A Prohibition on an Appliance Does Not Concern Its Energy Use ............... 3

    II.    EPCA's Legislative History Supports This Reading .................................. 7

        A.    EPCA's Evolution Demonstrates that Congress Did Not Intend to Preempt Regulations Like the Building Decarbonization Law ......................... 7

        B.    The Building Decarbonization Law Cannot Create the "Patchwork of Numerous Conflicting State Requirements" that Concerned Congress ........... 13

        C.    Congress Did Not Intend to Preempt the Broad Swath of Regulations Implicated by Appellants' Reading................................................................... 16

    III.    EPCA's Building-Code Exemptions Demonstrate that the Statute Does Not Preempt Appliance Prohibitions in Building Codes ..................................... 19

        A.    The Building Code Exemptions Support an Interpretation of EPCA that Does Not Preempt with Appliance Prohibitions............................................... 20

        B.    If the Building Decarbonization Law did "Concern[]…Energy Use," the Building Code Exemptions would Prevent Preemption ................................. 23

CONCLUSION..................................................................................................... 30

## TABLE OF AUTHORITIES

### Cases

*Assoc. of Contracting Plumbers v. City of New York*, Nos. 25-977 & 25-2041, 2026 WL 1871692 (2d Cir. June 30, 2026).......................... 2, 4, 5, 8, 11, 12, 13, 14, 18

*Bondi v. VanDerStok*, 604 U.S. 458 (2025)............................................................10

*Cal. Restaurant Assoc. v. Berkeley*, 89 F.4th 1094 (9th Cir. 2024)..........................4

*Holland v. Big River Minerals Corp.,* 181 F.3d 597 (4th Cir. 1999) .......................7

*Rinnai Am. Corp. v. S. Coast Air Qual. Mgmt. Dist.*, No. 25-5129 (9th Cir. July 2, 2026) (slip op.) .................................................................................................4

*Stiltner v. Beretta U.S.A. Corp.*, 74 F.3d 1473 (4th Cir. 1996) ...............................7

### Statutes

42 U.S.C. § 6291(4) .......................................................................................... 3, 4, 5, 6

42 U.S.C. § 6291(5) .......................................................................................................6

42 U.S.C. § 6291(6) .................................................................................................. 5, 17

42 U.S.C. § 6293(b) ....................................................................................................5, 6

42 U.S.C. § 6294(c) .......................................................................................................5

42 U.S.C. § 6295 ............................................................................................................5

42 U.S.C. § 6295(o) .................................................................................................. 6, 17

42 U.S.C. § 6297(b) .....................................................................................................29

42 U.S.C. § 6297(c) .................................................................................................. 1, 3, 29

42 U.S.C. § 6297(d) .....................................................................................................17

42 U.S.C. § 6297(f).................................... 2, 19, 20, 21, 22, 23, 25, 26, 27, 28, 29

42 U.S.C. § 6311(3) .......................................................................................................6

42 U.S.C. § 6311(5) ....................................................................................................3, 5

42 U.S.C. § 6311(18) .................................................................. 5, 17

42 U.S.C. § 6313 ..............................................................................6

42 U.S.C. § 6314(a) ......................................................................5, 6

42 U.S.C. § 6315(b) ..........................................................................5

42 U.S.C. § 6316(b) ................................................ 1, 2, 3, 19, 20, 23, 24

42 U.S.C. § 6316(h) ........................................................................29

### Session Laws and Legislative Materials

124 Cong. Rec. 34,487-34,672 (Oct. 7, 1978).........................................10

133 Cong. Rec. 4478-4558 (Mar. 3, 1987)................................... 14, 15, 16

Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871 ...............................................................................................7, 8

H.R. Rep. No. 95-1294 (1978)...............................................................9

H.R. Rep. No. 100-11 (1987)................................... 12, 13, 15, 18, 25, 27

National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, 101 Stat. 103 .......................................................................................11

*National Appliance Energy Conservation Act: Hearing on S.2781 Before the Subcomm. on Energy Regul. & Conservation of the Comm. on Energy & Nat. Res.*, 99th Cong. (Sept. 16, 1986)........................................................14

National Energy Conservation Policy Act of 1978, Pub. L. No. 95-619, 92 Stat. 3206 ..............................................................................................8, 9

S. Rep. No. 94-516 (1975) ...................................................................7

S. Rep. No. 100-6 (1987) ......................... 9, 11, 12, 14, 15, 18, 20, 21, 26

S. Rep. No. 100-345 (1988) ...............................................................12

### Administrative Materials

*Final Rule for Clothes Dryers and Kitchens Ranges and Ovens*, 47 Fed. Reg. 57,198 (Dec. 22, 1982)...................................................................28

*Final Rules Regarding State Petitions for Exemption From Federal Standards for Clothes Dryers and Kitchen Ranges and Ovens*, 49 Fed. Reg. 11,764 (Mar. 27, 1984)............................................................................................................10

*Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces*, 47 Fed. Reg. 14,424 (Apr. 2, 1982)...10

## Other Authorities

Association of Air Conditioning, Heating and Refrigerating Engineers, *Energy Conservation in New Building Design*, Standard 90-1975 (1975).......................21

Association of Air Conditioning, Heating and Refrigerating Engineers, *Energy Standard for Sites and Buildings Except Low-Rise Residential Buildings*, Standard 90.1-2022 (2022) ........................................................................ 23, 26

Executive Regulation 13-24, Montgomery Cty. Council (Dec. 10, 2024)....... 17, 26

International Code Council, 2021 International Energy Conservation Code (2021)...........................................................................................................26

International Code Council, 2021 International Residential Code (2020) ..............17

Montgomery Cnty. Code § 17-9 ............................................................................18

Montgomery Cnty. Zoning Ord. § 3 ......................................................................18

U.S. Dept. of Energy, *Commercial Energy Code (2007-2025) Normalized Energy Use & Incremental First Cost* .......................................................................29

U.S. Energy Info. Admin., *Residential Energy Consumption Survey* (2023) .........15

## STATEMENT OF IDENTIFICATION

The Public Health Law Center (Center) is a public interest legal resource center dedicated to improving health through the power of law and policy. The Center helps local, state, national, Tribal, and global leaders promote health by strengthening public policies. These policies include regulations, such as the rule challenged in this case, that reduce indoor and outdoor pollution caused by the combustion of certain fuels. The Center is also concerned with preserving the power of state and local governments to protect their constituents through regulations that protect public health. The Center files this brief with the consent of all parties. [1]

## SUMMARY OF ARGUMENT

The Energy Policy and Conservation Act (EPCA) does not preempt the local law at issue in this case. EPCA preempts regulations that "concern[] the energy efficiency[ or] energy use" of an EPCA-covered appliance. 42 U.S.C. §§ 6297(c), 6316(b). As Defendant-Appellee Montgomery County (the County) explains, the challenged Bill 13-22, also known as the "Building Decarbonization Law," does not address "energy efficiency" or "energy use" as those terms are defined in EPCA. *See generally* Br. of Appellee Montgomery County, Maryland, ECF No. 43

---

[1] No party's counsel authored this brief in whole or in part. No party's counsel, or any person other than the Center, contributed money intended to fund the preparation or submission of this brief.

(County Br.), at 25-48. Even if the Building Decarbonization Law result in fuel-based appliance prohibitions, as Appellants predict, such prohibitions do not "concern" the "energy efficiency" or "energy use" of covered appliances, as the Second Circuit has just affirmed. *See generally Assoc. of Contracting Plumbers v. City of New York* (*NYC*), Nos. 25-977 & 25-2041, 2026 WL 1871692 (2d Cir. June 30, 2026).

This reading is supported by EPCA's legislative history, which demonstrates Congress's intent to preempt only a narrow range of appliance standards focused on energy conservation. Neither EPCA's original preemption language, nor any of its amendments, would preempt appliance prohibitions. This comports with Congress's intent in amending the law, as the economic harms Congress sought to remedy are specific to appliance conservation standards. And Congress certainly indicated no intent to eliminate the broad swath of core state and local authority that would be threatened by Appellants' argument.

EPCA's exemptions from preemption for regulations in building codes, 42 U.S.C. §§ 6297(f), 6316(b)(2), likewise bolster this interpretation. These exemptions indicate that EPCA preemption is focused on appliance efficiency standards, not prohibitions. If, however, regulations issued under the Building Decarbonization Law did "concern[] the energy efficiency[ or] energy use" of covered appliances, the building-code exemptions would apply to them. Therefore,

2

there is no reasonable interpretation of the building-code exemptions, or the remainder of EPCA, that would preempt the Building Decarbonization Law.

## ARGUMENT

### I.    A Prohibition on an Appliance Does Not Concern Its Energy Use

EPCA does not preempt the Building Decarbonization Law because the law does not "concern[]" the "energy use" of an EPCA-covered appliance. 42 U.S.C. §§ 6297(c), 6316(b). EPCA defines "energy use" as "the quantity of energy directly consumed by [an appliance] at point of use, determined in accordance with [EPCA's] test procedures." *Id.* §§ 6291(4), 6311(5). The Building Decarbonization Law does not regulate the quantity of energy consumed by any appliance, nor does it direct the County to do so. *See generally* JA352-356 (text of Building Decarbonization Law).

Appellants and the United States, as *amicus*, argue that the Building Decarbonization Law would prohibit the use of gas appliances and therefore would require the "energy use" of those appliances to be "zero." *E.g.*, Corrected Opening Br. of Appellants, ECF No. 32 (Appellants' Br.), at 16-19; Br. for the U.S. as *Amicus Curiae* Supp. Appellants & Reversal, ECF No. 36 (U.S. Br.), at 10. This interpretation misunderstands the statutory definition of "energy use." As the Second Circuit recently explained, "a product's 'energy use' is a standardized, fixed measure assigned to a product before it reaches consumers.…Therefore, a

3

regulation that effectively bars the use of a covered appliance…has little to do with that appliance's 'energy use.'" *NYC*, 2026 WL 1871692, at *4. In other words, even if the Building Decarbonization Law prohibited the use of an EPCA-covered appliance in a specific building, this would not affect its "energy use" because that value is set prior to the appliance ever reaching that building.[2]

Appellants claim that EPCA preempts gas prohibitions even under this interpretation, since, in their reading, such prohibitions affect gas appliances based on whether their "factor-floor…energy use" is greater than zero. Appellants' Br. 14. This, too, misconstrues "energy use." First, "energy use" is not a measure of the *type* of energy consumed, but rather the "*quantity* of energy." 42 U.S.C. § 6291(4) (emphasis added). Because of this, "an appliance's 'energy use,' as that term is used in the preemption provision, has no effect whatsoever on that appliance's coverage" under a gas prohibition. *NYC*, 2026 WL 1871692, at *9. A

---

[2] Appellants primarily rely on *Cal. Restaurant Assoc. v. Berkeley*, 89 F.4th 1094 (9th Cir. 2024), for this interpretation. But even the Ninth Circuit has acknowledged the emerging judicial understanding that it was mistaken. *Rinnai Am. Corp. v. S. Coast Air Qual. Mgmt. Dist.*, No. 25-5129, slip op. at 30 n.9 (9th Cir. July 2, 2026) (quoting *NYC*'s observation of a "growing consensus" against *Berkeley*); *see also id.* at 38 n.1 (Lee, J., dissenting) ("[I]f we look at the entire structure and context of the statute, then perhaps 'energy use' should be read more narrowly such that it is tailored to energy efficiency. But…we are bound by [*Berkeley*]'s interpretation….").

gas prohibition applies regardless of whether the covered appliances would use a large or small amount of energy and therefore does not affect "energy use."

Second, "energy use" can never be "zero" for the relevant EPCA applications. EPCA defines "energy use" as consumption that is measurable under its "test procedures." 42 U.S.C. §§ 6291(4), 6311(5); *see also NYC*, 2026 WL 1871692, at *3-4. These test procedures measure "energy use" over "a representative average use cycle" or "period of use." *Id.* §§ 6293(b)(3), 6314(a)(3). Thus, the "energy use" of an appliance refers to the energy expected to be consumed by the appliance *during use*. All appliances relevant to this case consume some energy during use. The "energy use" for relevant EPCA-covered appliances cannot be zero, therefore, because the appliance would then not be in use.[3]

Similarly, Appellants' argument that a prohibition on gas appliances would "set[] a 'maximum quantity of energy use' standard for gas appliances just as a more traditional energy conservation standard would" is incorrect. Appellants' Br. 36 (quoting 42 U.S.C. §§ 6291(6), 6311(18)). No "energy conservation standard" set by EPCA prohibits the use of an appliance. *See generally* 42 U.S.C. §§ 6295,

---

[3] For the same reason, there is no such thing as an EPCA-required energy label with "0 kBtu/year." *See* Appellants' Br. 38. If an EPCA-mandated label includes a measure of energy consumption, it must be measurable by the same methods as EPCA prescribes for "energy use." 42 U.S.C. §§ 6294(c)(1)(A)(ii), 6315(b).

6313. Indeed, in Appellant's reading, EPCA does not even permit the federal government to include appliance prohibitions in its "energy conservation standards." Appellants' Br. 27 (quoting 42 U.S.C. § 6295(o)(4)).

Ultimately, "energy use," as used in EPCA, is a metric for energy conservation: specifically, the amount of energy an appliance consumes over a normal use period. 42 U.S.C. §§ 6291(4), 6293(b)(3), 6311(4), 6314(a)(2). The only reason for EPCA's distinction between "energy efficiency" and "energy use" is that the statute uses a technical definition of "energy efficiency"—the "ratio of useful output…to…energy use"—that does not allow for metrics based solely on energy consumption over time. *Id.* §§ 6291(5), 6311(3). The term "energy use" in EPCA therefore does not extend EPCA preemption to regulations that merely affect where or when an appliance can be used or what type of energy it may use.[4]

---

[4] Appellants assert that a gas prohibition also "concern[s]…energy efficiency" because it prohibits "appliances with federally approved energy efficiency standards that inherently contemplate the combustion of gas." Appellants' Br. 19 n.3. For the same reason that appliance prohibitions do not affect energy use, they do not affect energy efficiency: an appliance is prohibited regardless of its level of energy efficiency, and energy efficiency regulations are not divided by energy type under EPCA.

6

## II.    EPCA's Legislative History Supports This Reading

This reading of EPCA's text is supported by its legislative history.[5] The legislative record contains numerous clear statements that Congress intended EPCA preemption to apply to state and local appliance standards aimed at energy conservation. By contrast, there is no indication that Congress intended to eliminate appliance prohibitions, let alone the core state and local authorities that Appellants' reading would preempt.

### A.  EPCA's Evolution Demonstrates that Congress Did Not Intend to Preempt Regulations Like the Building Decarbonization Law

The evolution of EPCA's preemption provisions reflects a careful effort to address a specific problem: state and local appliance standards, aimed at conserving energy, that conflicted with Congress's system. Congress passed the Energy Policy and Conservation Act of 1975 (1975 EPCA) in the wake of the energy crisis of the early 1970s.[6] Pub. L. No. 94-163, 89 Stat. 871; *see also* S. Rep. No. 94-516, at 202-03 (1975). The express purposes of the 1975 EPCA were to

---

[5] Courts may look to legislative history to confirm Congress's intended scope where the statutory text is ambiguous. *E.g.*, *Stiltner v. Beretta U.S.A. Corp.*, 74 F.3d 1473, 1487 (4th Cir. 1996); *Holland v. Big River Minerals Corp.,* 181 F.3d 597, 604 (4th Cir. 1999). The Center takes the position that EPCA's preemption provisions unambiguously exclude the Building Decarbonization Law, *see supra* § I, but offers this material to resolve any ambiguities the Court may find.

[6] In this brief, "EPCA" refers to the law as periodically amended, and "1975 EPCA" refers to the version of EPCA passed in 1975.

7

increase energy production and reduce energy consumption. 1975 EPCA § 2, 89 Stat. at 874. The preemption provision in the original version covered state and local regulations that "provide for…any energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product," and went into effect after the imposition of federal standards and only insofar as the state or local standard deviated from them. *Id.* § 327(a), 89 Stat. at 927. Appellants appear to acknowledge that the 1975 EPCA's language would not have preempted the Building Decarbonization Law. Appellants' Br. 34. None of the subsequent amendments expand EPCA preemption to reach appliance prohibitions.

### 1. The 1978 NECPA Did Not Expand EPCA's Preemption Provision to Cover Appliance Prohibitions

Appellants argue that the National Energy Conservation Policy Act of 1978 (NECPA), Pub. L. No. 95-619, 92 Stat. 3206, was the point at which EPCA preemption expanded to include appliance prohibitions. Appellants' Br. 34.[7] NECPA did expand the federal government's role in appliance energy conservation by requiring the U.S. Department of Energy (DOE) to issue standards for thirteen specific categories of appliances, NECPA § 422, 92 Stat. at 3259-62,

---

[7] Appellants National Association of Home and National Propane Gas Association, however, have agreed in other litigation that NECPA preemption was limited to "'energy conservation standards' and the like." *NYC*, 2026 WL 1871692, at *12 (quoting Br. for Pls.-Appellants 24, *Mulhern Gas v. Mosley*, No. 25-2041, ECF No. 24.1 (2d Cir., filed Oct. 7, 2025)).

and preempting equivalent state and local standards until July 1, 1980. *Id.* § 424(a), 92 Stat. at 3264. But the move toward greater preemption was not uniform: NECPA also made the process for waiving preemption easier. *Id.*; *see also* H.R. Rep. No. 95-1294 at 118 (1978).

Most importantly, NECPA retained the 1975 EPCA's essential preemption structure: removing state and local appliance efficiency standards to make way for corresponding federal standards. Pub. L. No. 95-619, 92 Stat. at 3264. The enacting Congress continued to describe the subject of preemption as appliance "*efficiency* standards," H.R. Rep. No. 95-1294, at 117 (emphasis added), as did the Congress that later amended this language, *see* S. Rep. No. 100-6, at 3 (1987) (characterizing NECPA as "preempt[ing] State laws on appliance efficiency"). Likewise, the legislative record emphasizes that the preempted state and local standards would parallel the forthcoming federal conservation standards. *E.g.*, H.R. Rep. No. 95-1294, at 117-18.

NECPA's replacement of the word "similar" with "other" in the 1975 EPCA's preemption provision, on which Appellants rely, *see* Appellants' Br. 34, was intended to ensure that preemption reached "design regulations relating to the energy efficiency" of a product. Congress gave the example of prohibitions on gas pilot lights, which are aimed at conserving energy but do not set a numeric efficiency standard. H.R. Rep. No. 95-1294, at 118; *see also* 124 Cong. Rec.

9

34,563 (Oct. 7, 1978). There is no indication that Congress intended this single word change to transform EPCA into a sweeping limitation on state and local authority.

The DOE reached the same conclusion in a 1982 assessment of NECPA's preemptive scope:[8]

> [NECPA] clearly provides that only those regulations which provide for "*any energy standard or other requirement with respect to energy efficiency or energy use* of a covered product" will be superseded. (Emphasis added).…A rule whose purpose is other than energy efficiency such as a law on fire safety, would not appear to be preempted by the Federal rule….

*Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces*, 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982). In other words, a regulation like the Building Decarbonization Law, "whose purpose is other than energy efficiency," would not be preempted under NECPA. *See also Final Rules Regarding State Petitions for Exemption From Federal Standards for Clothes Dryers and Kitchen Ranges and Ovens*, 49 Fed. Reg. 11,764, 11,764 (Mar. 27, 1984) (describing preempted standards as "energy efficiency requirements…;

---

[8] "[C]ontemporary and consistent" agency interpretations of a statute "can provide evidence of the law's meaning." *Bondi v. VanDerStok*, 604 U.S. 458, 480-81 (2025).

prohibitions on standing pilot lights; and prohibition on the manufacture, sale and/or hookup of appliances with less than a certain efficiency"). It is therefore "clear" that appliance prohibitions would not be preempted under NECPA. *NYC*, 2026 WL 1871692, at *12.

2. NAECA's Enactment of the Current Preemption Language Did Not Preempt Appliance Prohibitions

The legislative record for the National Appliance Energy Conservation Act of 1987 (NAECA), which enacted the consumer appliance preemption provision at issue in this case, solidifies this conclusion. NAECA resulted from negotiations between energy efficiency advocates and appliance manufacturers worried about the inefficiencies of complying with many inconsistent state standards and produced a highly detailed preemption regime. *See, e.g.*, S. Rep. No. 100-6, at 4. The resulting legislation is layered and nuanced: it enacted some federal conservation standards directly, created appliance-specific carveouts, retained waiver procedures, and added a new categorical exemption for building codes. *See generally* Pub. L. No. 100-12, 101 Stat. 103. But ultimately NAECA "follow[ed] substantially the preemption requirements in [NECPA],…continu[ing] the basic concept of preempting State energy efficiency standards." *NYC*, 2026 WL 1871692, at *12 (quoting H.R. Rep. No. 100-11, at 23-24).

NAECA's conference reports described its preemption provision as covering "[s]tate appliance *efficiency* regulations or requirements," H.R. Rep. No. 100-11, at

11

37 (1987); S. Rep. No. 100-6, at 9 (emphasis added), and the Congressional Budget Office's review likewise summarized the language as preempting "state *energy conservation* appliance standards," H.R. Rep. No. 100-11, at 32 (emphasis added); *see also* S. Rep. No. 100-345, at 2 (1988) (description of statute by same Congress describing it as "preempt[ing] States from enacting energy efficiency standards"). Congress likewise continued to refer to state "standards" in parallel with federal "standards," confirming that the object of preemption remained the sort of regulations that directly competed with federal standards. *E.g.*, S. Rep. No. 100-6, at 1.

These descriptions reveal a Congress concerned with preempting appliance efficiency standards, not guaranteeing access to appliances, protecting particular fuels, or eliminating limits on the installation of fossil-fuel equipment. Thus, "a holistic view of the 1987 amendments illustrates that Congress's revisions to the preemption provision were intended to reinforce the limits of its scope, not broaden them." *NYC*, 2026 WL 1871692, at *13.

### 3. EPCA's Evolution Argues for a Nuanced Reading of Its Preemption Provision

EPCA's amendments use preemption to achieve a targeted objective, not a uniform increase in preemption. *Contra* Appellants' Br. 29-32. NECPA increased preemption to account for new federal standards but also made waivers easier to obtain. NAECA allowed for permanent preemption before federal standards were

12

promulgated but also created new categories of exemptions from preemption. In both amendments, the legislative record emphasizes the continuation of the general scheme of specifically preempting state and local regulations that conflict with federal energy conservation standards.

In short, the legislative history consistently reflects Congress's concern with appliance efficiency standards. Nothing in that history supports the notion that Congress silently transformed EPCA into a statute that preempts any state or local law that affects the market for covered appliances. The County's Building Decarbonization Law does not establish an appliance conservation standard, and the legislative history therefore supports the County's reading of EPCA's preemption provisions.

### B. The Building Decarbonization Law Cannot Create the "Patchwork of Numerous Conflicting State Requirements" that Concerned Congress

The Building Decarbonization Law also does not implicate the "regulatory patchwork" which Congress intended to address in NAECA. *Contra* Appellants' Br. 30-32. Congress intended NAECA's preemption provision "to protect the appliance industry from…a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24 (1987). But Congress did not want to "to ensure access to all covered products." *NYC*, 2026 WL 1871692, at *7 n.5. Rather, "Congress was concerned with a patchwork of *conservation standards specifically*, not a patchwork of any kind of regulation, because they could

13

'complicate [manufacturers'] design, production and marketing plans.'" *Id.* at *8 n.8 (quoting S. Rep. 100-6, at 4). This concern did not "cover all regulations which might impact the choices of manufacturers" and certainly did not implicate the "binary choice between electric and fossil-fuel appliances." *Id.*

Congress's primary concern in NAECA was market fragmentation. Legislators like Senator Wendell Ford, a cosponsor of NAECA, stressed that preemption would avoid a situation where manufacturers "have to produce 50 separate pieces of equipment, separate stoves, separate refrigerators, whatever it might be" to match differing regulations in each state. *National Appliance Energy Conservation Act: Hearing on S.2781 Before the Subcomm. on Energy Regul. & Conservation of the Comm. on Energy & Nat. Res.*, 99th Cong. 255 (Sept. 16, 1986); *see also, e.g.*, 133 Cong. Rec. 4501 (Mar. 3, 1987) (statement of Rep. Moorhead) (NAECA needed to "prevent[] a patchwork of State standards from…fragmenting the national marketplace").

Appliance prohibitions like the Building Decarbonization Law do not threaten this kind of fragmentation. There cannot be 50 conflicting prohibitions for the same appliance: an appliance is either prohibited or it is not. *See NYC*, 2026 WL 1871692, at *8 n.8 (a prohibition "does not represent the same risk of complication of the market as the potential for fifty different conservation standards"). And the Building Decarbonization Law would not even create any

14

new market segments, because electric appliances already exist.[9] Nor would the existence of "no-go zones scattered across the country," Appellants' Br. at 29, constitute a change in the status quo for gas appliances, since there are already broad swaths of the country where gas appliances cannot be used because no gas utility serves it. *See, e.g.*, U.S. Energy Info. Admin., *Residential Energy Consumption Survey* tbl. HC2.1, at 5 (2023) (almost 34 million U.S. homes are in areas without gas distribution).[10] Simply put, the Building Decarbonization Law does not create the "patchwork of *numerous*, *conflicting*…requirements" that NAECA was meant to eliminate. H.R. Rep. No. 100-11, at 24 (emphasis added).

The other major concern of Congress in enacting NAECA was that state and local standards at the time were "unpredictable." S. Rep. No. 100-6, at 12; *see also, e.g.*, 133 Cong. Rec. 4501 (statement of Rep. Moorhead) (stressing the importance of preemption to make it "difficult to change frequently and randomly appliance standards"). As an example, one Representative described the air-conditioning

---

[9] Appellants assert that gas appliance prohibitions could "force[]" manufacturers "to radically shift or add production lines." Appellants' Br. 28. But this "radical[] shift" appears limited to producing fewer gas appliances and more electric appliances. *See id.*; JA154 (declaration from Appellant Rinnai America Corp. describing impact of law in terms of "sales losses"). This is not market fragmentation; this is just shifting market share.

[10] https://www.eia.gov/consumption/residential/data/2020/hc/pdf/HC%202.1.pdf.

15

standards in Austin, Texas as poised to change three times in as many years. 133 Cong. Rec. 4501.

For the same reason that the Building Decarbonization Law will not cause market fragmentation, it also will not cause this sort of regulatory uncertainty. An appliance cannot become more prohibited in any way that would require changes to production lines. A manufacturer supplying air conditioners to Austin in 1986 did not know whether it would need to create more efficient products for 1987, or how much more efficient to make them. *Id.* But a prohibition on gas appliances would not create any uncertainty, since equivalent electric appliances are already in widespread usage.

Ultimately, NAECA's aim is not to eliminate all state and local regulation of EPCA-covered appliances but to ease the unpredictability and fragmentation caused by a proliferation of state and local appliance efficiency standards. The Building Decarbonization Law does not give rise to these problems because it does not require or threaten new product lines; it merely shifts market share from one existing category of product—fossil-fuel appliances—to another—electric appliances.

### C. Congress Did Not Intend to Preempt the Broad Swath of Regulations Implicated by Appellants' Reading

Just as importantly, the record lacks any indication that NAECA was meant to eliminate the broad array of state and local authorities implied by Appellants'

16

reading. Their interpretation is that any regulation that "render[s]" an EPCA-covered appliance "unavailable" in an area effectively "sets a 'maximum quantity of energy use' standard" and is therefore preempted. Appellants' Br. 32, 36 (quoting 42 U.S.C. §§ 6291(6), 6311(18)). Indeed, Appellants argue that EPCA preempts *any* regulation that could "significantly burden manufacturing, marketing, distribution, [etc.]" of a covered product. Appellants' Br. 28-29 (describing limits of federal authority under 42 U.S.C. §§ 6295(o) and 6297(d) and asserting that, "[i]f Congress denied that power even to DOE…then surely it also intended to prevent localities from doing the same").

The scope of regulations that either prevent an appliance from operating or "significantly burden" it is vast. To take just a few examples: Building codes typically prevents some appliances from operating in some locations—the County's building code does so in several ways, including by prohibiting the installation of large, unvented room heaters in residential units and limiting the areas in which similar appliances can be installed. International Code Council (ICC), 2021 International Residential Code (IRC) §§ G2406.2, G2445.3 (2020).[11] Likewise, state or local law essentially always allows for disconnecting electric

---

[11] *Available at* https://codes.iccsafe.org/content/IRC2021V3.0/. The County has adopted the IRC, with local amendments not relevant here, as part of its building code. Executive Regulation 13-24, Montgomery Cnty. Council (Dec. 10, 2024).

utilities for safety purposes. *E.g.*, Montgomery Cnty. Code § 17-9. And zoning regulations generally prohibit whole classes of equipment from being used in specified areas; for example, commercial clothes washing is prohibited in many residential zones in Montgomery County. Montgomery Cnty. Zoning Ord. §§ 3.1.6, 3.6.3 (classifying laundromats as "Retail/Service Establishments" and prohibiting such uses in various residential zones). Each of these regulations would be preempted under Appellants' reading of EPCA because they "render" those EPCA-covered appliances "unavailable" under some circumstances and "burden" the manufacture and distribution of such appliances to at least the same extent as the Building Decarbonization Law might.

It is "far-fetched to conclude that Congress imagined such consequences, let alone *intended* such consequences, when it drafted a preemption provision in a statute that by-and-large imposes energy conservation standards." *NYC*, 2026 WL 1871692, at *13 (discussing a similar slate of regulations preempted under this reading of EPCA). The legislative record shows no sign of congressional intent to attack state and local authority in this way. That omission is especially telling because Congress analyzed in detail the state and local appliance standards that would be preempted, including the associated energy savings and manufacturing burdens. H.R. Rep. 100-11, at 29-30; *see also* S. Rep. 100-6, at 12-13. Had

18

Congress intended the far broader preemption asserted by Appellants, one would expect some discussion of those effects.

## III. EPCA's Building-Code Exemptions Demonstrate that the Statute Does Not Preempt Appliance Prohibitions in Building Codes

The EPCA provisions that exempt building codes from preemption, 42 U.S.C. §§ 6297(f) and 6316(b)(2), do not indicate a broader sweep for its preemption requirements. *Contra* Appellants' Br. 23-27. The building-code regulations which Congress anticipated needing protection from preemption were the same sort of appliance efficiency standards that Congress intended to preempt. Building codes at the time (as today) include specific numeric standards for appliances, and Congress specifically intended to protect those codes from preemption, so long as they satisfied other flexibility requirements. Thus, the building-code exemptions do not imply that appliance prohibitions—in building codes or elsewhere—should be preempted.

On the other hand, if Appellants were correct that regulations pursuant to the Building Decarbonization Law "concern[]...energy use," then the building-code exemptions would protect them from preemption. These exemptions apply to any regulation within any building code for new construction that meets specified requirements. 42 U.S.C. §§ 6297(f)(3), 6316(b)(2)(B). Appellants do not dispute that the County's building code meets those requirements or that the regulations issued pursuant to the Building Decarbonization Law will be included in the

19

building code. Instead, Appellants argue that the Building Decarbonization Law itself is insufficient. Appellants' Br. 42. This is incorrect as to the exemption for industrial appliance regulations, and it is not even the correct test for the exemption for consumer appliance regulations.

### A. The Building Code Exemptions Support an Interpretation of EPCA that Does Not Preempt with Appliance Prohibitions

The regulations envisioned by 42 U.S.C. §§ 6297(f)(3) and 6316(b)(2)(B) are appliance standards, contained in building codes, aimed at energy conservation. At the time that NAECA was passed, "State and local building codes governing new construction typically regulate[d] the energy efficiency of central heating and cooling equipment and water heaters." S. Rep. No. 100-6, at 10. NAECA required building codes containing those "energy efficiency" regulations to meet specific flexibility requirements in order to continue in force. 42 U.S.C. § 6297(f). But NAECA did not address—nor did Congress indicate any intent to address—other types of regulations in building codes.

The structure of § 6297(f) supports this reading. Subsection (f)(2) was the most immediately relevant at the passage of NAECA, because it governed regulations in state and local building codes passed after NAECA but before a federal standard came into effect. For that period, such regulations were exempt from preemption as long as they did not impose an "energy efficiency" standard that "exceed[ed]" either "the applicable minimum efficiency requirement in a

national voluntary consensus standard" or a state standard that was otherwise exempt from EPCA preemption, "whichever is higher." 42 U.S.C. § 6297(f)(2).

The language in the provision clarifies that Congress was concerned with numeric efficiency requirements, not qualitative prohibitions. The exemption protects regulations so long as they do not require that any EPCA-covered appliance's "energy efficiency…exceed" one of two specified "level[s]" or "standard[s]." *Id.* Which "level" or "standard" to use depends, in turn, on which is "higher." *Id.* This provision can only work, therefore, with numeric efficiency standards; an appliance prohibition neither sets an "energy efficiency" standard nor enables comparison with other efficiency standards to determine which "exceed[s]" the other or which is "higher."

Also relevant is the provision's reference to a "national voluntary consensus standard." 42 U.S.C. § 6297(f)(2)(A). The legislative record explicitly defines these standards to "include those adopted by the Association of Air Conditioning, Heating and Refrigerating Engineers (ASHRAE)." S. Rep. 100-6, at 10. The ASHRAE standards at the time, like today, specified numeric efficiency levels for a variety of EPCA-covered equipment. *E.g.*, ASHRAE, *Energy Conservation in New Building Design*, Standard 90-1975, §§ 6.3-6.8 & tbls. 6.2, 6.4-6.6, 6.8 (1975) (setting minimum efficiency levels for air conditioners, heat pumps, and

21

combustion heating equipment). [12] Therefore, when Congress shielded building code regulations that did not "exceed…the applicable minimum efficiency requirement in a national voluntary consensus standard," 42 U.S.C. § 6297(f)(2), it specifically referred to numeric efficiency appliance standards.

Thus, if the exemptions "illustrate[] the kind of regulations Congress intended EPCA's preemptive reach to encompass," Appellants' Br. 26, they argue against reading EPCA to preempt appliance prohibitions. For a similar reason, interpreting EPCA so as not to preempt the Building Decarbonization Law would not render the exemptions a "nullity." *Contra* Appellants' Br. 23. These exemptions are intended to ensure that EPCA does not preempt building codes, like the ASHRAE standards referenced in the legislative record, that might address appliance efficiency directly but would also include flexibility provisions so that builders could always use appliances at the federal efficiency standards if they so choose. By contrast, Congress did not anticipate EPCA preempting an appliance prohibition, rather than an appliance efficiency standard.

---

[12] *Available at* https://www.ashrae.org/technical-resources/standards-and-guidelines/read-only-versions-of-ashrae-standards.

B. *If the Building Decarbonization Law did "Concern[]…Energy Use," the Building Code Exemptions would Prevent Preemption*

At the outset, the Code Exemptions do not apply to the Building Decarbonization Law, because the Law does not "concern" the "energy efficiency" or "energy use" of a covered product. 42 U.S.C. §§ 6297(f)(3) & 6316(b)(2); *see also supra* § I; County Br. 28-34, 39. But even if the exemptions did apply, the Building Decarbonization Law would be protected under EPCA's two building code exemptions: 42 U.S.C. § 6316(b)(2) (the Industrial Code Exemption) and § 6297(f)(3) (the Consumer Code Exemption).

1. The Building Decarbonization Law Does Not Violate the Industrial Code Exemption's Requirements

First, the Building Decarbonization Law would qualify under the Industrial Code Exemption. Under this Exemption, a regulation of industrial appliances "contained in a State or local building code for new construction" is protected from EPCA preemption so long as it meets two requirements. 42 U.S.C. § 6316(b)(2)(B). First, the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." *Id.* § 6316(b)(2)(B)(i).[13] Second, it must

---

[13] ASHRAE/IES Standard 90.1 is a model energy code for commercial and larger residential buildings. *E.g.*, ASHRAE, *Energy Standard for Sites and Buildings Except Low-Rise Residential Buildings*, Standard 90.1-2022 (2022) (ASHRAE 90.1-2022), *available at* https://www.ashrae.org/technical-resources/standards-and-guidelines/read-only-versions-of-ashrae-standards.

23

"not take effect prior to the effective date of the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." *Id.* § 6316(b)(2)(B)(ii). Taken together, these two requirements prevent codes from requiring an EPCA-covered industrial appliance to have an energy efficiency greater than that required by the current version of the relevant model code.

The Building Decarbonization Law meets these requirements because it does not set any minimum efficiency standard for any appliance. Appellants argue that the Law "does not meet this requirement because its ban on EPCA-covered gas industrial appliances that use any gas energy whatsoever effectively requires them to have an impossible level of energy efficiency." Appellants' Br. 43 n. 8. But this argument conflates the prohibition of an appliance with a requirement for that appliance to have a certain efficiency level. The Industrial Code Exemption is concerned with regulations that "require" a higher efficiency standard. 42 U.S.C. § 6316(b)(2)(B)(i). It says nothing of regulations that prevent the use of an appliance, with good reason: as discussed above, building codes place many restrictions on where appliances may be installed in order to promote health and safety. *Supra* § II.C. Congress was concerned with a patchwork of different conflicting appliance efficiency standards, not with prohibitions on the use of particular appliances. *Supra* § II.B.

24

2.  The Building Decarbonization Law Does Not Disqualify the County's Building Code from the Consumer Code Exemption

The Consumer Code Exemption, if it applied, would likewise protect the Building Decarbonization Law. The requirements of the Consumer Code Exemption apply to the code in which a regulation is located, not to the regulation itself. 42 U.S.C. § 6297(f)(3) ("[A] regulation or other requirement contained in a State or local building code for new construction…is not superseded by this part if *the code* complies with all of the following requirements…." (emphasis added)). The code must meet seven specific requirements, which, although detailed, are aimed at a simple concept: the code must not "expressly or effectively require the installation of covered products whose efficiencies exceed…the applicable Federal standard." H.R. Rep. No. 100-11, at 26.

Appellants' arguments are based on the incorrect assumption that the Building Decarbonization Law itself—rather than the code as a whole—must comply with the requirements of the Consumer Code Exemption. But when taking the code in its entirety as EPCA requires, the Montgomery County building code continues to meet the Consumer Code Exemption.

Appellants claim that the Building Decarbonization Law fails to satisfy two of the Consumer Code Exemption's requirements. First, they argue that the Building Decarbonization Law does not provide an "energy consumption or conservation objective" for builders to meet through energy efficiency measures.

25

Appellants' Br. 42 (quoting 42 U.S.C. § 6297(f)(3)(A) ("Requirement A")). But

Requirement A refers to "the code" as a whole. 42 U.S.C. § 6297(f)(3)(A).

Montgomery County's code does allow builders to select items to meet an energy

objective: both its residential and commercial building codes have performance-

based compliance pathways that replace most prescriptive requirements with a

specific energy goal for each proposed building.[14] This is the type of approach

Congress wanted to ensure was permitted under EPCA. It was not concerned with

appliance prohibitions, as noted above, but rather with allowing codes like the

IECC that use performance-based efficiency measures but do not require EPCA-

covered appliances to exceed federal standards. *See, e.g.*, S. Rep. No. 100-6, at 11

("The limited requirements of [§ 6297(f)(3)] are designed to ensure the

performance-based building codes cannot circumvent the federal standard for a

---

[14] The County has adopted the 2021 International Energy Conservation Code (IECC) as its energy code for residential buildings and ASHRAE 90.1-2022 for commercial buildings. Executive Regulation 13-24, Montgomery Cnty. Council (Dec. 10, 2024). The IECC provides a "Total Building Performance" option, which compares proposed buildings' energy usage to a target based on a standard reference design, and an "Energy Rating Index" option, which uses a target based on building performance under earlier IECC versions. ICC, 2021 IECC §§ R405, R406 (2020), https://codes.iccsafe.org/content/IECC2021P1/. ASHRAE Standard 90.1 provides similar performance-based options through the "Energy Cost Budget" and "Performance Rating Method" compliance pathways. ASHRAE 90.1-2022 § 12, Appx. G.

given covered product by effectively requiring the installation of such product with an efficiency exceeding the applicable Federal standards….").

To the extent that Appellants argue that Requirement A mandates that builders be able to use any item to achieve energy efficiency, their position is not supported by the text. Codes are required to "permit[] a builder to…select[] items," not to select any possible energy conservation item. 42 U.S.C. § 6297(f)(3)(A). Reading this as requiring codes to permit any item the builder wishes to use would be absurd, since, as discussed *supra* at § II.C, there are many items that building codes need to restrict to protect building occupants. Indeed, Congress specifically intended to avoid preempting such regulations. H.R. Rep. No. 100-11, at 23-24 ("[NAECA] does not affect a State's authority to adopt provisions in building codes that do not affect the energy efficiency or energy use of covered products, such as insulation, structure, fire, heating or safety standards.").

Appellants also argue that the Building Decarbonization Law does not "establish an 'energy consumption or conservation objective [that] is specified in terms of an estimated total consumption of energy.'" Appellants' Br. 42 (quoting 42 U.S.C. § 6297(f)(3)(F)). This is again the wrong test. The correct scope of analysis is Montgomery County's building code as a whole, which does contain performance-based energy conservation objectives, as described above. Adding the Building Decarbonization Law to the code does not remove these objectives, and,

27

again, there is no requirement in the Consumer Code Exemption that specific appliances be allowed as an option to meet the code's conservation objectives.

Finally, the United States asserts that the Consumer Code Exemption's requirements "foreclose imposing product-specific requirements." U.S. Br. 22 n.7. The only authority it cites for this is an administrative document from 1982, five years before the Consumer Code Exemption was enacted. *Id.* (citing *Final Rule for Clothes Dryers and Kitchen Ranges and Ovens*, 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982)). That document interprets the preemptive effect of issuing a federal standard under NECPA, not the requirements for any exemption. 47 Fed. Reg. at 57,215. And, in fact, it specifically states that at least one kind of appliance prohibition—a "prohibition against placing oversized furnaces and air conditioners in new buildings"—would *not* be preempted under NECPA. *Id.* In any case, there is no requirement in the Consumer Code Exemption that bars product-specific requirements. *See generally* 42 U.S.C. § 6297(f)(3).

### 3.  EPCA's Building-Code Exemptions Do Not Turn on Whether a Regulation is "Harsh"

The preceding discussion also clarifies that EPCA preemption does not depend on whether a regulation is "harsh" or "gentle." *Contra, e.g.*, Appellants' Br. 27. A building code could be "harsh," in terms of making builders go to extreme lengths to conserve energy, and still qualify for the exemptions. For example, the leading model commercial building code requires an almost 50%

28

reduction in energy use compared to its 2007 requirements. U.S. Dept. of Energy, *Commercial Energy Code (2007-2025) Normalized Energy Use & Incremental First Cost* (last updated June 19, 2026).[15]

Conversely, a building code could be extremely "gentle" and still fail the code-exemption requirements. The Consumer Code Exemption, for example, requires codes to use the same testing standards as federal standards do in most cases; if a code used different tests—even more lenient tests—it would fail this requirement. 42 U.S.C. § 6297(f)(3)(G). Ultimately, a building code's qualification for the relevant exemptions cannot be reduced to whether it is "harsh" or "gentle."

So, too, with the remainder of EPCA. The statute features a complicated and careful preemption scheme: Congress has carved out specific types of regulation, *e.g.*, 42 U.S.C. § 6297(b)(4), (c)(1) (exempting specific state and local standards for pool heaters); preserved regulations from specific states, *e.g.*, 42 U.S.C. § 6297(c)(8) (exempting California's standards for pedestrian walk signs); and crafted nuanced timed preemption provisions, *e.g.*, *id.* § 6316(h)(2) (preempting certain industrial refrigeration standards unless federal standards were delayed, in which case the standards would be temporarily permitted again). But no preemption provision in the statute is based on whether a regulation is "harsh."

---

[15] https://www.energycodes.gov/infographics.

## CONCLUSION

EPCA's text, structure, and history demonstrate that its preemptive scope does not cover the Building Decarbonization Law. The Center therefore urges the Court to affirm the holding below.

Dated: July 2, 2026                    Respectfully submitted,

/s/ Daniel Carpenter-Gold
Daniel Carpenter-Gold
Jamie Long

daniel.carpentergold@mitchellhamline.edu
Public Health Law Center
875 Summit Ave.
St. Paul, MN 55105
(651) 290-6329

*Counsel for* Amicus Curiae *Public Health Law Center*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __26-1449__      Caption: National Assoc. of Home Builders v. Montgomery Count⊞

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines.  Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines.  A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type.  See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑   this brief or other document contains ____6,480____ [*state number of*] words

☐   this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑   this brief or other document has been prepared in a proportionally spaced typeface using
Word _____ [*identify word processing program*] in
Times New Roman, 14pt, standard ____ [*identify font, size, and type style*];

**or**

☐   this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Daniel Carpenter-Gold _____

Party Name Public Health Law Center _____      Date: 7/2/26 _____

12/09/2024  NA/MEO